**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

In re EZCORP, Inc. Securities Litigation

Master File No. 1:15-cv-00608-SS

**AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION AND OVERVIEW ................................................................ 1

II.  JURISDICTION AND VENUE ........................................................................................ 10

III. PARTIES ........................................................................................................................ 10

IV.  CONFIDENTIAL WITNESSES ..................................................................................... 13

V.   SUBSTANTIVE ALLEGATIONS .................................................................................. 15

VII. LOSS CAUSATION ....................................................................................................... 83

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..................................................................................................... 85

IX.  NO SAFE HARBOR ...................................................................................................... 86

Co-Lead Plaintiffs Wu Winfred Huang and John Rooney (collectively, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by EZCORP, Inc. ("EZCORP" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, investor presentations, conference calls, and media reports issued by and disseminated by EZCORP; (c) interviews with confidential witnesses who have personal knowledge of the allegations contained herein; and (d) review of other publicly available information concerning EZCORP.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of purchasers of EZCORP Class A common stock[1] between November 6, 2012 and October 20, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    EZCORP delivers cash solutions to customers across channels, products, services, and markets. With approximately 1,400 locations, the Company offers customers multiple ways to access instant cash, including pawn loans and consumer loans in the United States, Mexico, and Canada, and fee-based credit services to customers seeking loans.  At its pawn and buy/sell stores and online, the Company also sells merchandise, primarily collateral forfeited from pawn lending operations and used merchandise purchased from customers.

---

[1] EZCORP has two classes of common stock, Class A Non-Voting Common Stock (publicly traded on the NASDAQ) and Class B Voting Common Stock. 100% of EZCORP's Class B Voting Common Stock is beneficially owned by Phillip E. Cohen.

3.      EZCORP announced on January 19, 2012 that it was acquiring a 60% ownership interest in Prestaciones Finmart, S.A. de C.V., SOFOM, E.N.R. ("Crediamigo"), a specialty consumer finance company headquartered in Mexico City.  Crediamigo later became known as Grupo Finmart (hereinafter, "Crediamigo" and "Grupo Finmart" are used interchangeably).   In essence, Grupo Finmart is a pay-day lender to individuals in Mexico.  The acquisition closed in February 2012 and EZCORP, as required under U.S. Generally Accepted Accounting Principles ("GAAP"), consolidated Grupo Finmart's financial results into its own results. Under the terms of the acquisition, EZCORP was obligated to pay the existing stockholders additional amounts on each of the first and second anniversaries of the closing if certain financial performance targets were achieved during 2012 and 2013.

4.      As alleged herein, in early 2012, EZCORP sent its internal auditors to Mexico to undertake a due diligence investigation of Grupo Finmart.  CW #3, a former administrator in EZCORP's internal audit group, stated that, after several months of due diligence investigation, the internal audit team recommended against the purchase of Grupo Finmart in a series of written reports sent to senior management; however, according to CW #3, the Company went through with the acquisition because Phillip Cohen – the owner of all of EZCORP's Class B Voting Common Stock – insisted on it.   CW #3 stated that the report described Grupo Finmart's accounting controls as a mess.  CW #3 said that Grupo Finmart's records were in such disarray that the team could not assess the value of its loan portfolio.  CW #3 also stated that Grupo Finmart had no aging report for its loans (an accounting report which shows non-paying loans and the period of time for which they are non-paying) to track bad debt, making it impossible to determine whether and when loans were in default.

5.      Notwithstanding these reports, EZCORP acquired Grupo Finmart and began to

consolidate its financial results.  EZCORP management also certified that its internal controls were adequate despite the written due diligence report containing contrary findings.

6.    As alleged herein, Defendants reported materially false and misleading financial results to Plaintiffs and the class and misrepresented that EZCORP's internal controls were adequate.  First, as of the first quarter of 2013, Defendant Mark Kuchenrither, EZCORP's Chief Financial Officer, knew that Grupo Finmart was experiencing issues because of non-performing loans.  EZCORP did not report losses on these loans in 2013 (or in 2012) and instead falsely understated the losses Grupo Finmart was incurring.  These misstatements had the intended effect of overstating EZCORP's publicly reported financial results.  Second, in the latter part of 2013, Defendant Kuchenrither came up with a plan to package and sell Grupo Finmart's loans to third-party investors which would have the dual effect of removing the non-performing loans from EZCORP's books and allowing EZCORP to record revenue and income from these sales, thereby boosting its reported earnings.  As alleged in detail herein, in October or November 2013 – *before the first such asset sale closed* – CW #1, a former Vice President ("VP") of Internal Audit, specifically told Defendant Kuchenrither that, based upon a review of the terms of sale documents to the third-party investors, the third-party retained a right to return non-performing loans to EZCORP, meaning that if any of the sold loans defaulted, the third-party had the right to make EZCORP repurchase the loans.  CW #1 told Kuchenrither that, under U.S. GAAP, EZCORP could not recognize any revenue from these loan sales due to the right of recourse.

7.    Despite this knowledge, in fiscal 2014, EZCORP engaged in five separate sales of Grupo Finmart loans, recognizing $33 million in gains on these sales.  The improper accounting for the asset sales had the effect of artificially boosting EZCORP's reported 2014 income by 45%.  EZCORP engaged in another loan sale in the first quarter of 2015, recognizing $6.6

million in income on this sale and artificially boosting 2015 first quarter income by 32%. In fact, at the time the sales of these loans were recorded, EZCORP knew of the proper U.S. GAAP guidance – FASB ASC 860-10-40-5, requiring that the seller does not maintain any right of return – yet, EZCORP booked the loan sales as sales anyway.

8.      In fact, during conference calls with research analysts and investors during 2014, certain analysts questioned the sales. In response, Kuchenrither directly misrepresented the true nature of the transactions, expressly (and falsely) stating that the sales were "true asset sales," and that "the risk associated with the loans passed to the buyer of the loans."

9.      Indeed, EZCORP was forced to restate its 2014 and first quarter of 2015 financial statements, in relevant part, because it improperly recognized revenue from these loan sales *because the sale of the loans were with recourse.*

10.      Defendants also falsely represented to EZCORP investors that its internal controls were adequate despite receiving direct reports from EZCORP's internal auditors that Grupo Finmart's internal controls were not adequate. As part of its restatement, EZCORP admitted that it had material weaknesses in its internal controls.

11.      As detailed herein, on November 9, 2015, EZCORP filed its forms 10-K/A and 10-Q/A, restating its financial statements for fiscal years 2014, 2013 and 2012, as well as that for the first quarter of fiscal 2015. The restated financials revealed – and confidential witnesses corroborated – that, throughout the Class Period, Defendants (1) failed to properly identify and record non-performing loan write-offs and improperly continued to accrue interest revenue on the related non-performing loans; (2) packaged and sold six portfolios of loans and improperly recorded those asset sales as sales in direct contravention of GAAP rules and in order to artificially inflate EZCORP's financial statements; and (3) failed to maintain effective internal

controls over financial reporting.

12.    The following table calculates the percent reduction and percent overstatement in net income as a result of the Restatement:

| Fiscal Period Net Income (numbers in millions) | As Originally Reported | Restatement Adjustments As Reported | As Restated | % Decrease of Net Income | % Overstatement of Net Income |
|---|---|---|---|---|---|
| Q1-2013 | $30.7 | ($3.6) | $27.1 | (11.7%) | 13.3% |
| Q2-2013 | 34.0 | (3.8) | 30.2 | (11.2%) | 12.6% |
| Q3-2013 | (5.9) | (1.1) | (7.0) | (18.6%) | 15.7% |
| Fiscal 2013 | 34.1 | (11.8) | 22.3 | (34.6%) | 52.9% |
| Q1-2014 | 22.6 | (3.8) | 18.7 | (17.3%) | 20.3% |
| Q2-2014 | 8.0 | (1.9) | 6.1 | (23.8%) | 31.1% |
| Q3-2014 | 11.5 | (7.6) | 3.9 | (66.1%) | 194.9% |
| Fiscal 2014 | (45.7) | (19.0) | (64.7) | (41.6%) | 29.4% |
| Q1-2015 | 15.3 | (3.6) | 11.6 | (24.2%) | 31.0% |

13.    The following table calculates the percent reduction in operating income (income from continuing operations before income taxes) per fiscal year as a result of the Restatement. As demonstrated therein, the Restatement resulted in a total reduction in operating income of **21.5%** and revealed a total overstatement of **27.3%**.

| Fiscal Period (numbers in millions) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations before Income Taxes | Restated Income from Continuing Operations before Income Taxes | % Reduction In Income from Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| 2012 | $227.1 | ($13.0) | $214.1 | (5.7%) | 6% |
| 2013 | 102.5 | (22.0) | 80.5 | (21.5%) | 27.3% |
| 2014 | 72.7 | (47.5) | 25.2 | (65.3%) | 188.5% |
| Q1-2015 | 20.4 | (8.2) | 12.2 | (40.2%) | 67.2% |
| **Total Restatement Impact** | **$442.7** | **($90.7)** | **$332.00** | **(21.5%)** | **27.3%** |

14.     The table below calculates the percent reduction in operating income (income from continuing operations before income taxes) per 2013 and 2014 interim fiscal quarter as a result of the Restatement.[2]

| Fiscal Period *(numbers in millions)* | Income From Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income From Continuing Operations before Income Taxes | Restated Income From Continuing Operations before Income Taxes | % Reduction In Income From Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| Q1-2013 | $51.7 | ($7.9) | $43.8 | (15.3%) | 18% |
| Q2-2013 | 55.0 | (6.6) | 48.4 | (12.0%) | 13.6% |
| Q3-2013 | 27.0 | (4.4) | 22.6 | (16.3%) | 19.5% |
| Q1-2014 | 37.8 | (13.4) | 24.4 | (35.4%) | 54.9% |
| Q2-2014 | 14.0 | (7.9) | 6.1 | (56.4%) | 129.5% |
| Q3-2014 | 19.2 | (15.1) | 4.1 | (78.6%) | 368.3% |

15.     The tables below demonstrate the impact to operating income (income from continuing operations before income taxes) as a result of the portfolio review and the application of proper accounting treatment to the asset sales:

---

[2] In 2013 and 2014, EZCORP discontinued certain operations. Pursuant to FASB ASC 205-20 *Discontinued Operations*, a company that discontinues operations can change results reported in prior years' financial statements to reflect the discontinued operations without restating those prior years' financial statements in order to provide users more comparable financial statements. Therefore, due to the effect of discontinued operations and the accounting standard applicable thereto, 2012 operating income was changed from $227.1 million (as reported in 2012 10-K) to $221.6 million (as reported in 2013 10-K). 2012 operating income was further adjusted to $214.1 million as a result of the Restatement. Similarly, due to discontinued operations, 2013 operating income was changed from $102.5 million (as reported in 2013 10-K) to $91.3 million (as reported in 2014 10-K). 2013 operating income was further adjusted to $80.5 million as a result of the Restatement. These reclassifications of certain operations into discontinued operations reduced operating income, but did not have an impact on net income or earnings per share.

6

| Fiscal Period *(numbers in millions)* | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Portfolio Review | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2012 | $227.1 | ($8.7) | (3.8%) |
| 2013 | 102.5 | (21.4) | (20.9%) |
| 2014 | 72.7 | (27.9) | (38.4%) |
| Q1-2015 | 20.4 | (8.0) | (39.2%) |
| **Total Restatement Impact** | **$442.7** | **($66.0)** | **(15.6%)** |

| Fiscal Period *(numbers in millions – There was no asset sale in fiscal 2012 or fiscal 2013.)* | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Asset Sales | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2014 | 72.7 | (25.3) | (34.8%) |
| Q1-2015 | 20.4 | (1.8) | (8.8%) |
| **Total Restatement Impact** | **$93.1** | **($27.1)** | **(29.1%)** |

16.     Moreover, the Restatement had a material impact on earnings per share, as demonstrated in the table below:

///

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| 2012 | $2.82 | ($0.13) | $2.69 | (4.6%) | 4.8% |
| 2013 | 0.64 | (0.23) | 0.41 | (35.9%) | 56.1% |
| 2014 | (0.84) | (0.36) | (1.20) | (42.9%) | 30% |
| Q1-2015 | $0.28 | ($0.06) | $0.22 | (21.4%) | 27.8% |
| **Total Restatement Impact** | **$2.90** | **($0.78)** | **$2.12** | **(26.9%)** | **36.8%** |

17.     The table below calculates the percent reduction in earnings per share per 2013 and 2014 interim fiscal quarter as a result of the Restatement:

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| Q1-2013 | $0.59 | ($0.07) | $0.52 | (11.9%) | 13.5% |
| Q2-2013 | 0.63 | (0.06) | 0.57 | (9.5%) | 10.5% |
| Q3-2013 | (0.11) | (0.02) | (0.13) | (18.2%) | 15.4% |
| Q1-2014 | 0.42 | (0.07) | 0.35 | (16.7%) | 20% |
| Q2-2014 | 0.15 | (0.04) | 0.11 | (26.7%) | 36.3% |
| Q3-2014 | 0.21 | (0.14) | 0.07 | (66.7%) | 200% |

18.     EZCORP's fraudulent accounting practices also had the intended effect of masking the poor performance of Grupo Finmart.  A key metric for a company such as EZCORP is the ratio of bad debt to outstanding loan fees and interest. The tables below, which are derived from information provided in the Restatement, demonstrate the impact of the fraud:

| Latin America - 2012 *(in millions)* | 2012 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $26.9 | ($.9) | $26.0 |
| Consumer loan bad debts expense (benefit) | 0.3 | 7.8 | 8.1 |
| Ratio of Consumer loan income/bad debts | **1.1%** | | **31.2%** |
| **Percentage Increase to bad debt expense** | **2,524.9%** | | |

| Latin America - 2013<br>*(in millions)* | 2013 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $50.5 | ($7.9) | $53.4 |
| Consumer loan bad debts expense (benefit) | (.113) | 11.8 | 11.714 |
| Ratio of Consumer loan income/bad debts | **(0.2%)** | | **27.5%** |
| **Percentage Increase to bad debt expense** | **10,466.4%** | | |

| Latin America - 2014<br>*(in millions)* | 2014 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $54.2 | ($0.8) | $53.4 |
| Consumer loan bad debts expense (benefit) | 6.9 | 12.7 | 19.6 |
| Ratio of Consumer loan income/bad debts | **12.7%** | | **36.7%** |
| **Percentage Increase to bad debt expense** | **185.5%** | | |

| Latin America – Q1 2015<br>*(in millions)* | Q1 2015 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $10.1 | $6.2 | $16.3 |
| Consumer loan bad debts expense (benefit) | 0.9 | 6.8 | 7.7 |
| Ratio of Consumer loan income/bad debts | **9.3%** | | **47.4%** |
| **Percentage Increase to bad debt expense** | **722.5%** | | |

19.     Thus, in fiscal 2012, EZCORP understated the bad debt expense by **2,525%**. The same metric was colossally understated by **10,466.4%** in fiscal 2013, by **185.5%** in fiscal 2014, and by **722.5%** in the first quarter of fiscal 2015. Accordingly, as detailed above, the ratio of consumer loan interest and fees to bad debt expense was vastly understated during the restated period.

20.     As alleged herein, Defendants' making of false and misleading statements caused EZCORP's common stock to trade at artificially inflated prices. Through a series of corrective disclosures, beginning on April 30, 2015 and ending on November 9, 2105, EZCORP revealed that it would delay the issuance of, and then be required to restate its previously issued financial results. As alleged herein, each time EZCORP revealed that its prior financial results would have to be restated (over time the size and scope of the restatement was expanded), EZCORP's

stock price declined, causing losses to Plaintiffs and the class.   Through this lawsuit, Plaintiffs seek recovery for these losses on behalf of themselves and the class.

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).   Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.   Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.   Additionally, EZCORP's principal executive offices are located within this Judicial District.

24.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

25.    Lead Plaintiff Wu Winfred Huang, as set forth in a certification previously filed with the Court, incorporated by reference herein, purchased EZCORP common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Lead Plaintiff John Rooney, as set forth in a certification previously filed with the Court, incorporated by reference herein, purchased EZCORP common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Defendant EZCORP is a Delaware corporation with its principal executive offices located at 2500 Bee Cave Road, Building 1, Suite 200, Rollingwood, Texas 78746.  EZCORP has two classes of common stock: Class A and Class B.  Class A shares are non-voting shares and only Class B shares are voting shares.  Philip E. Cohen owns 100% of EZCORP's Class B voting shares.  During the Class Period, EZCORP, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

28.     Defendant Mark E. Kuchenrither ("Kuchenrither") was, at all relevant times, Chief Financial Officer ("CFO") of EZCORP from October 2012 until May 26, 2015. Additionally, Defendant Kuchenrither was Chief Executive Officer ("CEO") of EZCORP from July 18, 2014 through February 1, 2015, and a director of the Company from August 12, 2014 through February 3, 2015.  Defendant Kuchenrither joined EZCORP as Senior Vice President, Strategic Development in March 2010. In May 2012, Kuchenrither was promoted to Executive Vice President and in October of the same year, he assumed the additional role of CFO. Defendant Kuchenrither also served as President of the Company from August 12, 2014 through May 26, 2015 and Chief Operating Officer ("COO") from February 3, 2015 through May 26, 2015.  Prior to joining EZCORP, Defendant Kuchenrither served as Vice President of Operations for private equity firm Sun Capital Partners where he was responsible for overseeing 10 portfolio

11

companies with an emphasis on profit improvement. Defendant Kuchenrither has also held executive leadership positions at Arch Aluminum & Glass Co. and Peavey Electronics Corporation. Throughout the Class Period, Defendant Kuchenrither participated in the Company's quarterly earnings conference calls and investor presentations wherein he made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others. In addition, during the Class Period, Defendant Kuchenrither participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including:

- Form 8-K filed with the SEC on November 7, 2012 ("2013 Form 8-K") and Form 10-K (and Exhibit 31.2 thereto) filed with the SEC on November 20, 2012 ("2012 Form 10-K");

- Form 8-K filed with the SEC on January 22, 2013 ("Q1 2013 Form 8-K") and Exhibit 31.2 to the Form 10-Q filed with the SEC on February 7, 2013 ("Q1 2013 Form 10-Q");

- Form 8-K filed with the SEC on April 30, 2013 and Exhibit 31.2 to the Form 10-Q filed with the SEC on May 10, 2013 ("Q2 2013 Form 10-Q");

- Form 8-K filed with the SEC on July 30, 2013 and Exhibit 31.2 to the Form 10-Q filed with the SEC on August 9, 2013 ("Q3 2013 Form 10-Q");

- Form 8-K filed with the SEC on November 7, 2013 and Form 10-K (and Exhibit 31.2 thereto) filed with the SEC on November 27, 2013 ("2013 Form 10-K");

- Form 8-K filed with the SEC on January 28, 2014 and Exhibit 31.2 to the Form 10-Q filed with the SEC on February 7, 2014 ("Q1 2014 Form 10-Q");

- Form 8-K filed with the SEC on April 29, 2014 and Exhibit 31.2 to the Form 10-

Q filed with the SEC on May 12, 2014 ("Q2 2014 Form 10-Q");

- Form 8-K filed with the SEC on July 29, 2014 and Exhibit 31.2 to the Form 10-Q filed with the SEC on August 8, 2014 ("Q3 2014 Form 10-Q");

- Form 8-K filed with the SEC on November 7, 2014 and Form 10-K (and Exhibit 31.2 thereto) filed with the SEC on November 26, 2014 ("2014 Form 10-K");

- Form 8-K filed with the SEC on January 27, 2015 and Exhibit 31.2 to the Form 10-Q filed with the SEC on February 6, 2015 ("Q1 2015 Form 10-Q").

