FILED

16 OCT 18 AM 11: 22

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

WU WINFRED HUANG and JOHN
ROONEY, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS
SIMILARLY SITUATED,
             Plaintiffs,

-vs-

EZCORP, INC. and MARK E.
KUCHENRITHER,[1]
             Defendants.

CAUSE NO.:
A-15-CA-00608-SS

**O R D E R**

BE IT REMEMBERED on the 22nd of June 2016, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel. Before the Court are Defendants EZCorp, Inc. and Mark Kuchenrither (Defendants)'s Motion to Dismiss [#32], Co-Lead Plaintiffs Wu Winfred Huang and John Rooney's Response [#33] in opposition, and Defendants' Reply [#37] in support. Having reviewed the documents, the arguments of the parties at the hearing, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

---

[1] Plaintiffs named Stuart I. Grimshaw as an individual defendant in their original complaint, but they appear to have dropped all claims against Grimshaw in their amended complaint. Indeed, they refer to Kuchenrither as the only "Individual Defendant." *See, e.g.*, Am. Compl. [#29] ¶ 186. The Court therefore construes Plaintiffs' amended complaint as notice under Federal Rule of Civil Procedure 41 that Plaintiffs have voluntarily dismissed Grimshaw as a defendant in this action. *See Neu Sec. Servs., LLC v. Bad Day Fabrication, LLC*, No. A-15-CV-149-SS, 2015 WL 1636869, at *2 (W.D. Tex. Apr. 10, 2015).

## Background

This is a securities fraud class action brought on behalf of all persons who purchased Class A common stock[2] of Defendant EZCorp, Inc., a company which provides "instant cash" services like payday loans and pawn loans, between November 6, 2012 to October 20, 2015 (the Class Period). Co-Lead Plaintiffs Wu Winfred Huang and John Rooney, on behalf of the plaintiff class, allege that during the Class Period, Defendant Mark Kuchenrither, EZCorp's CFO, CEO, and the only individual defendant,[3] made a variety of misrepresentations to shareholders in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

Defendants have moved to dismiss Plaintiffs' complaint, arguing Plaintiffs have failed to adequately plead scienter. Because the Court agrees with Defendants, their motion to dismiss is GRANTED.

## I.      EZCORP and Grupo Finmart

EZCORP offers its customers multiple ways to access instant cash, including pawn[4] and consumer loans in the United States, Mexico, and Canada, as well as fee-based credit services. Am. Compl. [#29] ¶ 2. In addition, at its pawn stores and online, EZCORP sells collateral forfeited from pawn lending operations and used merchandise purchased from customers. *Id.*

---

[2] EZCORP has two classes of common stock, Class A Non-Voting Common Stock, which is publicly traded on the NASDAQ, and Class B Voting Stock, all of which is beneficially owned by Phillip E. Cohen. Am. Compl. [#29] ¶ 1 n.1.

[3] Kuchenrither has served in several executive positions for EZCORP from the time he was hired as Senior Vice President, Strategic Development in March 2010. Am. Compl. [#29] ¶ 28. In October 2012, Kuchenrither assumed the role of CFO, and served as EZCORP's CFO until May 26, 2015. *Id.* ¶¶ 28, 152. Kuchenrither also served as EZCORP's CEO from July 18, 2014 to February 1, 2015 and as a director from August 12, 2014 to February 3, 2015. *Id.* ¶ 28.

[4] Defendants describe pawn loans as non-recourse loans collateralized by tangible property. Mot. Dismiss [#32-3] Ex. 1 (Dec. 24, 2015 Form 10-K) at 4.

On January 12, 2012, EZCORP announced it was acquiring a 60% ownership interest in Grupo Finmart, a Mexican company which issues small consumer loans to Mexican governmental employees. *Id.* ¶ 3. According to EZCORP,

> Grupo Finmart enters into payroll withholding agreements ("convenios") with Mexican employers, primarily federal, state and local governments and agencies, and provides unsecured, multiple-payment consumer loans to employees of those various employers. Interest and principal payments are collected by the employers through payroll deductions and remitted to Grupo Finmart.

*Id.* ¶ 102. EZCORP has described Grupo Finmart's role in Mexico's payroll lending industry:

> The unsecured payroll lending industry in Mexico is less developed than other Latin American countries. Payroll lending in Mexico is generally marketed to public sector employees, who on average earn more and rotate less frequently than their private sector peers. Additionally, government entities tend to be more stable and on average have more employees than private companies. It is estimated that less than 15% of the market potential is being serviced. Grupo Finmart is the fifth largest vertically integrated payroll lender in Mexico with 53 branch offices located in 24 of the 32 states in the country.

*Id.* ¶ 36 (quoting 2014 Form 10-K).

On June 30, 2014, EZCORP acquired an additional 16% of Grupo Finmart. *Id.* ¶ 34. On September 1, 2015, EZCORP purchased another 18% of Grupo Finmart, making it a 94% owner in Grupo Finmart. *Id.* ¶ 34. EZCORP now consists of three segments: (1) the United States and Canada segment, (2) the Latin America segment, and (3) the Other International segment.[5] *Id.* ¶ 35.

