**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

WU WINFRED HUANG and JOHN
ROONEY, Individually and on Behalf of
All Others Similarly Situated,
            Plaintiffs,

                                                            CAUSE NO.:
                                                            A-15-CA-00608-SS
-vs-

EZCORP, INC. and MARK E.
KUCHENRITHER,
            Defendants.

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause,

and specifically Defendants EZCORP, Inc. and Mark Kuchenrither (Defendants)' Motion to

Dismiss [#50], Co-Lead Plaintiffs Wu Winfred Huang and John Rooney's Response [#52] in

opposition, and Defendants' Reply [#53] in support. Having reviewed the documents, the

arguments of the parties at the hearing, the governing law, and the file as a whole, the Court now

enters the following opinion and order.

### Factual Background[1]

As recounted in the Court's October 18, 2016 Order, this is a securities fraud class action

brought on behalf of all persons who purchased Class A common stock[2] of Defendant EZCORP,

---

[1] The following is taken from the allegations in Plaintiffs' Second Amended Complaint [#47] (SAC), except as otherwise indicated. Thus, the facts are stated in the light most favorable to Plaintiffs. This is so because when "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although, in the interest of brevity, every allegation in the SAC is not recounted here, the Court is mindful of its duty to consider "the complaint in its entirety," *id.*, and has done so.



Inc., a company which provides "instant cash" services like payday loans and pawn loans, between November 7, 2013,[3] to October 20, 2015 (the Class Period). Co-Lead Plaintiffs Wu Winfred Huang and John Rooney, on behalf of the plaintiff class, allege that during the Class Period, Defendant Mark Kuchenrither, EZCorp's CFO, CEO, and the only individual defendant,[4] made material misrepresentations to shareholders in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

Defendants have moved to dismiss the SAC, arguing Plaintiffs have failed to plead facts giving rise to a strong inference of scienter. The Court agrees with Defendants in part and therefore grants Defendants' motion to dismiss in part.

## I. EZCORP's Acquisition of Grupo Finmart

EZCORP provides customers with multiple ways to access instant cash through pawn and consumer loans in the United States, Mexico, and Canada, as well as through fee-based credit services. SAC [#47] ¶ 2. In addition, at its pawn stores and online, EZCORP sells collateral forfeited from pawn lending operations and used merchandise purchased from customers. *Id.*

On January 12, 2012, EZCORP announced it was acquiring a 60% ownership interest in Grupo Finmart, a Mexican company which issues small consumer loans to Mexican governmental employees. *Id.* ¶ 4. According to EZCORP,

---

[2] EZCORP has two classes of common stock, Class A Non-Voting Common Stock, which is publicly traded on the NASDAQ, and Class B Voting Stock, all of which is beneficially owned by Phillip E. Cohen. SAC [#47] ¶ 33.

[3] Plaintiffs amended the Class Period to begin on November 7, 2013, the day EZCORP reported its fiscal year-end 2013 financial results. SAC [#47] ¶ 1.

[4] Kuchenrither has served in several executive positions for EZCORP from the time he was hired as Senior Vice President, Strategic Development in March 2010. SAC [#47] ¶ 34. In October 2012, Kuchenrither assumed the role of CFO, and served as EZCORP's CFO until May 26, 2015. *Id.* ¶¶ 34, 149. Kuchenrither also served as EZCORP's CEO from July 18, 2014, to February 1, 2015, and as a director from August 12, 2014, to February 3, 2015. *Id.* ¶ 34. Moreover, Kuchenrither was appointed as a member of both EZCORP's and Grupo Finmart's Board of Directors during the Class Period. *Id.* ¶ 5.

> Grupo Finmart enters into payroll withholding agreements ("convenios") with Mexican employers, primarily federal, state and local governments and agencies, and provides unsecured, multiple-payment consumer loans to employees of those various employers. Interest and principal payments are collected by the employers through payroll deductions and remitted to Grupo Finmart.

*Id.* ¶ 99 (quoting May 20, 2015 Form 8-K). EZCORP has described Grupo Finmart's role in Mexico's payroll lending industry:

> The unsecured payroll lending industry in Mexico is less developed than other Latin American countries. Payroll lending in Mexico is generally marketed to public sector employees, who on average earn more and rotate less frequently than their private sector peers. Additionally, government entities tend to be more stable and on average have more employees than private companies. It is estimated that less than 15% of the market potential is being serviced. Grupo Finmart is the fifth largest vertically integrated payroll lender in Mexico with 53 branch offices located in 24 of the 32 states in the country.

*Id.* ¶ 43 (quoting 2014 Form 10-K).

On June 30, 2014, EZCORP acquired an additional 16% of Grupo Finmart's ordinary shares. *Id.* ¶ 4. On September 1, 2015, EZCORP increased its ownership position in Grupo Finmart by 18%, thereby making it a 94% owner of Grupo Finmart. *Id.* EZCORP now consists of three segments: (1) the United States and Canada segment, (2) the Latin America segment, and (3) the Other International segment. *Id.* ¶ 42.

