# Exhibit 9

Job No. 2817298

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS


In Re EZCORP, Inc.                  Master File No.

Securities Litigation            1:15-cv-00608-SS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEO DEPOSITION OF

CHAD WILLIAM COFFMAN



March 6, 2018

9:43 a.m.


353 North Clark Street

Chicago, Illinois





Deanna Amore, CSR, RPR, 084-003999

Page 1

Job No. 2817298

APPEARANCES OF COUNSEL

On Behalf of the Lead Plaintiff, JOHN ROONEY:

LEVITON & BLOCK
MR. JEFFREY C. BLOCK
MR. JACOB A. WALKER
155 Federal Street
Suite 400
Boston, Massachusetts 02110
(617) 398-5600
jeff@blockesq.com
jake@blockesq.com

On Behalf of the Defendant, EZCORP, INC.:

VINSON & ELKINS
MR. STEPHEN S. GILSTRAP
2001 Ross Avenue
Suite 3700
Dallas, Texas 75201
(214) 220-7700
sgilstrap@velaw.com
        - and -
VINSON & ELKINS
MS. JENNIFER B. POPPE
2801 Via Fortuna
Suite 100
Austin, Texas 78746-7568
(512) 542-8411
jpoppe@velaw.com

ALSO PRESENT:
Daniel Froman, Videographer

*   *   *   *   *

Page 2

Job No. 2817298

                            I N D E X

 WITNESS                                    EXAMINATION

 CHAD WILLIAM COFFMAN

     EXAMINATION BY MR. GILSTRAP                     6

                       EXHIBITS

  NUMBER              DESCRIPTION                  PAGE

  Exhibit 14       1.31.2018 Expert Report          8

                   of Chad Coffman, CFA

  Exhibit 15       Event Study Regression           70

                   Analysis Output

  Exhibit 16       5.12.2015 Morningstar            78

                   Document Research - Form

                   NT 10-Q

Veritext Legal Solutions
800-336-4000

sometimes they do their own analyses of nonpublic information and provide information to the market that way.  So, yes, I think they are an important source of information, but they are not just a conduit of information, of spreading information.

Q.   Right.

And I believe you just talked about companies issuing information in press releases and that sort of thing.  That's a way that information gets to the market; is that correct?

A.   That's one way it can get to the market, yes.

Q.   Is another way SEC filings?

A.   Yes.

MR. GILSTRAP:  I'm at a good stopping point, if you want to take, like, a ten-minute break and start back at maybe about 11:00.

THE VIDEOGRAPHER:  We are going off the record at 10:49 a.m., and this is the end of Media Set 1.

(A short break was taken.)

THE VIDEOGRAPHER:  We are back on the record at 11:04 a.m.  This is Media Set 2.

BY MR. GILSTRAP:

Q.   Mr. Coffman, we were speaking earlier, before the break, we talked about how one of your

Page 49

is the regression analysis that you conduct; is that correct?

A.   Well, the regression analysis gives you the expected return based on looking at historical -- the historical relationship between the market indices and the stock at issue, and so that regression analysis, one of the outputs of that regression analysis is an expected return on a particular day.  So then there is the actual return, which is just observed, and the abnormal return is just the comparison between those two things.

Q.   And you spoke about the kind of control indices, and what were the control indices used in your regression model in this case?

A.   The return on the S&P 500 total return index and the return on the peer index we were discussing earlier, the daily change -- the percentage change in value of those indices.

Q.   And am I correct that if a stock price return on a specific date is above a certain threshold, that we can get into in a minute, the t-score, that you can state with a certain level of confidence that that abnormal return is explained by something other than randomness?

Page 63

A.   Yes.  I guess the way I would say it is the purpose of the statistical test is to identify -- so you go into each day with a null hypothesis, and the null hypothesis is the stock price wasn't -- the stock price was not impacted by information on that day.

And then the test statistic allows you to evaluate whether you can reject that null hypothesis and say that the stock price moved in such a way that just purely random chance did not cause that with a certain degree of confidence.

So with 95 percent confidence, you can reject the null hypothesis.  That's the threshold we're talking about.

Q.   And did you use the 95 percent threshold for purposes in this report?

A.   For purposes of this test, I identified significance through the 95 percent confidence level, yes.

Q.   And in your experience, is that the generally accepted confidence level required?

A.   It's not the only level.  I mean, there are certainly academic studies that draw inferences based on the 90 percent level of confidence, and in the past I've made note of results that are

Page 64

significant at the 90 percent level of confidence.