29.     Defendant Kuchenrither is referred to hereinafter as the "Individual Defendant." The Individual Defendant, because of his position with the Company, possessed the power and authority to control the content of EZCORP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of the Individual Defendant.

## IV.     CONFIDENTIAL WITNESSES

30.     Confidential Witness #1 ("CW #1") is a former employee of EZCORP who was a VP of Internal Audit at EZCORP from 2011 through early 2014.   Prior to separating from

EZCORP in 2014, CW #1 reported to the Chairman of the Audit Committee, William "Bill" C. Love, and had regular dealings with Defendant Kuchenrither and EZCORP's accounting personnel in the regular course of EZCORP's business and therefore possesses information directly related to EZCORP's accounting practices and internal controls.

31.    Confidential Witness #2 ("CW #2") is a former employee of EZCORP who worked in EZCORP's internal audit department from the summer of 2011 through March of 2014 and had responsibility for internal audit and Sarbanes-Oxley ("SOX") management. Prior to separating from EZCORP in 2014, CW #2 reported to the VP of Internal Audit and had regular dealings with EZCORP's accounting personnel in the regular course of EZCORP's business and therefore possesses information directly related to EZCORP's accounting practices and internal controls.

32.    Confidential Witness #3 ("CW #3") is a former employee of EZCORP who worked in EZCORP's internal audit department from October 2012 through May 2015. CW #3 reported to, among others, Tony Sanders, the Vice President of Human Resources (until his departure from the firm in the fall of 2014), Tom Welch, a Senior Vice President and General Counsel, and CEO Stuart Grimshaw. CW #3 assisted with the preparation of internal audit reports and presentations for the Board of Directors, including those prepared for the internal audit team's due diligence reports on Grupo Finmart. CW #3 had access to reports and information reviewed and generated by the internal audit department and therefore possesses information directly related to EZCORP's accounting practices and internal controls.

## V.   SUBSTANTIVE ALLEGATIONS

### a.  Background

33.     EZCORP delivers cash solutions to customers across channels, products, services, and markets. With approximately 1,400 locations, the Company offers customers multiple ways to access instant cash, including pawn loans and consumer loans in the United States, Mexico, and Canada, and fee-based credit services to customers seeking loans.  At its pawn and buy/sell stores and online, the Company also sells merchandise, primarily collateral forfeited from pawn lending operations and used merchandise purchased from customers.

34.     On January 30, 2012, the Company acquired a 60% interest in Grupo Finmart (which did business under the names "Crediamigo" and "Adex"), a consumer loan provider headquartered in Mexico City.  On June 30, 2014, the Company acquired an additional 16% of the ordinary shares outstanding of Grupo Finmart.   On September 1, 2015, the Company increased its ownership position in Grupo Finmart to 94%.   According to the Company, the purchase price for the additional 18% interest was approximately $29 million in cash.

35.     The Company's business consists of three reportable segments: The U.S. & Canada segment, which includes all business activities in the United States and Canada; the Latin America segment, which includes its Empeño Fácil pawn operations, the TUYO buy/sell operations and Grupo Finmart financial services operations in Mexico; and the Other International segment, which includes its equity interest in the net income of Cash Converters International.

36.     In its 2014 Form 10-K, the Company described Grupo Finmart's payroll lending business as follows:

> In Mexico, Grupo Finmart has over 100 active payroll withholding agreements with
> Mexican employers, primarily federal, state and local governments and agencies, and

15

provides unsecured multiple-payment consumer loans to the employees of the various employers. Interest and principal payments are collected through payroll deductions. The average loan is approximately U.S. $1,600, with a term of 31 months and annual yields of approximately 72%.

*      *      *

Our payroll withholding lending business in Mexico operates using a network of low-cost branch offices dedicated to making loans to employees of government agencies and other employers with whom Grupo Finmart has processing and withholding agreements in place. A centralized corporate office provides the lending approval function, processing of loans and repayments, collections, sales support and other administrative functions. Each branch location is headed by a sales manager and, depending upon size of the region, may have between eight and fifteen sales professionals reporting through the branch. Sales professionals are commission-based, with earnings tied to loans originated. All loan requests are approved or declined through the centralized credit process. Grupo Finmart also utilizes a network of brokers to augment the sales force.

*      *      *

The unsecured payroll lending industry in Mexico is less developed than other Latin American countries. Payroll lending in Mexico is generally marketed to public sector employees, who on average earn more and rotate less frequently than their private sector peers. Additionally, government entities tend to be more stable and on average have more employees than private companies. It is estimated that less than 15% of the market potential is being serviced. Grupo Finmart is the fifth largest vertically integrated payroll lender in Mexico with 53 branch offices located in 24 of the 32 states in the country.

37.    As detailed herein, throughout the Class Period, Defendants misrepresented the amount of non-performing loans from Grupo Finmart's loan portfolio and falsely reported income from the sale of portions of Grupo Finmart's loan portfolio. Such statements were materially false and misleading when made.

### b. The False and Misleading Statements During the Class Period Regarding the Company's Financials and its Internal Controls And Why Those Statements Were False and Misleading

38.    The Class Period begins on November 6, 2012 when EZCORP issued a press release disclosing its fiscal 2012 fourth quarter financial results.  These financial results – and the subsequent financial results revealed in each of the quarterly reports, annual reports and corresponding press releases through and including its first quarter of fiscal 2015 – contained

16

materially false and misleading statements when those statements were made. EZCORP has restated the financial results from each of these periods acknowledging that such statements were materially incorrect when they were made. The specific false statements are as follows:

**The 4Q 2012 False and Misleading Statements**

39.     On November 6, 2012, EZCORP published a press release, entitled "EZCORP Reports Record Revenues, Income and Earnings Per Share," containing the following false and misleading statements:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of instant cash solutions for consumers, today announced record results for its fourth quarter and fiscal year ended September 30, 2012.
>
> For the quarter, total revenues were $258.4 million, net income was $38.6 million and earnings per share were $0.75, all records for the Company's fourth fiscal quarter.
>
> ***The Company also generated record-setting performance for the full fiscal year. Compared with the prior year, total revenues increased 14% to $992.5 million, net income increased 18% to $143.7 million and earnings per share increased 16% to $2.81, all records for the Company***. The Company also added 151 locations in three countries, acquired majority ownership in two lending companies in Mexico and the United Kingdom and signed a multi-year agreement with Western Union to provide money transfer and other payment services across its growing network. [Emphasis added.]
>
> **Key Drivers**
>
> • **International Performance** – Reflecting the continued successful execution of the Company's geographic, product and channel diversification strategy, 31% of the Company's consolidated segment contribution in the quarter was attributable to areas outside the United States, up from 8% a year earlier. Furthermore, combined total revenue in the Latin American and Other International segments more than doubled during the quarter compared to the same quarter last year. For the full fiscal year, earnings generated outside the United States increased form 8% of consolidated segment contribution to 18%. These increases are the result of continued strength in the company's Empeno Facil business in Mexico, the acquisition of controlling interests in Crediamigo and Cash Genie and the Company's strategic investments in the United Kingdom and Australia

*          *          *

17

- **Mexico Payroll Withholding Lending** – Crediamigo recorded net revenues of $10.4 million in the quarter, and $27.4 million since the acquisition in late January, with bad debt as a percentage of fees of 1%. As expected, Crediamigo again refinanced portions of its $90 million third party debt at lower rates of interest. The lower interest rates will result in significantly reduced interest expense going forward. The weighted average interest rate on Crediamigo's third party debt is now 11%, compared to 19% before acquisition. Purchase accounting income impact during the quarter totaled $6.7 million, of which $4.0 million was attributable to EZCORP, with the majority of the adjustment coming from the accelerated amortization of debt premium associated with the refinanced debt. When reduced by income taxes and the noncontrolling interest, the net income attributable to EZCORP was $8.2 million for the quarter and $10.1 million during the fiscal year.

*      *      *

- **Consumer Lending Performance** – Consumer loan balances increased to $96 million globally at September 30, driving consumer loan fees earned during the quarter up 27%. In addition, improved underwriting and collections effectiveness, coupled with consolidation of the lower risk profile Crediamigo business, led to a significant improvement in bad debt as a percentage of consumer loan fees. On a consolidated basis, the measure improved 220 bps (from 24% to 22%). Within the United States, fee net revenues decreased by 5%, driven by regulatory pressures within Texas, but mostly offset by growth in other states; installment loan net revenues increased by 50% and auto title net revenues were flat.

*      *      *

**<u>Consolidated Financial Highlights – Fiscal year ended September 30, 2012 versus the prior year</u>**

- Total revenues increased 14% to a record $992.5 million due primarily to a 21% increase in consumer loan fees, a 19% increase in merchandise sales and a 17% increase in pawn service charges.

- Net revenues increased 17% due primarily to a 30 bps improvement on merchandise margins and a 260 bps improvement in consumer bad debt expense.

- Net income increased 18% to $143.7 million for the fiscal year, and diluted earnings per share were $2.81, a 16% increase over the prior year.

- For the fiscal year, administrative expense of $94.0 million reflects an $18.8 million increase over last year, $11.7 million of which result from the consolidation of Crediamigo and Cash Genie. The remaining $7.1 million year-over-year increase was attributable to supporting the Company's domestic and international growth.

- The Company's effective tax rate for the year was reduced from 35% to 32%, reflecting

the continued success and growth of the Company's business in areas outside the United States and the benefit of state NOLS's mentioned previously.

- The Company delivered strong return on equity of 19% for the trailing twelve months.

40.    The press release quoted in the preceding paragraph falsely represented that EZCORP's total net income was $143.7 million when, in fact, total net income was only $136.8 million – an overstatement of $6.9 million, or 5%.  The press release quoted in the preceding paragraph also falsely represented that earnings per share ("EPS") were $2.81 when, in fact, EPS was only $2.69 per share -  a $0.12, or 4%, overstatement.

41.    On November 20, 2012, EZCORP filed its Annual Report with the SEC on Form 10-K for the 2012 fiscal year.   The Company's Form 10-K was signed by Defendant Kuchenrither, and represented that EZCORP's Operating Income was $227.1 million and EPS was $2.82 per share when, in fact, Operating Income was $214.1 million and EPS was $2.69 per share. For the Latin America segment, the Company falsely reported total revenues from consumer loan fees and interest of $26,901,000 and consumer loan bad debt expense of $309,000.  In fact, consumer loan fees and interest were overstated by $900,000 and consumer loan bad debt expense was actually $8.1 million.  The Latin America segment's ratio of consumer loan interest and fees to bad debt expense was originally reported as 1% but, in actuality, was 31.2%.  Thus, EZCORP understated the bad debt expense in Latin America by 2,524.9%, thereby significantly understating the ratio of consumer loan interest and fees to bad debt expense.

42.    The ratio of consumer loan interest and fees divided by bad debt expense measures how efficiently a company can create income from making loans while trying to keep bad debt expense to a minimum.  This ratio also measures how well a company is able to collect on its loans as compared to total income generated from such loans.  By understating its bad debt

expense in Latin America by **2,524.9%** and thereby artificially suppressing this ratio, EZCORP

misled investors as to the profitability of its Latin American division.

43.     Finally, the 2012 Form 10-K contained required SOX certifications, signed by

Defendant Kuchenrither, who falsely certified that:

I, Mark E. Kuchenrither, certify that:

1. I have reviewed this Annual Report on Form 10-K of EZCORP, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and of financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(c) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the

registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

44.     As stated by CW #3, at the time Kuchenrither signed his SOX certification he knew that Grupo Finmart's internal controls were "a mess," and that Grupo Finmart had no aging report for its loans, meaning so there was no acceptable accounting methodology to determine whether Grupo Finmart was properly recording losses from non-performing loans.  According to CW #3, at the time EZCORP's internal audit team undertook its due diligence regarding the Grupo Finmart acquisition, it was reported to management that Grupo Finmart lacked basic internal controls. CW #3 further stated that Grupo Finmart's records were in such disarray that the internal audit team could not assess the value of the loan portfolio.  CW #3 also stated that there were basic questions that Grupo Finmart employees could not answer that they should have been able to answer.

**The 1Q 2013 False and Misleading Statements**

45.     On January 22, 2013, the Company issued a press release entitled, "EZCORP Announces First Quarter Results." Therein, the Company, in relevant part, falsely stated:

EZCORP, Inc. (NASDAQ: EZPW), a leading provider of instant cash solutions for consumers, today announced results for its first fiscal quarter ended December 31, 2012.

For the quarter, total revenues were $277.1 million, a record for the Company. Net income was $30.7 million, and earnings per share were $0.59, at the upper end of the Company's previously announced guidance range of $0.55 to $0.60.

\*     \*     \*

**Consolidated Financial Highlights – First quarter of fiscal 2013 vs. prior year quarter**

- Total revenues were $277.1 million, up 11%, driven primarily by growth in the Latin American segment. This increase is partially attributable to mid-year fiscal 2012 acquisitions of controlling interests in Crediamigo and Cash Genie and the inclusion of 100% of their revenues in EZCORP's consolidated revenues. Excluding these acquisitions, total revenues increased 3.4%, driven by growth in merchandise sales, pawn service charges and consumer loan fees.

\*     \*     \*

- The Company ended the quarter with $419 million in earning assets (consisting of pawn loans, consumer loans and inventory on the balance sheet, combined with CSO loans not on the balance sheet), an increase of 41%, driven primarily by the acquisition of Crediamigo.

- Cash and cash equivalents at quarter-end were $46.7 million, with debt of $235.5 million, including $92.9 million Crediamigo third party debt, which is non-recourse to EZCORP.

\*     \*     \*

**Latin America – 110% Increase in Segment Contribution**

\*     \*     \*

- *Payroll Lending* – Crediamigo, the Company's Mexico payroll withholding lending business, gained market share through rapid growth and contributed nearly two-thirds of Latin America's segment contribution during the quarter.

  o Total loans outstanding at the end of the quarter were $81 million, up 24% since acquisitions in January 2012, and well ahead of the Company's investment pro-forma.

  o Net revenues were $13.8 million in the quarter, with bad debt as a percentage of fees less than 1%.

  o Crediamigo added 8 new employer contracts (a 12% increase) during the quarter, gaining access to over 175,000 potential new customers.

  o These and other operational metrics for the business were at or better than the

Company's original investment expectations.

46.     Also on January 22, 2013, the Company held an earnings conference call with investors. During that call, Defendant Kuchenrither made the following misrepresentations:

> Moving to Crediamigo, it contributed net revenues of $13.8 million with bad debt as a percentage of fees less than 1% and segment contribution of $6.2 million roughly two-thirds of the total segment contribution for the Latin America segment. All three of these key financial metrics were ahead of expectations. At quarter-end, Crediamigo's loan portfolio was $81 million, up 24% since acquisition. Crediamigo signed several new employer contracts during the quarter, a key measure in the payroll [withholding] sector and a leading indicator to future loan growth. These contracts alone provide access to over 175,000 new potential customers.

47.     On February 7, 2013, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal first quarter.  The Company's Q1 2013 Form 10-Q reaffirmed the Company's financial results previously announced on January 22, 2013.  The Company reported EPS of $0.59 when, in fact, EPS was only $0.52 per share - a $0.07, or 13.5%, overstatement.[3] The Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, *supra*.

**The 2Q 2013 False and Misleading Statements**

48.     On April 30, 2013, the Company issued a press release, entitled "EZCORP Announces Second Quarter Results." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of instant cash solutions for consumers, today announced results for its second fiscal quarter ended March 31, 2013.

---

[3] Other reported financial metrics, including consumer loan fees and interest, consumer loan bad debt expense and income from continuing operations before income tax, were also falsely stated during each quarter in the Class Period. The Restatement details adjustments to consumer loan fees and interest, consumer loan bad debt expense for each fiscal year and income from continuing operations before income tax, demonstrating that the underlying quarterly numbers were false and misleading when originally stated. However, due to the effect of discontinued operations and the related altering of EZCORP's financial statements, the precise overstatement of each of these metrics per quarter is subject to continued factual development.

For the quarter, total revenues were $272 million, a record for the Company. Net income was $34 million, and earnings per share were $0.63, within the Company's previously announced guidance range of $0.60 to $0.65.

EZCORP continued to execute its growth strategy of developing new stores, new channels and new products:

*     *     *

- *New Channels* – The Company continues to develop and grow its payroll withholding lending business in Mexico through its Grupo Finmart subsidiary (doing business under the names "Crediamigo" and "Adex"), where total loans outstanding were up 37% year-over-year. And in the first full quarter since acquisition, the Company's U.S. online lending business more than doubled its total loans outstanding and is now offering loan products in five states. At quarter end, over 70% of the Company's non-pawn loan balances were attributable to payroll withholding and online lending.