Plaintiffs allege that throughout the Class Periods, Defendants' internal controls over financial reporting gave rise to two primary accounting errors: (1) the failure to adequately track non-performing loans (Non-Performing Loans), and (2) the failure to properly account for the structured asset sales (Loan Sales). Plaintiffs claim Kuchenrither "knew" of these accounting

---

[5] Despite EZCORP's majority ownership of Grupo Finmart, Grupo Finmart comprises a small, albeit growing, segment of EZCORP's business. Since it was acquired in 2012, Grupo Finmart has accounted for less than 10% of EZCORP's consolidated revenue in any given year.

control issues, but nevertheless materially overstated EZCORP's financial results by misrepresenting the amount of non-performing loans in Grupo Finmart's loan portfolio and improperly recording gains from the sale of certain Grupo Finmart loans. *Id.* ¶¶ 6, 37, 105.

## A.    Non-performing Loans

Plaintiffs allege Defendants failed to properly identify and record non-performing loans and improperly continued to accrue interest revenue on the non-performing loans. Non-performing loans are "loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments." *Id.* ¶ 105. Out-of-payroll loans are outstanding loans from customers who are no longer employed. *Id.* Pursuant to "Grupo Finmart's historic accounting policy," "[i]f one payment of an out-of-payroll loan is delinquent, that one payment is considered in default; if two or more payments are delinquent at any time, the entire loan is considered in default." *Id.* Upon default of an out-of-payroll loan, EZCORP ceased accruing future interest revenue. *Id.* However, "[d]ue to the likelihood of ultimately receiving payment if the customer remains employed, [Grupo Finmart] continue[d] to accrue interest on all in-payroll loans, even though Grupo Finmart may not be currently receiving payments." *Id.*

In its corrective disclosures, EZCORP determined Grupo Finmart's non-performing loans included a number of out-of-payroll loans that had not been properly classified as such. *Id.* This error resulted in an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods. *Id.* EZCORP further determined that many of the non-performing loans, while still in-payroll, had been in non-performing status for "some time." *Id.* Despite the loans' non-performing status, Grupo Finmart continued to accrue interest income on in-payroll loans over the stated life of the loans, such that "the period over which the interest income is actually received is longer than the stated loan term." *Id.* However, EZCORP later concluded "it is more

appropriate to accrue and recognize interest income over the period that payments are actually received rather than over the stated term of the loan." *Id.*

Plaintiffs allege EZCORP sent its internal auditors to Mexico to conduct a pre-acquisition due diligence report of Grupo Finmart in early 2012. At the close of the investigation, EZCORP's internal audit team allegedly recommended against the purchase of Grupo Finmart in a series of written reports to senior management. *Id.* ¶ 4. The internal audit team purportedly believed Grupo Finmart's internal controls were "in such disarray that the internal audit team could not assess the value of the loan portfolio." *Id.* ¶ 44. Plaintiffs point to two specific examples of Grupo Finmart's poor internal accounting controls: (1) while investigating Grupo Finmart, the audit team never saw an accounts payable aging report—an account report which shows non-paying loans and the period of time during which they are non-paying—thereby making it impossible to accurately assess whether Grupo Finmart's customers were timely repaying their loans; and (2) the audit team allegedly found Grupo Finmart's collections system and recordkeeping so flawed that it took Grupo Finmart up to two years to realize its debtors had stopping making payments. *Id.* ¶¶ 4, 44, 58, 118, 119, 142.

Despite the internal audit reports supposedly notifying Kuchenrither of "significant red flags as to Grupo Finmart's operational and internal controls during the Class Period," Kuchenrither nevertheless certified EZCORP's internal controls were adequate throughout the Class Period. *Id.* ¶¶ 5, 42, 91, 120, 143–144.

**B.     Loan Sales**

According to Plaintiffs, in response to "the loan losses piling up at Grupo Finmart due to non-performing loans," Kuchenrither devised a plan to package and sell Grupo Finmart's loans to third-party investors in order to remove non-performing loans from EZCORP's books and

allow EZCORP to record revenue and income from the sales. *See* Resp. [#33] at 9; Am. Compl. [#29] ¶¶ 6, 120. However, one confidential source, EZCORP's former Vice President of Internal Audit (CW1), claims to have told Kuchenrither that under the terms of the loan sale documents, the third-party investors retained a right to return non-performing loans to EZCORP. *Id.* Thus, if any of the sold loans defaulted, the third parties had the right to make EZCORP repurchase the loans. According to Plaintiffs, CW1 told Kuchenrither generally accepted accounting principles (GAAP) prohibited EZCORP from recognizing any revenue from the loan sales. *Id.* Despite Kuchenrither's apparent knowledge, EZCORP executed five separate sales of Grupo Finmart's loans in the 2014 fiscal year, recognizing $33 million in gains on these sales. *Id.* ¶¶ 7, 98. In the first quarter of 2015, EZCORP executed another loan sale, recognizing $6.6 million in income on this sale. *Id.* ¶¶ 7, 123. Plaintiffs claim the improper accounting for the sale of the loans had the effect of artificially boosting EZCORP's reported income in the 2014 fiscal year by 45% and its reported income during the first quarter of 2015 by 32%. *Id.* ¶ 7.