## II.    EZCORP's Alleged Accounting Deficiencies

Plaintiffs allege that throughout the Class Period, EZCORP's lack of internal controls over its financial reporting gave rise to two primary accounting errors: (1) the failure to properly account for the sale of certain non-performing loans to third parties (Loan Sales), and (2) the failure to properly account for Grupo Finmart's non-performing payroll loans (Non-Performing Loans). As alleged in the SAC, Non-Performing Loans are "loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments." *Id.* ¶ 99. Out-of-payroll loans are outstanding loans from customers who are no longer employed. *Id.*

"Under Grupo Finmart's historic accounting policy," "[i]f one payment of an out-of-payroll loan is delinquent, that one payment is considered in default; if two or more payments are delinquent at any time, the entire loan is considered in default." *Id.* Upon default of an out-of-payroll loan, EZCORP ceased accruing future interest revenue. *Id.* However, "[d]ue to the likelihood of ultimately receiving payment if the customer remains employed, [Grupo Finmart] continue[d] to accrue interest on all in-payroll loans, even though Grupo Finmart may not be currently receiving payments." *Id.* In its corrective disclosures, EZCORP determined Grupo Finmart's non-performing loans included a number of out-of-payroll loans that had not been properly classified as such, and some in-payroll loans that had been in non-performing status for some time. *Id.* By failing to properly account for the Non-Performing Loans, Plaintiffs argue, EZCORP was able "to artificially maintain its ratio of bad debt expense to consumer loan fees and interest – a measure of health of the underlying loan portfolio." *Id.* ¶ 108.

Plaintiffs further contend EZCORP failed to properly account for the sale of these Non-Performing Loans. According to Plaintiffs, a confidential witness informed Kuchenrither that under the terms of the loan sale documents, the third-party purchasers retained a right to return non-performing loans to EZCORP, and generally accepted accounting principles (GAAP) prohibited EZCORP from recognizing any revenue from these loan sales. *Id.* ¶ 7. Despite the confidential witness's warning, EZCORP executed five separate sales of Grupo Finmart's loans in the 2014 fiscal year, recognizing $33 million in gains on these sales. *Id.* ¶ 9. In the first quarter of 2015, EZCORP executed another loan sale, recognizing $6.6 million in income on this sale. *Id.* Plaintiffs claim the improper accounting for the sale of the loans had the effect of artificially boosting EZCORP's reported income in the 2014 fiscal year by 45% and its reported income during the first quarter of 2015 by 32%. *Id.*

### III.    The Allegedly False and Misleading Statements

The statements Plaintiffs identify as misleading are taken from EZCORP's press releases, conference calls, and SEC forms disclosing EZCORP's financial results during the Class Period. These statements deal with EZCORP's financial results during the fourth quarter of 2013 (4Q13), the 2014 fiscal year (FY2014), and the first quarter of 2015 (1Q15). Plaintiffs' SAC quotes extensively from Defendants' various public statements made throughout the Class Period, but the allegedly false and misleading statements and omissions fall into two general categories: (1) statements relating to the overstatement of EZCORP's financial results, as a result of EZCORP's failure to properly account for the Loan Sales and Non-Performing Loans, and (2) statements relating to the nature of the Loan Sales.

First, Plaintiffs contend EZCORP's financial reports misrepresented its financial results, including its net income and earnings per share. For instance, in its 3Q14 press release, EZCORP reported $11.3 million in net income from continuing operations and earnings per share of $0.21. *Id.* ¶ 70. According to Plaintiffs, the reporting of $11.3 million of net income from continuing operations was false because EZCORP improperly recorded $14.3 million in income from the sale of Grupo Finmart debt to third parties. *Id.* ¶ 71. Similarly, in its 4Q14 press release, EZCORP reported $47 million of net income from continuing operations for the 2014 fiscal year, but according to Plaintiffs, this amount was overstated by $31.956 million. *Id.* ¶ 79.

Moreover, throughout the Class Period, EZCORP filed its quarterly and annual reports with the SEC. Each of these forms (Forms 10-Q and 10-K) reaffirmed EZCORP's financial results previously announced in its press releases. Kuchenrither certified the reports did not contain any false statements of material fact or omit any material facts. *See, e.g., id.* ¶¶ 62, 68, 76, 91.

Second, Plaintiffs maintain Defendants misrepresented the nature of the Loans Sales. For example, in a January 28, 2014 press release, EZCORP stated "[c]ash and cash equivalents, including restricted case, were $45 million at quarter-end, with debt of $252 million, including $106 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP.*" *Id.* ¶ 61 (emphasis added); *see also id.* ¶ 66 ("Cash and cash equivalents . . . were $63 million at quarter-end, with debt of $228 million, including $145 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP.*") (emphasis added). Moreover, during an earnings conference call held on July 29, 2014, Kuchenrither described the Loan Sales as "true loan sales," explaining "it's a true profit" because "the risk associated with the loans passed to the buyer of the loans." *Id.* ¶ 73. He further stated the Loan Sales were not securitizations, but instead "truly an asset sale. I just want to make that distinction, because [it's] very important." *Id.* ¶ 74. According to Plaintiffs, the "asset sales" identified by Kuchenrither were not true asset sales and were improperly recorded as revenue by EZCORP in violation of GAAP. *Id.* ¶ 75.