I would say the 95 percent confidence level is

what's most often looked at both in this context

and in the literature, but it's certainly not the

only threshold that's ever relied upon.

Q.    And what does a t-statistic or a t-score

need to be in order to show an abnormal return

that's explained by something other than randomness

at the 95 percent confidence level?

A.    Well, in a very large sample size, that

statistic is about 1.96, which means that the

abnormal return is more than 1.96 standard

deviations away from zero.

In a less than very large sample size,

that threshold can move a little bit from 1.96.

You know, it might be -- and the sample sizes we're

talking about here, it might be more like 1.97 or

1.98.

What you do is you take that t-statistic

and turn it into what's called a p-value based

on -- and that takes into account the sample size

you're looking at, and so, ultimately, you're

actually judging on that p-value.  So if the

p-value is less than 5 percent, then you deem

something as statistically significant at the

Page 65

95 percent level.

But the 1.96 threshold is a -- sort of a marker that's often discussed because that's the -- sort of for the very large sample sizes, what the threshold is, but the threshold for a smaller sample size is actually slightly different than that. And we take into account the sample size in calculating the p-values to actually determine whether something is significant or not.

Q. When you say "very large sample size," do you know how many samples roughly are needed for that 1.96 threshold, generally speaking?

A. Well, I don't recall exactly how many data points you need to get, you know, to where it rounds to 1.96. It's one of those things where it's true in the limit to infinity, but it approaches 1.96 pretty quickly, I believe, after a couple hundred observations. But, like I said, the statistics we calculate and the p-values we calculate explicitly take into account the sample size we're using.

Q. Sure.

And so if a specific sample is associated with a t-statistic that, let's say, is three, is it fair to say that that would be a statistically

Page 66

Chad Coffman - March 6, 2018
Job No. 2817298

significant sample?

A.   I don't think of -- I don't like the way your question is worded just because it's -- you don't determine that the sample is statistically significant.

Q.   Sorry.  I guess I should have said data point.

A.   Yeah, I mean, essentially, I think what you're asking me -- and tell me if you're asking something different -- is when you observe a t-statistic of three for a particular stock price return, is that typically statistically significant?

And I think in reasonably sized samples, that's true.  I mean, you might imagine very small sample sizes where that might not be true.

But, certainly, in my event study where I'm looking at the previous 120 days, when I'm looking at each day and whether it's statistically significant or not, if I observe a t-statistic of three, that easily meets the 95 percent threshold and would be statistically significant.

Q.   And in your regression analysis, if you observed a t-statistic of one, then the stock price movement on that day would not be statistically

Page 67

significant?

A.   Certainly not at the 95 percent level, that's correct.

Q.   And I'm correct that t-statistics are both positive and negative.  So, for example, if there was a stock price drop, for a day to be statistically significant, it would need to be more negative than 1.96; is that correct?

A.   Or somewhere right around that area, yes.

Q.   I'd like to direct your attention to footnote 46, which is on page 22.  It's the footnote we were looking at earlier.

A.   Okay.

Q.   And it talks about, toward the end of that footnote, certain days being removed from the estimation period.  Do you see where I am?

A.   Yes.

Q.   What does that mean?

A.   Sure.

So the reason that's done or why that's done is when you're testing the null hypothesis that the stock price was not impacted by any news and, therefore, didn't move as a result of news, what you ultimately want to evaluate is what is the variability of the stock under conditions where

Page 68

there is no news because that's the null hypothesis you are trying to reject against.

And so if there are days during the estimation window where there is obvious firm-specific news that obviously moved the stock price or at least could have moved the stock price, then including those days as if they didn't have news and bias attached, because you are introducing volatility that was clearly induced by news into the control, and ideally, you'd like to have an estimate of what the variability of the stock price is in the absence of news.

And so if there are days that are essentially outliers where their returns are sufficiently large, that by including them in the estimation, you are really biasing against the test you are trying to perform, then it makes sense to exclude them.

Q.   And footnote 46 notes the dates that you excluded from your analysis?

A.   Correct.

And you know, there is -- you can always argue that there is potentially more dates that should have been excluded with news on other dates, but by leaving the rest of the dates in that might

Page 69

Veritext Legal Solutions
800-336-4000

have had at least some news, it's actually biasing against our particular test.

So these were just two very large returns on obvious dates that were outliers that to make the test less biassed, I excluded them.

Q.   Mr. Coffman, I am handing to you what's going to be marked as Exhibit 15, which is a very big spreadsheet that was provided in the backup materials by plaintiffs' counsel.