*     *     *

### Consolidated Financial Highlights – Second quarter of fiscal 2013 vs. prior year quarter

- Total revenues were $272 million, up 6%, largely attributable to the acquisition of controlling interests in Grupo Finmart at the end of January 2012 and Cash Genie in April 2012 and the inclusion of 100% of their revenues in EZCORP's consolidated revenues.

*     *     *

- The Company ended the quarter with $389 million in earning assets, an increase of 25%, driven primarily by increases in consumer loans in Mexico, as well as inventory and pawn loans in the U.S. and Mexico. Earning assets consist of pawn loans, consumer loans and inventory on the balance sheet, combined with CSO loans not on the balance sheet.

- Cash and cash equivalents, including restricted cash, at quarter-end were $43 million, with debt of $172 million, including $98 million Crediamigo third party debt, which is non-recourse to EZCORP.

*     *     *

### Latin America – Strong Increase in Segment Contribution

Contribution from the Latin America segment increased 133% and now accounts for over 10% of consolidated segment contribution, up from less than 4% a year ago.

*     *     *

- *Payroll Withholding Lending* – Grupo Finmart, the Company's Mexico payroll withholding lending business (now doing business under two names, Crediamigo and Adex), continues to gain market share through the addition of new contracts and

24

increased contract penetration.

49.     Also on April 30, 2013, the Company held an earnings conference call with

investors. During that call, Defendant Kuchenrither made the following misrepresentations:

> As discussed last quarter, this is another year of significant investment for EZCORP as
> we transitioned from a primarily U.S.-based storefront focused company to a multi-
> channel leading provider of cash solutions across the world. Execution of our strategy is
> on track and our team delivered earnings of $0.63 per share during the quarter within the
> upper half of our guidance range.

> Our earnings release provides consolidated financial highlights for the second quarter. I
> will focus primarily on our performance by operating segment.

> *        *        *

> The fastest growing of our [] segments Latin America includes our Empeno Facil Pawn
> business, our payroll withholding lending business, Grupo Finmart which conducts
> business under the brands Crediamigo and Adex and our buy/sell stores TUYO. Because
> our payroll withholding lending business added another brand this past quarter you will
> start to hear us refer to this business as Grupo Finmart rather than Crediamigo.

> Latin America had another outstanding quarter with net revenues up 50% and segment
> contribution of $6.4 million. Approximately two-thirds of the segment contribution came
> from Grupo Finmart. …

> Moving to Grupo Finmart; Grupo Finmart contributed net revenues of $12.6 million with
> bad debt as a percentage of fees less than 1%. At quarter end, Grupo Finmart's loan
> portfolio was $91 million, up 37% from a year ago. Grupo Finmart signed four additional
> new employer contracts this quarter and continues to focus on increasing penetration of
> newly acquired employer contracts and has driven penetration from 1% to 6% over the
> last year. Grupo Finmart continues to focus on a multi-channel growth strategy designed
> to more effectively penetrate the new and current customer base, resulting in their
> distribution channel representing 18% of originations during the quarter and call center
> operations representing 11%.

50.     On May 10, 2013, EZCORP filed its Quarterly Report with the SEC on Form 10-

Q for the 2013 fiscal second quarter.  The Company's Q2 2013 Form 10-Q reaffirmed the

Company's financial results previously announced on April 30, 2013.  The Company reported

EPS of $0.63 when, in fact, EPS was only $0.57 per share, a $0.06, or 10.5%, overstatement.

The Form 10-Q also contained the required SOX certification, signed by Defendant

Kuchenrither, substantially similar to the certification contained in ¶43, *supra*.

**The 3Q 2013 False and Misleading Statements**

51.     On July 30, 2013, the Company issued a press release, entitled "EZCORP

Announces Growth in Revenues and Earning Assets for Its Fiscal Third Quarter of 2013."

Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, announced total revenues from continuing operations for its third fiscal quarter ended June 30, 2013 increased 5% to $235 million. Excluding gold scrapping revenues, total revenues were up 13%. Earning assets increased 21% over last year. Net income from continuing operations was $16 million, or $0.29 per share.

> *         *         *

> **Consolidated Financial Highlights – Third Quarter of Fiscal 2013 vs. Prior Year Quarter**

> • Total revenues were $235 million, an increase of 5%, representing growth across all business segments. Excluding gold scrapping, total revenues were up 13%.

> • Earning assets (which consist of pawn loans, consumer loans and inventory on the balance sheet, combined with CSO loans not on the balance sheet, net of reserves) were $416 million, an increase of 21%. This was a result of increases in all categories of earning assets, including pawn, payday, installment, and auto title loans, as well as inventory in the U.S. and Mexico.

> • Net income declined mainly due to the previously announced impact of volatility in the gold market in both the U.S. and Mexico, which caused a deterioration of approximately $15 million in consolidated net revenues. It was also impacted by one-time investment, and expense reduction costs of $2 million. Net income from continuing operations was $16 million, down 48%.

> • Cash and cash equivalents, including restricted cash, were $51 million at quarter-end, with debt of $232 million, including $109 million of Grupo Finmart third-party debt, which is non-recourse to EZCORP.

> *         *         *

> **Latin America – Strong Increase in Segment Contribution**

> Contribution from the Latin America segment increased 79%, excluding the one-time purchase accounting adjustment related to the refinancing of Grupo Finmart debt in the prior year quarter. Including this adjustment, segment contribution decreased 21%. The

segment now accounts for 14% of consolidated segment contribution, up from 13% a year ago.

*       *       *

- *Payroll Withholding Lending* – Grupo Finmart continues to gain market share through the addition of new contracts, multi-channel growth, and increased contract penetration. During the quarter, Grupo Finmart also completed a $30 million cross-border debt offering at 8.5%.

    o   Total loan balances at the end of the quarter were $98 million, up 53%.

    o   Net revenues were $13 million in the quarter, with bad debt as a percentage of fees of 5%, which improved 100 bps over the prior year quarter.

52.     On August 9, 2013, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal third quarter.  The Company's Q3 2013 Form 10-Q reaffirmed the Company's financial results previously announced on July 30, 2013.  The Company reported EPS of -$0.11 when, in fact, EPS was -$0.13 per share - a $0.02, or 15.4%, overstatement.  The Q3 2013 Form 10-Q also contained the required Sarbanes-Oxley certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, *supra*.

**The 4Q 2013 False and Misleading Statements**

53.     On November 7, 2013, EZCORP issued a press release, entitled "EZCORP Reports 2013 Revenues of More Than $1 Billion," that contained the following false and misleading statements:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, announced that for the fiscal year ended September 30, 2013, total revenues were $1.01 billion, a record for the company. Net income from continuing operations attributable to EZCORP was $57 million.
>
> EZCORP's core lending and retain businesses in the United States and Latin America showed continued strength, highlighted by the following:

*       *       *

- Latin America's segment contribution improved 40% during the year, after normalizing the prior year's results for a $16 million positive purchase accounting adjustment. This

27

significant growth was driven by strong performance in the company's Mexico payroll withholding lending business (Grupo Finmart), where loan balances increased 46% during the year and total revenues increased 89%.

*    *    *

## Consolidated Financial Highlights – Fiscal Year ended September 30, 2013 versus the prior year

- Total revenues exceeded $1 billion, a record for the company. Excluding jewelry scrapping, total revenues grew 14%, driven by a 24% increase in consumer loan fees, an 11% increase in merchandise sales, and an 8% increase in pawn service charges.

- Net income from continuing operations attributable to EZCORP was $57 million, while diluted earnings per share from continuing operations attributable to EZCORP were $1.06.

- Cash and cash equivalents, including restricted cash, were $42 million at year-end, with long-term debt of $246 million, including $105 million of Grupo Finmart third-party debt, which is non-recourse to EZCORP.

- Net earning assets, including discontinued operations, were $466 million, a 20% increase over last year. Net earning assets consist of pawn loans, consumer loans and inventory on the balance sheet, combined with CSO loans not on the balance sheet, net of reserves. The growth in net earnings assets was driven by a 35% increase in loan balances in our combined financial services businesses, and a 13% increase in earning assets related to our pawn and retail businesses.

## Fiscal Year 2013 Business Review

*    *    *

## Latin America

The Latin America segment contribution was $27 million, a 40% increase over the prior year after normalizing for the prior year's purchase accounting adjustments. This increase was driven by strong performance at Grupo Finmart, the company's payroll withholding lending division.

- *Payroll Withholding Lending* –

    o Total loan balances at Grupo Finmart at the end of the year were $107 million, up 46%.

    o Total revenue was $52 million, an increase of 89%, as a result of better contract terms and better penetration. Net revenues, including a credit for aged consumer loans that were sold, were $53 million. Absent this credit, bad debt as a

28

percentage of fees was approximately 2%.

54.     On November 27, 2013, EZCORP filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year.   The Company's 2013 Form 10-K was signed by Defendant Kuchenrither, and reaffirmed the Company's financial results previously announced on November 7, 2013.   For the Latin America segment, the Company reported total revenues for consumer loan fees and interest of $50,461,000 and consumer loan bad debt benefit of $113,000. The company did not report "consumer loan bad debt expense as a percentage of consumer loan fees and interest" because bad debt expense was negative, *i.e.*, a bad debt benefit.  Additionally, the 2013 Form 10-K stated: "Segment information is prepared on the same basis that our management reviews financial information for operational decision-making purposes."

55.     With respect to the Latin America segment, the 10-K falsely stated that:

The Latin America segment's total revenues increased $46.7 million, or 45%, in fiscal 2013 to $150.0 million. Same store total revenues increased $11.0 million, or 11%, and new and acquired stores contributed $35.7 million. The overall increase in total revenues was due to the $23.6 million increase in Grupo Finmart consumer loan fees, $16.7 million increase in merchandise sales, a $6.6 million increase in pawn service charges and a $1.9 million increase in other revenues, partially offset by a $2.0 million decrease in jewelry scrapping sales.

*        *        *

Consumer loan fees and interest increased $23.6 million, or 8%, to $50.5 million. The increase is due to a full year inclusion of Grupo Finmart as opposed to eight months in fiscal 2012, coupled with a 46% increase in the average loan balance during the period. The increase in the loan balance is due higher penetration on existing contracts with government entities, coupled with the addition of new contracts in fiscal 2013.

56.     The representations in paragraphs 53 and 55 regarding total revenues for consumer loan fees and interest in the Latin America segment of approximately $50.5 million were false when made as total revenue was overstated by $7.9 million.  The consumer loan bad debt expense in the Latin America segment, as originally reported, was ($113,000), meaning that

EZCORP purportedly captured more previously reported bad debt expense than it wrote off. That figure was understated by $11.8 million, and was actually $11.7 million - evidencing a 10,466% understatement.  The ratio of consumer loan income to bad debt was restated to 27.5%.

57.     Finally, the 2013 Form 10-K contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification detailed in ¶43.

58.     According to CW #3, at the time Kuchenrither signed his SOX certification he knew that Grupo Finmart's internal controls were a mess and that Grupo Finmart had no aging report to track bad debt and there was no acceptable accounting methodology to determine whether Grupo Finmart was properly recording losses from non-performing loans.  According to CW #3, at the time EZCORP's internal audit team undertook its due diligence regarding the Grupo Finmart acquisition, it was reported that because of Grupo Finmart's lack of controls, the valuation of risks did not make sense.  CW #3 further stated that Grupo Finmart's records were in such disarray the team could not assess the value of the portfolio and that there were basic questions that Grupo Finmart employees could not answer that they should have been able to answer.

59.     CW #2, a member of EZCORP's internal audit team from July 2011 through March 2014, was part of an internal audit team that visited Grupo Finmart every quarter to test for SOX compliance.  CW #2 stated that, in particular, the team visited Grupo Finmart in September/October 2013 to test for SOX compliance and tested internal controls.  CW #2 stated that the internal audit team had resorted to "black box testing" for loan balances so that Grupo Finmart could technically be SOX compliant for a quarter, but Grupo Finmart was never SOX complaint for a full year during CW #2's employment at EZCORP.  CW #2 explained that black box testing consisted of simply verifying the reported numbers and ignoring the methods that

were used to get to those numbers.  CW #2 stated that the team had little faith in the Mexican staff's ability to consistently produce accurate numbers and that internal controls were messed up at Grupo Finmart.  CW #2 further stated that Grupo Finmart had constant "fire drills", that its systems were manually driven with little automation, and there was very little integration between the many different systems. Moreover, CW #2 stated that Grupo Finmart's systems were relying on data from external sources, in many cases there was no back up documentation to support the numbers, and it was a challenge to get the necessary supporting documentation. CW #2 also stated that Grupo Finmart's staff was confused and did not understand what was needed because they lacked the technical knowledge and they were not getting the appropriate level of support from the USA.  CW #2 further stated that Grupo Finmart had no access controls, meaning that employees could override a "support schedule."   A support schedule is the documentation that supports estimates or ledger entries.

60.    CW #2 also corroborated CW #3's statement that Grupo Finmart's employees had not been properly trained. Specifically, CW #2 stated that EZCORP's code of conduct had not been drilled down to the Mexican employees and part of SOX compliance is training employees to resist posting journal entries just because their boss told them to do so.   CW #2 said the lower level staff in Mexico tried to do the right thing, but the internal audit team did not have confidence in the management in Mexico.  CW #2 said that management in Mexico was not diligent about reporting correctly and that if there were mistakes in the information they gathered, the managers in Mexico would just send it along.

61.    Accordingly, Kuchenrither had no reasonable basis to sign his SOX certification for fiscal 2013.

**The 1Q 2014 False and Misleading Statements**

62.     On January 28, 2014, the Company issued a press release, entitled "EZCORP Reports Revenues of $269 Million and Earnings Per Share of $0.42." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, today announced its financial results for its first quarter of fiscal 2014.
>
> For the quarter, total revenues were $269 million with net income of $23 million and earnings per share of $0.42. Excluding the negative impact of the company's minority investment in Albermarle & Bond and losses related to the company's immature online lending businesses, net income was $27 million and earnings per share were $0.49, both non-GAAP measures.
>
> Paul Rothamel, EZCORP's President and Chief Executive Officer, stated, "I am pleased with our consolidated financial results this quarter and our underlying revenue and expense trends in our core U.S. and Latin America pawn and financial services businesses...."

> **Consolidated Financial Highlights**

> - Total revenues were $269 million compared to $273 million in the same period last year. Excluding gold scrapping, total revenues were up 6%, driven by strong retail sales and consumer loan fee growth in the United States and Mexico.
>
> - Net income for the quarter was $23 million, net of a $1 million impact from Albemarle & Bond and a $3 million impact from the company's online lending businesses. The $27 million of net income before those impacts was driven primarily by the company's U.S. storefront businesses, which accounted for 82% of total adjusted segment contribution. The company's Latin America segment accounted for 14% of total adjusted segment contribution in the quarter.
>
> - Earning assets were $471 million at quarter-end, an increase of 13%, as a result of growth in payroll withholding, installment, and auto title loans, as well as inventory in the U.S. and Mexico. Net inventory was $143 million, a 19% increase over the same period last year, as the company executed against its strategy to drive jewelry retail sales rather than scrapping. The second quarter is typically the highest retail selling quarter of the year.
>
> - Cash and cash equivalents, including restricted cash, were $45 million at quarter-end, with debt of $252 million, including $106 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP*. [Emphasis added.]
>
> - The effective tax rate was 30% compared to 33% for the same period last year, as the

company continued to diversify its operations worldwide.

\*       \*       \*

**Latin America**

*Payroll Withholding Lending –*

\*       \*       \*

• Net revenues were \$32 million in the quarter, with bad debt as a percentage of fees of 10%, compared to bad debt benefit of 9% in the prior year due to a large aged debt sale. Bad debt is expected to decline over the next several quarters to approximately 5% to 8% of loan fees.

63.      The press release disclosing 2014 first quarter financial results contained the following materially false and misleading statements: 1) the representation that Grupo Finmart third-party debt, "which is non-recourse to EZCORP" was false and misleading when made as the debt was recourse to EZCORP; and 2) the reporting of \$23 million of net income was false as EZCORP improperly recorded \$4.6 million in income from the sale of Grupo Finmart debt to third-parties and the actual net income was \$18.7 million, a \$3.839 million, or 20.5% overstatement of net income.

64.      On February 7, 2014, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter.  The Company's Q1 2014 Form 10-Q reaffirmed the Company's financial results previously announced on January 28, 2014.  The Company reported EPS of \$0.42 when, in fact, EPS was only \$0.35 per share - a \$0.07, or 20%, overstatement.  The Q1 2014 Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, supra.

65.      Kuchenrither's SOX certification was false and misleading for the reasons set forth in paragraphs 58 to 60 above.

**The 2Q 2014 False and Misleading Statements**

66.    On April 29, 2014, the Company held an earnings conference call with investors to discuss 2Q 2014 results. During that call, Defendant Kuchenrither made the following false and misleading statements:

> I want to highlight a few line items on our consolidated statement of operations. If you look at the other revenue line that is where the accelerated gain of $5 million is recorded from the Grupo Finmart structured asset sale. The structured financing also resulted in $16 million of cash flow receivable inside the quarter, which was received by the company in April. This is the second of these types of transactions this year. And we will continue to consider this type of transaction in the future to finance our growing business.
>
> *        *        *
>
> Grupo Finmart has collateral obligations with respect to some of the loans they have outstanding. The collateral can be either in the form of loans or cash, due to the success of the second securitization they had temporarily used cash as collateral in some cases and were replaced with loans over the course of time. There will always be a balance though as some of the loan structures create sinking fund balances to ensure adequate liquidity to make payments.

67.    The statement by Kuchenrither in the preceding paragraph was false and misleading when made.  The assets sales were improperly recorded as revenues and earnings as the asset sales were with recourse to EZCORP, meaning EZCORP was responsible for any loan losses incurred. Thus, recording a sale from these assets was in violation of GAAP.  EZCORP improperly recorded $5.8 million of net income and $16 million in revenue from these asset sales.