## II.     The Allegedly False and Misleading Statements

The statements Plaintiffs identify as misleading are taken from EZCORP's press releases, conference calls, and SEC forms disclosing EZCORP's financial results during the Class Period. These statements deal with EZCORP's financial results during the fourth quarter of 2012 (4Q12), the 2013 fiscal year (FY2013), the 2014 fiscal year (FY2014) and the first quarter of 2015 (1Q15). The alleged misstatements and omissions fall into two general categories: (1) reports which overstated EZCORP's financial results because EZCORP failed to track its non-performing loans, and (2) statements which misrepresented the nature of the loan sales by recording them as gains. A few examples of both categories will suffice.[6]

---

[6] A majority of the 94-page Amended Complaint are devoted to quoting from EZCORP's public statements, followed by Plaintiffs' conclusory assertions that these statements were false or misleading.

First, Plaintiffs contend EZCORP's financial reports during the Class Period falsely misrepresented EZCORP's financial results, including its net income and earnings per share.[7] For example, on November 6, 2012, EZCORP published a press release which stated, "[t]he Company [EZCORP] also generated record-setting performance for the full fiscal year. Compared with the prior year, total revenues increased 14% to $992.5 million, net income increased by 18% to $143.7 million and earnings per share increased 16% to $2.81, all records for the Company." Id. ¶ 39. According to Plaintiffs, the press release falsely represented EZCORP's financial results. In fact, EZCORP's total net income was only $136.8 million and the earnings per share were only $2.69 per share. Similarly, on July 29, 2014, EZCORP issued a press release which stated, "[f]or the quarter [3Q14], total revenues were $241 million, with net income from continuing operations of $11.3 million and earnings per share of $0.21." Id. ¶ 72. According to Plaintiffs, the reporting of $11.3 million of net income from continuing operations was false, because EZCORP improperly recorded $14.3 million income from the sale of Grupo Finmart debt to third parties. Id. ¶ 73.

Second, Plaintiffs maintain Defendants misrepresented the loan sales by recording them as gains. For example, in a press release issued on January 28, 2014, EZCORP stated "[c]ash and cash equivalents, including restricted case, were $45 million at quarter-end, with debt of $252 million, including $106 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP.*" Id. ¶ 62 (emphasis added); *see also id.* ¶ 69 ("Cash and cash equivalents . . . were $63 million at quarter-end, with debt of $228 million, including $145 million of Grupo Finmart third-

---

Unfortunately for Plaintiffs, "[s]uch allegations fall far short of adequately pleading securities plead." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1066 n.4 (5th Cir. 1994).

[7] Plaintiffs allege EZCORP did not consistently report one income metric each quarter. Instead, EZCORP chose "whichever metric was most favorable and report[ed] that metric to investors." Am. Compl. [#29] ¶ 69 n.4. Accordingly, in some quarters, EZCORP reported net income, while in others it reported net income from continuing operations or adjusted income.

party debt, *which is non-recourse to EZCORP.*") (emphasis added); *id.* ¶ 72 (similar). Moreover, during an earnings conference call held on July 29, 2014, Kuchenrither described the loan sales as "true loan sales," expressly stating "it's a true profit" because "the risk associated with the loans passed to the buyer of the loans." *Id.* ¶ 75. He further stated the loan sales were not securitizations, but instead "truly an asset sale. I just want to make that distinction, because [it's] very important." *Id.* ¶ 76. According to Plaintiffs, the "asset sales" identified by Kuchenrither were not true asset sales and were improperly recorded as revenue by EZCORP in violation of GAAP. *Id.* ¶ 77.

On December 11, 2014, EZCORP hosted its 2014 Investor Day. Jodie Maccarrone, EZCORP's President of Global Financial Services, touted Grupo Finmart as EZCORP's growth center, specifically stating:

> From an operational perspective, we spent a lot of time on the front-end of this acquisition, looking at profitability and really looking at the fundamentals of the business. So, when we first acquired the company that total profitability across all our contracts -- at the contract level, was less than 1%, our largest contract was suspended for non-payments. And so, we had a situation where we really had to get serious about operational excellence. So we took that average profit from negative 1% to 30% within the first nine months of the business and we've managed to insert just a little bit by making sure that we're measuring and managing every aspect of the value chain. And so, operational excellence, again, is part of the way the Grupo Finmart operates.

*Id.* ¶ 90. Plaintiffs contend these representations were misleading because EZCORP and Kuchenrither were aware of Grupo Finmart's significant operational and control issues. *Id.* ¶¶ 91. 45, 51, 68, 72, 74.