## IV.    The Alleged Corrective Disclosures

Plaintiffs allege Defendants' corrective disclosures began on April 30, 2015, and ended on November 9, 2015. On April 30, 2015, EZCORP announced the release of its 2Q15 financial results would be delayed "due to an ongoing review of certain elements of its Grupo Finmart loan portfolio, which is not yet completed." *Id.* ¶ 96. In that same press release, EZCORP further stated it "did not undertake any asset sales in Grupo Finmart this quarter" and "noted some differences in the performance of parts of our Grupo Finmart loan portfolio that prompted a more thorough review and analysis of our loan reserves[.]"*Id.* ¶ 96. Following this announcement, EZCORP's stock fell $0.79 per share to close at $8.41 per share on May 1, 2015. *Id.* ¶ 97.

On May 20, 2015, EZCORP filed its Form 8-K with the SEC, stating

> We have identified certain errors in a portion of our Grupo Finmart loan portfolio
> that may impact current and historical amounts of loan reserves and interest
> income. . . . We are also reviewing whether certain structured asset sales from
> Grupo Finmart met the criteria required for sale accounting treatment or whether
> they should have been accounted for as secured borrowings.

*Id.* ¶ 99. EZCORP further stated "we believe that it is likely that management and the Audit

Committee will conclude that we have a material weakness in internal control over financial

reporting and deficiencies in our disclosure controls and procedures." *Id.* Following this

announcement, EZCORP's stock declined $0.66 per share to close at $8.33 per share on May 21,

2015. *Id.* ¶ 100.

On July 17, 2015, EZCORP issued a press release, which corrected previous

representations regarding the Loan Sales and the Non-Performing Loans. As to the Loan Sales,

EZCORP stated,

> Following a comprehensive review of the terms and conditions of each of the
> structured asset sales, management has determined that the asset sales should not
> have been accounted for as sales, principally due to certain control rights that
> Grupo Finmart retained as servicer of the loans. Because of these control rights,
> the trusts to which the loans were sold should be accounted for as "variable
> interest entities" and consolidated pursuant to ASC 810-10 (Consolidation and the
> Variable Interest Model), and therefore, the sales should not have been recognized
> for accounting purposes.

*Id.* ¶ 101.

> As to the Non-Performing Loans, EZCORP stated,

> The company has identified a number of out-of-payroll loans that had not been
> properly classified and accounted for as such, causing an understatement of bad
> debt expense and an overstatement of accrued interest revenue in prior periods. In
> addition, after reviewing the aging characteristics of the non-performing loans, the
> company[] . . . has determined that it is more appropriate to accrue and recognize
> interest income over the period that payments are actually received rather than
> over the stated term of the loans[.]

*Id.* That same day, EZCORP filed its Form 8-K with the SEC, announcing it would restate its

financial statements for FY2014, 1Q15, and possibly for periods prior to FY2014. *Id.* ¶ 102.

Following this announcement, EZCORP's stock declined $0.26 per share to close at $6.48 per share on July 17, 2015. *Id.* ¶ 106.

On October 20, 2015, EZCORP issued a press release confirming it would restate its previously issued financial statements for FY2012 and FY2013. *Id.* ¶ 104. The restatement would correct errors relating to the accrued interest revenue associated with non-performing loans. *Id.* Following this announcement, EZCORP's stock declined $0.29 per share to close at $6.32 per share on October 20, 2015. *Id.* ¶ 105.

On November 9, 2015, EZCORP filed its restated financials from 2Q12 through 1Q15. *Id.* ¶ 107. The Restatement revealed, among other things, EZCORP's operating income was overstated by $90.7 million, or 27.3%, during the restated periods, and its earnings per share were overstated by $0.78, or 36.8%, during the restate periods. *Id.* ¶ 109. Following the filing of its restated financial results, EZCORP's stock declined $0.29 per share to close at $6.51 per share on November 9, 2015. *Id.* ¶ 163.

## V. Plaintiffs' Scienter Allegations

According to Plaintiffs, Kuchenrither knew all of the statements described above were materially false and misleading at the time they were made. In support of this contention, Plaintiffs rely on the existence and magnitude of the Restatement, statements from confidential witnesses, inaccurate Sarbanes-Oxley (SOX) certifications, and Kuchenrither's incentive-based bonus. In its October 18, 2016 Order, the Court concluded the size of the Restatement provided some basis from which to infer scienter, but taken together, Plaintiffs' allegations were insufficient to give rise to a strong inference of scienter. Plaintiffs have amended their allegations in the SAC to add statements from a new confidential witness, CW4, and to expand on previous statements provided by CW1, CW2, and CW3.