(Whereupon, Exhibit 15 was marked for identification.)

BY MR. GILSTRAP:

Q.   Please take a second to glance through and let me know when you're ready.

A.   Okay.

Q.   And have you seen Exhibit 15 before?

A.   If it's what I believe it appears to be, I have.  It's likely the output of the event study regression I ran in this case, but in order to verify that, I'd want to double-check against some of the numbers in the report.  But I believe that's probably what this is.

Q.   Well, to the extent you need to check to make your -- I'll represent to you it was what was provided by your counsel, but, please, take the

Page 70

Job No. 2817298

time you need to check and make sure the numbers match to your satisfaction.

A.   Yes, this appears to be the output of the event study I ran.

Q.   Okay.  And just broadly speaking, we are going to go through some of the columns so I can understand, but when you say it shows the output of your regression for the event study, broadly speaking, what does that mean?

A.   Sure.

Well, it also includes, I think, many of the input variables.  So I think the easiest way to describe it would be to just go through the first line and explain what each number means.

Q.   Sure.  That would be great.

A.   Column A just shows the trading date.

Column B shows the return for EZCORP on that day when comparing against the prior day.  So for that column it's minus 0.058.  So that means there was a 5.8 percent decline in the stock price on that day.

Column C is the return on one of the control variables.  That's the S&P 500.  So that would suggest the S&P 500 was up six tenths of 1 percent that day.

Page 71

Column D shows the return of the equally weighted index, the peer index that we discussed earlier.  So that would imply that on this day, the peer index was down, it looks like, eight one-hundredths of 1 percent.

Then E, F, G, H, I and J are all the regression coefficients and the t-statistics for those regression coefficients.  So I don't know if you want me to get into the detail of what all of those things mean, but each line item here represents there is a separate regression.

So the regression in what we're talking about on line 2, this reflects the regression coefficients from looking at the 120 prior trading days, and based on that, running that regression, Columns E through J describe some -- the coefficients from that regression equation and the statistical test of whether those factors were statistically significant or not.

Q.   Okay.

A.   Column K is the root mean squared error or what I talk about in the report of the standard deviation of errors.  So that's -- when you see in the first line that the RMSE is 0.016, that means that the standard deviation of the abnormal returns

Page 72

is 1.6 percent.  So another way to think about what that means is you would need roughly 1.9, six times that of a price movement for it to be statistically significant.  Okay?

L is another output statistic from the regression.  That's the adjusted R-squared of the regression.  It measures the goodness of fit or how much of the variation in the EZCORP returns can be explained by the control indices.

Column M identifies the number of observations that went into the estimation.  So as I described in the report, I exclude earnings announcements, and those two other dates we just talked about so that's why it can be slightly less than 120.

N reflects what we talked about before as the expected return.  So based on the regression I ran and the coefficient in Column E through J as well as the observed returns of the S&P 500 and the peer index, this is what the model says, absent any new firm-specific information, we would expect the stock price to move in that fashion.

So, here, the expected return is 0.0033.  This is saying the model would have expected, absent any news, the stock price to increase by

Page 73

33 basis points or 33 one-hundredths of a percent.

O is the abnormal return that we talked about.  So that's just the difference between the observed return in Column B and the expected return in Column N.

P, Column P is the abnormal dollar movement.  So that just takes the abnormal return and converts it into dollars and cents.  So this would imply that the stock price declined by 61 cents in a way that was different than what the model predicted.

And then Column Q is the t-statistic for the abnormal return.  So that's the t-statistics that we look at for determining whether or not -- that's the number of standard deviations the actual return was away from the predicted return.  So you get to that by taking the abnormal return divided by Column K, the root mean squared error.

And then Column R is the statistical value -- what's the p-value, which is translating the abnormal return -- I'm sorry -- the t-statistic into a probability figure based on the number of data points they are using to determine -- you can think of the p-value as essentially the probability you would observe an abnormal return as far from

Page 74

Chad Coffman - March 6, 2018
Job No. 2817298

zero as you are by random chance alone.  So if that value is less than 0.05 implies that there is a less than a 5 percent chance.  So that would be statistically significant.

And then Column S just is an indicator of the level of statistical significance.  So I believe if there is three characters there, that's significant at the 99 percent level.  If there is two characters there, it's significant at the 95 but not the 99 percent level, and if there is one character, it is significant at the 90 percent level but not the 95 percent level.