68.    On April 29, 2014, the Company issued a press release, entitled "EZCORP Reports Second Quarter Revenues of $260 Million." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, today announced its financial results for the second quarter of fiscal 2014.
>
> For the quarter, total revenues were $260 million, with net income of $8 million and

earnings per share of $0.15. Excluding the negative impact of certain one-time charges discussed below, as well as minimal losses related to our immature online lending businesses, adjusted net income was $20 million and adjusted earnings per share were $0.36, both non-GAAP measures.

\*       \*       \*

**Consolidated Financial Highlights – Second Quarter of Fiscal 2014 vs. Prior Year Quarter**

- Total revenues were $260 million compared to $268 million in the same period last year. Excluding an expected decrease in gold scrapping, total revenues were up 4%, driven by excellent jewelry sales and consumer loan fee growth in the United States and Mexico.

- Adjusted net income for the quarter was $20 million, net of the after-tax impacts of the Albemarle & Bond impairment charge ($6 million), the retirement benefit accrual for our long-time Executive Chairman ($6 million) and performance of our online businesses ($0.6 million).

- Earning assets, including CSO loans, were $417 million at quarter-end, an increase of 7%, as a result of growth in payroll withholding, installment and auto title loans, as well as inventory in the U.S.

- Cash and cash equivalents, including restricted cash, were $63 million at quarter-end, with debt of $228 million, including $145 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP*.  [Emphasis added.]

\*       \*       \*

**Latin America**

*Payroll Withholding Lending –*
\*       \*       \*

- Bad debt as a percentage of fees was 3%, ahead of our expectations.

- Financing activities for the quarter included a structured asset sale by Grupo Finmart and a public securitization of a portion of its receivables. The asset sale accelerated $16 million in cash flow, which was received in April, as well as a $5 million gain including in "Other Revenues." The securitization of $56 million, our second securitization in twelve months, reduced the cost of capital for the receivables financed to 6.3%. We incurred approximately $1 million in expenses during the quarter associated with this securitization. We expect to continue to use these and other types of structured transactions to finance the rapidly growing Grupo Finmart business going forward.

69.     The press release disclosing 2014 second quarter financial results contained the

following materially false and misleading statements: 1) the representation that Grupo Finmart third-party debt, "which is non-recourse to EZCORP" was false and misleading when made as the debt was recourse to EZCORP; and 2) the reporting of $20 million of adjusted net income was false as EZCORP improperly recorded $5.8 million in income from the sale of Grupo Finmart debt to third-parties.[4]

70.     On May 12, 2014, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter.  The Company's Q2 2014 Form 10-Q reaffirmed the Company's financial results previously announced on April 23 and 29, 2014.  The Company reported EPS of $0.15 when, in fact, EPS was only $0.11 per share - a $0.04, or 36.3%, overstatement.  The Q2 2014 Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, *supra*.

71.     Kuchenrither's SOX certification was false and misleading for the reasons set forth in paragraphs 58 to 60 above.

**The 3Q 2014 False and Misleading Statements**

72.     On July 29, 2014, the Company issued a press release, entitled "EZCORP Reports Third Quarter Revenues of $241 Million, and Earnings Per Share of $0.21." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for customers, today announced its financial results for the third quarter of fiscal 2014.
>
> For the quarter, total revenues were $241 million, with net income from continuing operations of $11.3 million and earnings per share of $0.21.
>
> Mark Kuchenrither, EZCORP's Interim President and Chief Executive Officer, stated,

---

[4] EZCORP did not consistently report one income metric each quarter – choosing whichever metric was most favorable and reporting that metric to investors. In certain quarters, it reported net income. In other quarters, it reported net income from continuing operations or adjusted income.

"We are pleased to have met our outlook for the third quarter. Our Pawn business and our Grupo Finmart business continued to drive our growth, representing 69% of our total revenues this quarter. During the quarter we strengthened our financial flexibility by raising $230 million through a private convertible debt offering which enabled us to pay off all outstanding debt under our senior secured credit agreement and to buy back one million shares of stock. These capital structure enhancements in combination with our improving operational efficiencies enhance our ability to grow revenue and earnings, while improving the customer experience."

**Consolidated Financial Highlights – Third Quarter Fiscal 2014 vs. Prior Year Quarter**

\*     \*     \*

- Total revenues were $241 million, an increase of 3% compared to $235 million in the same period last year. Excluding an expected decrease in gold scrapping, total revenues were up 6%, driven by 3% increases in consumer loan fees and merchandise sales in the United States and Mexico. In addition, we had two structured financing transactions at Grupo Finmart from which we recognized $10 million of revenues.

- Cash and cash equivalents, including restricted cash, were $86 million at quarter-end, with aggregate consolidated debt of $382 million, comprised of the $230 million of our newly issued convertible debt and $152 million of Grupo Finmart third-party debt, ***which is non-recourse to EZCORP***. [Emphasis added.]

\*     \*     \*

**Latin America**

*Consumer Lending –*

On the last day of the third quarter of fiscal 2014, EZCORP acquired an additional 16% ownership of Grupo Finmart and now owns 76% of the company. Grupo Finmart is a vertically integrated lender focused on the following core business activities:

\*     \*     \*

- Grupo Finmart began using structured financing transactions in the first quarter of this year. As a result, Grupo Finmart operates as a distributor, while continuing to service customer loans.

- Grupo Finmart will continue to grow the loan portfolio as well as sell a portion of the portfolio on a regular basis.

In the third quarter, Grupo Finmart's financial results were driven by focusing on organic growth initiatives, optimizing financing strategy, and capitalizing on increasing market demand.

\*     \*     \*

- Our planned structured financing transactions this quarter resulted in $38 million in accelerated cash flow to find new loan originations, and a $10 million gain reported in "Consumer loan sales and other."

- This quarter's structured asset sales represented less than 25% of the company's current loan portfolio.

73.     The press release disclosing 2014 third quarter financial results contained the following materially false and misleading statements: 1) the representation that Grupo Finmart third-party debt, "which is non-recourse to EZCORP" was false and misleading when made as the debt was recourse to EZCORP; and 2) the reporting of $11.3 million of net income from continuing operations was false as EZCORP improperly recorded $14.3 million in income from the sale of Grupo Finmart debt to third-parties.

74.     Also on July 29, 2014, the Company held an earnings conference call with investors to discuss the Q3 2014 results. During the conference call, Defendant Kuchenrither made the following false and misleading statements:

From a trending perspective, the growth in our pawn business in encouraging, but when we look at our year-over-year pawn loan growth and compare ourselves to our peers we see additional opportunities to growth loan balances and pawn service charges. We are pleased with the growth of Grupo Finmart a business that just a few years ago was a fraction of what it is today. In addition, we are pleased with the hybrid approach of using a distributor model and a traditional loan origination and servicing model. We also continued to work on strengthening Grupo Finmart's balance sheet by restructuring and paying off its debt.                *       *       *

Now I would like to point out a few items from our income statement on Page 6 of the press release. If you look at the consumer loan sales and other revenue line, we reported $10.9 million in the third quarter representing approximately 300% growth when compared to the third quarter last year. This growth primarily reflects a gain of $10 million from structured financing transactions at Grupo Finmart. These transactions also resulted in $38 million in accelerated cash flow.

Again I want to be clear that through these structured financing transactions, we are acting as the distributor which accelerates cash flow and improves our ability to fund new loans. We will continue with both the traditional loan origination and servicing model and the new distributor model. This quarter's structured financing transactions

represented less than 25% of the company's current loan portfolio.

To move down the income statement and you look at the operating and expense lines, I want you to know that I am not satisfied with our current expense structure. We went too far, too fast in decentralization and we will analyze these areas closely over the next 90 days as part of our planning process. Interest expense in the third quarter was up 70% year-over-year to approximately $6 million. At Grupo Finmart, interest expense increased $1.4 million compared to the same quarter last year and this was due to growth. The corporate expense was $1.8 million in the third quarter compared to $900,000 in the same quarter last year and that was due to larger debt balance. Equity and net income from unconsolidated affiliates was $2.1 million representing fully the contribution from cash converters.

If you turn to the balance sheet on Page 7 of our press release, I just want to point out one item. Restricted cash on the current and noncurrent lines totaled approximately $35 million. Grupo Finmart has collateral obligations with respect to some of the debt agreements they have outstanding. The collateral can be either in the form of loans or cash. Due to the success of the second securitization, we have temporarily used cash as collateral in some cases and expect to replace the cash with loans over the next couple of quarters. Lastly in the quarter, we strengthened our financial flexibility by raising $230 million through a private convertible debt offering, which enabled us to payoff and close our senior secured credit agreement that lowered our interest rate. We were able to create a call spread to protect shareholders from dilution and we bought back 1 million shares of stock to further protect shareholders from dilution.

75.    In addition, during the earnings conference call, Defendant Kuchenrither made the following false and misleading statement in an exchange with an analyst, Henry Coffey, from Sterne Agee:

**Henry Coffey – Sterne Agee**

Yes. I am trying to understand the structured financing transaction, was that a cash gain that you got from selling those loans into a facility or is that the sort of a gain on sale having to do with the present value of residuals or what was the nature of the gain?

**Mark Kuchenrither**

Hi, Henry. First, it's good to hear you. So, just want to say, hello and it's a good question. The structured financing transaction at Grupo Finmart are true loan sales, so they are actually true sales of part of the loan portfolio and *so the risk associated with the loans passed to the buyer of the loans*. Grupo Finmart acts as the servicer. It actually goes into a trust, in a Mexican trust and the Grupo Finmart acts a servicer of that trust and serves the customer and also does the collections and so on. *So, it's a true profit.* It's – the transaction in effect convinces a 3-year revenue and cash flow cycle down to 90 days in

this case. So, we accelerate both revenue and expense, associated expense such as commissions, but we also accelerate the cash flow from it. It is costing the company about a 3% premium over their cost of financing, but that's a great trade-off moving from three years to 90 days.  [Emphasis added.]

**Henry Coffey - Sterne Agee**

So, it's a cash gain from selling the assets?

**Mark Kuchenrither**

Yes, yes.

**Henry Coffey - Sterne Agee**

So, they were sold at the par – they were sold at a gain over the par value of the loan, because of the higher rate and the lower rate required by securitization party?

**Mark Kuchenrither**

That's exactly right. So, it is a cash gain.

76.     Similarly, during the earnings conference call, Defendant Kuchenrither made the following false and misleading statements in an exchange with an analyst, Bob Ramsey, from FBR Capital Markets:

**Bob Ramsey – FBR Capital Markets**

Thanks for taking the follow-up. Just a follow-up on John's question there about the securitizations, I know you said it will make earnings a little more predictable. With the two transactions, what is the sort of expected size or the range of size? And then is that kind of a good quarterly run-rate or is there a good annual rate way to think about that business on a go forward basis?

**Mark Kuchenrither**

Yes, great question. First, I would tell you these are not securitizations, these are – Grupo Finmart has a securitization, a public securitization and that's true financing, ***but this is truly an asset sale. I just want to make that distinction, because [it's] very important.*** And the size that Grupo Finmart is working with their partners that buy the loans to determine the size, but I am going to give you a wide range right now. It's probably somewhere between $5 million and $10 million a month depending on seasonality and growth – the growth projections of the business. And I think that, that will be – that's why we are not starting till August, because the team is actively working on refining what

that's going to look like for the next 12 months going forward. And I would expect a controlled step function growth in size over time as the Grupo Finmart grows its business organically.  [Emphasis added.]

**Bob Ramsey - FBR Capital Markets**

Okay. And then the – is it right or fair to think about gain on sale in future period as being the same ballpark as this quarter and last?

**Mark Kuchenrither**

Well, again, I don't want to – I think it's probably in the range, but I don't want to commit to that, because again, the team is doing the work. ***And so I don't want to mislead you with giving you a bad number****.* [Emphasis added.]

**Bob Ramsey – FBR Capital Markets**

Okay. And then I guess two as I think about the sales, it's a tradeoff of fee income from interest income obviously there is a pretty big transaction this quarter. Just curious if it was early in the quarter or late in the quarter or if it will have any impact on consumer loan fees in the future periods?

**Mark Kuchenrither**

Well, it does have an impact on consumer loan fees, because remember you are accelerating the fees that would have been collected over a three-year period by getting the sale you are in essence by limiting those loan fees going forward and you are taking the gain on the sale of the transaction all at once. So, you are also eliminating the commission expenses that would rollout for 36 months as well. Now, those are all rolled forward as well. And so the way to think about this is almost like inventory turns. I can turn one time every three years or over the course of three years I am turning this loan, I am collecting revenue and I am recognizing expenses over a three-year period or for a 3% premium, I can accelerate that now down to 30 days. And for us, we look at the analysis and say you know what paying a 3% is worth it to us, because we can use the cash that we gained to reinvest in a higher return.

77.     The statements identified in paragraphs 72 and 74 to 76 were materially false and

misleading when made.  The "asset sales" identified by Kuchenrither were, in fact, not true asset

sales and were improperly recorded as revenue by EZCORP in violation of GAAP.  CW #1

specifically told Kuchenrither that the loans being sold were subject to recourse and could not be

properly recorded as sales under GAAP.  Moreover, in the Restatement, EZCORP admitted that

each of the sales of these Grupo Finmart loans had to be restated because they were recourse loans and thus not properly recognizable under GAAP.  Thus, Kuchenrither falsely stated that "the risk associated with these loans passed to the buyer of the loans;" "this is truly an asset sale. I just want to make that distinction, because it's very important;" and "I don't want to mislead you with giving you a bad number."

78.    On August 8, 2014, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter.  The Company's Q3 2014 Form 10-Q reaffirmed the Company's financial results previously announced on July 29, 2014. The Company reported EPS of $0.21 when, in fact, EPS was only $0.07 per share - a $0.14, or 200%, overstatement. The Q3 2014 Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, *supra*.

79.    Kuchenrither's SOX certification was false and misleading for the reasons set forth in paragraphs 58 to 60 above.

**The 4Q 2014 False and Misleading Statements**

80.    On November 6, 2014, the Company issued a press release entitled, "EZCORP Reports 2014 Financial Results and Establishes Foundation for Sustainable Growth in 2015 and Beyond."   Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (Nasdaq:EZPW), a leading provider of easy cash solutions for consumers, today announced fiscal fourth quarter financial results consistent with its October 27 pre-release. Adjusted non-GAAP net income from continuing operations was $14 million, or $0.27 per share. On a GAAP-basis, net loss from continuing operations attributable to EZCORP was $2 million or $(0.04) per share.* For the fiscal year ended September 30, 2014 total revenues were $990 million, and net income from continuing operations attributable to EZCORP was $47 million or $0.86 per share.
>
> *        *        *
>
> **Financial and Operating Highlights - Fiscal Year ended September 30, 2014 vs. Prior Year**

**Consolidated**

- For the fiscal year ended September 30, 2014, total revenues were $990 million as compared to $980 million for the same period last year.

- Net income from continuing operations attributable to EZCORP was $47 million or $0.86 per share, as compared to $69 million or $1.27 per share in the same period a year earlier.

- Cash and cash equivalents, including restricted cash, were $123 million at year-end, with aggregate consolidated debt of $367 million comprised of the $223 million of convertible debt and $144 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP*. [Emphasis added.]

                        \*       \*       \*

**Latin America Segment**

*Consumer Lending* —

- New loan originations for the year were $81 million, up 30% over the prior year.

- *Total consumer loan and interest fees were $54 million, up 7% as compared to the prior year.*

- *Structured financing transactions in fiscal 2014 resulted in approximately $26 million of gains (consisting of consumer loan and interest fees, less commission and other related expenses) reported in "Consumer loan sales and other."*

- *Bad debt as a percentage of fees was 13%, up from a bad debt benefit in the prior year. The increase is primarily due to an increase in bad debt reserves after a government agency offered early retirement to its workers, which increased the number of loans outside of the automatic payroll deduction system.* [Emphasis added.]

- The number of contracts, primarily with government agencies, grew by 75% for the fiscal year, from 72 contracts in fiscal year 2013 to 126 contracts in fiscal year 2014.

81.     The November 6, 2014 press release falsely reported $47 million of net income from continuing operations as, after EZCORP restated its financial results, net income from continuing operations for 2014 was overstated by $31.956 million.

82.     Also on November 6, 2014, EZCORP held a conference call with investors and

analysts to discuss the Company's 2014 fiscal fourth quarter and 2014 fiscal year-end earnings results.   During the conference call, the following exchange occurred between Defendant Kuchenrither and John Rowan, an analyst for Sidoti & Company:

> JOHN ROWAN: I guess kind of going back to the sales from Grupo Finmart, how much were they for the quarter? And now with kind of a nonrevolving chunk of debt in your capital structure, are you relying on selling assets from Grupo Finmart in order to meet your liquidity needs?

> MARK KUCHENRITHER: So the first question I'll answer. We had -- let me find the amount. I had to get to the right page; I apologize. ***So in the quarter we had -- the portfolio sale was a little over $14 million. And for the year we've sold about $35 million.*** And you'll see that in the operational segment results under consumer loan sales and other. That number primarily represents our structured asset sales. But then there's also expenses below the line in operations that are accelerated also when we make those sales. But that's the sales results of the fees that have been accelerated based on the sale. [Emphasis Added.]

> And our strategy at Grupo Finmart for this next year is to sell about 60% of new loan originations through these structured asset sales because we want to pay down our debt and work toward becoming more self-funded at Grupo Finmart.

> JOHN ROWAN: But Grupo Finmart will be paying down the nonrecourse chunk of debt?

> MARK KUCHENRITHER: Yes.

83.    As Defendant Kuchenrither knew that the asset sales should not have been recorded as sales, he falsely misrepresented that "the portfolio sale was a little over $14 million [a]nd for the year we've sold about $35 million."

84.    On November 26, 2014, EZCORP filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year.   The Company's 2014 Form 10-K was signed by Defendant Kuchenrither, and reaffirmed the Company's financial results previously announced on October 27, 2014.   For the Latin America segment, the Company reported total revenues for consumer loan fees and interest of $54,138,000 and consumer loan bad debt expense of $6,867,000. According to the Company, the consumer loan bad debt expense as a percentage of consumer

loan fees and interest ratio in Latin America for the 2014 fiscal year was 13%.  The Company reported a loss per share of $0.84 when, in fact, the loss per share was $1.20 - a $0.36, or 42.9%, reduction to earnings per share. Additionally, the 2014 Form 10-K stated that "Segment information is prepared on the same basis that our chief operating decision maker reviews financial information for operational decision-making purposes."