Finally, throughout the Class Period, EZCORP filed its quarterly and annual reports with the SEC. Each of these forms (Forms 10-Q and 10-K) reaffirmed EZCORP's financial results previously announced in its press releases. Kuchenrither certified the reports did not contain any false statements of material fact or omit any material facts. *See, e.g., id.* ¶¶ 43, 47, 64.

### III.   The Alleged Corrective Disclosures

Plaintiffs allege Defendants' corrective disclosures began on April 30, 2015, when EZCORP announced the release of its 2Q15 financial results would be delayed "due to an ongoing review of certain elements of its Grupo Finmart loan portfolio, which is not yet completed." *Id.* ¶ 99. Following this announcement, EZCORP's stock fell $0.79 per share to close at $8.41 per share on May 1, 2015. *Id.* ¶ 100.

On May 20, 2015, EZCORP filed its Form 8-K with the SEC, stating "we believe that it is likely that management and the Audit Committee will conclude that we have a material weakness in internal control over financial reporting and deficiencies in our disclosure controls and procedures." *Id.* ¶ 102. EZCORP further stated, "[w]e believe that failure to identify out-of-payroll loans and failure to adequately track the aging of non-performing loans are control deficiencies that likely constitute a material weakness in our internal control over financial reporting." *Id.* Following this announcement, EZCORP's stock declined $0.66 per share to close at $8.33 per share on May 21, 2015. *Id.* ¶ 103.

On July 17, 2015, EZCORP issued a press release, which stated "[f]ollowing a comprehensive review of the terms and conditions of each of the structured asset sales, management has determined that the asset sales should not have been accounted for as sales, principally due to certain control rights that Grupo Finmart retained as servicer of the loans." *Id.* ¶ 104. EZCORP further "identified a number of out-of-payroll loans that had not been properly classified and accounted for as such, causing an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods." *Id.* That same day, EZCORP filed its Form 8-K with the SEC, announcing it would restate its financial statements for FY2014, 1Q15,

and possibly for periods prior to FY2014. *Id.* ¶ 105. Following this announcement, EZCORP's stock declined $0.26 per share to close at $6.48 per share on July 17, 2015. *Id.* ¶ 106.

On October 20, 2015, EZCORP issued a press release confirming it would restate its previously issued financial statements for FY2012 and FY2013. *Id.* ¶ 107. The restatement would correct errors relating to the accrued interest revenue associated with non-performing loans. *Id.* Following this announcement, EZCORP's stock declined $0.29 per share to close at $6.32 per share on October 20, 2015. *Id.* ¶ 108.

On November 9, 2015, EZCORP filed its restated financials from 2Q12 through 1Q15. *Id.* ¶ 110. The restatement dealt primarily with the two discrete issues identified above: (1) the non-performing loans and (2) the loans sales. *Id.* ¶ 137. In regards to Grupo Finmart's non-performing loans, EZCORP explained "[m]anagement did not recognize the extent of the Grupo Finmart non-performing loans[,]" because:

> Processes to identify and address aging concerns [including loans with delayed or partial payments) were missing or inadequate;
>
> Risk assessment processes were inadequate;
>
> Detailed loan performance data was not reviewed by the appropriate accounting and management personnel; and
>
> Overall senior management supervision and review of Grupo Finmart's business performance was ineffective at identifying loan portfolio issues.

*Id.* As to the improper accounting of the loan sales, EZCORP explained "[m]anagement reached incorrect conclusions with respect to proper accounting of the Asset Sales," because:

> The appropriate accounting expertise (internally and externally) was not engaged, resulting in a failure to recognize important U.S. GAAP issues;
>
> The accounting consequences of significant, unusual transactions were not identified and evaluated; and

> The accounting positions taken on significant, unusual transactions were not reviewed and approved at the appropriate level.

*Id.*

> According to Plaintiffs, the restatement revealed EZCORP had:

> overstat[ed] Operating Income by a total of $90.7 million, or 27.3% for the restated period; overstat[ed] EPS by $0.78 per share, or 36.8% for the restated period; and, for fiscal 2014 alone, overstat[ed] income by $33 million due to the improper accounting for the "sales" of Grupo Finmart loans that were sold with recourse and which should not have been recorded as sales in accordance with [generally accepted accounting principles].

*Id.* ¶ 98.

Following the restatement and correction of the accounting errors, EZCORP's stock declined $0.29 per share to close at $6.51 per share on November 9, 2015. *Id.* ¶ 166.

## V.    Plaintiffs' Scienter Allegations

According to Plaintiffs, Kuchenrither knew or recklessly disregarded the possibility that the statements describing EZCORP's financial results were materially false and misleading when they were made. Plaintiffs rely on the following allegations to support a finding of Kuchenrither's scienter: (1) the size of the restatement, (2) statements from confidential witnesses, (3) Kuchenrither's Sarbanes-Oxley certifications, and (4) Kuchenrither's incentive-based bonus.