## A.    Loan Sales

To establish Kuchenrither acted with the required state of mind when he misrepresented the nature of the Loan Sales and the accuracy of EZCORP's financial reports, Plaintiffs rely on statements from CW1, EZCORP's Vice President of Internal Audit, who reported to Kuchenrither, attended monthly meetings with Kuchenrither, and spoke with Kuchenrither on a near-daily basis at EZCORP's headquarters. *Id.* ¶ 7. CW1 managed approximately 75 internal auditors at EZCORP and its subsidiaries, all of whom reported directly to CW1. *Id.* Plaintiffs contend CW1 has personal knowledge of the Loan Sales because CW1 oversaw the internal audit team for Grupo Finmart, which notified CW1 of the first loan transaction. *Id.* CW1 reviewed the loan documents and determined that in light of GAAP, the transaction should not have been recorded as revenue because the third-party purchasers of the loans retained a right to return non-performing loans to EZCORP, meaning that if any of the sold loans defaulted, the third-party purchaser had the right to make EZCORP repurchase the loans. *Id.* CW1 claims to have informed Kuchenrither of this accounting irregularity at EZCORP's headquarters in early November 2013, sometime before EZCORP issued its press release on November 7, 2013, announcing its 2013 fiscal year-end results.[5] *Id.* CW1 contends that Kuchenrither dismissed CW1's concerns and claimed he had consulted the appropriate personnel regarding the Loan Sales. *Id.*

---

[5] Defendants take issue with this factual recitation because in the SAC, Plaintiffs indicate EZCORP's headquarters were in Rollingwood, Texas in 2013, when in fact EZCORP's headquarters were not moved to Rollingwood until 2015. Second Mot. Dismiss [#50] at 7; Resp. [#52] at 7. Moreover, Defendants contend the SAC is inherently contradictory because Plaintiffs first allege CW1 discussed the loans sales with Kuchenrither in "early November 2013," but later suggest the meeting may have occurred prior to October 21, 2013. These issues are addressed in the Application section. *See infra* Section II.A.

## B.     Non-Performing Loans

To establish Kuchenrither acted with the required state of mind when he misrepresented the accuracy of EZCORP's financial reports with regard to EZCORP's failure to properly account for the Non-Performing Loans, Plaintiffs rely on statements from CW1, CW2, CW3, and CW4.

CW2 was EZCORP's Internal Audit and SOX Manager who oversaw EZCORP's internal audit of Grupo Finmart and reported directly to CW1. *Id.* ¶ 14. Both CW2 and CW4 traveled to Mexico to conduct the 2013 fiscal year-end internal audit of Grupo Finmart. *Id.* CW2 claims Grupo Finmart was not SOX compliant and was not properly tracking payday loans because Grupo Finmart did not have adequate aging reports. *Id.* ¶ 15. An aging report is an accounting tool for measuring bad debt by sorting loans by the period for which they were unpaid, for example, sorting loans that had not been paid for 0–30 days or 31–60 days. *Id.* CW2 reported this accounting issue to CW1 in early November 2013, and CW1 claims to have conveyed these accounting issues to Kuchenrither in a "series of meetings" at EZCORP's headquarters in early November 2013. *Id.* ¶ 16.

CW3, CW1's administrative assistant who worked at EZCORP from October 2012 to February 2015, assisted in compiling an internal audit report from Grupo Finmart's 2013 fiscal year-end review (Internal Audit Report) and distributing the report to Kuchenrither via email sometime between October 29, 2013, and November 4, 2013. *Id.* ¶ 18. CW3 also distributed a hard copy of the report to Kuchenrither's executive assistant and explained it was customary for Kuchenrither to receive copies of internal audit reports a week before the standard email distribution. *Id.* ¶ 18. CW4, an internal auditor at EZCORP who reported directly to CW2, claims the Internal Audit Report revealed that (1) Grupo Finmart had inadequate aging reports

and inadequate loan tracking procedures, (2) Grupo Finmart had a weak collections system which made it difficult to collect unpaid loans, and (3) Grupo Finmart's accounting personnel were not properly trained or proficient in accounting. *Id.* ¶ 17.

According to Plaintiffs, although CW1 purportedly informed Kuchenrither of the accounting deficiencies related to the Loan Sales issue, and CW3 allegedly sent Kuchenrither the Internal Audit Report detailing Grupo Finmart's accounting deficiencies, Kuchenrither nevertheless certified EZCORP's financial reports as accurate. *Id.* ¶ 19. Following Kuchenrither's certifications, Plaintiffs allege EZCORP issued its financial statements containing material misstatements concerning its financial results. *Id.*

## Procedural History

Plaintiffs filed this lawsuit on July 20, 2015, alleging Defendants false and misleading statements caused EZCORP's stock to trade at artificially inflated prices and Plaintiffs suffered financial losses as a result of EZCORP's restated financial reports. *See* Compl. [#1]. The Court granted Defendants' first motion to dismiss, concluding Plaintiffs failed to plead facts demonstrating a strong inference of scienter. Order of Oct. 18, 2016 [#44] at 1, 14–24. The Court's dismissal was without prejudice, and Plaintiffs filed their SAC on November 4, 2016. *See* SAC [#47].

In their SAC, Plaintiffs again allege Defendants violated federal securities law by making false and misleading statements designed to artificially inflate the price of EZCORP's stock. *Id.* ¶ 157. The instant motion to dismiss followed, which has been fully briefed by the parties and is now ripe for the Court's consideration. *See* Second Mot. Dismiss [#50].