Q.    Thank you for going through that.

And looking at Column S, that you just spoke about, the significant -- statistical significance column, when you talk about characters, there are some dates that have, you know, one minus, two minus and three minuses, and am I correct that that just means that there is a negative price movement at those various confidence intervals, 90 percent, 95 percent and 99 percent?

A.    Yes, that's correct.

Q.    And same for the plus marks.  If there is one plus mark, then that means that day's return is statistically significant at the 90 percent

Page 75

confidence level.  If there are two plus marks, at the 95 percent, and if there are three plus marks, at the 99 percent?

A.   That's correct, yes.

Q.   And if there is nothing in Column S associated with a particular day, that means that the return on that day was not statistically significant in your model?

A.   That's correct.

Q.   And so just taking the first date that we were looking at, Column Q, which shows the t-statistic is negative 3.849, which is more negative than the 1.96 t-statistic number we spoke about earlier.  So based on that t-score, we would anticipate that there would be at least some minus marks in Column S given that it's more negative than that 1.96 number?

A.   That's correct.

Again, to be precise, you translate it through the p-value, but generally speaking, that's correct, yes.

Q.   And I believe earlier you said for the p-value for a date to be statistically significant, you would -- the p-value would be less than 5 percent; is that correct?

Page 76

A.    To be significant at the 95 percent confidence level, the p-value would have to be less than 0.05.

Q.    And what would the p-value have to be to be statistically significant at the 99 percent level?

A.    Less than 0.01.

Q.    And am I correct that if it's less than 0.1, that it would be statistically significant at the 90 percent level?

A.    That's correct, yes.

Q.    My stats teacher would be proud.

Turning back to Exhibit 14, so the report, page 62, which is Appendix A.  Let me know when you're there and you've had a chance to review.

A.    Okay.

Q.    So am I correct Appendix A lists the documents that you considered in drafting the report that's Exhibit 14?

A.    Yes.

Some of the line items are summaries of information, not a detailed list of every single document, but, yes, Appendix A is meant to reflect the material I considered in preparing the report.

Q.    And in looking through Appendix A, as you

Page 77

Chad Coffman - March 2018
Job No. 2817298

sit here today, are there any documents not included in Appendix A that you have reviewed and should have been included and may have been inadvertently left off?

A.    Not that I'm aware of, no.

(Whereupon, Exhibit 16 was marked for identification.)

BY MR. GILSTRAP:

Q.    Mr. Coffman, I'm going to hand you what's being marked as Exhibit 16.

Let me know when you've had a chance to review.

A.    Okay.

Q.    In putting together your report, Exhibit 14, did you -- do you recall reviewing Exhibit 16?

A.    I don't recall reviewing this specific document.  Whether or not it was part of the material I considered, it would be easy to ascertain, but I don't specifically recall this document as something I considered.

Q.    Let me back up.

What is Exhibit 16?

A.    It appears to be an SEC filing, Form NT 10-Q, filed by EZCORP on May 12, 2015.  At

Page 78

least that's what it purports to be.

Q.   And as we talked about earlier, would this type of SEC filing be something that potentially made information available, publicly available to the marketplace?

A.   That's plausible, yes.

MR. GILSTRAP:   I think we're coming down the home stretch.  I think probably take a short five-minute break and then we can wrap up pretty quickly before lunch, if that works with everybody.

THE VIDEOGRAPHER:   We are going off the record at 11:47 a.m.

(A short break was taken.)

THE VIDEOGRAPHER:   We are back on the record at 11:52 a.m.

MR. GILSTRAP:   Mr. Coffman, thank you for your testimony today.

Defendant EZCORP has no further questions. We'll pass the witness.

MR. BLOCK:   We have no questions either.  Thank you.

THE VIDEOGRAPHER:   This marks the end of Media Set 2 and the end of this deposition at 11:53 a.m.

Page 79

Job No. 2817298

C E R T I F I C A T E


I, DEANNA AMORE, a Shorthand Reporter and notary public, within and for the State of Illinois, County of DuPage, do hereby certify:

That CHAD WILLIAM COFFMAN, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.


IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of March 2018.

*Deanna Amore*

Deanna M. Amore, CSR, RPR
Veritext Legal Solutions
Veritext Firm Registration No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102

Page 80

Job No. 2817298

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

In Re EZCORP, Inc.                    Master File No.

Securities Litigation              1:15-cv-00608-SS


DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2018.

_____

CHAD WILLIAM COFFMAN

Page 81

Veritext Legal Solutions
800-336-4000