85.    With respect to the transfer of financial assets, the 2014 Form 10-K in relevant part, falsely stated:

*Transfer of Financial Assets*

In accordance with FASB ASC 860-10-40-5, transfers of financial assets are accounted for as sales when control over the assets has been relinquished. Control over transferred assets is deemed to be surrendered when the assets have been isolated from the Company, the transferee obtains the right (free of conditions that constrain it from taking advantage of that right) to pledge or exchange the transferred assets, and the Company does not maintain effective control over the transferred assets through an agreement to repurchase them before their maturity, or the ability to unilaterally cause the holder to return specific assets.

The sales price net of the carrying amount of the loan portfolio is recorded as revenue in "Consumer loan sales and other revenue" in our consolidated statements of operations. The accelerated commission and other related expenses are recorded in "Operations" expense in our consolidated statements of operations. The proceeds of the loan portfolio sales are reflected as investing activities in the Company's consolidated statements of cash flows, as they were not specifically originated for resale.

86.    With respect to the Company's Latin America segment, the 2014 Form 10-K, in relevant part, falsely stated:

The Latin America segment's total revenues increased $35.5 million, or 24%, in fiscal 2014 to $185.5 million. Same store total revenues increased $27.7 million, or 18%, and new stores contributed $7.8 million. The overall increase in total revenues was due to a $31.8 million increase in consumer loan sales and other revenues, a $3.6 million increase in consumer loan fees and interest, a $1.4 million increase in merchandise sales and a $0.9 million increase in pawn service charges, partially offset by a $2.2 million decrease in jewelry scrapping sales.

\*        \*        \*

Consumer loan fees and interest increased $3.7 million, or 7%, from the prior year to $54.1 million. The increase is primarily due to a 19% increase in the average outstanding consumer loan balance during the period. The increase in the loan balance is due to a 30% increase in loan originations as a result of higher penetration on existing contracts with government entities, coupled with the addition of new contracts in fiscal 2014.

***Consumer loan sales and other revenues increased $31.8 million from the prior year to $35.0 million. The increase is primarily a result of several structured asset sales of consumer loan portfolios by Grupo Finmart for total consideration of $117.4 million. As part of these transactions, we recorded revenues of $33.0 million, partially offset by commission and other related expenses. Grupo Finmart began using structured asset sales in the first quarter of fiscal 2014. As a result, Grupo Finmart operates as a distributor, while continuing to service customer loans.*** Grupo Finmart will continue to grow the loan portfolio as well as sell a portion of the portfolio on a regular basis. Grupo Finmart expects to sell approximately 60% of the portfolio during fiscal 2015. The hybrid approach is an important competitive advantage for the business that allows for maximum flexibility, healthy diversification in funding sources and consistent availability of capital for growth. [Emphasis Added.]

Total consumer loan bad debt increased $7.0 million, from the prior year to $6.9 million. The increase is primarily due to an increase in bad debt reserves after a government agency offered early retirement to its workers, which increased the number of loans outside of the automatic payroll deduction system.

87.     The representations in the preceding paragraphs regarding total revenues for consumer loan fees and interest of $54,138,000 was false when made as total revenue was overstated by $800,000.  The consumer bad debt expense, as originally reported as $6,867,000, was understated by $12.7 million, and was actually $19.6 million, evidencing a 185.5% understatement.  The ratio of consumer loan income to bad debt was originally reported as 12.7% but was restated to 36.7%,

88.     The 2014 Form 10-K also contained the required the SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, *supra*.

89.     Kuchenrither's SOX certification was false and misleading for the reasons set forth in paragraphs 58 to 60 above.

**The December 11, 2014 False and Misleading Statements**

90.    On December 11, 2014, the Company hosted its 2014 Investor Day, an institutional investor day with investors and analysts, in Austin, Texas and via webcast.   After touting Grupo Finmart's "record year and tremendous performance" Defendant Kuchenrither introduced Jodie Maccarrone ("Maccarrone"), the Company's President of Global Financial Services to discuss Grupo Finmart. During the Investor Day presentation, Maccarone stated, in relevant part:

> ***From an operational perspective, we spent a lot of time on the front-end of this acquisition, looking at profitability and really looking at the fundamentals of the business.*** So, when we first acquired the company that total profitability across all our contracts -- at the contract level, was less than 1%, our largest contract was suspended for non-payments. ***And so, we had a situation where we really had to get serious about operational excellence. So we took that average profit from negative 1% to 30% within the first nine months of the business and we've managed to insert just a little bit by making sure that we're measuring and managing every aspect of the value chain. And so, operational excellence, again, is part of the way the Grupo Finmart operates.*** [Emphasis added.]

91.    The representations made in the preceding paragraph were misleading because the Company and Kuchenrither were aware of significant operational and internal control issues at Grupo Finmart.  Moreover, the statement that "we took that average profit from negative 1% to 30% within the first nine months of the business" was false because, as evidenced in the Restatement, the Company overstated its income for 2012 by 5.7%.

**The 1Q 2015 False and Misleading Statements**

92.    On January 27, 2015, just after the market closed, the Company issued a press release entitled, "EZCORP Reports Fiscal First Quarter 2015 Results."  Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, today announced financial results for the fiscal first quarter ended December 31, 2014.

Total revenues were $252.6 million compared to $263.0 million for the same period last year. Net income from continuing operations attributable to EZCORP was $14.2 million or $0.26 per share as compared to $26.1 million or $0.48 per share in the same period a year earlier.

*     *     *

**Latin America Segment**

We recorded strong performance in Latin America, with impressive increases in consumer loan originations and improvement in bad debt, and solid increases in both pawn service charges and pawn loan balances. The improvements were strong in both the translated and constant currency results.

*Consumer Lending —*

- New loan originations at Grupo Finmart were $21.9 million, a year-over-year increase of 28% in total and 37% on a constant currency basis. Strength in new loan originations can be seen in both the growth in number of contracts and steady penetration rates at existing contracts.

- Structured asset sales resulted in approximately $6.6 million of gains (reported in "Consumer loan sales and other revenues"), up 43% as compared to the prior year and up 61% year-over-year on a constant currency basis. Consumer loan and interest fees on the remaining loan portfolio were $10.1 million, a year-over-year decrease of 30% (25% on a constant currency basis), primarily the result of structured asset sales over the last year.

- Reflecting the improvement of the quality of the loan portfolio, bad debt expense as a percentage of fees declined to 9%, down 100 basis points over the prior year.

- We continue to manage the growth and cost of capital at Grupo Finmart and have reduced the overall cost of debt to 9%, down from 11% in the same quarter last year. Total interest expense was up $1.9 million, up 57% year-over-year and 69% year-over-year on a constant currency basis, on a higher debt base.

93.    The press release disclosing 2015 first quarter financial results contained the following materially false and misleading statements: 1) the reporting of $14.2 million of net income from continuing operations was false as EZCORP reported after it restated its financial results that income was $10.569 million, an overstatement of $3.648 million or 35%; and 2) the reporting of $6.6 million of gains from structured asset sales as the $6.6 million gain was

improperly recognized.

94.     Additionally during the January 27, 2015 conference call, the following exchange

occurred between Defendant Kuchenrither and John Rowan, an analyst for Sidoti & Company:

> JOHN ROWAN: Okay. And then lastly, can you remind me the $6.6 million gain that
> you reported in the quarter for the Grupo Finmart sales, can you remind, is that a net
> number, is that fully loaded for expenses?
>
> MARK KUCHENRITHER: Yes, it's fully loaded.
>
> JOHN ROWAN: So a $6.6 million gain and the tax rate you would use if you were trying
> to figure out what the per share impact was, is that still at 31%?
>
> MARK KUCHENRITHER: Well let me walk through and answer your question very
> clearly. So the $6.6 million when it is fully loaded, the commissions that are accelerated
> are at the lines below in the expense lines. But when you look at the entire contribution of
> that segment, everything is fully loaded and all expenses are accelerated. And that was
> about $5.5 million total net.
>
> So the net benefit of the transaction was $5.5 million. So you got to look at the revenue
> and then the expenses will net that down to $5.5 million pretax. And the tax affect is
> 30%.

95.     On February 6, 2015, after the market closed, EZCORP filed its Quarterly Report

with the SEC on Form 10-Q for the 2015 fiscal first quarter.  The Company's Q1 2015 Form 10-

Q reaffirmed the Company's financial results previously announced on January 27, 2015.  In

particular, the Company reported total revenues for consumer loan fees and interest in Latin

America of $10,070,000 and consumer loan bad debt expense of $941,000 for the 2015 fiscal

first quarter.

96.     The representations in the preceding paragraphs regarding total revenues for

consumer loan fees and interest of approximately $10.1 million for the first quarter of 2015 were

false when made as total revenue for consumer loan fees and interest was overstated by $6.2

million. The consumer loan bad debt expense, originally reported as $941,000, was understated

by $6.8 million, and was actually $7.7 million - a 722.5% understatement.   The ratio of

consumer loan income to bad debt was originally reported as 9.3% but was restated to 47.4%.

97.     The Q1 2015 Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶43, *supra*. Kuchenrither's SOX certification was false and misleading for the reasons set forth in paragraphs 58 to 60 above.

98.     As set forth in its Form 10-K/A, which discloses its restated financial results, for each of the financial statements that were restated, EZCORP admitted to: overstating Operating Income by a total of $90.7 million, or 27.3% for the restated period; overstating EPS by $0.78 per share, or 36.8% for the restated period; and, for fiscal 2014 alone, overstating income by $33 million due to the improper accounting for the "sales" of Grupo Finmart loans that were sold with recourse and which should not have been recorded as sales in accordance with U.S. GAAP.

c.     **EZCORP Disclosed the Need to Restate Its Financials with Respect to Grupo Finmart**

99.     On April 30, 2015, after the market closed, the Company issued a press release entitled, "EZCORP Reports Preliminary Financial Data for Second Quarter; Delays Earnings Release." Therein, the Company, in relevant part, stated:

> EZCORP, Inc. (EZPW), a leading provider of pawn and consumer loans in the United States, Mexico and Canada, today announced that it will delay its earnings release for the second quarter of fiscal 2015 (ended March 31, 2015), due to an ongoing review of certain elements of its Grupo Finmart loan portfolio, which is not yet completed. The company identified certain errors in a portion of the Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income, and is conducting a more thorough review to quantify the errors and assess the associated processes and controls. The company will announce its second quarter earnings upon completion of that review.
>
> *              *              *
>
> "Grupo Finmart continued to grow its base of earning assets, with strong double digit-growth in loan originations over last year. *We did not undertake any asset sales in Grupo Finmart this quarter as we have done over the past several quarters. During the quarter, we noted some differences in the performance of parts of our Grupo Finmart*

***loan portfolio that prompted a more thorough review and analysis of our loan reserves, interest income, processes and controls.*** We are diligently working to complete that review as soon as possible and will delay our earnings release accordingly." [Emphasis added.]

*    *    *

**Latin America Segment**

All revenue and pawn operating metrics are quoted a constant currency basis. See the accompanying table for a reconciliation of such amounts to the comparable GAAP amounts.

*    *    *

*Payroll Withholding Lending*

Demand for loans at Grupo Finmart was strong with double-digit growth in loan originations compared to the same period last year. ***This quarter Grupo Finmart did not conduct any loan sales that would have otherwise contributed to quarterly earnings from the segment. This is a timing issue, and for comparative purposes, an asset sale in the second quarter of the prior year provided $5 million in pre-tax gains.*** [Emphasis added.]

100.    On this news, shares of EZCORP declined $0.79 per share, over 8%, to close on

May 1, 2015, at $8.41 per share, on unusually heavy volume.

101.    On May 20, 2015, after the market closed, the Company issued a press release

entitled, "EZCORP Releases Selected Information For The Second Quarter Of Fiscal 2015."

Therein, the Company, in relevant part, stated:

**Company receives deficiency notice from Nasdaq related to the delayed quarterly filing**

EZCORP, Inc. (Nasdaq: EZPW), a leading provider of pawn and consumer loans in the United States, Mexico and Canada, has released selected financial and operating information for the second quarter of fiscal 2015 in a Current Report on Form 8-K filed with the Securities and Exchange Commission.  As previously announced, the company delayed the filing of its Quarterly Report on Form 10-Q for the second quarter until it completes the review and analysis of certain errors identified in a portion of its Grupo Finmart loan portfolio. The Form 8-K discloses information about the second quarter that is unaffected by that review and contains more detail about the nature and scope of the Grupo Finmart review.

On May 14, 2015, the company received a written notice from The Nasdaq Stock Market stating that, due to the failure to timely file its Quarterly Report on Form 10-Q for the

51

second quarter of fiscal 2015, the company is not currently in compliance with Nasdaq Listing Rule 5250(c)(1). The notice gives the company 60 days to submit a plan to regain compliance, and if that plan is accepted, the Nasdaq staff can grant an exception of up to 180 calendar days from the filing's due date. The notice was expected and has no immediate effect on the listing or trading of the company's common stock on the Nasdaq Global Select Market. The company will submit a plan of compliance within the 60-day period, and believes that its plan will be an acceptable plan to regain compliance with the Nasdaq's listing rules.

102.   On May 20, 2015, after the market closed, filed a Current Report on Form 8-K

with the SEC. Therein, the Company, in relevant part, stated:

**ITEM 2.02 — RESULTS OF OPERATIONS AND FINANCIAL CONDITION**

As previously disclosed, EZCORP, Inc. ("we" or the "Company") has delayed the filing of our Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 (ended March 31, 2015) pending the completion of the review and analysis of certain accounting issues relating to our Grupo Finmart loan portfolio. We have identified certain errors in a portion of our Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income. We are conducting a thorough review to quantify the errors, evaluate the associated processes and controls and remediate the identified control deficiencies. We are also reviewing whether certain structured asset sales from Grupo Finmart met the criteria required for sale accounting treatment or whether they should have been accounted for as secured borrowings.

We have not completed our review and analysis, and therefore, no definitive conclusions have been made. However, we believe that it is likely that management and the Audit Committee will conclude that we have a material weakness in internal control over financial reporting and deficiencies in our disclosure controls and procedures. For a description of the nature and scope of the Grupo Finmart review, including the preliminary findings to date, see "Item 7.01 — Regulation FD Disclosure — Grupo Finmart Review" below.

\*       \*       \*

**ITEM 7.01 — REGULATION FD DISCLOSURE**

As noted above, we have delayed the filing of our Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 until we have completed the review and analysis of the Grupo Finmart loan portfolio described below, have determined the impact on our current and historical financial statements, and have evaluated the significance of identified control deficiencies. We expect to file the delinquent Quarterly Report upon completion of that review, including a review of the results by BDO (our current independent registered public accounting firm) and Deloitte & Touche LLP ("Deloitte") (our independent registered public accounting firm for fiscal 2014 and 2013), and after BDO has completed its required review of our second quarter unaudited financial statements.

**Grupo Finmart Review**

*Background Description of Grupo Finmart Business and Accounting Policies*

We own a 76% interest in Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. ("Grupo Finmart"), a payroll withholding lender headquartered in Mexico City. We acquired a controlling interest in Grupo Finmart in January 2012, and its financial results are consolidated and reported as part of our Latin America segment.

Grupo Finmart enters into payroll withholding agreements ("convenios") with Mexican employers, primarily federal, state and local governments and agencies, and provides unsecured, multiple-payment consumer loans to employees of those various employers. Interest and principal payments are collected by the employers through payroll deductions and remitted to Grupo Finmart. As of March 31, 2015, Grupo Finmart had over 100 active convenios and a total of 101,800 consumer loans outstanding. Those loans had an average principal balance per loan of approximately $900 and an average term per loan of 30 months.

We accrue and recognize interest revenue ratably over the life of all loans that are in current status, and we reserve the percentage of interest revenue that we expect not to collect (based on historical experience). We also reserve against the loan principal based on the percentage of loans that we expect not to collect (again, based on historical experience).

Grupo Finmart's loans are considered in current status as long as the customer remains employed ("in-payroll" loans). Loans outstanding from customers who are no longer employed ("out-of-payroll" loans) are considered current if payments are made by the due date. If one payment of an out-of-payroll loan is delinquent, that one payment is considered in default; if two or more payments are delinquent at any time, the entire loan is considered in default. Upon default, we charge the loan principal to consumer loan bad debt expense, reduce interest revenue by the amount of unpaid interest accrued on the loan prior to default and cease accruing future interest revenue. If we subsequently collect some or all of the defaulted loan, we reduce consumer loan bad debt expense by the amount of collected principal and increase interest revenue by the amount of collected interest.

Under Grupo Finmart's current policy, only defaulted out-of-payroll loans are considered in nonaccrual status. Due to the likelihood of ultimately receiving payment if the customer remains employed, we continue to accrue interest on all in-payroll loans, even though Grupo Finmart may not be currently receiving installment payments. It is not uncommon for payments to be temporarily interrupted. For example, it typically takes up to 90 days for the employer to set up initial payroll withholding and begin submitting payments to Grupo Finmart. Further, it is not unusual to have an interruption in payments for a number of reasons, such as holidays, summer vacations, illness, convenio renewals, union permits and political elections. In addition, issues with employer systems or payment consolidation processes sometimes cause interruptions in payments.

*Review of "Non-Performing" Loans*

During the second quarter of fiscal 2015, we began a review of the loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments ("non-performing" loans). During this review, we identified a number of out-of-payroll loans that had not been properly coded and recognized as such. The failure to properly account for these out-of-payroll loans results in an understatement of bad debt expense and an overstatement of accrued interest revenue. We are in the process of quantifying the magnitude of the error and determining the periods affected by the required adjustments.

In our review of the aging characteristics of the non-performing loans, we noted that many of these loans, while still in-payroll, have been in non-performing status for some time. Even though we have accounted for these loans in accordance with Grupo Finmart's current revenue recognition and bad debt policies, we are reviewing those policies to ensure they comply with generally accepted accounting principles in the United States of America ("GAAP"). If we determine that those policies do not comply with GAAP, we will resolve the extent to which we have understated bad debt expense and overstated interest revenue in prior periods.