First, Plaintiffs contend the sheer magnitude of the restatement was highly suggestive of fraud. *Id.* ¶¶ 109, 112–14. Second, Plaintiffs rely on statements from three former employees in EZCORP's internal audit department (CW1, CW2, and CW3),[8] who supposedly confirm Kuchenrither was aware of EZCORP's lack of internal controls over financial reporting. *Id.*

---

[8] CW1 served as a Vice President of Internal Audit at EZCORP from 2011 to early 2014. Am. Compl. [#29] ¶ 30. Plaintiffs contend CW1 had regular dealings with Kuchenrither and EZCORP's accounting personnel in the regular course of business. *Id.* CW2 worked in EZCORP's internal audit department during the summer of 2011 through March 2014 and was responsible for internal audit and Sarbanes-Oxley management. *Id.* ¶ 31. CW3 also worked in EZCORP's internal audit department from October 2012 through May 2015. *Id.* ¶ 32.

¶¶ 58–60, 119. According to Plaintiffs, prior to the first loan sale, CW1 purportedly reviewed its terms and advised Kuchenrither that third parties retained a right to return non-performing loans, purportedly in violation of GAAP. *Id.* ¶ 6. Despite this knowledge, EZCORP engaged in six separate sales of Grupo Finmart loans and improperly recorded these loans as "non-recourse loans," representing to investors the sales were "true asset sales." *Id.* ¶¶ 7–8.

CW2, who was part of the internal audit team that visited Grupo Finmart every quarter to test its Sarbanes-Oxley compliance, stated the internal audit team was forced to resort to "black box testing" for loan balances in order to conclude Grupo Finmart was technically in Sarbanes-Oxley compliance. *Id.* ¶ 59. According to CW2, "black box testing" consists of simply verifying the reported numbers and ignoring the potentially questionable methods used to calculate those numbers. *Id.* Plaintiff also rely on statements from CW3, who alleges Kuchenrither knew Grupo Finmart's internal controls "were a mess" when he signed the Sarbanes-Oxley certifications. *Id.* ¶ 58. According to CW3, Kuchenrither was aware Grupo Finmart had no aging report to track bad debt, and there was no acceptable accounting methodology to determine whether Grupo Finmart was properly recording losses from non-performing loans. *Id.* ¶ 44. CW3 further stated "Grupo Finmart's records were in such disarray the team could not assess the value of the portfolio[,] and [] there were basic questions that Grupo Finmart employees could not answer that they should have been able to answer." *Id.* Based on CW2 and CW3's statements, Plaintiffs contend Kuchenrither had no reasonable basis to sign the Sarbanes-Oxley certifications. *Id.* ¶¶ 61, 143.

Finally, Plaintiffs contend it was Kuchenrither himself who fashioned a plan to package and sell Grupo Finmart's non-performing loans to third-party investors, which purportedly allowed EZCORP to remove the non-performing loans from its books and to record revenue and

income from the sales, which in turn artificially boosted its reported earnings. *Id.* ¶ 6. Plaintiffs maintain Kuchenrither was motivated to inflate EZCORP's financials, because he received a bonus for developing this plan. *Id.* ¶ 149.

## Analysis

### I.      Legal Standard

### A.      Motion to Dismiss—Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff

must plead "specific facts, not mere conclusory allegations." *Tuchman*, 14 F.3d at 1067. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**B.      Securities Exchange Act § 10(b) Pleading Requirements**

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b-5, which makes it unlawful:

(a)     To   employ   any   device,   scheme,   or   artifice   to   defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Fifth Circuit has held the elements of a claim under § 10(b) are: (1) a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) scienter by the defendant; (5) justifiable reliance by the plaintiff; (6) damages; and (7) proximate cause. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003). To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is limited to "highly unreasonable

omissions or misrepresentations" involving an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

Both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA) impose a heightened pleading requirement on § 10(b) claims. FED. R. CIV. P. 9(b); 15 U.S.C. § 78u-4(b). Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). In order to avoid dismissal under Rule 9(b) for lack of particularity, the Fifth Circuit has held a plaintiff must:

(1)     specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2)     identify the speaker;

(3)     state where and when the statement was made;

(4)     plead with particularity the contents of the false representations;

(5)     plead with particularity what the person making the misrepresentation obtained thereby; and

(6)     explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Rosenzweig*, 332 F.3d at 866.

The PSLRA dictates a more rigorous pleading standard for private securities fraud actions in two ways. First, in any such action alleging the defendant made an untrue statement of material fact or a misleading omission:

[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b). Second, for claims under which the plaintiff must prove a particular state

of mind to recover:

> [T]he complaint shall, with respect to each act or omission alleged to violate this
> chapter, state with particularity facts giving rise to a *strong inference* that the
> defendant acted with the required state of mind.

*Id.* (emphasis added). Based on the elements of a § 10(b) claim described above, it is clear that

§ 10(b) claims are subject to both of these requirements of the PSLRA.