**Analysis**

## I.  Legal Standard

### A.  Motion to Dismiss—Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman*, 14 F.3d at 1067. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as

12

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**B.     Securities Exchange Act § 10(b) Pleading Requirements**

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b-5, which makes it unlawful:

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Fifth Circuit has held the elements of a claim under § 10(b) are: (1) a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) scienter by the defendant; (5) justifiable reliance by the plaintiff; (6) damages; and (7) proximate cause. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003). To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is limited to "highly unreasonable omissions or misrepresentations" involving an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

Both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA) impose a heightened pleading requirement on § 10(b) claims. FED. R. CIV. P. 9(b); 15 U.S.C. § 78u-4(b). Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). In order to avoid dismissal under Rule 9(b) for lack of particularity, the Fifth Circuit has held a plaintiff must:

(1)    specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2)    identify the speaker;

(3)    state where and when the statement was made;

(4)    plead with particularity the contents of the false representations;

(5)    plead with particularity what the person making the misrepresentation obtained thereby; and

(6)    explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Rosenzweig*, 332 F.3d at 866.

The PSLRA dictates a more rigorous pleading standard for private securities fraud actions in two ways. First, in any such action alleging the defendant made an untrue statement of material fact or a misleading omission:

[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b). Second, for claims under which the plaintiff must prove a particular state of mind to recover:

14

[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Id.* (emphasis added). Based on the elements of a § 10(b) claim described above, it is clear that

§ 10(b) claims are subject to both of these requirements of the PSLRA.

## C.    "Strong Inference" of Scienter Requirement

The United States Supreme Court has outlined a framework for courts to use in analyzing

motions to dismiss § 10(b) complaints for failing to establish a "strong inference" of scienter. *See*

*Tellabs*, 551 U.S. at 322–23. First, as in any other motion to dismiss, the court accepts all factual

allegations in the complaint as true. Second, the court considers the entire complaint, other

sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the

complaint, and matters of which a court may take judicial notice. Third, in determining whether

the pleaded facts give rise to a "strong" inference of scienter, as required by the PSLRA, a court

should consider all of the facts alleged, taken collectively, and should also take into account

plausible opposing inferences. *Id.* "A district court may best make sense of scienter allegations

by first looking to the contribution of each individual allegation to a strong inference of scienter,

especially in a complicated case . . . ." *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015). "As

a matter of efficiency, if any single allegation, standing alone, create[s] a strong inference of

scienter, the court [does] not need to consider additional allegations of scienter." *Id.* If analyzing

each allegation alone does not support a strong inference of scienter, "the court must follow this

initial step with a holistic look at all the scienter allegations," or may assess the allegations

holistically, without first engaging in an allegation-by-allegation analysis. *Id.*

The scienter inference need not be irrefutable, nor even the most compelling of all

competing inferences, but must be strong in light of other inferences. *Tellabs*, 551 U.S. at 324.

Ultimately, a complaint will only survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## II.    Application

In its October 18, 2016 Order granting Defendants' first motion to dismiss, the Court concluded Plaintiffs' allegations, taken together, failed to give rise to a strong inference of scienter. Specifically, the Court found the Restatement provides "some basis from which to infer scienter," but Plaintiffs' allegations regarding Kuchenrither's SOX certifications were too vague to permit an inference of scienter; the confidential witness statements were either too vague and unreliable or not indicative of scienter; and Kuchenrither's incentive-based bonus, while not sparing, was not sufficient to demonstrate a strong inference of scienter. Order of Oct. 18, 2016 [#44] at 18, 22–24. Plaintiffs have attempted to cure these deficiencies in the SAC by furnishing additional details describing the confidential witnesses' statements and supplementing these statements with allegations from a new confidential witness.

Defendant's sole argument in support of dismissal is that Plaintiffs failed to plead sufficient facts giving rise to a strong inference of scienter based on statements from confidential witnesses. The Court does not fully agree.

## A.    Knowledge of the Loan Sales

As alleged in the SAC, Kuchenrither knew or recklessly disregarded the fact that recording the Loan Sales as revenue violated GAAP, but nevertheless represented to analysts that the Loan Sales were "true asset sales" and thereafter certified EZCORP's financial reports as accurate. In support of their claim, Plaintiffs rely on allegations from CW1, who claims to have directly informed Kuchenrither of this GAAP violation.

"Following *Tellabs*, courts must discount allegations from confidential sources." *Ind. Elec. Workers' Pension Trust Fun IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). To be given any weight, confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002). The complaint should give details such as the person's job description, individual responsibilities, and specific employment dates. *Cent. Laborers' Pension Fund*, 497 F.3d at 552. Furthermore, plaintiffs must allege with particularity when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred. *Ind. Elec.*, 537 F.3d at 538; *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 382 (5th Cir. 2004).