In addition to our review of the non-performing loans, we are also evaluating associated processes and controls. ***We believe that failure to identify out-of-payroll loans and failure to adequately track the aging of non-performing loans are control deficiencies that likely constitute a material weakness in our internal control over financial reporting.*** We also believe that these failures likely constitute deficiencies in our disclosure controls and procedures. We have not yet completed our evaluation of the processes and controls, and there can be no assurance that we will not identify other deficiencies in our controls or that those deficiencies, if identified, will not constitute additional material weaknesses. [Emphasis added.]

We are conducting our review and evaluation under the supervision of the Audit Committee of our Board of Directors and in consultation with BDO and Deloitte. The Audit Committee has also engaged PricewaterhouseCoopers LLP to assist management with the review of the non-performing loans, the evaluation of associated processes and controls, and the design and implementation of an appropriate remediation plan, as well as to provide objective advice to the Audit Committee.

We have recently created the position of Chief Risk Officer of EZCORP and filled that position with an experienced executive with industry-related background and expertise. The Chief Risk Officer will report to the EZCORP Chief Executive Officer and will be responsible for the design, implementation and oversight of a comprehensive, enterprise-wide risk management program, which will analyze and seek to manage and mitigate internal and external risks, including loan portfolio risks, for Grupo Finmart and EZCORP's other businesses.

*Review of Accounting Treatment of Prior Asset Sales*

During fiscal 2014 and the first quarter of fiscal 2015, Grupo Finmart entered into structured asset sales pursuant to which a portion of the consumer loan portfolio was sold to third parties. These transactions were accounted for as sales, and we recognized gain on these sales. We are reviewing these transactions to confirm that they have met the criteria required for sale accounting treatment or whether they should have been accounted for as secured borrowings.

*Impact on Financial Statements*

In accordance with Staff Accounting Bulletin ("SAB") No. 99, Materiality, and SAB No. 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, we will assess the materiality of the identified errors on our consolidated financial statements for the first quarter of fiscal 2015 and for the fiscal years ended September 30, 2014, 2013 and 2012 (and the quarterly periods within those years). At this point, we have not completed our review and analysis and, thus, have reached no definitive conclusions regarding whether correction of the identified accounting errors will require a restatement of prior period financial statements.

103.    On this news, shares of EZCORP declined $0.66 per share, over 7%, to close on

May 21, 2015, at $8.33 per share, on unusually heavy volume.

104.    On July 17, 2015, the Company issued a press release entitled, "EZCORP to

Restate Certain Financial Results."  Therein, the Company, in relevant part, stated:

EZCORP, Inc. (Nasdaq:EZPW), a leading provider of pawn and consumer loans in the United States, Mexico and Canada, today announced that it will restate its financial statements for fiscal 2014 (including the interim periods within that year) and the first quarter of fiscal 2015. This decision to restate was made by the company's board of directors, upon the recommendation of management and the audit committee and in consultation with the company's independent registered public accounting firms.

**Structured Asset Sales**
The restatement adjustments, all of which are non-cash, will correct certain errors relating to the accounting for Grupo Finmart's structured assets sales in fiscal 2014 and the first quarter of fiscal 2015. ***Following a comprehensive review of the terms and conditions of each of the structured asset sales, management has determined that the asset sales should not have been accounted for as sales, principally due to certain control rights that Grupo Finmart retained as servicer of the loans.*** Because of these control rights, the trusts to which the loans were sold should be accounted for as "variable interest entities" and consolidated pursuant to ASC 810-10 (Consolidation and the Variable Interest Model), and therefore, the sales should not have been recognized for accounting purposes. [Emphasis added.]

55

As a result of the consolidation, the prior gains on sale will be eliminated, the assets and liabilities of the trusts will be included in the company's consolidated balance sheet and interest income (along with related expenses) will be recognized over the life of the loans. This process will result in a reduction in net income in the periods during which a structured asset sale occurred (due to the reversal of the gain on sale) and an increase in net income thereafter (due to the accrual and recognition of interest income, net of related expenses, over the life of the loans).

Although the company has not yet quantified the effect of reversing the sale accounting treatment, it should be noted that, as a result of the asset sales, the company previously recognized $39.6 million of gain ($33.0 million in fiscal 2014 and $6.6 million in the first quarter of fiscal 2015). That gain will be eliminated, but interest income in the periods subsequent to the assets sales will be increased.  Grupo Finmart's Mexican GAAP financial statements are unaffected by this adjustment.

**Grupo Finmart Loan Portfolio**

As previously disclosed, the company is also reviewing the Grupo Finmart loan portfolio to quantify errors that may impact current and historical amounts of loan reserves and interest income. ***The company has identified a number of out-of-payroll loans that had not been properly classified and accounted for as such, causing an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods.***  In addition, after reviewing the aging characteristics of the non-performing loans, the company, in consultation with Deloitte & Touche LLP, the company's independent registered public accounting firm for fiscal 2014 and 2013, and BDO USA, LLP, the company's current independent registered public accounting firm, has determined that ***it is more appropriate to accrue and recognize interest income over the period that payments are actually received rather than over the stated term of the loans*** (as has been Grupo Finmart's historic policy).  That policy has caused interest income to be recognized earlier than will be the case by recognizing interest income over the actual term. [Emphasis added.]

Although these issues could be material, the company has not fully quantified the impact on bad debt reserves and accrued interest and, therefore, has not yet determined which prior reporting periods have been affected.  Identified errors that relate to fiscal 2014 or the first quarter of fiscal 2015 will be corrected as part of the restatement described above.  Based on the outcome of our review of the loan portfolio, we may determine that the financial statements for periods prior to fiscal 2014 should also be restated.

Additional information about these matters can be found in the company's Current Report on Form 8-K filed with the Securities and Exchange Commission contemporaneous with the issuance of this release.

105.     Also on July 17, 2015, the Company filed a Current Report on Form 8-K with the

SEC.  Therein, the Company, in relevant part, stated:

**Item 4.02 — Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or a Completed Interim Review**

(a) As previously disclosed, EZCORP, Inc. ("we" or the "Company") has delayed the filing of our Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 (ended March 31, 2015) pending the completion of a review and analysis of certain accounting issues relating to our Grupo Finmart loan portfolio, specifically:

- The review of certain structured asset sales and the determination of whether those transactions met the criteria required for sale accounting treatment; and

- The quantification of certain errors in a portion of our Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income and the evaluation and remediation of associated processes and controls.

Based on management's review and analysis of the structured asset sales (as further described below), the Audit Committee, in consultation with management and Deloitte & Touche LLP ("Deloitte"), our independent registered public accounting firm for fiscal 2014 and 2013, and BDO USA, LLP ("BDO"), our current independent registered accounting firm, concluded on July 14, 2015 that the structured asset sales did not meet the criteria required for sale accounting treatment and should not have been accounted for as sales and, therefore, that our previously issued financial statements for fiscal 2014 and the first quarter of fiscal 2015 should be restated. The Audit Committee's recommendation was presented to the full Board of Directors on July 15, 2015, and at that time, the Board determined that the audited financial statements for fiscal 2014 (including the report of the independent registered public accounting firm relating thereto), the unaudited financial statements for the quarterly periods within fiscal 2014, and the unaudited financial statements for the first quarter of fiscal 2015 should no longer be relied upon because of the accounting errors associated with the structured asset sales. Accordingly, we will restate our previously issued financial statements for those periods.

We are continuing our quantification and evaluation of other accounting errors in our Grupo Finmart loan portfolio, and have not yet determined whether additional reporting periods have been affected. See "Review of Non-Performing Loans" below.

\*       \*       \*

***Review of Grupo Finmart Asset Sales***

During fiscal 2014 and the first quarter of fiscal 2015, Grupo Finmart entered into a total of six structured asset sales pursuant to which a portion of the loan portfolio was sold to a special purpose trust for the benefit of third parties (the "Asset Sales"). Each of the Asset Sales was accounted for as a sale, and we recognized a gain equal to the difference between the book value of the sold loans and the purchase price, which was generally equal to the aggregate amount of the payments Grupo Finmart expected to receive over

the life of the loans minus a negotiated discount. The practical effect of this accounting treatment was to accelerate the recognition of the interest income that would otherwise have been recognized over the life of the loans.

Following a comprehensive review of the terms and conditions of each of the Asset Sales and considerable discussion involving management, Ernst & Young ("EY") (our accounting advisors), our legal advisors in the U.S. and Mexico, Deloitte and BDO, management has determined that the Asset Sales should not have been accounted for as sales, principally due to certain control rights that Grupo Finmart retained as servicer of the loans. We believe that, because of these control rights, the trusts to which the loans were sold should be accounted for as "variable interest entities" and consolidated pursuant to ASC 810-10 (Consolidation and the Variable Interest Model), and therefore, the sales should not have been recognized for accounting purposes.

The practical effect of the consolidation is that the gain on sale is eliminated, the assets and liabilities of the trusts are included in our consolidated balance sheet and interest income (along with the related expenses) is recognized over the life of the loans. This process will result, generally, in a reduction in net income in the periods during which an Asset Sale occurred (due to the reversal of the gain on sale) and an increase in net income thereafter (due to the accrual and recognition of interest income, net of expenses, over the life of the loans). We are now engaged in the process of reconstructing the financial statements for the affected periods to reflect the trust consolidation.

Although we have not yet quantified the effect of reversing the sale accounting treatment, it should be noted that, as a result of the Asset Sales, we previously recognized a total of $39.6 million of gain, as follows:

| Fiscal Quarter | Realized Gain on Sale |
|---|---|
| First quarter of fiscal 2014 | $4.6 million |
| Second quarter of fiscal 2014 | $4.7 million |
| Third quarter of fiscal 2014 | $9.9 million |
| Fourth quarter of fiscal 2014 | $13.8 million |
| First quarter of fiscal 2015 | $6.6 million |
| Total | $39.6 million |

That gain will be eliminated, but interest income in the periods subsequent to the Asset Sales will be increased. Grupo Finmart's Mexican GAAP financial statements are unaffected by this adjustment.

### Review of "Non-Performing" Loans

*Relevant Accounting Policies* — Historically, the Company has recognized interest revenue on the Grupo Finmart loans ratably over the stated term of the loans. Based on historical experience, the Company estimates the percentage of loans that it expects not to collect and establishes a bad debt reserve against the principal and accrued interest.

Grupo Finmart's loans are considered in current status as long as the customer remains

employed ("in-payroll" loans). Loans outstanding from customers who are no longer employed ("out-of-payroll" loans) are considered current if payments are made by the due date. If one payment of an out-of-payroll loan is delinquent, that one payment is considered in default; if two or more payments are delinquent at any time, the entire loan is considered in default. Upon default, we charge the loan principal to consumer loan bad debt expense, reduce interest revenue by the amount of unpaid interest accrued on the loan prior to default and cease accruing future interest revenue. If we subsequently collect some or all of the defaulted loan, we reduce consumer loan bad debt expense by the amount of collected principal and increase interest revenue by the amount of collected interest.

Under Grupo Finmart's historic accounting policy, only defaulted out-of-payroll loans are considered in nonaccrual status. Due to the likelihood of ultimately receiving payment if the customer remains employed, we continue to accrue interest on all in-payroll loans, even though Grupo Finmart may not be currently receiving payments. It is not uncommon for payments to be temporarily interrupted. For example, it typically takes up to 90 days for the employer to set up initial payroll withholding and begin remitting payments to Grupo Finmart (a process referred to as "ratification"). Further, it is not unusual to have an interruption or delay in payments for a number of reasons, such as holidays, summer vacations, illness, convenio renewals and political elections. In addition, some larger employers act as a consolidator and remitter on behalf of other smaller employers and the payment consolidation processes, or other issues with employer systems, sometimes cause interruptions in payments.

*Issues Identified in Review* — In January 2015, Grupo Finmart management notified our finance management that a previous loan purchaser had requested to have some of its loans replaced because, nine months after the loan sale, some of the sold loans had still not been ratified. Upon receipt of that information, we initiated a review of the entire Grupo Finmart loan portfolio to identify all loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments ("non-performing" loans) and to determine the reason that payments on the loans were not being received. During the course of this review, the following issues were identified:

- We determined that the non-performing loans included a number of out-of-payroll loans that had not been properly classified and recognized as such. This error has caused an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods. Since March and continuing to date, we have been thoroughly analyzing the non-performing loan portfolio to (1) identify all out-of-payroll loans and (2) determine, on a loan-by-loan basis, the period during which Grupo Finmart should have charged the loan to bad debt expense and ceased accruing interest.

- We also found that many of the non-performing loans, while still in-payroll, have been in non-performing status for some time. Under Grupo Finmart's historic interest accrual policy, we have accrued and recognized interest income on in-payroll loans over the stated life of the loans even though, because of delays or

interruptions in the receipt of payments, the period over which the interest income is actually received is longer than the stated loan term. After reviewing the aging characteristics of the non-performing loans and consulting with Deloitte and BDO, we have determined that it is more appropriate to accrue and recognize interest income over the period that payments are actually received rather than over the stated term of the loan. Grupo Finmart's historic interest accrual policy has caused interest income to be recognized earlier than will the case by recognizing interest income over the over actual term. Since March and continuing to date, we have been thoroughly analyzing the entire Grupo Finmart loan portfolio to determine the appropriate period for the recognition of accrued interest income for each loan.

Although the issues described above could be material, we have not fully quantified the impact on bad debt reserves and accrued interest and, therefore, have not determined which prior reporting periods are affected. The identified errors that relate to fiscal 2014 or the first quarter of fiscal 2015 will be corrected as part of the restatement described above under "Review of Grupo Finmart Asset Sales." Based on the outcome of our review of the loan portfolio, we may determine that financial statements for periods prior to fiscal 2014 should also be restated. The restatements are expected to have no cash impact.

### *Nature of Accounting Errors*

Based on the work performed to date, we believe that the errors in our previously issued financial statements are the result of unintentional accounting errors or mistakes and ineffective internal controls, and the Audit Committee has concurred with that assessment. Neither the Audit Committee nor management has identified any evidence that would indicate that the errors were the result of any deliberate attempt to misstate financial statements, misrepresent the Company's financial condition or results of operations, or deceive or defraud investors.

### *Control Deficiencies and Remedial Measures*

Management and the Audit Committee are working to identify and evaluate the deficiencies in our internal control over financial reporting that gave rise to the accounting errors described above. We believe that failure to properly account for the structured asset sales constitutes a material weakness in our internal control over financial reporting and a deficiency in our disclosure controls and procedures. We also believe that the failure to identify out-of-payroll loans and the failure to adequately track the aging of non-performing loans are control deficiencies that likely constitute material weaknesses in our internal control over financial reporting and likely constitute deficiencies in our disclosure controls and procedures. Because of the control deficiencies described above, our previous disclosures regarding internal control over financial reporting (including the report of the independent registered public accounting firm related thereto) and disclosure controls and procedures contained in our Annual Report on Form 10-K for the year ended September 30, 2014 and our Quarterly Report on Form 10-Q for the quarter ended

December 31, 2014 should no longer be relied upon. We have not yet completed our evaluation of the processes and controls, and there can be no assurance that we will not identify other deficiencies in our controls or that those deficiencies, if identified, will not constitute additional material weaknesses.

The Audit Committee has engaged PricewaterhouseCoopers LLP ("PwC") to evaluate the processes and controls at Grupo Finmart, assist with the design and implementation of an appropriate remediation plan, and provide independent advice to the Audit Committee.

106.    On this news, shares of EZCORP declined $0.26 per share, nearly 3.9%, to close on July 17, 2015, at $6.48 per share, on unusually heavy volume.

107.    On October 20, 2015, the Company issued a press release entitled, "EZCORP Restatement to Include Fiscal 2012 and 2013."  Therein, the Company, in relevant part, stated:

EZCORP, Inc. (Nasdaq:EZPW) announced that its previously announced financial statement restatement will include fiscal 2012 and fiscal 2013.  On July 17, 2015, the company announced that it will restate its financial statements for fiscal 2014 and the first quarter of fiscal 2015 to correct the accounting treatment of certain structured asset sales completed by its Grupo Finmart division during those periods.  The company also stated at that time that it was continuing to evaluate other accounting issues related to its Grupo Finmart loan portfolio and, based on the outcome of that review, may determine that financial statements for periods prior to fiscal 2014 should also be restated.

The company has now substantially completed its review of the accounting issues and has determined that the previously issued financial statements for fiscal 2012 and fiscal 2013 (including the quarterly periods within those years, other than the first quarter of fiscal 2012) should be restated to adjust the interest revenue and bad debt reserves associated with the Grupo Finmart loan portfolio.  The decision to restate the financial statements for fiscal 2012 and fiscal 2013 was made by the company's board of directors, upon the recommendation of management and the audit committee and in consultation with the company's independent registered public accounting firms.

The restatement adjustments will correct certain errors relating to the accrued interest revenue and bad debt reserves associated with "non-performing" loans.  The inclusion of fiscal 2012 and 2013 in the restatement will result in a consistent interest income recognition and bad debt reserve methodology being applied across all periods since the company began consolidation of Grupo Finmart in the second quarter of fiscal 2012.

The company currently expects that the aggregate restatement adjustments (including those attributable to the review of the asset sales and those attributable to the non-performing loan review, as well as certain other immaterial adjustments identified during the restatement process) will result in the following reductions to pre-tax income:

Estimated Range of

Reduction in Pre-Tax Income

| Period | (in millions) |
|---|---|
| Fiscal 2012 | $12 to $18 |
| Fiscal 2013 | $22 to $25 |
| Fiscal 2014 | $48 to $53 |
| Fiscal 2015 (first quarter) | $9 to $13 |

A significant portion of the restatement adjustments reflects the timing of income recognition, such that negative adjustments in past periods are expected to result in positive adjustments in subsequent periods. The restatement is expected to have no cash impact.

As previously disclosed, The Nasdaq Stock Market has granted the company an exception to the listing requirements regarding the timely filing of periodic reports subject to the condition that, on or before November 9, 2015, the company must have filed all delinquent SEC filings as required by the Nasdaq listing rules. The Company continues to believe that it will be able to regain compliance within the timeframe allowed by that exception. The company also expects to file its Annual Report on Form 10-K for the fiscal year ended September 30, 2015 on or before the due date of December 14, 2015.