## II.     Application

In their motion to dismiss, Defendants contend Plaintiffs' 94-page amended complaint

falls short of meeting the PSLRA's heightened pleading requirements, because the complaint

fails to plead facts giving rise to a strong inference of scienter. Because the Court agrees with

Defendants that Plaintiffs have failed to plead facts giving rise to a strong inference of scienter,

Plaintiffs' complaint must be dismissed.

### A.     "Strong Inference" of Scienter Requirement

The United States Supreme Court has outlined a framework for courts to use in analyzing

motions to dismiss § 10(b) complaints for failing to establish a "strong inference" of scienter.

First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint

as true. Second, the court considers the entire complaint, other sources typically examined in a

12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a

court may take judicial notice. Third, in determining whether the pleaded facts give rise to a

"strong" inference of scienter, as required by the PSLRA, a court should consider all of the facts

alleged, taken collectively, and should also take into account plausible opposing inferences.

*Tellabs*, 551 U.S. at 322–23. The inference need not be irrefutable, nor even the most compelling

of all competing inferences, but must be strong in light of other inferences. *Id.* at 324.

Ultimately, a complaint will only survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## B. Plaintiffs Failed to Plead Facts Giving Rise to a Strong Inference of Scienter.

Plaintiffs assert the following allegations to support a strong inference of scienter: (1) the post-Class Period financial restatements themselves, (2) the confidential witnesses' allegations, (3) Kuchenrither's inaccurate Sarbanes-Oxley certifications, and (4) Kuchenrither's incentive-based bonus. The Court addresses each allegation in turn.

### i. Restatement

GAAP violations are insufficient in and of themselves to establish scienter, but can contribute significant weight to the analysis based on their "number, size, timing, nature, frequency, and context[.]" *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721 (W.D. Tex. 2010) (citation omitted); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Serv. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (finding a detailed description of GAAP violations and subsequent restatement "provide some basis to infer scienter"). Indeed "[m]any courts have held significant overstatements of revenue or income tend to support the conclusion that defendants acted with scienter." *ArthroCare*, 726 F. Supp. 2d at 721–22. "[C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000)

In this case, Plaintiffs contend the sheer magnitude of the restatement warrants a departure from the general rule that the existence of a restatement does not support a strong inference of scienter. As alleged in the amended complaint, EZCORP overstated its net income

by 52.9% in fiscal year 2013, 29.4% in fiscal year 2014, and 31% in the first quarter of 2015. Am. Compl. [#29] ¶ 12.

Plaintiffs insist EZCORP's overstatements to net income are much higher than the overstatements in *City of Pontiac*, where this Court found overstatements of 7.8% in 3Q13, 41% in 1Q14, and 8.3% in 2Q14 provided "some basis from which to infer scienter," and are comparable to *ArthroCare*, where this Court found overstatements of 98.9% in 2007, 12.6% in 2006, and 19% in 2005 "significantly contribute[d] to a finding of scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. Asar et. al.*, No. A-14-CA-1026-SS, slip op. at 25 (W.D. Tex. April 1, 2016); *ArthroCare*, 726 F. Supp. 2d at 722. The Court finds the present case lies somewhere between *City of Pontiac* and *Arthrocare*, and therefore concludes the overstated income and revenues figure provide some basis from which to infer scienter. *See, e.g., MicroStrategy, Inc.*, 115 F. Supp. 2d at 637 (concluding some inference of scienter was warranted where company overstated revenue by $66 million over a three-year period, had actually been operating at a loss, and overstatement occurred because revenue was recognized on company's three largest unexecuted contracts).

## ii.    Confidential Witnesses

As noted above, the restatement addressed two discrete issues: (1) non-performing loans and (2) the loan sales. To support an inference of scienter regarding these discrete issues, Plaintiffs rely on CW1 and CW3's allegations.[9] According to Plaintiffs, CW3 will testify Kuchenrither knew about Grupo Finmart's improper classification of certain non-performing

---

[9] Plaintiffs also rely on statements from CW2. In their response to Defendants' motion to dismiss, Plaintiffs claim CW2's statements confirm Kuchenrither had knowledge of Grupo Finmart's internal control deficiencies before signing his Sarbanes-Oxley certifications. However, Plaintiffs' description of CW2's statements makes no reference to Kuchenrither. CW2's statements are therefore not probative of whether Kuchenrither knew or recklessly disregarded Grupo Finmart's lack of internal controls.

loans, because he allegedly received an internal audit report stating Group Finmart's accounting controls were "a mess." Am. Compl. [#29] ¶¶ 4, 44, 58, 119. Plaintiffs further contend CW1 will testify Kuchenrither knew EZCORP improperly accounted for the sale of six Grupo Finmart loans, because CW1 supposedly told Kuchenrither the first loan sale was subject to recourse and therefore could not be recorded as a true asset sale under GAAP.[10] *Id.* ¶¶ 6, 77, 120.