Even though CW1 is not identified by name, Plaintiffs have adequately alleged that CW1, as EZCORP's Vice President of Internal Audit, was in a position to have the knowledge he or she professes to have. Moreover, the SAC alleges CW1's statements are based on personal knowledge of a conversation he or she had with Kuchenrither, not on hearsay stemming from an unidentified source. Defendants maintain, however, that CW1's allegations are unreliable because Plaintiffs have again failed to specify "where" and "when" the alleged conversation between CW1 and Kuchenrither regarding the Loan Sales occurred. In the SAC, Plaintiffs allege this conversation occurred in Rollingwood, Texas, in early November 2013. SAC [#47] ¶ 7. As Defendants correctly note, however, EZCORP did not move its headquarters to Rollingwood until late 2015. Second Mot. Dismiss [#50] at 7; Resp. [#52] at 7. Prior to that time, EZCORP was headquartered in Austin, Texas. In their response to Defendants' second motion to dismiss, Plaintiffs attribute this blunder to a "drafting error" by their counsel, and maintain the

investigator's interview report reveals CW1 actually stated the meetings occurred at EZCORP's headquarters in Austin. Resp. [#52] 7 n.4. Though Plaintiffs' "drafting error" does nothing to bolster their own credibility, the Court does not find this error so egregious as to wholly undermine CW1's allegations.

As alleged in the SAC, the purported conversation occurred sometime between November 1 and November 7, 2013, but Defendants nevertheless contend this seven-day period "adds little specificity compared" to the two-month range of "October to November 2013" alleged in the FAC. Second Mot. Dismiss [#50] at 11. The purpose of the "when and where" requirement is not to raise the pleading burden so that facially valid claims are routinely dismissed, but rather to provide sufficient detail for a court to determine whether the confidential witness' statements are reliable. *See Tchuruk*, 291 F.3d at 354 ("[T]he plaintiffs need not allege all facts that may be related to their claims, since such a requirement is impossible at the pleading stage because, in nearly every securities fraud case, only the defendants know all the facts related to the alleged fraud. In this sense, the PSLRA may have changed federal securities law; it did not eliminate it."). According to Plaintiffs, "CW1's office was in close proximately with Kuchenrither's" and "CW1 spoke with Kuchenrither on a near-daily basis" during regularly scheduled and as-needed meetings. SAC [#47] ¶ 36. CW1's recollection, without access to discovery, was that this conversation occurred between November 1 and November 7, 2013. This

one-week timeframe is sufficiently specific, at this stage of the litigation, to suggest CW1's account is reliable.[6]

Defendants next argue that the substance of CW1's alleged conversation with Kuchenrither casts doubt on CW1's reliability and reveals his or her purported conversation with Kuchenrither is not suggestive of fraud. CW1 claims to have warned Kuchenrither that "because there was a right to return loans to EZCORP[,] [the first Loan Sale] was not a true asset sale and under EZCORP's accounting policy the loan sale could not be recorded as revenue." SAC [#47] ¶ 118. According to Plaintiffs, Kuchenrither was aware of Accounting Standards Committee (ASC) 860-10-40-5, which "requires [] the seller does not maintain any right of return," when he represented the Loan Sales were "true asset sales" and later certified EZCORP's financial reports as accurate. *See id.* ¶¶ 10, 34. Defendants note, however, that the Restatement identifies ASC 810-10, which involves consolidating the financials of variable interest entities (VIEs), as the reason the Loan Sales should not have been recognized as revenue. *See id.* ¶ 101 (quoting July 17, 2015 press release entitled, "EZCORP to Restate Certain Financial Results"). Because Plaintiffs do not allege CW1 notified Kuchenrither that ASC 810-10, rather than ASC 860-10-140-5, was violated, Defendants contend, the allege conversation between CW1 and Kuchenrither is not probative of Kuchenrither's state of mind regarding VIEs. Alternatively, Defendants claim CW1's "incorrect reference" to the accounting rule shows CW1 "lacks the expertise necessary to support the allegations" attributed to CW1. Second Mot. Dismiss [#50] at 17.

---

[6] Defendants further maintain the SAC is "internally inconsistent" regarding when the alleged conversation took place, because although Plaintiffs specifically allege the conversation took place "in early November[] 2013," they allege in the next paragraph that "[d]espite what CW#1 told Kuchenrither, EZCORP completed its first loan sale in October 2013 and realized $4.6 million in income on the sale gain in its 2013 fiscal fourth quarter." SAC [#47] ¶¶ 118–19. At best, however, the phrase "[d]espite what CW#1 told Kuchenrither" represents a *possible* inconsistency in CW1's allegations. The statement is not directly attributed to CW1, and one reading of the sentence suggests Plaintiffs simply intended to highlight the fact that the Loan Sale violated GAAP, not that Kuchenrither *knew* at that time that the Loan Sale violated GAAP.