108.    On this news, shares of EZCORP declined $0.29 per share, nearly 4.4%, to close on October 20, 2015, at $6.32 per share, on heavy volume.

d.   **Defendants' Statements During the Class Period Regarding Grupo Finmart and The Company's Internal Controls Were Knowingly or Recklessly False and Misleading When Made**

109.    As alleged herein, the admissions in the Restatement, coupled with information provided by the Confidential Witnesses, provides a strong inference that the statements identified above (Section V.b.) were either knowingly or recklessly false and misleading when made. Thus, EZCORP issued financial statements throughout the class period that were materially false and misleading when issued, Defendants omitted from disclosure material facts necessary in order to make the statements made not misleading, and those statements were made either with knowledge or in reckless disregard for the truth.

110.    As revealed in the restated financials filed on November 9, 2015, the Company

(1) failed to properly identify and record non-performing loan write-offs and failed to cease accrual of interest revenue on the related non-performing loans, (2) improperly recorded as sales six portfolio asset sales of payroll loans from Grupo Finmart's loan portfolio, and (3) failed to maintain adequate internal controls over financial reporting.

111.    The improper accounting was a ploy to cover the Company's losses on its Grupo Finmart loan portfolio and to artificially prop up its overall financial performance. First, Defendants covered up Grupo Finmart's losses related to non-performing loans by failing to write off those non-performing loans and failing to cease recognition of their related interest income. This manipulation allowed the Company to artificially maintain its ratio of bad debt expense to consumer loan fees and interest – a measure of health of the underlying loan portfolio. Second, because the Company's loan portfolio was portrayed as being healthier that it actually was, the Company was able to package and sell portions of the Grupo Finmart loan portfolio to variable interest entities. However, because Grupo Finmart retained certain control rights and the loans were with recourse to EZCORP, the Company violated GAAP by recording the asset sales as sales thereby improperly recording large amounts of income.

112.    Defendants' brazen disregard for proper accounting procedures and for Grupo Finmart's lack of adequate internal controls resulted in a massive impact on key financial metrics such as operating income and earnings per share. Specifically, as detailed herein, the Restatement revealed that operating income was overstated by **$90,700,000, or 27.3%**, during the restated periods. Similarly, the Restatement revealed that the Company overstated earnings per share by **$0.78 - or 36.8%** - during the restated periods. Such significant adjustments to the Company's financials demonstrate the severity of the fraud carried out by Defendants.

i. **The Restatement Reveals Accounting Errors that are Highly Suggestive of Fraud**

113.    The Restatement contained material changes to the Company's financial statements as originally stated. As revealed therein, the Company failed to properly identify and record non-performing loan write-offs and failed to cease accrual of interest revenue on the related non-performing loans. Thus, the Company overstated or prematurely recognized revenue from "Consumer loan fees and interest" and understated or improperly delayed recognition of "Consumer loan bad debt" expense.  This error began in the second quarter of fiscal 2012 and continued through the first quarter of 2015.

114.    Specifically, the Restatement described these errors as follows:

*Review of "Non-Performing" Loans*

Relevant Accounting Policies — Historically, we have recognized interest revenue on the Grupo Finmart loans ratably over the stated terms of the loans. Based on historical experience, we estimated the percentage of loans that Grupo Finmart expects not to collect and established a bad debt reserve against the principal and accrued interest.

Loans to Grupo Finmart customers whose employment is continuing are referred to as "in-payroll" loans, while loans to Grupo Finmart customers whose employment is discontinued are referred to as "out-of-payroll" loans. A customer is generally considered to have discontinued their employment if they are no longer employed by the employer that is responsible for the payroll withholding.

Grupo Finmart's loans were considered active as long as they were in-payroll. Out-of-payroll loans were considered active if Grupo Finmart continued to receive payments, but were considered defaulted if payments were not made. Upon default, we charged the loan principal to consumer loan bad debt expense, reduced interest revenue by the amount of unpaid interest accrued on the loan prior to default and ceased accruing future interest revenue. If Grupo Finmart subsequently collected some or all of the defaulted loan, we reduced consumer loan bad debt expense by the amount of collected principal and increased interest revenue by the amount of collected interest.

Under Grupo Finmart's historical accounting policy, only defaulted out-of-payroll loans were considered in nonaccrual status. Due to the likelihood of ultimately receiving payment if the customer's employment continued, we continued to accrue interest on all in-payroll loans, even though Grupo Finmart might not be currently receiving payments. A number of circumstances cause delays in the receipt of payments on a Grupo Finmart

loan. For example:

- It often takes 90 days or more for the employer to set up initial payroll withholding and begin remitting payments to Grupo Finmart (a process referred to as "ratification").

- It is not unusual to have an interruption or delay in payments for a number of reasons, such as holidays, summer vacations, illness, convenio renewals, union permits and political elections.

- Many convenios limit the amount that can be withheld from a borrower's paycheck, and if the borrower has multiple loans outstanding, the withheld amount is generally used to repay the loans in the order in which they were made.

- Some larger employers act as a consolidator and remitter on behalf of other smaller employers and the payment consolidation processes, or other issues with employer systems, sometimes cause interruptions in payments.

*Issues Identified in Review* — In January 2015, Grupo Finmart management notified our finance management that a previous loan purchaser had requested to have some of its loans replaced because, several months after the loan sale, some of the sold loans had still not been ratified. Upon receipt of that information, we initiated a review of the entire Grupo Finmart loan portfolio to identify all loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments ("non-performing" loans) and to determine the reason that payments on the loans were not being received. During the course of this review, the following issues were identified:

- We determined that the non-performing loans included a number of out-of-payroll loans that had not been correctly classified and recognized as such. This error caused an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods. We have now analyzed the non-performing loan portfolio to identify all out-of-payroll loans and determine, on a loan-by-loan basis, the period during which Grupo Finmart should have charged the loan to bad debt expense and ceased accruing interest revenue.

- We also found that many of the non-performing loans, while still in-payroll, had been in non-performing status for some time. Under Grupo Finmart's historical interest accrual policy, we accrued and recognized interest income on in-payroll loans over the stated life of the loans even though partial or delayed payments extended the loan's payback period beyond the stated loan term. After reviewing the aging characteristics of the non-performing loans and consulting with our independent registered public accounting firms, we have determined that it is appropriate to:

  o Accrue and recognize interest income over the period that payments are expected to be received rather than over the stated term of the loan;

     o   For loans that have been in non-performing status for 180 days, charge the loan principal to consumer loan bad debt expense, reduce interest revenue by the amount of unpaid interest theretofore accrued on the loan, cease accruing future interest revenue and record future collections under the cost recovery method (recognizing income after principal has been recovered); and

     o   Expense certain brokerage and other commission costs as incurred rather than amortize them over future periods.

The application of this methodology has resulted in adjustments to interest income and bad debt expense for all periods since we began consolidation of Grupo Finmart in the second quarter of fiscal 2012. Those adjustments are reflected in the restated financial statements for fiscal 2012, 2013 and 2014 presented in this Amended Annual Report on Form 10-K/A, and will be reflected in the restated financial statements for the first quarter of fiscal 2015, as well as in the financial statements for the second and third quarters of fiscal 2015 and future periods.

115.    By overstating consumer loan fees and interest while understating consumer loan bad debt expense, Defendants were able to manipulate the ratio of bad debt expense to loan fees and interest. The ratio of bad debt expense to consumer loan fees and interest is an important metric for investors because it (a) measures how efficiently the Company can create income from making loans while keeping bad debt expense to a minimum, and (b) measures how well the Company collects on its loans as compared to total income generated from such loans.

116.    Artificially depressing this ratio made the Company appear healthier than it truly was. Indeed, as the Restatement revealed, a large amount of Grupo Finmart's loan portfolio was non-performing, requiring significant adjustments to both bad debt expense and loan fees and interest income in the Latin America segment. The tables below, which are derived from information provided in the Restatement, demonstrate the impact of the fraud on these metrics:

///

| Latin America - 2012 *(in millions)* | 2012 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $26.9 | ($.9) | $26.0 |
| Consumer loan bad debts expense (benefit) | 0.3 | 7.8 | 8.1 |
| Ratio of Consumer loan income/bad debts | **1.1%** | | **31.2%** |
| **Percentage Increase to bad debt expense** | **2,524.9%** | | |

| Latin America - 2013 *(in millions)* | 2013 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $50.5 | ($7.9) | $53.4 |
| Consumer loan bad debts expense (benefit) | (.113) | 11.8 | 11.714 |
| Ratio of Consumer loan income/bad debts | **(0.2%)** | | **27.5%** |
| **Percentage Increase to bad debt expense** | **10,466.4%** | | |

| Latin America - 2014 *(in millions)* | 2014 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $54.2 | ($0.8) | $53.4 |
| Consumer loan bad debts expense (benefit) | 6.9 | 12.7 | 19.6 |
| Ratio of Consumer loan income/bad debts | **12.7%** | | **36.7%** |
| **Percentage Increase to bad debt expense** | **185.5%** | | |

| Latin America – Q1 2015 *(in millions)* | Q1 2015 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $10.1 | $6.2 | $16.3 |
| Consumer loan bad debts expense (benefit) | 0.9 | 6.8 | 7.7 |
| Ratio of Consumer loan income/bad debts | **9.3%** | | **47.4%** |
| **Percentage Increase to bad debt expense** | **722.5%** | | |

117.    Thus, in fiscal 2012, EZCORP overstated bad debt by **2,524.9%**. The same metric was colossally overstated by **10,466.4%** in fiscal 2013, by **185.5%** in fiscal 2014, and by **722.5%** in the first quarter of fiscal 2015. Accordingly, the ratio of consumer loan interest and fees to bad debt expense was immensely understated in each restated period, as evidenced by the charts in the preceding paragraph.

118.    By manipulating the ratio of bad debt expense to consumer loan income and fees,

EZCORP was able to portray its loan portfolio as of higher quality, thus selling them for more money and stymieing Grupo Finmart's mounting losses. According to CW #1, Grupo Finmart was amassing large losses due to non-performing loans, mainly due to the fact that Grupo Finmart did not have a strong collections facility and it made loans to older debtors who subsequently left their jobs and failed to repay their loans. As CW #1 reported, because Grupo Finmart had a poor collections system, it took up to two years in certain cases for Grupo Finmart to realize that debtors had left their jobs and were no longer making payments. These loans were subsequently written off as a cost of doing business, thus causing Grupo Finmart to amass large losses.

119.    CW #3 confirmed that the internal auditing team that performed the initial due diligence review of Grupo Finmart identified in their written reports that Grupo Finmart's financial controls were a mess. The internal audit team found that Grupo Finmart lacked internal controls and that the records were in such disarray that the team could not assess the value of the portfolio.  The internal audit team never saw an accounts payable aging report so they could not make accurate assessments of whether loans were being re-paid or not.

120.    CW #1 stated that, in October 2013, Kuchenrither was well aware of the losses which were piling up at Grupo Finmart as the result of non-performing loans.  CW #1 stated that, because of these mounting losses, Kuchenrither decided to package and sell the debt.  CW #1 read the terms and conditions of the loan sales, which indicated that the buyer did not assume the risk and the loans were sold with recourse to EZCORP.  CW #1 told Kuchenrither that because of the right of recourse, the loans could not be booked as a sale.

121.    Despite what CW #1 told Kuchenrither, EZCORP completed its first loan sale in October 2013 and realized $4.6 million in income on the sale gain despite knowing that

recording this income was in violation of GAAP.  According to CW #1, after it was determined that these loans would be sold, and earnings were increased as a result, an emergency bonus meeting was held where it was decided that Tom Welch (Sr. VP and General Counsel), Stephen Brown (Chief Accounting Officer), Paul Rothamel (then-CEO), Defendant Kuchenrither and board member Sterling Brinkley would each receive up to a $1 million cash bonus.

122.    According to the Company's 2013 Form 10-K, during fiscal 2013, the Company did not achieve the specified business performance goals necessary for the payment of incentive bonuses under the fiscal 2013 annual incentive bonus plan to Defendant Kuchenrither, then-Chairman of the Board Sterling Brinkley, or then-CEO Paul Rothamel.  The Compensation Committee declined to award any fiscal 2013 bonus to these three executives, and the Board charged them with quickly developing a plan to address the Company's challenges over the next several quarters. However, after the Compensation Committee reviewed their plan in November 2013, the Committee determined "that management, led by Mr. Brinkley, Mr. Rothamel and Mr. Kuchenrither, had formulated an effective plan for fiscal 2014, and on November 22, 2013, approved the following bonuses payable immediately for the completion of the strategic plan for fiscal 2014: Mr. Brinkley, $1,000,000; Mr. Rothamel, $1,000,000; and Mr. Kuchenrither, $350,000."

123.    During fiscal 2014 and the first quarter of fiscal 2015, "Grupo Finmart entered into a total of **six** structured asset sales pursuant to which a portion of the loan portfolio was sold to special purpose trusts...." Each asset sale occurred at the tail end of each reporting period. When sold, these loans were improperly moved off-balance sheet and a gain on sale was simultaneously improperly recognized (as "Consumer loan sale and other income"). The table below describes the six structured asset sales:

| Description of Portfolio (in millions) | Book Value of Principal | Book Value of Accrued Interest | Promissory Note Received | Realized Gain on Sale | Accelerated Amortization |
|---|---|---|---|---|---|
| 14,500 in payroll loans sold October 21, 2013 (Q1-2014) | $14.0 | $0.7 | $19.3 | $4.6 | $1.2 |
| 7,500 in payroll loans sold March 31, 2014 (Q2-2014) | 10.0 | 1.3 | 16.0 | 4.7 | 0.7 |
| 7,100 in payroll loans sold June 30, 2014 (Q3-2014) | 10.0 | 2.1 | 16.5 | 4.4 | 0.7 |
| 8,500 in payroll loans sold June 30, 2014 (Q3-2014) | 14.0 | 2.3 | 21.8 | 5.5 | 1.0 |
| 16,135 in payroll loans sold September 30, 2014 (Q4-2014) | 26.7 | 3.3 | 43.8 | 13.8 | 2.0 |
| **Total Gain on sale of payroll loans sold in 2014** | | | | **$33.0** | |
| 10,900 payroll loans sold December 19, 2014 (Q1-2015) | 13.9 | 1.5 | 22.0 | 6.6 | 1.0 |
| **Total Gain on sale of payroll loans sold in 2015** | | | | **$6.6** | |

124.    Significantly, EZCORP's as-stated financials disclosed the proper accounting treatment. In the 2014 Form 10-K, the Company disclosed that "ASC 860-10-40-5, transfers of financial assets are accounted for as sales when control over assets has been relinquished." Thus, Defendant Kuchenrither was aware of the proper accounting standard at the time the statements in the 2014 Form 10-K were made and, yet, the proper accounting treatment was completely disregarded.

125.    Moreover, in conference calls with research analysts, Kuchenrither expressly stated, in response to analysts' questions, that the loan sales were specifically without recourse to

EZCORP.  In response to questions, Kuchenrither stated:  "so the risk associated with the loans passed to the buyer of the loans" (¶ 75); "but this is truly an asset sale. I just want to make that distinction, because it's very important" (¶ 76).  Ironically, Kuchenrither even said "I don't want to mislead you with giving you a bad number" (¶ 76) despite knowing that the risk on the loans **did not** pass to the buyer and that these were truly **not** asset sales.

126.    As detailed in the Restatement, in 2015, the loan purchasers "requested to have some of its loans replaced because, several months after the loan sale, some of the sold loans had still not been ratified," causing management to review Grupo Finmart's loan portfolio and subsequently issue the Restatement.

127.    The impact of correcting this intentional GAAP violation was significant. The table below provides an analysis of the impact of the reversal of the recorded gains on the sale of the six portfolios which were recorded throughout each quarter of fiscal 2014 and the first quarter of fiscal 2015 in violation of GAAP standards:

| Fiscal Period *(number in millions)* | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 | Fiscal 2014 | Q1-2015 |
|---|---|---|---|---|---|---|
| Income from continuing operations before income taxes, as previously reported | $32.8 | $13.3 | $16.5 | $10.1 | $72.7 | $20.4 |
| Recorded gains on sale of loan portfolio(s) | 4.5 | 5.8 | 14.3 | 8.4 | 33.0 | 6.6 |
| **Percentage reduction to income from continuing operations due to reversal of gains on sale of loan portfolio(s)** | **(14%)** | **(44%)** | **(87%)** | **(83%)** | **(45%)** | **(32%)** |

128.    Thus, the false statements made by Defendants regarding the asset sales resulted in substantial overstatements the Company's operating income, thereby artificially inflating other key financial metrics, such as leverage. This manipulation painted a false picture of the

Company's success and facilitated additional borrowing, including issuance of a $320 million convertible bond in 2014.

### ii.  The Restatement Had a Material Impact on the Company's Financial Statements

129.    The Restatement had a material impact on the Company's financial statements – specifically operating income and earnings per share. As operating income measures the income that a company can generate from its continuing operations, it is a metric that is closely watched by analysts and investors alike. The Company's stock price is heavily dependent on operating income and, thus, changes in operating income had a material impact on the Company's stock price.