"Following *Tellabs*, courts must discount allegations from confidential sources." *Ind. Elec. Workers' Pension Trust Fun IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). To be given any weight, confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002). The complaint should give details such as the person's job description, individual responsibilities, and specific employment dates. *Cent. Laborers' Pension Fund*, 497 F.3d at 552. Furthermore, plaintiffs must allege with particularity when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred. *Ind. Elec.*, 537 F.3d at 538; *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 382 (5th Cir. 2004).

In light of the Fifth Circuit's clear directive to view confidential witnesses with some level of skepticism, the Court finds CW3's allegations insufficient to support an inference of scienter. Plaintiffs claim Kuchenrither knew Grupo Finmart incorrectly accounted for certain non-performing loans, because CW3 states "a series of written reports sent to senior management" indicated Grupo Finmart's accounting controls were "a mess" and recommended against EZCORP's acquisition of Grupo Finmart. Am. Compl. [#29] ¶ 4. These written reports

---

[10] The remainder of CW1 and CW3's statements Plaintiffs rely on constitute conclusory, unsupported allegations which fail to support an inference of scienter. *See, e.g.*, Am. Compl. [#29] 58, 120.

resulted from an internal audit which occurred sometime between one and three months before the Grupo Finmart transaction closed on January 30, 2012. *Id.* ¶¶ 3, 4, 34. Notably, however, Plaintiffs have failed to show CW3 possessed personal knowledge regarding the internal audit or the reports it generated, because according to Plaintiffs, CW3 did not even work in EZCORP's internal audit department until October 2012, several months after the Grupo Finmart transaction closed and the audit reports were allegedly sent to senior management. *Id.* ¶ 32. Without personal knowledge of the events CW3 describes, the Court finds CW3's statements unreliable. *See, e.g., Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (concluding only those statements which are reported by confidential witnesses with "sufficient reliability and personal knowledge" support an inference of scienter); *In re Vertex Pharm. Inc. Sec. Litig.*, 357 F. Supp. 2d 343, 353 (D. Mass. 2005) (concluding the plaintiffs' allegations did not establish a strong inference of scienter, where "none of the [confidential witnesses] claims to have personal knowledge of the most important facts they allege").

Moreover, Plaintiffs have failed to specify the contents of the reports beyond a vague allegation that they described Grupo Finmart's accounting controls "as a mess." Am. Compl. [#29] ¶ 4. Such vague allegations are insufficient to support an inference of scienter. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (allegations regarding non-specific internal reports "must have corroborating details regarding the contents of [the] reports"). CW3 goes on to claim Grupo Finmart's records "were in such disarray that the team could not assess the value of its loan portfolio," and "Grupo Finmart had no aging report for its loans . . . to track bad debt, making it impossible to determine whether and when loans were in default." Am. Compl. [#29] ¶ 4. Notably absent from CW3's statements, however, is any allegation that these alleged deficiencies were included in the reports.

Furthermore, even assuming the report contained the requisite level of detail, Plaintiffs have failed to specifically allege Kuchenrither actually saw the report. Instead, CW3 simply states the report was "sent to senior management," but does not provide any information as to whether "senior management" included Kuchenrither, who did not assume the position of CFO until October 2012 and was not even promoted to Executive Vice President until May 2012. Am. Compl. [#29] ¶¶ 4, 28. Accordingly, CW3's statements are too vague to permit an inference of scienter. *See Abrams*, 292 F.3d at 432 (concluding the plaintiffs' allegations failed to "reach the required standard" for scienter where the plaintiffs "point[ed] to no allegations that the defendants knew about the internal control problems, only that they should have known").

Likewise, the Court finds CW1's allegations insufficient to support an inference of scienter. Plaintiffs claim Kuchenrither knew or should have known the loans could not be accounted as "true asset" sales because CW1 supposedly told Kuchenrither doing so was a violation of ASC 860-10-40-5. According to CW1, this conversation occurred "in October or November 2013." Am. Compl. [#29] ¶ 6. However, CW1's statements lack sufficient indicia of reliability to give rise to a strong inference of scienter, because neither CW1 nor Plaintiffs provide the Court with any further specifics as to "when and where the conversation occurred."[11] *See Ind. Elec.*, 537 F.3d at 538.

Based on the foregoing, the Court concludes the confidential witness statements are either not indicative of scienter or so vague and unreliable as to be unpersuasive.

---

[11] Moreover, even ignoring the vagueness and unreliability of CW1's statements, CW1 only claims to have warned Kuchenrither about the first of six loans sales. And yet each sale was independently conducted and possessed unique terms, terms which CW1 admits determined the proper way to account for the sales. Am. Compl. [#29] ¶ 6 (stating CW1 told Kuchenrither the first loan sale could not be accounted for as a true sale "based upon a review of the terms of sale documents to third-party investors"). At best, then, CW1's statements establish some inference of scienter as to the first loan sale, but fail to do to the same for the remaining five sales.