Importantly, however, Defendants' motion to dismiss rests entirely on their claim that Kuchenrither acted with the required state of mind; they do not challenge the other elements of Plaintiffs' § 10(b) claim, such as whether Plaintiffs described the alleged misrepresentations with sufficient particularity. To establish Kuchenrither's scienter, Plaintiffs allege ASC 860-10-40-5 "requires that the seller does not maintain any right of return"; prior to the first Loan Sale, CW1 told Kuchenrither the Loan Sale was not a true asset sale because the third-party purchasers had a right to return non-performing loans; and even though Kuchenrither was aware of ASC 860-10-40-5 and CW1's warnings regarding Grupo Finmart's accounting deficiencies, he nevertheless certified EZCORP's financial reports as accurate. SAC [#47] ¶¶ 10, 118, 122. It is irrelevant at this stage of the litigation whether the Loan Sales actually violated ASC 860-10-140-5. "The question of whether [EZCORP's financial] statements actually violated GAAP is fact-dependent [and] not properly addressed on a motion to dismiss." *Owens*, 789 F.3d at 540. Rather, "[t]he issue, for the scienter analysis, is whether, assuming the statements violated GAAP, the allegations give rise to a strong inference that individual defendants were severely reckless in valuing the securities." *Id.* In this case, CW1's allegation that he or she directly informed Kuchenrither that the Loan Sale could not be recorded as revenue, and Kuchenrither knew that doing so violated GAAP, gives rise to a strong inference of scienter. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("The party must know that it is publishing materially false information, or must be severely reckless in publishing such information.").

In its October 18, 2016 Order, the Court advised Plaintiffs that it had not adequately explained how CW1's allegations regarding the first Loan Sale raised an inference of scienter as to the five subsequent Loan Sales. See Order of Oct. 18, 2016 [#44] at 21 n.11. This time, however, the Court is satisfied Plaintiffs have met their burden to show scienter as to each of the

similarly-structured Loan Sales. As alleged in the SAC, Defendants refer to these transactions as following the same "new distributor model" when discussing the transactions with investors and analysts, and the Restatement itself confirms that "[e]ach of the Asset Sales was accounted for as a sale, and we recognized a gain equal to the difference between the book value of the sold loans and the purchase price, which was generally equal to the aggregate amount of the payments." SAC [#47] ¶¶ 72, 102.

Taking Plaintiffs' factual allegations in the SAC as true, as the Court is required to do at the motion to dismiss stage, the Court finds Plaintiffs have adequately pled a strong inference of scienter against Kuchenrither based on the Loan Sales. Defendants' motion to dismiss is therefore denied on this ground.

## B.    Knowledge of the Non-Performing Loans

Plaintiffs further allege Kuchenrither, in certifying EZCORP's financial records as accurate, knew or recklessly disregarded the fact that Grupo Finmart failed to identify certain Non-Performing Loans and improperly continued to accrue interest revenue on these loans. To support this claim, Plaintiffs rely on (1) the Internal Audit Report CW3 purportedly emailed to Kuchenrither "sometime between October 29 and November 4, 2013," which allegedly describes accounting deficiencies identified by CW2 and CW4, and (2) an alleged "series of meetings" involving CW1 and Kuchenrither in which CW1 relayed CW2's report of Grupo Finmart's various accounting deficiencies to Kuchenrither.

Plaintiffs' first allegation represents a marked shift in their theory of liability, as the first amended complaint (FAC) said nothing about a 2013 internal audit report related to Grupo Finmart. Instead, it presented allegations from CW3 about a "series of written reports sent to senior management" in 2012, prior to EZCORP's acquisition of Grupo Finmart. FAC [#29] ¶¶ 4,

44. Based on Plaintiffs' representations in the FAC, the Court previously described the report as "a pre-acquisition due diligence report of Grupo Finmart" conducted in 2012. Order of Oct. 18, 2016 [#44] at 5. The Internal Audit Report cited in the SAC, however, is described as a 2013 fiscal year-end review of Grupo Finmart. Instead of explaining the inconsistency between CW3's allegations in the FAC and his or her new allegations in the SAC, Plaintiffs attempt to sweep this distinction under the rug by stating, "[t]he only difference between the FAC and the SAC is more detailed and precise facts as to the report sent to Kuchenrither . . . ." Resp. [#52] at 16. Plaintiffs' refusal to even acknowledge the difference in CW3's allegations regarding the report he or she purportedly sent to Kuchenrither undermines the reliability of CW3's new allegations.

Even assuming the reliability of CW3's account, however, the Court finds these newly discovered allegations fail to support a strong inference of scienter. As an initial matter, there is no allegation Kuchenrither actually saw or reviewed the Internal Audit Report. Instead, Plaintiffs allege the report was sent to Kuchenrither, "among others," via email and hard copy. SAC [#47] ¶ 57. The inferential leap required to tie Kuchenrither's receipt of the report to the conclusion that he acted knowingly or recklessly when certifying EZCORP's financials is tenuous given the heightened pleading standards.