130.    The following table calculates the percent reduction and percent overstatement in net income as a result of the Restatement:

| Fiscal Period Net Income (numbers in millions) | As Originally Reported | Restatement Adjustments As Reported | As Restated | % Decrease of Net Income | % Overstatement of Net Income |
|---|---|---|---|---|---|
| Q1-2013 | $30.7 | ($3.6) | $27.1 | (11.7%) | 13.3% |
| Q2-2013 | 34.0 | (3.8) | 30.2 | (11.2%) | 12.6% |
| Q3-2013 | (5.9) | (1.1) | (7.0) | (18.6%) | 15.7% |
| Fiscal 2013 | 34.1 | (11.8) | 22.3 | (34.6%) | 52.9% |
| Q1-2014 | 22.6 | (3.8) | 18.7 | (17.3%) | 20.3% |
| Q2-2014 | 8.0 | (1.9) | 6.1 | (23.8%) | 31.1% |
| Q3-2014 | 11.5 | (7.6) | 3.9 | (66.1%) | 194.9% |
| Fiscal 2014 | (45.7) | (19.0) | (64.7) | (41.6%) | 29.4% |
| Q1-2015 | 15.3 | (3.6) | 11.6 | (24.2%) | 31.0% |

131.    The following table calculates the percent reduction and percent overstatement in operating income per fiscal year as a result of the Restatement. As demonstrated therein, the Restatement resulted in an overall reduction in operating income (income from continuing operations before income taxes) of **21.5%** and a total overstatement of **27.3%**.

| Fiscal Period (numbers in millions) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations before Income Taxes | Restated Income from Continuing Operations before Income Taxes | % Reduction In Income from Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| 2012 | $227.1 | ($13.0) | $214.1 | (5.7%) | 6% |
| 2013 | 102.5 | (22.0) | 80.5 | (21.5%) | 27.3% |
| 2014 | 72.7 | (47.5) | 25.2 | (65.3%) | 188.5% |
| Q1-2015 | 20.4 | (8.2) | 12.2 | (40.2%) | 67.2% |
| **Total Restatement Impact** | **$442.7** | **($90.7)** | **$332.00** | **(21.5%)** | **27.3%** |

132.    The table below calculates the percent reduction in operating income (income from continuing operations before income taxes) per 2013 and 2014 interim fiscal quarter as a result of the Restatement:

| Fiscal Period (numbers in millions) | Income From Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income From Continuing Operations before Income Taxes | Restated Income From Continuing Operations before Income Taxes | % Reduction In Income From Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| Q1-2013 | $51.7 | ($7.9) | $43.8 | (15.3%) | 18% |
| Q2-2013 | 55.0 | (6.6) | 48.4 | (12.0%) | 13.6% |
| Q3-2013 | 27.0 | (4.4) | 22.6 | (16.3%) | 19.5% |
| Q1-2014 | 37.8 | (13.4) | 24.4 | (35.4%) | 54.9% |
| Q2-2014 | 14.0 | (7.9) | 6.1 | (56.4%) | 129.5% |
| Q3-2014 | 19.2 | (15.1) | 4.1 | (78.6%) | 368.3% |

133.    The tables below demonstrate the impact to operating income (income from continuing operations before income taxes) as a result of the portfolio review and the application of proper accounting treatment to the asset sales:

| Fiscal Period (numbers in millions) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Portfolio Review | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2012 | $227.1 | ($8.7) | (3.8%) |
| 2013 | 102.5 | (21.4) | (20.9%) |
| 2014 | 72.7 | (27.9) | (38.4%) |
| Q1-2015 | 20.4 | (8.0) | (39.2%) |
| Total Restatement Impact | $442.7 | ($66.0) | (15.6%) |

| Fiscal Period (numbers in millions – There was no asset sale in fiscal 2012 or fiscal 2013.) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Asset Sales | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2014 | 72.7 | (25.3) | (34.8%) |
| Q1-2015 | 20.4 | (1.8) | (8.8%) |
| Total Restatement Impact | $93.1 | ($27.1) | (29.1%) |

134.   Moreover, the Restatement had a material impact on earnings per share, as demonstrated in the table below:

///

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| 2012 | $2.82 | ($0.13) | $2.69 | (4.6%) | 4.8% |
| 2013 | 0.64 | (0.23) | 0.41 | (35.9%) | 56.1% |
| 2014 | (0.84) | (0.36) | (1.20) | (42.9%) | 30% |
| Q1-2015 | $0.28 | ($0.06) | $0.22 | (21.4%) | 27.8% |
| **Total Restatement Impact** | **$2.90** | **($0.78)** | **$2.12** | **(26.9%)** | **36.8%** |

135.    And the Restatement had a material impact on earnings per share per 2013 and 2014 interim fiscal quarter as demonstrated in the table below:

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| Q1-2013 | $0.59 | ($0.07) | $0.52 | (11.9%) | 13.5% |
| Q2-2013 | 0.63 | (0.06) | 0.57 | (9.5%) | 10.5% |
| Q3-2013 | (0.11) | (0.02) | (0.13) | (18.2%) | 15.4% |
| Q1-2014 | 0.42 | (0.07) | 0.35 | (16.7%) | 20% |
| Q2-2014 | 0.15 | (0.04) | 0.11 | (26.7%) | 36.3% |
| Q3-2014 | 0.21 | (0.14) | 0.07 | (66.7%) | 200% |

**e.   Defendant Kuchenrither Recklessly Disregarded EZCORP's Deficient Internal Controls**

136.    In its restated 10-K/A, the Company admitted that it had reassessed its evaluation "of the effectiveness of our internal control over financial reporting as of September 30, 2014, and concluded that a number of deficiencies in the design and operating effectiveness of our internal controls, collectively, represent material weaknesses in our internal control over financial reporting." Therefore, the Company concluded, "we did not maintain effective internal control over financial reporting as of September 30, 2014, September 30, 2013 and September 30, 2012."

137.    Specifically, the Company admitted:

• Management did not apply the appropriate authoritative accounting literature and thus reached incorrect conclusions with respect to proper accounting of the Asset Sales as a result of the following deficiencies that, collectively, represent a material weakness:

• The appropriate accounting expertise (internally and externally) was not engaged, resulting in a failure to recognize important U.S. GAAP issues;

• The accounting consequences of significant, unusual transactions were not identified and evaluated; and

• The accounting positions taken on significant, unusual transactions were not reviewed and approved at the appropriate level.

• Management did not recognize the extent of the Grupo Finmart non-performing loans, or understand the reasons that loans did not recognize were non-performing, as a result of the following deficiencies that, collectively, represent a material weakness:

• Processes to identify and address aging concerns (including loans with delayed or partial payments) were missing or inadequate;

• Risk assessment processes were inadequate to identify situations that were likely to lead to payment non-performance;

• Detailed loan performance data was not reviewed by the appropriate accounting and management personnel; and

• Overall senior management supervision and review of Grupo Finmart's business performance was ineffective at identifying loan portfolio issues.

These material weaknesses in internal control over financial reporting resulted in the accounting errors that led to the restatement of previously issued financial statements.

138.    Similar disclosures regarding the Company's material weaknesses in internal controls were included in the Company's 10-Q/A:

Management identified a number of deficiencies in the design and operating effectiveness of the Company's internal controls as of September 30, 2014 that represent material weaknesses in our internal control over financial reporting. These deficiencies are the result of management's failure to design, implement and maintain adequate operational and internal controls and processes to (1) identify complex transactions requiring specialized accounting expertise and other financial reporting requirements and (2)

monitor and report the performance of the Grupo Finmart loan portfolio.

139.    The Restatement, which identifies the internal control failures during the Class Period, is corroborated by CW #1, CW #2 and CW #3.

140.    According to CW #1, Grupo Finmart lacked a strong collections facility and routinely gave loans without regard for the fact that its collections facility was insufficient.

141.    According to CW #2, Grupo Finmart was never SOX compliant for a full year during CW #2's tenure. According to CW #2, Grupo Finmart only achieved SOX compliance for any period because the internal audit team resorted to black-box testing on loan-balances, the single most important part of Grupo Finmart's business. With black-box testing, the internal audit team merely reviewed final numbers that Grupo Finmart produced, and ignored the questionable methods that were used to calculate those numbers. CW #2 confirmed that Grupo Finmart lacked essential facilities for adequate internal controls, including lack of automation, lack of integration between various accounting systems, lack of support from EZCORP, and lack of back-up documentation for the financial results reported. Moreover, CW #2 confirmed that Grupo Finmart had no access controls, allowing employees to override the support schedules that support estimates or ledger entries. Such access was not secure and would not have passed operational auditing.

142.    According to CW #3, the internal auditing team that performed the initial due diligence review of Grupo Finmart identified, in a series of written reports, that Grupo Finmart's financial controls were a mess. The internal audit team found that Grupo Finmart lacked internal controls and that the records were in such disarray that the team could not assess the value of the portfolio.  The internal audit team never saw an aging report for its loans so they could not make an assessment of whether loans were being re-paid or not.

143.    Thus, as admitted in the Restatement, the Company did not have proper controls in place to monitor Grupo Finmart's loan portfolio – *i.e.* the cornerstone of its business. Thus, Defendant Kuchenrither either knew, or recklessly disregarded, that EZCORP's internal controls were woefully inadequate and insufficient. Because Grupo Finmart lacked the internal controls sufficient even to monitor its loan portfolio, it is inconceivable that Kuchenrither could have honestly certified that EZCORP's internal financial controls were adequate during the Class Period.

144.    As a result, EZCORP did not have adequate internal financial controls and Kuchenrither either knew this, or in reckless disregard for the truth, certified that EZCORP did have adequate internal controls.

### f.   **EZCORP's Violation Of GAAP Rules In Its Financial Statements Filed With The SEC**

145.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB").  Beginning July 1, 2009, the FASB's Accounting Standards Codification ("ASC") became the single official source of authoritative GAAP.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

146.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations

due to the Company's improper accounting for Grupo Finmart's structured asset sales and non-performing payroll loans, in violation of GAAP rules. The fact that EZCORP restated its financial statements, and informed investors that the previous financial statements should not be relied upon is an admission that they were false and misleading when originally issued (FASB ASC 250 *Accounting Changes and Error Corrections*).

147.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

### g.   Defendant Kuchenrither's Compensation Package

148.    In October 2012, after Defendant Kuchenrither assumed the role of CFO, his base salary increased 56%, from $450,000 to $700,000. Additionally, in 2012, Kuchenrither was eligible for an annual incentive bonus, targeting 75% of his base salary tied to the Company's annual consolidated net income, and received a 2012 incentive award of $236,250. For 2013, Kuchenrither was eligible for an annual incentive bonus, targeting 125% of his base salary tied to the Company's annual consolidated net income. Kuchenrither also received an equity incentive grant of 33,200 shares for 2012.

149.    In fiscal 2013, the Company did not achieve the established business performance goals to award any annual incentive bonuses under the fiscal 2013 Incentive Bonus Plan. Nevertheless, as described in ¶¶121-22, Kuchenrither received a $350,000 discretionary bonus in 2013 which, according to the Form 10-K, was merited because of his role in developing a plan "to address the Company's challenges over the next several quarters." It was around this time that Kuchenrither came up with a plan to package and sell a portion of Grupo Finmart's loans to third-party investors. Kuchenrither also received an equity incentive grant of 200,000 shares for

2013.

150.    For 2014, Kuchenrither was eligible for an annual incentive bonus, targeting 75% of his base salary tied to the Company's annual consolidated net income.  However, the Company did not achieve the established business performance goals in fiscal 2014 to award any annual incentive bonuses under the fiscal 2014 Incentive Bonus Plan.

151.    During 2015, Kuchenrither was eligible for an annual incentive bonus, targeting 150% of his base salary tied to the Company's annual consolidated net income. However, the Company did not achieve the established business performance goals in fiscal 2015 to award any annual incentive bonuses under the fiscal 2015 Incentive Bonus Plan.

152.    Kuchenrither ceased to serve as CEO in February 1, 2015 and he ceased to serve as CFO on May 26, 2015. In May 2015, the Company entered into a consulting agreement with Kuchenrither, to provide "certain consulting and advisory services."  During the term of the agreement, the Company agreed to pay Mr. Kuchenrither $450,000 per year and executive-level healthcare benefits for up to two years. If the agreement was terminated prior to the end of its stated two-year term by either party, Kuchenrither was eligible for a severance payment equal to $800,000, less the aggregate amount of payments he was already paid under the agreement. The agreement also allowed Kuchenrither to continue vesting in any existing equity awards in accordance with their terms. On November 30, 2014, Kuchenrither notified the Company that he would be terminating the agreement effective January 4, 2016, which entitled him to a severance payment of approximately $575,000.

153.    In summary, Kuchenrither's compensation for 2012-2015 is as follows:

| Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) (Estimated Value) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 2012 | 432,837 | — | 900,716 | 236,250 | 78,789 | 1,648,592 |
| 2013 | 690,385 | — | 4,038,000 | — | 154,434 | 4,882,819 |
| 2014 | 700,000 | 350,000 | — | — | 161,898 | 1,211,898 |
| 2015 | 526,731 | — | 857,956 | — | 250,698 | 1,635,385 |

## VI.    CLASS ACTION ALLEGATIONS

154.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased EZCORP's Class A common stock between November 6, 2012 and October 20, 2015, inclusive, "" and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

155.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, EZCORP's Class A common shares were actively traded on the Nasdaq Stock Market (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of EZCORP Class A shares were traded publicly during the Class Period on the NASDAQ.  As of December 31, 2014, EZCORP had 50,680,358 shares of Class A Non-voting common stock outstanding and 2,970,171 shares of Class B Voting common stock outstanding.

Record owners and other members of the Class A stock may be identified from records maintained by EZCORP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

158.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of EZCORP; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

159.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

### VII.    LOSS CAUSATION

160.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EZCORP's reported financial results.  These material misstatements and/or omissions caused the Company's Class A common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

161.    EZCORP's fraudulent accounting practices were revealed in a series of corrective disclosures beginning on April 30, 2015 and ending on November 9, 2015.

162.    On April 30, 2015, after the close of trading, EZCORP revealed that it would delay its earnings release for the second quarter of fiscal 2015.  The Company revealed, among other things, that it "identified certain errors in a portion of the Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income, and is conducting a more thorough review to quantify the errors and assess the associated processes and controls."   On this news, shares of EZCORP declined $0.79 per share, over 8%, to close on May 1, 2015, at $8.41 per share, on unusually heavy volume.

163.    In a Form 8-K filed with the Securities and Exchange Commission after the close of trading on May 20, 2015, EZCORP revealed that it was now "reviewing whether certain structured asset sales from Grupo Finmart met the criteria required for sale accounting treatment

or whether they should have been accounted for as secured borrowings."   On this news, shares of EZCORP declined $0.66 per share, over 7%, to close on May 21, 2015, at $8.33 per share, on unusually heavy volume.

164.    On July 17, 2015, the Company issued a press release entitled, "EZCORP to Restate Certain Financial Results."   The press release revealed that EZCORP would restate its 2014 and first quarter 2015 financial results due to errors identified in the Grupo Finmart loan portfolio and to reverse the asset sales from Grupo Finmart.   On this news, shares of EZCORP declined $0.26 per share, nearly 3.9%, to close on July 17, 2015, at $6.48 per share, on unusually heavy volume.

165.    On the morning of October 20, 2015, EZCORP issued a press release entitled, "EZCORP Restatement to Include Fiscal 2012 and 2013."   On the news that EZCORP would restate an additional two years of financial results, its stock price declined $0.29 per share, nearly 4.4%, to close on October 20, 2015, at $6.32 per share, on heavy volume.

166.    On November 9, 2015 EZCORP filed its restated financial results with the SEC. In response to this filing, EZCORP's stock price declined $0.29 per share, nearly 4.5%, to close at $6.51 per share.

167.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

168.    During the Class Period, Plaintiffs and the Class purchased EZCORP's securities at artificially inflated prices and were damaged thereby.   The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

169.    The market for EZCORP's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, EZCORP's securities traded at artificially inflated prices during the Class Period.  On January 26, 2015, the Company's stock closed at a Class Period high of $12.25 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of EZCORP's securities and market information relating to EZCORP, and have been damaged thereby.

170.    During the Class Period, the artificial inflation of EZCORP's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EZCORP's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of EZCORP and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

171.    At all relevant times, the market for EZCORP's securities was an efficient market for the following reasons, among others:

(a)     EZCORP stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      As a regulated issuer, EZCORP filed periodic public reports with the SEC and/or the NASDAQ;

(c)      EZCORP regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)      EZCORP was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

172.   As a result of the foregoing, the market for EZCORP's securities promptly digested current information regarding EZCORP from all publicly available sources and reflected such information in EZCORP's stock price. Under these circumstances, all purchasers of EZCORP's securities during the Class Period suffered similar injury through their purchase of EZCORP's securities at artificially inflated prices and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

173.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of EZCORP who knew that the statement was false when made.

**COUNT I**

**Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

174.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

175.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase EZCORP's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

176.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for EZCORP's securities in violation of Section 10(b) of

87

the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

177.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about EZCORP's financial well-being and prospects, as specified herein.

178.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EZCORP's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about EZCORP and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

179.    The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendant was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) the Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendant enjoyed significant personal contact and familiarity with

the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

180.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, including, among other things, that certain of the Company's subsidiaries or business units were engaged in improper business practices and misrepresented the financial results, performance, and value of the Company's business units and equity investments. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing EZCORP's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

181.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of EZCORP's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or

indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired EZCORP's securities during the Class Period at artificially high prices and were damaged thereby.

182.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that EZCORP was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their EZCORP securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

183.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

184.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendant

185.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

186.     The Individual Defendant acted as controlling person of EZCORP within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

187.    In particular, the Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

188.    As set forth above, EZCORP and the Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of his position as a controlling person, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  January 11, 2016                        By:  _s/ Jamie J. McKey_

                                                **KENDALL LAW GROUP, LLP**
                                                Joe Kendall
                                                State Bar No. 11260700
                                                Jamie J. McKey
                                                State Bar No. 24045262
                                                3232 McKinney Avenue, Suite 700
                                                Dallas, Texas 75204
                                                Telephone: (214) 744-3000
                                                Facsimile: (214) 744-3015
                                                jkendall@kendalllawgroup.com
                                                jmckey@kendalllawgroup.com

                                                *Liaison Counsel for Lead Plaintiffs and the Class*


                                                By:  _s/ Jeffrey C. Block_

                                                **BLOCK & LEVITON LLP**
                                                Jeffrey C. Block (*pro hac vice*)
                                                Erica G. Langsen (*pro hac vice*)
                                                155 Federal Street, Suite 400
                                                Boston, Massachusetts 02110
                                                Telephone: (617) 398-5600

Facsimile: (617) 507-6020
Email: Jeff@blockesq.com
        Erica@blockesq.com

*Counsel for Lead Plaintiff John Rooney and*
*Co-Lead Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Elaine Chang
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  lglancy@glancylaw.com
        echang@glancylaw.com

*Counsel for Lead Plaintiff Wu Winfred Huang and*
*Co-Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this document was forwarded to counsel of record through the court's ECF system on January 11, 2016.

/s/ Jeffrey C. Block

94