### iii.    Sarbanes-Oxley Certifications

Kuchenrither's Sarbanes-Oxley certifications provide little, if any, additional support for an inference of scienter. An officer's Sarbanes-Oxley certification on an SEC financial report is not, standing alone, indicative of scienter, but may provide support for such an inference where the officer had reason to know or suspect the financial statements contained material inaccuracies "due to the presence of glaring accounting irregularities or other 'red flags[.]'" *See Cent. Laborers' Pension Fund*, 497 F.3d at 554–55.

In an attempt to demonstrate it has pled such "red flags," Plaintiffs point to CW2's statement that the audit team had to resort to "black box" testing in order to find Grupo Finmart Sarbanes-Oxley-certified.[12] Conspicuously absent from CW2's statement, however, is any indication that Kuchenrither was aware of this issue. Grupo Finmart comprised a small, albeit growing, segment of EZCORP's business: in 2012, it accounted for 2.8% of EZCORP's consolidated revenue, 5.5% in 2013, less than 7% in 2014, and less than 9% in 2015. As EZCORP's CFO, Kuchenrither was not exclusively devoted to policing EZCORP's Latin American segment or Grupo Finmart's business. Thus, any suggestion Kuchenrither was aware of the audit team's alternative internal testing simply by virtue of his position as EZCORP's CFO fails to give rise to an inference of scienter. Indeed, the Fifth Circuit has made clear: "[a] pleading of scienter may not rest on the inference that defendants must have been aware of a misstatement based on their positions with the company." *Abrams*, 292 F.3d at 432.

Without any specific allegations Kuchenrither knew about the "black box testing"—even assuming this constitutes an accounting violation—the pleadings are too vague to permit an inference of scienter. *See, e.g.*, *In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d 877, 894 (W.D. Tex.

---

[12] Plaintiffs also rely on CW1 and CW3's allegations regarding the non-performing loans and the loans sales to establish scienter. As noted above, however, the Court finds these allegations deficient. *See supra* Section II.B.ii.

2008) (concluding the plaintiffs failed to plead a strong inference of scienter where the "Individual Defendants oversaw accounting functions, had unfettered access to information, and approved high-level decisions, but [the plaintiffs] allege[d] nothing specific about what the Individual Defendants knew or intended").

### iv.   Incentive-Based Bonus

Plaintiffs attempt to show a strong inference of scienter based on CW1's assertion that Kuchenrither was motivated to inflate Grupo Finmart's financials because Kuchenrither's compensation was partially tied to EZCORP's performance. According to Plaintiffs, Kuchenrither received a $350,000 bonus in 2014 for developing a plan "to address [EZCORP's] challenges over the next several quarters" by selling a portion of Grupo Finmart's loans to third-party investors. Am. Compl. [#29] ¶ 149.

As an initial matter, CW1 is the sole source of this information, and Plaintiffs have provided no basis why CW1—a former Vice President of Internal Audit—would be privy to Board of Directors' discussions regarding executive compensation and bonuses. Moreover, standing alone, the alleged desire to increase compensation does not support a strong interference of scienter. Indeed, as the Fifth Circuit has noted,

> [I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.

*Tuchman*, 14 F.3d at 1068–69 (quoting lower court's holding in *Tuchman v. DSC Commc'ns Corp.*, 818 F. Supp. 971, 976 (N.D. Tex. 1993)). While "[i]ncentive compensation packages may be considered in conjunction with other scienter allegations, [] only in an extraordinary case is it probative." *Ind. Elec.*, 537 F.3d at 544 (internal citations omitted). Kuchenrither's $350,000

bonus is by no means sparing, but neither is it extraordinary. "[A]s a motivation to fraud," it is minor. *See id.*

## C.     Plaintiffs Failed to Plead Facts Establishing Control-Person Liability

Finally, because Plaintiffs have filed to state a claim for any predicate securities fraud violation under § 10(b), Plaintiffs have necessarily failed to state a claim against Defendants for "controlling person" liability under § 20(a). The Court therefore dismisses Plaintiffs' § 20(a) claims. *See ABC Arbitrage*, 291 F.3d at 362 n. 123.

## Conclusion

Because Plaintiffs failed to properly allege a violation of the federal securities law, Plaintiffs' claims against EZCORP and Kuchenrither are properly dismissed.

Accordingly,

IT IS ORDERED that Defendants EZCORP, Inc. and Mark Kuchenrither's Motion to Dismiss [#32] is GRANTED; and

IT IS FURTHER ORDERED that Co-Lead Plaintiffs Wu Winfred Huang and John Rooney's Amended Complaint [#29] is DISMISSED WITHOUT PREJUDCE; and

IT IS FINALLY ORDERED that Co-Lead Plaintiffs Wu Winfred Huang and John Rooney are granted TWENTY (20) DAYS from the date of entry of this Order to file an amended complaint, or this case will be closed.

SIGNED this the ___*18*ᵗᵉ___ day of October 2016.

*Bamsparks*

SAM SPARKS
UNITED STATES DISTRICT JUDGE