Moreover, Plaintiffs' allegations regarding the contents of the Internal Audit Report are still too vague to support a strong inference of scienter. Courts evaluating similar allegations have found them insufficient to demonstrate a strong inference of scienter. *See Owens*, 789 F.3d at 544; *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186–88 (2d Cir. 2014) (concluding an internal investigation report, which determined there were "valuation uncertainties," a lack of transparency, and "inherent risks not adequately analyzed" in the valuation of certain assets, did not demonstrate a strong inference of scienter). In *Owens*,

investors brought federal securities law claims against a company's officers, alleging the officers made false and misleading statements about the company's assets. 789 F. 3d at 533. Specifically, the investors alleged the defendants were aware of deficiencies in their internal valuation model, in part because a confidential witness purportedly warned the defendants of these deficiencies in an email. *Id.* at 544. Nevertheless, the Fifth Circuit concluded the investors failed to adequately plead scienter, noting that "CW1's warnings did not mention GAAP and do not seem to suggest that any issues were so severe that they could lead to a large overvaluation of the MBS portfolio." *Id.* Similar to the investors' deficient allegations in *Owens*, Plaintiffs fail to allege the Internal Audit Report informed Kuchenrither that Grupo Finmart's financial reports were false or would require restatement. And Plaintiffs make no suggestion that any other EZCORP executive alleged to have received this report or any outside auditors raised any "red flags" as to the veracity of Grupo Finmart's financial reports.

Finally, Plaintiffs fail to explain how CW3, an administrative assistant, would know what findings were included in the Internal Audit Report. Plaintiffs rely on allegations from CW2 and CW4, both internal audit employees, to describe what was in the report, but Plaintiffs do not allege that either CW2 or CW4 even saw the final version of the report which CW3 purportedly "assisted in finalizing" and allegedly sent to Kuchenrither. SAC [#47] ¶ 57. In light of the foregoing, the Court finds CW3's allegations regarding the alleged Internal Audit Report fail to give rise to a strong inference of scienter.

Plaintiff's second allegation regarding the "series of meetings" involving CW1 and Kuchenrither likewise fails to give rise to a strong inference of scienter. CW1 claims he or she informed Kuchenrither of Grupo Finmart's "accounting issues" in a "series of meetings" held at EZCORP's headquarters sometime between late October 2013 and November 7, 2013. *Id.* ¶ 16.

Defendants again challenge the reliability of CW1's alleged conversations with Kuchenrither, claiming CW1's allegations lack the requisite specificity as to when and where these meetings occurred. For the reasons explained above, however, the Court finds this challenge unpersuasive.

Nevertheless, the Court finds CW1's account of his or her conversation with Kuchenrither in a "series of meetings" unreliable, as CW1's statements are based on hearsay-within-hearsay. Unlike CW1's first-hand review of the Loan Sales, CW1's knowledge of Grupo Finmart's accounting deficiencies is based on CW2's report to CW1 that Grupo Finmart "was not properly tracking payday loans" because it "did not have adequate aging reports." *Id.* ¶ 15. Nowhere in the SAC do Plaintiffs allege with any more particularity what CW2 told CW1, nor do they explain in their response how, based on Plaintiffs' description of what CW2 told CW1, CW1 would have personal knowledge of the "very accounting problems that were in the 2013 [Internal Audit Report] [] given to Kuchenrither by CW3." *See* Resp. [#52] at 20 (citing SAC [#47] ¶ 58). The Court finds this hearsay-within-hearsay account too unreliable to give rise to an inference of scienter as cogent or compelling as any competing inference of nonfraudulent intent. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009) ("[A] hearsay statement, while not automatically precluded from consideration to support allegations of scienter, may indicate that a confidential witness's report is not sufficiently reliable, plausible, or coherent to warrant further consideration[.]").

Taken together, Plaintiffs' allegations regarding the Internal Audit Report and CW1's "series of meetings" with Kuchenrither—in conjunction with any inference of scienter raised from the existence and magnitude of the Restatement—do not present a strong inference of scienter against Kuchenrither "at least as compelling as any opposing inference of nonfraudulent

intent." *See Tellabs*, 551 U.S. at 314. Defendants' motion to dismiss is therefore granted on this ground.

### III.    Control-Person Liability

Defendants move to dismiss Plaintiffs' § 20(a) control-person claim on the ground that Plaintiffs have failed to establish a predicate securities fraud violation under § 10(b). As the Court finds Plaintiffs failed to adequately plead Kuchenrither's scienter regarding Grupo Finmart's Non-Performing Loans under § 10(b), it grants Defendants' motion to dismiss Plaintiffs' § 20(a) claim premised on this ground. However, because the Court finds Plaintiffs have adequately plead scienter against Kuchenrither regarding Grupo Finmart's Loan Sales under § 10(b), the Court denies Defendants' dependent request to dismiss Plaintiffs' corresponding § 20(a) claim.

### Conclusion

For the reasons explained above, the Court concludes Plaintiffs' § 10(b), § 20(a), and Rule 10b-5 claims based on the Loan Sales survive Defendants' motion to dismiss. However, because the Court finds Plaintiffs failed to adequately plead scienter as to their § 10(b) and Rule 10b-5 claims based on the Non-Performing Loans, these claims are dismissed. Having failed to establish a predicate securities fraud violation under § 10(b) regarding the Non-Performing Loans, Plaintiffs' corresponding § 20(a) claims are likewise dismissed.

Accordingly,

IT IS ORDERED that Defendants EZCORP, Inc. and Mark Kuchenrither's Motion to Dismiss [#50] is GRANTED IN PART and DENIED IN PART as described in this opinion.

SIGNED this the 5th day of May 2017.

SAM SPARKS
UNITED STATES DISTRICT JUDGE