# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| In re EZCORP, Inc. Securities Litigation | Master File No. 1:15-cv-00608-SS |
| | **PROPOSED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION AND OVERVIEW ............................................................ 1

II.    JURISDICTION AND VENUE ................................................................................... 188

III.   PARTIES ........................................................................................................... 199

IV.    CONFIDENTIAL WITNESSES ................................................................................ 21

V.     SUBSTANTIVE ALLEGATIONS .............................................................................. 23

       a.    Background .................................................................................................... 23

       b.    The False and Misleading Statements During the Class Period Regarding the
             Company's Financials and its Internal Controls And Why Those Statements Were
             False and Misleading ..................................................................................... 25

       c.    EZCORP Disclosed the Need to Restate Its Financials with ............................ 49

       d.    Defendants' Statements During the Class Period Regarding Grupo Finmart and
             The Company's Internal Controls Were Knowingly or Recklessly False and
             Misleading When Made .................................................................................. 61

             i.    The Restatement Reveals Accounting Errors that are Highly Suggestive of
                   Fraud ...................................................................................................... 63

             ii.   The Restatement Had a Material Impact on the Company's Financial
                   Statements ............................................................................................. 72

       e.    Defendant Kuchenrither Recklessly Disregarded EZCORP's Deficient Internal
             Controls .......................................................................................................... 76

       f.    EZCORP's Violation Of GAAP Rules In Its Financial Statements Filed With The
             SEC ................................................................................................................. 80

       g.    Defendant Kuchenrither's Compensation Package ......................................... 80

VI.     CLASS ACTION ALLEGATIONS ................................................................. 83

VII.    LOSS CAUSATION................................................................................. 84

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET

        DOCTRINE)..................................................................................... 866

IX.     NO SAFE HARBOR ............................................................................. 888

    COUNT I ........................................................................................... 899

        Violation of Section 10(b) ............................................................... 899

    COUNT II .......................................................................................... 92

        Violation of Section 20(a).................................................................. 92

    PRAYER FOR RELIEF ......................................................................... 93

    JURY TRIAL DEMANDED................................................................... 94

Lead Plaintiff John Rooney, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsels' investigation, which includes: (a) review and analysis of regulatory filings made by EZCORP, Inc. ("EZCORP" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, investor presentations, conference calls, and media reports issued by and disseminated by EZCORP; (c) interviews with confidential witnesses who have personal knowledge of the allegations contained herein; (d) documents produced by defendants during pre-trial discovery; and (e) review of other publicly available information concerning EZCORP.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.     This is a securities class action on behalf of purchasers of EZCORP Class A common stock between January 28, 2014 and October 20, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     EZCORP delivers cash solutions to customers across channels, products, services, and markets. With approximately 1,400 locations, the Company offers customers multiple ways to access instant cash, including pawn loans and consumer loans in the United States, Mexico, and Canada, and fee-based credit services to customers seeking loans. At its pawn and buy/sell stores and online, the Company also sells merchandise, primarily collateral forfeited from pawn lending operations and used merchandise purchased from customers.

3.     In a series of disclosures beginning on April 30, 2015 and ending on October 20, 2015, EZCORP announced that it would restate its prior financial results. EZCORP's stock, which

closed at $9.20 per share on April 29, 2015, plummeted by almost 30% to close at $6.48 per share on July 17, 2015 after EZCORP fully revealed all the facts concerning the restatement of EZCORP's prior financial results.

4.     As described herein, EZCORP was forced to restate its financial results due to accounting irregularities at its Mexican subsidiary, Grupo Finmart. On January 19, 2012 EZCORP announced that it was acquiring a 60% ownership interest in Prestaciones Finmart, S.A. de C.V., SOFOM, E.N.R. ("Crediamigo"), a consumer loan provider headquartered in Mexico City, Mexico. Crediamigo later became known as Grupo Finmart (hereinafter, "Crediamigo" and "Grupo Finmart" are used interchangeably). The acquisition closed in February 2012 and EZCORP, as required under U.S. Generally Accepted Accounting Principles ("GAAP"), consolidated Grupo Finmart's financial results into its own results. On June 30, 2014, the Company acquired an additional 16% of the ordinary shares outstanding of Grupo Finmart. On September 1, 2015, the Company increased its ownership position in Grupo Finmart to 94%.

5.     Grupo Finmart maintained a separate Board of Directors, but EZCORP's 60% interest in Grupo Finmart in 2012 gave EZCORP the right to appoint six of the ten Grupo Finmart Board of Directors. Accordingly, Defendant Mark Kuchenrither was one of EZCORP's appointments to the Grupo Finmart Board of Directors and he sat on the Grupo Finmart Board during fiscal years 2013 and 2014. Defendant Kuchenrither therefore served as a member of both EZCORP's and Grupo Finmart's Board of Directors during the Class Period and attended Grupo Finmart Board of Directors meetings in Mexico.

6.     Grupo Finmart essentially acts a payday lender to individuals in Mexico by providing payroll withholding agreements with Mexican employers, primarily federal, state and local governments and agencies, and unsecured multiple-payment consumer loans to the

employees of the various employers. Grupo Finmart collected interest and principal payments through payroll deductions. However, unlike in the U.S., where payday lending is typically fairly short term (often due on the next pay cycle), Grupo Finmart's loan periods were typically longer, often multiple years. According to EZCORP's 2013 10-K filed on November 27, 2013, the average Grupo Finmart loan was approximately USD $1,200, with a term of 31 months. According to EZCORP's 2014 10-K filed on November 26, 2014, the average Grupo Finmart loan was approximately USD $1,600, with a term of 31 months.

7.     Grupo Finmart's and EZCORP's financial results were restated for two primary reasons. First, beginning in the fourth quarter of EZCORP's 2013 fiscal year-end (EZCORP's fiscal year ends on September 30) and continuing for each quarter throughout 2014 and the first quarter of 2015, EZCORP recorded revenue from the sale of Grupo Finmart loan portfolios to third-parties. As alleged herein, CW#1, EZCORP's Vice President of Internal Audit, discussed the first loan sale with Kuchenrither at EZCORP's Rollingwood, Texas headquarters in early November 2013. This conversation occurred after October 21, 2013, the date of the loan sale agreement and before EZCORP issued its press release on November 7, 2013 announcing its 2013 fiscal year-end results. CW#1 reported to, among others, defendant Mark Kuchenrither. As part of CW#1's job responsibilities, CW#1 had regularly scheduled monthly meetings with Kuchenrither, and typically spoke with Kuchenrither on a near-daily basis at EZCORP's executive offices at Rollingwood, Texas. CW#1 managed approximately 75 internal auditors at EZCORP and its subsidiaries, all of whom directly reported to CW#1. CW#1 stated that the internal audit team for Grupo Finmart (led by CW#2, as described in ¶ 56, *infra*), had identified the loan transaction contract through its regular internal audit procedures and "rolled up" the contract to CW#1. CW#1 reviewed the loan documents and determined that the transaction should not have been recorded

as revenue due to a right to return non-performing loans to EZCORP. EZCORP's accounting policy at the time prohibited recording revenue from an asset sale if a right to return existed. During CW#1's meeting with Kuchenrither in early November 2013, CW#1 informed Kuchenrither that based upon a review of the terms of sale documents to the third-party investors, the third-party retained a right to return non-performing loans to EZCORP, meaning that if any of the sold loans defaulted, the third-party had the right to make EZCORP repurchase the loans. Even though CW#1 explained that the loan transactions should not be recognized as revenue due to this right of return, Kuchenrither dismissed CW#1's concerns and claimed that he had consulted the appropriate personnel concerning the loan sale.

8.      As part of the restatement it later made, however, EZCORP admitted that the Company had "material weaknesses in [its] internal control over financial reporting" and, with respect to each of the Grupo Finmart loan transactions, that: (1) "[t]he appropriate accounting expertise (internally and externally) was not engaged, resulting in a failure to recognize important U.S. GAAP issues"; (2) "[t]he accounting consequences of significant, unusual transactions were not identified and evaluated"; and (3) "[t]he accounting positions taken on significant, unusual transactions were not reviewed and approved at the appropriate level."

9.      Throughout fiscal 2014, EZCORP engaged in four additional sales of loans at Grupo Finmart and recognized a total of $33 million in gains on all five loan package sales in fiscal 2014. The improper accounting for the asset sales had the effect of artificially boosting all of EZCORP's reported 2014 income by 45%. The second such loan sale closed on March 31, 2014, the last day of the fiscal quarter; two additional loan sales both closed on June 30, 2014, the last day of the fiscal quarter; and the last such sale closed on September 30, 2014, the last day of the fiscal quarter. EZCORP engaged in another loan sale in the first quarter of 2015, recognizing $6.6

million in income on this sale and artificially boosting 2015 first quarter income by 32%. This loan sale closed on December 19, 2014, twelve days before year-end.

10.     EZCORP's own internal accounting policy required that before a sale could be recognized as revenue, EZCORP was required to relinquish all control over the asset. In fact, at the time the sales of these loans were recorded, EZCORP knew of the proper U.S. GAAP guidance – FASB ASC 860-10-40-5, which requires that the seller does not maintain any right of return – yet, EZCORP booked the loan sales as sales anyway.

11.     During conference calls with research analysts and investors during 2014, certain analysts questioned the terms of these sales. In response, Kuchenrither directly responded that the sales were "true asset sales," and that "the risk associated with the loans passed to the buyer of the loans." Kuchenrither also informed analysts that EZCORP expected to make additional loan sales going forward and that they expected to sell approximately $5 million to $10 million in loans per month. Although one analyst directly asked **when** the loans were closed, Kuchenrither did not respond other than relying on his prior response that loans were being sold on a monthly basis.

12.     On February 1, 2015, Kuchenrither was replaced as Chief Executive Officer ("CEO") of EZCORP. On April 30, 2015 EZCORP announced its 2015 fiscal year-end second quarter financial results, revealed it was reviewing its Grupo Finmart loan portfolio and stated that "[w]e did not undertake any asset sales in Grupo Finmart this quarter as we have done over the past several quarters. During the quarter, we noted some differences in the performance of parts of our Grupo Finmart loan portfolio that prompted a more thorough review and analysis of our loan reserves, interest income, processes and controls."

13.     The second reason that Grupo Finmart's and EZCORP's financial statements were restated was due to the failure to properly account for non-performing payroll loans, which resulted

in an understatement of bad debt expense and an overstatement of accrued interest revenue and income. In addition, Grupo Finmart lacked adequate internal controls to ensure that its accounting was proper.

14.    In May 2014, EZCORP engaged in a sale of Grupo Finmart loans to a third-party, Altum.  In August 2014, EZCORP learned that a number of loans that it sold to Altum were non-performing. EZCORP undertook an investigation and, among other things, uncovered that loan "documents were being altered regarding the employee type," (*i.e.*, fraud was being committed when the loans were being initiated in Mexico). *See* Ex. A[1]; "[T]he discovery of customer fraud in one of the portfolio sales triggered the company's investigation." *See* Ex. B.

15.    In December 2014, Altum "requested that the loans [with the issues of fraud] be replaced." *Id*. No later than January 2015, "EZCORP CFO [Kuchenrither] was made aware of the request by Altum and the issues regarding the sold loans. . . . This issue led to a concern by EZCORP accounting that there may be non-performing loans such as these unidentified on the balance sheet of Grupo Finmart." *Id.* As a result, in early 2015 EZCORP undertook an investigation into Grupo Finmart's loans, their performance and reserves, which ultimately led to the restatement of EZCORP's financial results.

16.    Kuchenrither, however, knew, as of April 16, 2014, that Grupo Finmart's financial statements were not being prepared in accordance with both Mexican and US GAAP and that its loan reserves were understated.

17.    On April 16, 2014 Kuchenrither received an email from Jeff Byal, who was the Senior Vice President and Chief Accounting Officer for EZCORP. Byal was providing

---

[1] The contents of each of the Exhibits to the Proposed Third Amended Class Action Complaint are hereby incorporated by reference.

Kuchenrither with "the facts" for him to inform then EZCORP President Paul Rothamel why Grupo Finmart missed its first quarter numbers. (In the second quarter of 2014 Kuchenrither replaced Rothamel as EZCORP's interim CEO). Byal wrote that: "this is why we pushed for GF to hire a seasoned and strong technical CFO, which did not occur. We've since hired a former CFO here in Austin as our Director of International Accounting to be able to dig deep into GF's accounting each month both on-site and from Austin. Jose has had to resort to showing GF in the Mexican GAAP codification (in Spanish) where **they are not even keeping their books according to Mexican GAAP, which by the way is the same as US GAAP in many instances**. . . . The team is also working on getting the data pulled together **so we have a better view on what our bad debt reserves should be at GF, which based on my time with them in Mexico will be an increase in our reserves.**" *See* Ex. C (emphasis added).

18.     Kuchenrither also knew that EZCORP "needed" the revenue from the Grupo Finmart loan sales to operate the business and close an earnings gap in 2014. In an email dated April 28, 2014 he wrote to Jodie Maccarrone that "Grupo Finmart cash flow/loan generation review. **EZCORP needs the benefit of $20 million worth of loan sales**. Currently we have forecasted two $10 million loan sales transactions – one in each of the remaining quarters. Is this feasible and does it make sense? Could we go bigger?" *See* Ex. D (emphasis added).

19.     In Q2 2014 EZCORP sold $9.9 million in loans; in Q3 2014 it sold $24 million in loans and in Q4 214 it sold $26.7 million in loans.

20.     Discovery produced to date shows that in 2014 alone Kuchenrither and Maccarrone emailed each other at least 63 times just related to the Loan Sale issue.

21.     On May 18, 2015, as the evaluation of the restatement process was underway, Stuart Grimshaw (who replaced Kuchenrither as CFO of EZCORP) received a timeline of events

from Jodie Maccarrone, President of US Financial Services for EZCORP. As she wrote:

> In Q114, the local team proposed to the GF Board of Directors the CiBanco [the first loan asset sale] transaction to 'test' the Columbia model.
> - There were two factors driving this test:
>   - 1) **the business was facing a shortfall to achieve their Y2 earn out payment and this would bridge the earnings gap**
>   - 2) the Columbia model appeared to be a favorable opportunity to create a self-funding mechanism which was important
>     .      .      .
>
> - **As a result of the cash flow need AND the opportunity to accelerate earnings**, both GF and EZCORP jointly agreed to pursue another transaction in Feb 2014
>   - BasePoint was identified as the potential partner and the 2nd transaction was completed in Q2 (to bridge an earnings gap at EZCORP and to fund the business)
> - From there, the scenarios started to be more draconian (selling all the book, transitioning to an originator only model)
>   - The Minority were not comfortable with the approach nor were local management nor was I at 100%
>     .      .      .
>
> - In addition however, I worked with the local team and Mark to continue to try to identify other unsecured funding sources . . .
> - In addition, due to the two asset sales in Q2/Q3, we had access to significant cash – but a significant portion was restricted due to the sale of the collateral pledged against the secured lines of credit.

*See* Ex. E (emphasis added).

    22.    After the fraud involving the loans being sold to Altum was discovered, EZCORP, in July 2014, Grupo Finmart retained Minglewood Administrative Services (a division of BasePoint, to whom EZCORP also sold loans) to "perform an on-site assessment of Finmart's operation, reporting and analytical functions." *See* Ex. F.

    23.    In July 2014 Kuchenrither was exchanging emails with the Minglewood team and with Jodie Maccarrone about scheduling the Minglewood assessment. *See, e.g.,* Exs. 9, 10. Kuchenrither also prepared a spreadsheet for the Minglewood team to use in the assessment. *See*

Ex. G ("I asked Mark to send me the hedge spreadsheet. . . "). It is thus fair to infer that Kuchenrither knew Minglewood was undertaking its assessment.

24.     Minglewood, in its report dated October 30, 2014, found that "the one critical element that is absent [from Grupo Finmart's reports] is timing or a vintage analysis." The "timing or vintage" analysis is also known as an aging report. *Id*. It also found that "the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio. One critical performance indicator is the percent of Out-Of-Payroll ('OOP') loans. . . . While this measurement is a good indicator of the amount of loans that are OOP in the current portfolio, **it does not accurately reflect what the true OOP rate is on the Finmart portfolio on a static basis. It is estimated that historical OOP rate could be as high as 8 to 10% absent OOP loan sales."** *See* Ex. F.

25.     Discovery so far does not reveal who, if anyone, at EZCORP received the Minglewood assessment after it was completed on October 10, 2014. A copy of the report, however, was emailed to EZCORP executives after the need for a restatement was announced and Kuchenrither wrote: "You can see the third party work that was happening." *See* Ex. H.

26.     Jodie Maccarrone, during the restatement investigation, wrote to Stuart Grimshaw, who became CEO on February 3, 2015, that "I feel it is critical to share with you the following activities and measures that were taken to manage risk and provide oversight to the company over the past two years as **I feel strongly that Mark is grossly misrepresenting his awareness of the delays/nature of delays** and what was already being done to reconcile the lack of visibility and intervention to improve risk management." *See* Ex. I (which, according to the document's metadata, was sent on March 25, 2015 and 3:14 PM EDT.)

27.     Grimshaw sent an email to Lachie Given, who became Executive Chairman on

February 3, 2015, in discussing the Loan Sale issue also questioning Kuchenrither's transparency: "And you wonder why we can't meet budget! This is an absolute wreckage that mainlines . . . **with a CFO [Kuchenrither was CFO at the time] pleading ignorance! Bullshit.. . . why can't he tell us this? $27M in asset sales to prop the business up is [unbelievable]**. Why can't we make plan???? We can fix but I am not comfortable uncovering the crap that no one has been told about." *See* Ex. J.

28.      In fact, Matt Appel, who was Board of Director of EZCORP and a member of the Board's audit committee wrote to Stuart Grimshaw on May 2, 2015 discussing the accounting deficiencies at EZCORP. He wrote: "I am surprised at the lag between discovery of potential portfolio issues and the current quarter. Lots of time to address but looks like we have not remediated the issues. And I am surprised at how slowly these issues have been communicated to the audit committee, at least during my tenure. **Were these matters discussed with the committee in calendar 2014**? While a single distributor committed fraud this fraud really has nothing to do with the issues that remain in the portfolio. **Those issues have existed for a long time.** As I have said all along, **aging/collectability reviews are fundamental to a business that lends and manages receivables. Clearly there was no system, manual or automated, that was operating for a very long time.** . . . Management is not operating effectively simply because the review that is currently on-going was initiated. I do not agree that we had compensating controls in place – if we did we would have detected these issues long ago and not be engaged in this fire drill." *See* Ex. K (emphasis added).

29.      Jill Svoboda, the BDO audit partner assigned to EZCORP and who worked on the restatement, informed Kuchenrither on May 6, 2015 that she believed EZCORP did not have "compensating controls in place" to detect or prevent a financial statement misstatement. "It does

not appear that these items [adequate controls] were in place as of March 31, 2015 and were not in place as of September 30, 2014. What affect does this have [on] management's assessment and certifications in the 2014 10-K? . . . [T]he compensating controls were not in place at period end. Conclusion – The overall analysis needs to take into consideration the 'could factor.' The actual misstatement is only the starting point. When the issue was identified, approximately $26M in loans (principle only) were not being collected and many had been outstanding for extended periods of time. Management has represented that they have begun to receive payments, but the potential magnitude seems to be much greater." *See* Ex. L.

30.     On May 6, 2015 Svoboda emailed Kuchenrither questioning the lack of a "timing or vintage report." She asked "was there a control present that an aging report was being produced and reviewed? Who was supposed to be reviewing the aging report? Why did that not happen?" *Id.*.

31.     As was previously alleged, CW#2, was an internal auditor for EZCORP who went to Grupo Finmart on a quarterly basis to review its accounting practices and determine whether Grupo Fimmart was Sarbanes-Oxley ("SOX") compliant. CW#2 was the EZCORP Internal Audit and SOX Manager responsible for overseeing EZCORP's internal audit of Grupo Finmart in Mexico. CW#4 was an internal auditor at EZCORP who reported directly to CW#2 as part of the team that visited Grupo Finmart to conduct EZCORP's internal audit review. CW#4 and CW#2 both traveled to Mexico to work Grupo Finmart's 2013 fiscal year-end internal audit review.

32.     Both CW#2 and CW#4 found that Grupo Finmart accounting personnel were not properly trained and were not knowledgeable of basic accounting functions. Specifically, CW#2 stated that Grupo Finmart was not SOX compliant and was not properly tracking payday loans. This was because, as CW#2 and CW#4 stated, Grupo Finmart did not have adequate aging reports,

in which Grupo Finmart could track and write-off non-performing loans. An aging report is an accounting tool for measuring bad debt by sorting loans by the period for which they were unpaid, *e.g.* 0-30 days, 31-60 days, 61-90, days, and so on. Because Grupo Finmart lacked adequate aging reports and an adequate collections system, CW#1 explained based on information provided from CW#2, that it could take **up to two years** for Grupo Finmart to even realize that a debtor had left his or her job and was not making payments.

33.     CW#2, who reported directly to CW#1, reported the accounting issues identified in paragraph 32 to CW#1 in early November 2013. CW#1 relayed the accounting issues and concerns that CW#2 and the Grupo Finmart internal audit team brought to CW#1's attention, as set forth in paragraph 32, directly to Kuchenrither in a series of meetings at EZCORP's headquarters in Austin, Texas in early November 2013, before EZCORP issued its fiscal 2013 year-end financial results.

34.     CW#4, who also worked on the internal audit report for Grupo Finmart's 2013 fiscal year-end review, stated that this report included information describing: (1) that Grupo Finmart had inadequate aging reports and inadequate loan tracking procedures; (2) that Grupo Finmart had a very weak collections system making it difficult to collect unpaid loans; (3) that Grupo Finmart's accounting personnel were not properly trained or proficient in accounting; (4) that adequate checks and balances did not exist such that Grupo Finmart account or department mangers failed to approve or verify many of the reconciliations; and (5) as a result, information was not properly vetted by Grupo Finmart personnel and reconciliations lacked adequate support. With respect to Grupo Finmart's inadequate aging reports and collections system, CW#4 explained that there was a significant lag time between when a borrower left his government job and when Grupo Finmart learned of the departure, in part because of the inadequate aging reports, and due

to the lag time, it was very difficult to track down the borrower long after the borrower left the employer.

35.     CW#1 stated that CW#1 informed Kuchenrither in early November 2013 that Grupo Finmart was not SOX compliant because CW#1 and the Grupo Finmart internal audit team had raised a number of issues with Kuchenrither regarding their concerns about the loan contract and whether Grupo Finmart's accounting deficiencies affected EZCORP's ability to sign off on SOX compliance.

36.     As the documentary evidence now establishes, Grupo Finmart did not have an adequate aging report that allowed it to track loans that were in default and should have been reserved for or written off. Kuchenrither was specifically informed of this by November 2013 by CW#1. Although the Court previously found CW#1's informing Kuchenrither of the lack of an aging report as unreliable as it was "hearsay based on hearsay", the documents confirm that Grupo Finmart, in fact, did not have an aging report adding to the reliability of what CW#1 informed Kuchenrither.

37.     Kuchenrither was motived to disregard accounting issues at Grupo Finmart as he acknowledged that EZCOPR need needed the cash from the loan sales to bridge its earnings gap. This was right around the same time that Kuchenrither was told by Byal that Grupo Finmart "was not keeping [its] books according to Mexican GAAP, which by the way is the same as US GAAP in many instances" and that the Grupo Finmart loan reserves would have to be increased. *See* Ex. C.

38.     Plus, Kuchenrither knew Minglewood was assessing Grupo Finmart's controls in the summer of 2014. Minglewood found that Grupo Finmart did not have an aging report nor did it properly track out of payroll loans. Kuchenrither either saw the Minglewood assessment or he

recklessly failed to review it.

39.     Nothwithstanding knowing these facts, Kuchenrither signed his SOX certifications attesting that EZCORP's financial statements, including its year-end 2013, quarterly results for 2014 and 2014 10-K, contained no internal control deficiencies and EZCORP issued its financial statements which contained material misstatements concerning the financial results at Grupo Finmart and included in EZCORP's results.

40.     As detailed herein, on November 9, 2015, EZCORP filed its forms 10-K/A and 10-Q/A, restating its financial results for fiscal years 2014, 2013 and 2012, as well as that for the first quarter of fiscal 2015. The restated financials revealed – and confidential witnesses corroborated – that, throughout the Class Period, Defendants (1) failed to properly identify and record non-performing loan write-offs and improperly continued to accrue interest revenue on the related non-performing loans; (2) packaged and sold six portfolios of loans and improperly recorded those asset sales as sales in direct contravention of GAAP rules and in order to artificially inflate EZCORP's financial statements; and (3) failed to maintain effective internal controls over financial reporting.

41.     The following table calculates the percent reduction and percent overstatement in net income as a result of the Restatement:

| Fiscal Period Net Income (numbers in millions) | As Originally Reported | Restatement Adjustments | As Restated | % Decrease of Net Income | % Overstatement of Net Income |
|---|---|---|---|---|---|
| Q1-2013 | $30.7 | ($3.6) | $27.1 | (11.7%) | 13.3% |
| Q2-2013 | 34.0 | (3.8) | 30.2 | (11.2%) | 12.6% |
| Q3-2013 | (5.9) | (1.1) | (7.0) | (18.6%) | 15.7% |
| Fiscal 2013 | 34.1 | (11.8) | 22.3 | (34.6%) | 52.9% |
| Q1-2014 | 22.6 | (3.9) | 18.7 | (17.3%) | 20.9% |
| Q2-2014 | 8.0 | (1.9) | 6.1 | (23.8%) | 31.1% |
| Q3-2014 | 11.5 | (7.6) | 3.9 | (66.1%) | 194.9% |

| Fiscal 2014 | (45.7) | (19.0) | (64.7) | (41.6%) | 29.6% |
| Q1-2015 | 15.3 | (3.7) | 11.6 | (24.2%) | 31.9% |

42.     The following table calculates the percent reduction in operating income (income from continuing operations before income taxes) per fiscal year as a result of the Restatement. As demonstrated therein, the Restatement resulted in a total reduction in operating income of **21.5%** and revealed a total overstatement of **27.3%**.

| Fiscal Period *(numbers in millions)* | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations before Income Taxes | Restated Income from Continuing Operations before Income Taxes | % Reduction In Income from Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| 2012 | $227.1 | ($13.0) | $214.1 | (5.7%) | 6% |
| 2013 | 102.5 | (22.0) | 80.5 | (21.5%) | 27.3% |
| 2014 | 72.7 | (47.5) | 25.2 | (65.3%) | 188.5% |
| Q1-2015 | 20.4 | (8.2) | 12.2 | (40.2%) | 67.2% |
| **Total Restatement Impact** | **$442.7** | **($90.7)** | **$332.00** | **(21.5%)** | **27.3%** |

43.     The table below calculates the percent reduction in operating income (income from continuing operations before income taxes) per 2013 and 2014 interim fiscal quarter as a result of the Restatement.[2]

---

[2] In 2013 and 2014, EZCORP discontinued certain operations. Pursuant to FASB ASC 205-20 *Discontinued Operations*, a company that discontinues operations can change results reported in prior years' financial statements to reflect the discontinued operations without restating those prior years' financial statements in order to provide users more comparable financial statements. Therefore, due to the effect of discontinued operations and the accounting standard applicable thereto, 2012 operating income was changed from $227.1 million (as reported in 2012 10-K) to $221.6 million (as reported in 2013 10-K). 2012 operating income was further adjusted to $214.1 million as a result of the Restatement. Similarly, due to discontinued operations, 2013 operating income was changed from $102.5 million (as reported in 2013 10-K) to $91.3 million (as reported in 2014 10-K). 2013 operating income was further adjusted to $80.5 million as a result of the Restatement. These reclassifications of certain operations into discontinued operations reduced operating income, but did not have an impact on net income or earnings per share.

| Fiscal Period (numbers in millions) | Income From Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income From Continuing Operations before Income Taxes | Restated Income From Continuing Operations before Income Taxes | % Reduction In Income From Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| Q1-2013 | $51.7 | ($7.9) | $43.8 | (15.3%) | 18% |
| Q2-2013 | 55.0 | (6.6) | 48.4 | (12.0%) | 13.6% |
| Q3-2013 | 27.0 | (4.4) | 22.6 | (16.3%) | 19.5% |
| Q1-2014 | 37.8 | (13.4) | 24.4 | (35.4%) | 54.9% |
| Q2-2014 | 14.0 | (7.9) | 6.1 | (56.4%) | 129.5% |
| Q3-2014 | 19.2 | (15.1) | 4.1 | (78.6%) | 368.3% |

44.     The tables below demonstrate the impact to operating income (income from continuing operations before income taxes) because of the portfolio review and the application of proper accounting treatment to the asset sales:

| Fiscal Period (numbers in millions) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Portfolio Review | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2012 | $227.1 | ($8.7) | (3.8%) |
| 2013 | 102.5 | (21.4) | (20.9%) |
| 2014 | 72.7 | (27.9) | (38.4%) |
| Q1-2015 | 20.4 | (8.0) | (39.2%) |
| **Total Restatement Impact** | **$442.7** | **($66.0)** | **(15.6%)** |

| Fiscal Period (numbers in millions – There was no asset sale in fiscal 2012 or fiscal 2013.) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Asset Sales | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2014 | 72.7 | (25.3) | (34.8%) |
| Q1-2015 | 20.4 | (1.8) | (8.8%) |
| Total Restatement Impact | $93.1 | ($27.1) | (29.1%) |

Moreover, the Restatement had a material impact on earnings per share, as demonstrated in the table below:

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| 2012 | $2.82 | ($0.13) | $2.69 | (4.6%) | 4.8% |
| 2013 | 0.64 | (0.23) | 0.41 | (35.9%) | 56.1% |
| 2014 | (0.84) | (0.36) | (1.20) | (42.9%) | 30% |
| Q1-2015 | $0.28 | ($0.06) | $0.22 | (21.4%) | 27.8% |
| Total Restatement Impact | $2.90 | ($0.78) | $2.12 | (26.9%) | 36.8% |

45.     The table below calculates the percent reduction in earnings per share per 2013 and 2014 interim fiscal quarter as a result of the Restatement:

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| Q1-2013 | $0.59 | ($0.07) | $0.52 | (11.9%) | 13.5% |
| Q2-2013 | 0.63 | (0.06) | 0.57 | (9.5%) | 10.5% |
| Q3-2013 | (0.11) | (0.02) | (0.13) | (18.2%) | 15.4% |
| Q1-2014 | 0.42 | (0.07) | 0.35 | (16.7%) | 20% |
| Q2-2014 | 0.15 | (0.04) | 0.11 | (26.7%) | 36.3% |
| Q3-2014 | 0.21 | (0.14) | 0.07 | (66.7%) | 200% |

46.     As alleged herein, Defendants' making of false and misleading statements caused EZCORP's common stock to trade at artificially inflated prices. Through a series of corrective disclosures, beginning on April 30, 2015 and ending on July 17, 2015, EZCORP revealed that it would delay the issuance of, and then be required to restate its previously issued financial results. As alleged herein, each time EZCORP revealed that its prior financial results would have to be restated (over time the size and scope of the restatement was expanded), EZCORP's stock price declined, causing losses to Lead Plaintiff and the class. Through this lawsuit, Lead Plaintiff seek recovery for these losses on behalf of himself and the class.

## II.     JURISDICTION AND VENUE

47.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

49.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, EZCORP's principal executive offices are located within this Judicial District.

50.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   **PARTIES**

51.     Lead Plaintiff John Rooney, as set forth in a certification previously filed with the Court, incorporated by reference herein, purchased EZCORP common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

52.     Defendant EZCORP is a Delaware corporation with its principal executive offices located at 2500 Bee Cave Road, Building 1, Suite 200, Rollingwood, Texas 78746. EZCORP has two classes of common stock: Class A and Class B. Class A shares are non-voting shares and only Class B shares are voting shares. Philip E. Cohen owns 100% of EZCORP's Class B voting shares. During the Class Period, EZCORP, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

53.     Defendant Mark E. Kuchenrither ("Kuchenrither") was, at all relevant times, Chief Financial Officer ("CFO") of EZCORP from October 2012 until May 26, 2015. Additionally, Defendant Kuchenrither was Chief Executive Officer ("CEO") of EZCORP from July 18, 2014 through February 1, 2015, and a director of the Company from August 12, 2014 through February 3, 2015. Defendant Kuchenrither joined EZCORP as Senior Vice President, Strategic Development in March 2010. In May 2012, Kuchenrither was promoted to Executive Vice President and in October of the same year, he assumed the additional role of CFO. Defendant Kuchenrither also served as President of the Company from August 12, 2014 through May 26,

2015 and Chief Operating Officer ("COO") from February 3, 2015 through May 26, 2015. In fiscal 2013 and 2014 Kuchenrither was one of EZCORP's designees to Grupo Finmart's Board of Directors. Kuchenrither was not a certified public accountant. Prior to joining EZCORP, Defendant Kuchenrither served as Vice President of Operations for private equity firm Sun Capital Partners where he was responsible for overseeing 10 portfolio companies with an emphasis on profit improvement. Defendant Kuchenrither has also held executive leadership positions at Arch Aluminum & Glass Co. and Peavey Electronics Corporation. Throughout the Class Period, Defendant Kuchenrither participated in the Company's quarterly earnings conference calls and investor presentations wherein he made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others. In addition, during the Class Period, Defendant Kuchenrither participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including:

- Form 8-K filed with the SEC on January 28, 2014 and Exhibit 31.2 to the Form 10-Q filed with the SEC on February 7, 2014 ("Q1 2014 Form 10-Q");

- Form 8-K filed with the SEC on April 29, 2014 and Exhibit 31.2 to the Form 10-Q filed with the SEC on May 12, 2014 ("Q2 2014 Form 10-Q");

- Form 8-K filed with the SEC on July 29, 2014 and Exhibit 31.2 to the Form 10-Q filed with the SEC on August 8, 2014 ("Q3 2014 Form 10-Q");

- Form 8-K filed with the SEC on November 7, 2014 and Form 10-K (and Exhibit 31.2 thereto) filed with the SEC on November 26, 2014 ("2014 Form 10-K");

- Form 8-K filed with the SEC on January 27, 2015 and Exhibit 31.2 to the Form 10-Q filed with the SEC on February 6, 2015 ("Q1 2015 Form 10-Q").

54.    Defendant Kuchenrither is referred to hereinafter as the "Individual Defendant."

The Individual Defendant, because of his position with the Company, possessed the power and authority to control the content of EZCORP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the actions of the Individual Defendant.

## IV.    CONFIDENTIAL WITNESSES

55.    Confidential Witness #1 ("CW#1") is a former employee of EZCORP who was a VP of Internal Audit at EZCORP from 2011 through early 2014. Approximately 75 internal auditors reported to CW#1. CW#1 reported to Defendant Kuchenrither. CW#1's office was in close proximity to Kuchenrither's at EZCORP's corporate offices in Rollingwood, Texas, and CW#1 spoke with Kuchenrither on a near-daily basis. CW#1 had regular monthly meetings with Kuchenrither during CW#1's tenure at EZCORP and also met with Kuchenrither on an interim, as-needed basis in between the regularly scheduled meetings. As Vice President of Internal Audit at EZCORP, CW#1 would be expected to be made aware of issues relating to accounting at EZCORP and to report those issues to Kuchenrither. On at least one occasion, CW#1 attended a Grupo Finmart Board of Director's meeting in Mexico as Kuchenrither's guest and participated in several other board meetings via telephone. CW#1 stated that Kuchenrither regularly visited

Mexico for Grupo Finmart board meetings and other events. CW#1 stated that each member of the EZCORP internal audit team responsible for auditing Grupo Finmart spoke Spanish.

56.     Confidential Witness #2 ("CW#2") is a former employee of EZCORP who worked in EZCORP's internal audit department from the summer of 2011 through March of 2014. CW#2 was the EZCORP Internal Audit and SOX Manager responsible for overseeing the internal audit of Grupo Finmart each quarter, including its 2013 fiscal year-end review. Accordingly, CW#2 traveled to Grupo Finmart's Mexico City office each quarter for the internal audit review and to test for SOX compliance, including a trip during or around October 2013 to conduct Grupo Finmart's 2013 fiscal year-end SOX compliance review. Prior to separating from EZCORP in 2014, CW#2 reported to the VP of Internal Audit (namely, CW#1). CW#2 had regular dealings with EZCORP's accounting personnel in the regular course of EZCORP's business and therefore possesses information directly related to Grupo Finmart's accounting practices and internal controls.

57.     Confidential Witness #4 ("CW#4")[3] is a former employee of EZCORP and internal auditor at EZCORP from October 2009 through February 2014. CW#4 worked on gathering information for internal audit reports at Grupo Finmart, including the fiscal 2013 year-end review and reported to CW#2. CW#4 explained that the purpose of various trips for the internal audit team dealt with multiple internal audit concerns, which sometimes included SOX compliance testing, but could also include, among other things, account reconciliations, IT and business process relations, reviewing loan aging, verification of account records with actual statements, review of collections procedures. According to CW#4, the internal audit team would then compile its

---

[3] Confidential Witness #3 ("CW#3") is intentionally omitted from the Proposed Third Amended Class Action Complaint.

recommendations and a list of exceptions into internal audit reports for each period. Accordingly, CW#4 traveled to Grupo Finmart's Mexico City office at least six times during CW#4's tenure, including during or around October 2013 to gather information for Grupo Finmart's 2013 fiscal year-end internal audit report.

### V.   SUBSTANTIVE ALLEGATIONS

#### a.  Background

58.     EZCORP delivers cash solutions to customers across channels, products, services, and markets. With approximately 1,400 locations, the Company offers customers multiple ways to access instant cash, including pawn loans and consumer loans in the United States, Mexico, and Canada, and fee-based credit services to customers seeking loans. At its pawn and buy/sell stores and online, the Company also sells merchandise, primarily collateral forfeited from pawn lending operations and used merchandise purchased from customers.

59.     On January 30, 2012, the Company acquired a 60% interest in Grupo Finmart (which did business under the names "Crediamigo" and "Adex"), a consumer loan provider headquartered in Mexico City. On June 30, 2014, the Company acquired an additional 16% of the ordinary shares outstanding of Grupo Finmart. On September 1, 2015, the Company increased its ownership position in Grupo Finmart to 94%. According to the Company, the purchase price for the additional 18% interest was approximately $29 million in cash.

60.     The Company's business consists of three reportable segments: The U.S. & Canada segment, which includes all business activities in the United States and Canada; the Latin America segment, which includes its Empeño Fácil pawn operations, the TUYO buy/sell operations and Grupo Finmart financial services operations in Mexico; and the Other International segment, which includes its equity interest in the net income of Cash Converters International.

61.     In its 2014 Form 10-K, the Company described Grupo Finmart's payroll lending business as follows:

> In Mexico, Grupo Finmart has over 100 active payroll withholding agreements with Mexican employers, primarily federal, state and local governments and agencies, and provides unsecured multiple-payment consumer loans to the employees of the various employers. Interest and principal payments are collected through payroll deductions. The average loan is approximately U.S. $1,600, with a term of 31 months and annual yields of approximately 72%.
>
> *     *     *
>
> Our payroll withholding lending business in Mexico operates using a network of low-cost branch offices dedicated to making loans to employees of government agencies and other employers with whom Grupo Finmart has processing and withholding agreements in place. A centralized corporate office provides the lending approval function, processing of loans and repayments, collections, sales support and other administrative functions. Each branch location is headed by a sales manager and, depending upon size of the region, may have between eight and fifteen sales professionals reporting through the branch. Sales professionals are commission-based, with earnings tied to loans originated. All loan requests are approved or declined through the centralized credit process. Grupo Finmart also utilizes a network of brokers to augment the sales force.
>
> *     *     *
>
> The unsecured payroll lending industry in Mexico is less developed than other Latin American countries. Payroll lending in Mexico is generally marketed to public sector employees, who on average earn more and rotate less frequently than their private sector peers. Additionally, government entities tend to be more stable and on average have more employees than private companies. It is estimated that less than 15% of the market potential is being serviced. Grupo Finmart is the fifth largest vertically integrated payroll lender in Mexico with 53 branch offices located in 24 of the 32 states in the country.

62.     As detailed herein, throughout the Class Period, Defendants misrepresented the amount of non-performing loans from Grupo Finmart's loan portfolio and falsely reported income from the sale of portions of Grupo Finmart's loan portfolio. Such statements were materially false and misleading when made.

**b.   The False and Misleading Statements During the Class Period Regarding the Company's Financials and its Internal Controls And Why Those Statements Were False and Misleading**

**The 1Q 2014 False and Misleading Statements**

63.    On January 28, 2014, the Company issued a press release, entitled "EZCORP Reports Revenues of $269 Million and Earnings Per Share of $0.42." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, today announced its financial results for its first quarter of fiscal 2014.
>
> For the quarter, total revenues were $269 million with net income of $23 million and earnings per share of $0.42. Excluding the negative impact of the company's minority investment in Albermarle & Bond and losses related to the company's immature online lending businesses, net income was $27 million and earnings per share were $0.49, both non-GAAP measures.
>
> Paul Rothamel, EZCORP's President and Chief Executive Officer, stated, "I am pleased with our consolidated financial results this quarter and our underlying revenue and expense trends in our core U.S. and Latin America pawn and financial services businesses...."

> **Consolidated Financial Highlights**
>
> • Total revenues were $269 million compared to $273 million in the same period last year. Excluding gold scrapping, total revenues were up 6%, driven by strong retail sales and consumer loan fee growth in the United States and Mexico.
>
> • Net income for the quarter was $23 million, net of a $1 million impact from Albemarle & Bond and a $3 million impact from the company's online lending businesses. The $27 million of net income before those impacts was driven primarily by the company's U.S. storefront businesses, which accounted for 82% of total adjusted segment contribution. The company's Latin America segment accounted for 14% of total adjusted segment contribution in the quarter.
>
> • Earning assets were $471 million at quarter-end, an increase of 13%, as a result of growth in payroll withholding, installment, and auto title loans, as well as inventory in the U.S. and Mexico. Net inventory was $143 million, a 19% increase over the same period last year, as the company executed against its strategy to drive jewelry retail sales rather than scrapping. The second quarter is typically the highest retail selling quarter of the year.
>
> • Cash and cash equivalents, including restricted cash, were $45 million at quarter-end, with debt of $252 million, including $106 million of Grupo Finmart third-party debt, ***which is***

***non-recourse to EZCORP***. [Emphasis added.]

- The effective tax rate was 30% compared to 33% for the same period last year, as the company continued to diversify its operations worldwide.

\*       \*       \*

**Latin America**

*Payroll Withholding Lending –*

\*       \*       \*

- Net revenues were $32 million in the quarter, with bad debt as a percentage of fees of 10%, compared to bad debt benefit of 9% in the prior year due to a large aged debt sale. Bad debt is expected to decline over the next several quarters to approximately 5% to 8% of loan fees.

64.     The press release disclosing 2014 first quarter financial results contained the following materially false and misleading statements: 1) the representation that Grupo Finmart third-party debt, "which is non-recourse to EZCORP" was false and misleading when made as the debt was recourse to EZCORP; and 2) the reporting of $23 million of net income was false as EZCORP improperly recorded $4.6 million in income from the sale of Grupo Finmart debt to third-parties and the actual net income was $18.7 million, a $3.839 million, or 20.5% overstatement of net income.

65.     On February 7, 2014, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter. The Company's Q1 2014 Form 10-Q reaffirmed the Company's financial results previously announced on January 28, 2014. The Company reported EPS of $0.42 when, in fact, EPS was only $0.35 per share - a $0.07, or 20%, overstatement.

66.     The 2014 Form 10-Q contained required SOX certifications, signed by Defendant Kuchenrither, who falsely certified that:

I, Mark E. Kuchenrither, certify that:

1. I have reviewed this Annual Report on Form 10-K of EZCORP, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and of financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the period presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(c) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

67.     Kuchenrither either knew, or in reckless disregard for the truth, attested that EZCORP's fiscal 2013 year-end financial results were fairly and accurately presented and that its internal controls were accurate.

68.     As EZCORP's CFO at the time and a member of Grupo Finmart's Board of Directors, Kuchenrither was aware that EZCORP regularly sent a team of internal auditors to review Grupo Finmart's accounting and internal controls and test for SOX compliance.

69.     In October 2013, CW#2's internal audit team for Grupo Finmart, including CW#4 and other internal auditors, traveled to Mexico to test Grupo Finmart's accounting processes, SOX compliance, internal controls and its financial results. CW#2 stated that because Grupo Finmart's accounting procedures and controls were so weak, EZCORP's internal audit team had resorted to "black box testing" for loan balances so that Grupo Finmart could technically be SOX compliant for a quarter, but Grupo Finmart was never SOX complaint for a full year during CW#2's employment at EZCORP. CW#2 explained that black box testing consisted of simply verifying the reported numbers and ignoring the often questionable methods that were used to get to those numbers. CW#2 stated that the internal audit team had little faith in the Grupo Finmart staff's ability to consistently produce accurate numbers, that Grupo Finmart had problems with its reconciliations, and that internal controls were messed up at Grupo Finmart. CW#2 further stated that Grupo Finmart had constant "fire drills", that its systems were manually driven with little automation, and there was very little integration between the many different systems. Moreover, CW#2 stated that Grupo Finmart's systems were relying on data from external sources, in many cases there was no back up documentation to support the numbers, and it was a challenge to get

the necessary supporting documentation. CW#2 explained that Grupo Finmart's staff was confused and did not understand what was needed because they lacked the technical knowledge and they were not getting the appropriate level of support from EZCORP. CW#2 further stated that Grupo Finmart had no access controls, meaning that employees could override a "support schedule" without documentation or management control A support schedule is the documentation that supports estimates or ledger entries. Therefore, CW#2 stated that Grupo Finmart's lack of access controls would not have passed an operational audit.

70.    CW#2 also stated that, in additional to lacking the technical expertise, Grupo Finmart's employees had not been properly trained with respect to accounting professional ethics. Specifically, CW#2 stated that EZCORP's code of conduct had not been drilled down to the Mexican employees and part of SOX compliance is training employees to resist posting journal entries just because their boss told them to do so. CW#2 said the lower level staff in Mexico tried to do the right thing, but did not question their managers. According to CW#2, the internal audit team did not have confidence in the management in Mexico because they were not diligent about reporting correctly and if there were mistakes in the information they gathered (whether internally or from a third party), the managers in Mexico would just send it along. CW#2 stated that the internal team could not tell if the management in Mexico knew there were mistakes and did not care, or if they simply did not understand, but noted that in such a cash-heavy business, integrity was essential.

71.    CW#2 reported directly to CW#1. CW#2 informed CW#1 of the findings from the internal review of Grupo Finmart's accounting, internal controls and financial statements, as set forth in paragraphs 69-70.

72.    CW#4 was also a member of EZCORP's internal audit team for Grupo Finmart and

participated in the internal audit review of Grupo Finmart's accounting systems and financial results in September/October 2013. CW#4 stated that Grupo Finmart's collections department and systems were weak, resulting in significant losses. Grupo Finmart had no system to track when the borrower/employees left their positions and the payroll deductions ended. CW#4 explained that because Grupo Finmart had inadequate systems to track employee departures and timely place such loans into non-performing status, a significant period of time could pass before Grupo Finmart learned about the employee's departure, making it very difficult to track that employee down to seek repayment. CW#4 said that most individuals to whom Grupo Finmart engaged in payday loans to were government employees, which EZCORP touted as a sign of stability, but the Grupo Finmart loans had key differences from payday lending in the United States. In the United States, payday loans are typically short-term (due in the next pay period or for a number of months), but in Mexico, Grupo Finmart's payday loans were typically longer term (for several years or even up to 10 years), which made it harder to keep track of payments. Moreover, an individual could have up to ten different loans and the loan amounts could be quite significant in aggregate. CW#4 confirmed that Grupo Finmart had an inadequate aging report that did not allow for the proper tracking or recording of non-performing loans. CW#4 relayed this information to CW#2.

73.    CW#4 worked on preparing internal audit reports, including the internal audit report for Grupo Finmart's 2013 fiscal year-end review that was sent to Defendant Kuchenrither. This internal audit report contained information about the accounting issues at Grupo Finmart including information as set forth in paragraphs 69-72, describing: (1) that Grupo Finmart had inadequate aging reports and inadequate loan tracking procedures; (2) that Grupo Finmart had a very weak collections system making it difficult to collect unpaid loans; (3) that Grupo Finmart's

accounting personnel were not properly trained or proficient in accounting; (4) that adequate checks and balances did not exist such that Grupo Finmart account or department mangers failed to approve or verify many of the reconciliations; and (5) as a result, information was not properly vetted by Grupo Finmart personnel and reconciliations lacked adequate support. CW#4 further stated that part of the audit included a section for the internal audit team to verify the personnel with whom they communicated with during the audit procedures. According to CW#4, members of the internal audit team spoke with Grupo Finmart's Board of Directors, including Defendant Kuchenrither, and his name was therefore listed in this section of the Grupo Finmart 2013 fiscal year-end internal audit report.

74.     Prior to November 7, 2013, CW#1 met with Kuchenrither at EZCORP's offices in Austin, Texas, and relayed to Kuchenrither the accounting issues identified by CW#2 at Grupo Finmart. In particular, CW#1 informed Kuchenrither that Grupo Finmart's aging report for outstanding loans was inadequate and insufficient to allow a proper analysis as to whether loans were being properly written off. CW#1 also told Kuchenrither that Grupo Finmart's accounting personnel lacked adequate training and there was no acceptable accounting methodology to determine whether Grupo Finmart was properly recording losses from non-performing loans. CW#1 informed Kuchenrither, in a series of meetings prior to November 7, 2013 that Grupo Finmart was not SOX complaint.

75.     As was subsequently determined, Grupo Finmart did not keep its books in accordance with Mexican GAAP or in accordance with US GAAP. Plus, Grupo Finmart never had an adequate aging report that would allow it to properly track loans that were in default and for which EZCORP should have increased its reserves.

76.     Accordingly, Kuchenrither knew, or recklessly disregarded that his SOX

certification for fiscal 2013 was false and/or materially misleading.

77.     Kuchenrither's SOX certification was false and misleading for the reasons set forth
in paragraphs 69  to 76 above.

**The 2Q 2014 False and Misleading Statements**

78.     On April 29, 2014, the Company held an earnings conference call with investors to
discuss 2Q 2014 results. During that call, Defendant Kuchenrither made the following false and
misleading statements:

> I want to highlight a few line items on our consolidated statement of operations. If you look
> at the other revenue line that is where the accelerated gain of $5 million is recorded from
> the Grupo Finmart structured asset sale. The structured financing also resulted in $16
> million of cash flow receivable inside the quarter, which was received by the company in
> April. This is the second of these types of transactions this year. And we will continue to
> consider this type of transaction in the future to finance our growing business.
>
> *       *       *
>
> Grupo Finmart has collateral obligations with respect to some of the loans they have
> outstanding. The collateral can be either in the form of loans or cash, due to the success of
> the second securitization they had temporarily used cash as collateral in some cases and
> were replaced with loans over the course of time. There will always be a balance though
> as some of the loan structures create sinking fund balances to ensure adequate liquidity to
> make payments.

79.     The statement by Kuchenrither in the preceding paragraph was false and misleading
when made. The assets sales were improperly recorded as revenues and earnings as the asset sales
were with recourse to EZCORP, meaning EZCORP was responsible for any loan losses incurred.
Thus, recording a sale from these assets was in violation of GAAP. EZCORP improperly recorded
$5.8 million of net income and $16 million in revenue from these asset sales.

80.     On April 29, 2014, the Company issued a press release, entitled "EZCORP Reports
Second Quarter Revenues of $260 Million." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for
> consumers, today announced its financial results for the second quarter of fiscal 2014.

For the quarter, total revenues were $260 million, with net income of $8 million and earnings per share of $0.15. Excluding the negative impact of certain one-time charges discussed below, as well as minimal losses related to our immature online lending businesses, adjusted net income was $20 million and adjusted earnings per share were $0.36, both non-GAAP measures.

*       *       *

**Consolidated Financial Highlights – Second Quarter of Fiscal 2014 vs. Prior Year Quarter**

- Total revenues were $260 million compared to $268 million in the same period last year. Excluding an expected decrease in gold scrapping, total revenues were up 4%, driven by excellent jewelry sales and consumer loan fee growth in the United States and Mexico.

- Adjusted net income for the quarter was $20 million, net of the after-tax impacts of the Albemarle & Bond impairment charge ($6 million), the retirement benefit accrual for our long-time Executive Chairman ($6 million) and performance of our online businesses ($0.6 million).

- Earning assets, including CSO loans, were $417 million at quarter-end, an increase of 7%, as a result of growth in payroll withholding, installment and auto title loans, as well as inventory in the U.S.

- Cash and cash equivalents, including restricted cash, were $63 million at quarter-end, with debt of $228 million, including $145 million of Grupo Finmart third-party debt, ***which is non-recourse to EZCORP***. [Emphasis added.]

*       *       *

**Latin America**

*Payroll Withholding Lending –*
*       *       *

- Bad debt as a percentage of fees was 3%, ahead of our expectations.

- Financing activities for the quarter included a structured asset sale by Grupo Finmart and a public securitization of a portion of its receivables. The asset sale accelerated $16 million in cash flow, which was received in April, as well as a $5 million gain including in "Other Revenues." The securitization of $56 million, our second securitization in twelve months, reduced the cost of capital for the receivables financed to 6.3%. We incurred approximately $1 million in expenses during the quarter associated with this securitization. We expect to continue to use these and other types of structured transactions to finance the rapidly growing Grupo Finmart business going forward.

Proposed THIRD AMENDED CLASS ACTION COMPLAINT

81.     The press release disclosing 2014 second quarter financial results contained the following materially false and misleading statements: 1) the representation that Grupo Finmart third-party debt, "which is non-recourse to EZCORP" was false and misleading when made as the debt was recourse to EZCORP; and 2) the reporting of $20 million of adjusted net income was false as EZCORP improperly recorded $5.8 million in income from the sale of Grupo Finmart debt to third-parties.[4]

82.     On May 12, 2014, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter. The Company's Q2 2014 Form 10-Q reaffirmed the Company's financial results previously announced on April 23 and 29, 2014. The Company reported EPS of $0.15 when, in fact, EPS was only $0.11 per share - a $0.04, or 36.3%, overstatement. The Q2 2014 Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶ 66, *supra*.

83.     On April 16, 2014, however, Kuchenrither received an email from Jeff Byal, EZCORP's Senior Vice President and Chief Accounting Officer. On April 16, 2014, Kuchenrither received an email from Jeff Byal, EZCORP's Senior Vice President and Chief Accounting Officer. Byal informed Kuchenrither that:

> • In addition, the Fondo purchase accounting adjustments [for Grupo Finmart] were identified 11 months ago and we recently discovered that they had not been made, thus the catch-up. At our counsel, GF has retained local Big 4 accounting firms to prepare the analysis, valuations and purchase accounting around the acquisitions they've made but we're trying to stay plugged in to make sure they follow what the advisors are telling them. A better approach would be for them to prepare the entire front to back analysis whenever they present an acquisition to the Board for consideration. This is why we pushed for GF to hire a seasoned and strong technical CFO, which did not occur. We've

---

[4] EZCORP did not consistently report one income metric each quarter – choosing whichever metric was most favorable and reporting that metric to investors. In certain quarters, it reported net income. In other quarters, it reported net income from continuing operations or adjusted income.

since hired a former CFO here in Austin as our Director of International Accounting to be able to dig deep into GF's accounting each month both on-site and from Austin. Jose has had to resort to showing GF in the Mexican GAAP codification (in Spanish) **where they are not even keeping their books according to Mexican GAAP, which by the way is the same as US GAAP in many instances.** We continually hear from them that the adjustments we end up giving them are US GAAP only – which is not the case.

The team is also working on getting the data pulled together so we have a better view on what our bad debt reserves should be at GF, **which based on my time with them in Mexico will be an increase in our reserve.** More work is being done on this now that the quarter is closed.

*See* Ex. C.

84.     Kuchenrither ignored Byal's warning that Grupo Finmart's is "not even keeping their books according to Mexican GAAP, which by the way is the same as US GAAP in many instances" and that Grupo Finmart's "bad debt reserves" needed to be "increase[d]" because he knew EZCORP "needed" the Loan Sales. *See* Ex. C. Indeed, the Loans Sales were necessary to "prop the business up," *See* Ex. J, thus Kuchenrither ignored the accounting problems at Grupo Finmart to complete the needed Loan Sales.

85.     Kuchenrither's SOX certification was false and misleading for the reasons set forth in the paragraphs above.

**The 3Q 2014 False and Misleading Statements**

86.     On July 29, 2014, the Company issued a press release, entitled "EZCORP Reports Third Quarter Revenues of $241 Million, and Earnings Per Share of $0.21." Therein, the Company, in relevant part, falsely stated:

EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for customers, today announced its financial results for the third quarter of fiscal 2014.

For the quarter, total revenues were $241 million, with net income from continuing operations of $11.3 million and earnings per share of $0.21.

Mark Kuchenrither, EZCORP's Interim President and Chief Executive Officer, stated,

"We are pleased to have met our outlook for the third quarter. Our Pawn business and our Grupo Finmart business continued to drive our growth, representing 69% of our total revenues this quarter. During the quarter we strengthened our financial flexibility by raising $230 million through a private convertible debt offering which enabled us to pay off all outstanding debt under our senior secured credit agreement and to buy back one million shares of stock. These capital structure enhancements in combination with our improving operational efficiencies enhance our ability to grow revenue and earnings, while improving the customer experience."

**Consolidated Financial Highlights – Third Quarter Fiscal 2014 vs. Prior Year Quarter**

\*     \*     \*

- Total revenues were $241 million, an increase of 3% compared to $235 million in the same period last year. Excluding an expected decrease in gold scrapping, total revenues were up 6%, driven by 3% increases in consumer loan fees and merchandise sales in the United States and Mexico. In addition, we had two structured financing transactions at Grupo Finmart from which we recognized $10 million of revenues.

- Cash and cash equivalents, including restricted cash, were $86 million at quarter-end, with aggregate consolidated debt of $382 million, comprised of the $230 million of our newly issued convertible debt and $152 million of Grupo Finmart third-party debt, ***which is non-recourse to EZCORP***. [Emphasis added.]

\*     \*     \*

**Latin America**

*Consumer Lending –*

On the last day of the third quarter of fiscal 2014, EZCORP acquired an additional 16% ownership of Grupo Finmart and now owns 76% of the company. Grupo Finmart is a vertically integrated lender focused on the following core business activities:

\*     \*     \*

- Grupo Finmart began using structured financing transactions in the first quarter of this year. As a result, Grupo Finmart operates as a distributor, while continuing to service customer loans.

- Grupo Finmart will continue to grow the loan portfolio as well as sell a portion of the portfolio on a regular basis.

In the third quarter, Grupo Finmart's financial results were driven by focusing on organic growth initiatives, optimizing financing strategy, and capitalizing on increasing market demand.

\*     \*     \*

- Our planned structured financing transactions this quarter resulted in $38 million in accelerated cash flow to find new loan originations, and a $10 million gain reported in "Consumer loan sales and other."

- This quarter's structured asset sales represented less than 25% of the company's current loan portfolio.

87.     The press release disclosing 2014 third quarter financial results contained the following materially false and misleading statements: 1) the representation that Grupo Finmart third-party debt, "which is non-recourse to EZCORP" was false and misleading when made as the debt was recourse to EZCORP; and 2) the reporting of $11.3 million of net income from continuing operations was false as EZCORP improperly recorded $14.3 million in income from the sale of Grupo Finmart debt to third-parties.

88.     Also on July 29, 2014, the Company held an earnings conference call with investors to discuss the Q3 2014 results. During the conference call, Defendant Kuchenrither made the following false and misleading statements:

> From a trending perspective, the growth in our pawn business in encouraging, but when we look at our year-over-year pawn loan growth and compare ourselves to our peers we see additional opportunities to growth loan balances and pawn service charges. We are pleased with the growth of Grupo Finmart a business that just a few years ago was a fraction of what it is today. In addition, we are pleased with the hybrid approach of using a distributor model and a traditional loan origination and servicing model. We also continued to work on strengthening Grupo Finmart's balance sheet by restructuring and paying off its debt.
>
> *       *       *
>
> Now I would like to point out a few items from our income statement on Page 6 of the press release. If you look at the consumer loan sales and other revenue line, we reported $10.9 million in the third quarter representing approximately 300% growth when compared to the third quarter last year. This growth primarily reflects a gain of $10 million from structured financing transactions at Grupo Finmart. These transactions also resulted in $38 million in accelerated cash flow.
>
> Again I want to be clear that through these structured financing transactions, we are acting as the distributor which accelerates cash flow and improves our ability to fund new loans. We will continue with both the traditional loan origination and servicing model and the

new distributor model. This quarter's structured financing transactions represented less than 25% of the company's current loan portfolio.

To move down the income statement and you look at the operating and expense lines, I want you to know that I am not satisfied with our current expense structure. We went too far, too fast in decentralization and we will analyze these areas closely over the next 90 days as part of our planning process. Interest expense in the third quarter was up 70% year-over-year to approximately $6 million. At Grupo Finmart, interest expense increased $1.4 million compared to the same quarter last year and this was due to growth. The corporate expense was $1.8 million in the third quarter compared to $900,000 in the same quarter last year and that was due to larger debt balance. Equity and net income from unconsolidated affiliates was $2.1 million representing fully the contribution from cash converters.

If you turn to the balance sheet on Page 7 of our press release, I just want to point out one item. Restricted cash on the current and noncurrent lines totaled approximately $35 million. Grupo Finmart has collateral obligations with respect to some of the debt agreements they have outstanding. The collateral can be either in the form of loans or cash. Due to the success of the second securitization, we have temporarily used cash as collateral in some cases and expect to replace the cash with loans over the next couple of quarters. Lastly in the quarter, we strengthened our financial flexibility by raising $230 million through a private convertible debt offering, which enabled us to payoff and close our senior secured credit agreement that lowered our interest rate. We were able to create a call spread to protect shareholders from dilution and we bought back 1 million shares of stock to further protect shareholders from dilution.

89.    In addition, during the earnings conference call, Defendant Kuchenrither made the following false and misleading statement in an exchange with an analyst, Henry Coffey, from Sterne Agee:

**Henry Coffey – Sterne Agee**

Yes. I am trying to understand the structured financing transaction, was that a cash gain that you got from selling those loans into a facility or is that the sort of a gain on sale having to do with the present value of residuals or what was the nature of the gain?

**Mark Kuchenrither**

Hi, Henry. First, it's good to hear you. So, just want to say, hello and it's a good question. The structured financing transaction at Grupo Finmart are true loan sales, so they are actually true sales of part of the loan portfolio and ***so the risk associated with the loans passed to the buyer of the loans***. Grupo Finmart acts as the servicer. It actually goes into a trust, in a Mexican trust and the Grupo Finmart acts a servicer of that trust and serves the customer and also does the collections and so on. ***So, it's a true profit.*** It's – the transaction

in effect convinces a 3-year revenue and cash flow cycle down to 90 days in this case. So, we accelerate both revenue and expense, associated expense such as commissions, but we also accelerate the cash flow from it. It is costing the company about a 3% premium over their cost of financing, but that's a great trade-off moving from three years to 90 days. [Emphasis added.]

**Henry Coffey - Sterne Agee**

So, it's a cash gain from selling the assets?

**Mark Kuchenrither**

Yes, yes.

**Henry Coffey - Sterne Agee**

So, they were sold at the par – they were sold at a gain over the par value of the loan, because of the higher rate and the lower rate required by securitization party?

**Mark Kuchenrither**

That's exactly right. So, it is a cash gain.

90.     Similarly, during the earnings conference call, Defendant Kuchenrither made the following false and misleading statements in an exchange with an analyst, Bob Ramsey, from FBR Capital Markets:

**Bob Ramsey – FBR Capital Markets**

Thanks for taking the follow-up. Just a follow-up on John's question there about the securitizations, I know you said it will make earnings a little more predictable. With the two transactions, what is the sort of expected size or the range of size? And then is that kind of a good quarterly run-rate or is there a good annual rate way to think about that business on a go forward basis?

**Mark Kuchenrither**

Yes, great question. First, I would tell you these are not securitizations, these are – Grupo Finmart has a securitization, a public securitization and that's true financing, ***but this is truly an asset sale. I just want to make that distinction, because [it's] very important.*** And the size that Grupo Finmart is working with their partners that buy the loans to determine the size, but I am going to give you a wide range right now. **It's probably somewhere between $5 million and $10 million a month** depending on seasonality and growth – the growth projections of the business. And I think that, that will be – that's why we are not

starting till August, because the team is actively working on refining what that's going to look like for the next 12 months going forward. And I would expect a controlled step function growth in size over time as the Grupo Finmart grows its business organically. [Emphasis added.]

**Bob Ramsey - FBR Capital Markets**

Okay. And then the – is it right or fair to think about gain on sale in future period as being the same ballpark as this quarter and last?

**Mark Kuchenrither**

Well, again, I don't want to – I think it's probably in the range, but I don't want to commit to that, because again, the team is doing the work. ***And so I don't want to mislead you with giving you a bad number***. [Emphasis added.]

**Bob Ramsey – FBR Capital Markets**

Okay. And then I guess two as I think about the sales, it's a tradeoff of fee income from interest income obviously there is a pretty big transaction this quarter. **Just curious if it was early in the quarter or late in the quarter** or if it will have any impact on consumer loan fees in the future periods?

**Mark Kuchenrither**

Well, it does have an impact on consumer loan fees, because remember you are accelerating the fees that would have been collected over a three-year period by getting the sale you are in essence by limiting those loan fees going forward and you are taking the gain on the sale of the transaction all at once. So, you are also eliminating the commission expenses that would rollout for 36 months as well. Now, those are all rolled forward as well. And so the way to think about this is almost like inventory turns. I can turn one time every three years or over the course of three years I am turning this loan, I am collecting revenue and I am recognizing expenses over a three-year period or for a 3% premium, I can accelerate that now down to 30 days. And for us, we look at the analysis and say you know what paying a 3% is worth it to us, because we can use the cash that we gained to reinvest in a higher return.

91.    The statements identified in paragraphs 86-90 were materially false and misleading when made. The "asset sales" identified by Kuchenrither were, in fact, not true asset sales and were improperly recorded as revenue by EZCORP in violation of GAAP. Moreover, in the Restatement, EZCORP admitted that each of the sales of these Grupo Finmart loans were not properly reviewed by appropriate accounting personnel for compliance with US GAAP. These

sales were in violation of EZCORP's own internal accounting policy. Kuchenrither also misled

analysts when he discussed sales of $5 million to $10 million monthy when, in fact, during fiscal

2014 all of the loans were sold and closed on the last day of the fiscal quarter, except the first loan

for which CW#1 discussed with Kuchenrither that under the terms of that sale the loan should not

be recorded.

92.     On August 8, 2014, EZCORP filed its Quarterly Report with the SEC on Form 10-

Q for the 2014 fiscal third quarter. The Company's Q3 2014 Form 10-Q reaffirmed the Company's

financial results previously announced on July 29, 2014. The Company reported EPS of $0.21

when, in fact, EPS was only $0.07 per share - a $0.14, or 200%, overstatement. The Q3 2014 Form

10-Q also contained the required SOX certification, signed by Defendant Kuchenrither,

substantially similar to the certification contained in ¶ 66, *supra*.

93.     Kuchenrither's SOX certification was false and misleading for the reasons set forth

in paragraphs 69-79.

**The 4Q 2014 False and Misleading Statements**

94.     On November 6, 2014, the Company issued a press release entitled, "EZCORP

Reports 2014 Financial Results and Establishes Foundation for Sustainable Growth in 2015 and

Beyond." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (Nasdaq:EZPW), a leading provider of easy cash solutions for consumers,
> today announced fiscal fourth quarter financial results consistent with its October 27 pre-
> release. Adjusted non-GAAP net income from continuing operations was $14 million, or
> $0.27 per share. On a GAAP-basis, net loss from continuing operations attributable to
> EZCORP was $2 million or $(0.04) per share.* For the fiscal year ended September 30,
> 2014 total revenues were $990 million, and net income from continuing operations
> attributable to EZCORP was $47 million or $0.86 per share.

*     *     *

**Financial and Operating Highlights - Fiscal Year ended September 30, 2014 vs. Prior Year**

**Consolidated**

- For the fiscal year ended September 30, 2014, total revenues were $990 million as compared to $980 million for the same period last year.

- Net income from continuing operations attributable to EZCORP was $47 million or $0.86 per share, as compared to $69 million or $1.27 per share in the same period a year earlier.

- Cash and cash equivalents, including restricted cash, were $123 million at year-end, with aggregate consolidated debt of $367 million comprised of the $223 million of convertible debt and $144 million of Grupo Finmart third-party debt, *which is non-recourse to EZCORP*. [Emphasis added.]

*     *     *

**Latin America Segment**

*Consumer Lending —*

- New loan originations for the year were $81 million, up 30% over the prior year.

- ***Total consumer loan and interest fees were $54 million, up 7% as compared to the prior year.***

- ***Structured financing transactions in fiscal 2014 resulted in approximately $26 million of gains (consisting of consumer loan and interest fees, less commission and other related expenses) reported in "Consumer loan sales and other."***

- ***Bad debt as a percentage of fees was 13%, up from a bad debt benefit in the prior year. The increase is primarily due to an increase in bad debt reserves after a government agency offered early retirement to its workers, which increased the number of loans outside of the automatic payroll deduction system.*** [Emphasis added.]

- The number of contracts, primarily with government agencies, grew by 75% for the fiscal year, from 72 contracts in fiscal year 2013 to 126 contracts in fiscal year 2014.

95.    The November 6, 2014 press release falsely reported $47 million of net income from continuing operations as, after EZCORP restated its financial results, net income from continuing operations for 2014 was overstated by $31.956 million.

96.    Also on November 6, 2014, EZCORP held a conference call with investors and analysts to discuss the Company's 2014 fiscal fourth quarter and 2014 fiscal year-end earnings results. During the conference call, the following exchange occurred between Defendant Kuchenrither and John Rowan, an analyst for Sidoti & Company:

> JOHN ROWAN: I guess kind of going back to the sales from Grupo Finmart, how much were they for the quarter? And now with kind of a nonrevolving chunk of debt in your capital structure, are you relying on selling assets from Grupo Finmart in order to meet your liquidity needs?
>
> MARK KUCHENRITHER: So the first question I'll answer. We had -- let me find the amount. I had to get to the right page; I apologize. **So in the quarter we had -- the portfolio sale was a little over $14 million. And for the year we've sold about $35 million.** And you'll see that in the operational segment results under consumer loan sales and other. That number primarily represents our structured asset sales. But then there's also expenses below the line in operations that are accelerated also when we make those sales. But that's the sales results of the fees that have been accelerated based on the sale. [Emphasis Added.]
>
> And our strategy at Grupo Finmart for this next year is to sell about 60% of new loan originations through these structured asset sales because we want to pay down our debt and work toward becoming more self-funded at Grupo Finmart.
>
> JOHN ROWAN: But Grupo Finmart will be paying down the nonrecourse chunk of debt?
>
> MARK KUCHENRITHER: Yes.

97.    As Defendant Kuchenrither knew that the asset sales should not have been recorded as sales, he falsely misrepresented that "the portfolio sale was a little over $14 million [a]nd for the year we've sold about $35 million."

98.    On November 26, 2014, EZCORP filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year. The Company's 2014 Form 10-K was signed by Defendant Kuchenrither, and reaffirmed the Company's financial results previously announced on October 27, 2014. For the Latin America segment, the Company reported total revenues for consumer loan fees and interest of $54,138,000 and consumer loan bad debt expense of $6,867,000. According to the Company, the consumer loan bad debt expense as a percentage of consumer loan fees and

interest ratio in Latin America for the 2014 fiscal year was 13%. The Company reported a loss per share of $0.84 when, in fact, the loss per share was $1.20 - a $0.36, or 42.9%, reduction to earnings per share. Additionally, the 2014 Form 10-K stated that "Segment information is prepared on the same basis that our chief operating decision maker reviews financial information for operational decision-making purposes."

99.     With respect to the transfer of financial assets, the 2014 Form 10-K in relevant part, falsely stated:

*Transfer of Financial Assets*

In accordance with FASB ASC 860-10-40-5, transfers of financial assets are accounted for as sales when control over the assets has been relinquished. Control over transferred assets is deemed to be surrendered when the assets have been isolated from the Company, the transferee obtains the right (free of conditions that constrain it from taking advantage of that right) to pledge or exchange the transferred assets, and the Company does not maintain effective control over the transferred assets through an agreement to repurchase them before their maturity, or the ability to unilaterally cause the holder to return specific assets.

The sales price net of the carrying amount of the loan portfolio is recorded as revenue in "Consumer loan sales and other revenue" in our consolidated statements of operations. The accelerated commission and other related expenses are recorded in "Operations" expense in our consolidated statements of operations. The proceeds of the loan portfolio sales are reflected as investing activities in the Company's consolidated statements of cash flows, as they were not specifically originated for resale.

100.     With respect to the Company's Latin America segment, the 2014 Form 10-K, in relevant part, falsely stated:

The Latin America segment's total revenues increased $35.5 million, or 24%, in fiscal 2014 to $185.5 million. Same store total revenues increased $27.7 million, or 18%, and new stores contributed $7.8 million. The overall increase in total revenues was due to a $31.8 million increase in consumer loan sales and other revenues, a $3.6 million increase in consumer loan fees and interest, a $1.4 million increase in merchandise sales and a $0.9 million increase in pawn service charges, partially offset by a $2.2 million decrease in jewelry scrapping sales.

*        *        *

Consumer loan fees and interest increased $3.7 million, or 7%, from the prior year to $54.1

million. The increase is primarily due to a 19% increase in the average outstanding consumer loan balance during the period. The increase in the loan balance is due to a 30% increase in loan originations as a result of higher penetration on existing contracts with government entities, coupled with the addition of new contracts in fiscal 2014.

***Consumer loan sales and other revenues increased $31.8 million from the prior year to $35.0 million. The increase is primarily a result of several structured asset sales of consumer loan portfolios by Grupo Finmart for total consideration of $117.4 million. As part of these transactions, we recorded revenues of $33.0 million, partially offset by commission and other related expenses. Grupo Finmart began using structured asset sales in the first quarter of fiscal 2014. As a result, Grupo Finmart operates as a distributor, while continuing to service customer loans.*** Grupo Finmart will continue to grow the loan portfolio as well as sell a portion of the portfolio on a regular basis. Grupo Finmart expects to sell approximately 60% of the portfolio during fiscal 2015. The hybrid approach is an important competitive advantage for the business that allows for maximum flexibility, healthy diversification in funding sources and consistent availability of capital for growth. [Emphasis Added.]

Total consumer loan bad debt increased $7.0 million, from the prior year to $6.9 million. The increase is primarily due to an increase in bad debt reserves after a government agency offered early retirement to its workers, which increased the number of loans outside of the automatic payroll deduction system.

101.    The representations in the preceding paragraphs regarding total revenues for consumer loan fees and interest of $54,138,000 was false when made as total revenue was overstated by $800,000. The consumer bad debt expense, as originally reported as $6,867,000, was understated by $12.7 million, and was actually $19.6 million, evidencing a 185.5% understatement. The ratio of consumer loan income to bad debt was originally reported as 12.7% but was restated to 36.7%.

102.    Kuchenrither knew that Minglewood was hired to "perform an on-site detailed assessment of Finmart's operation, reporting and analytical functions" *See* Ex. F. During the week of August 25, 2014, Minglewood met with Grupo Finmart executives. *Id.* In an assessment report dated October 10, 2014, Minglewood concluded that "while the reports, overall, contain metrics deemed important to understanding the performance of the Finmart's portfolio, **the one critical element that is absent is a timing or vintage analysis.**" *Id.* (A "timing or vintage analysis" is an

aging report). The Minglewood assessment also found that "the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio. One critical performance indicator is the percent of Out-Of-Payroll ('OOP') loans. . . . While this measurement is a good indicator of the amount of loans that are OOP in the current portfolio, **it does not accurately reflect what the true OOP rate is on the Finmart portfolio on a static basis. It is estimated that historical OOP rate could be as high as 8 to 10% absent OOP loan sales.**"

103.    The 2014 Form 10-K also contained the required the SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶ 66, *supra*.

104.    Kuchenrither's SOX certification was false and misleading for the reasons set forth in the paragraphs 69-76.

**The 1Q 2015 False and Misleading Statements**

105.    On January 27, 2015, just after the market closed, the Company issued a press release entitled, "EZCORP Reports Fiscal First Quarter 2015 Results." Therein, the Company, in relevant part, falsely stated:

> EZCORP, Inc. (NASDAQ: EZPW), a leading provider of easy cash solutions for consumers, today announced financial results for the fiscal first quarter ended December 31, 2014.
>
> Total revenues were $252.6 million compared to $263.0 million for the same period last year. Net income from continuing operations attributable to EZCORP was $14.2 million or $0.26 per share as compared to $26.1 million or $0.48 per share in the same period a year earlier.
>
> *            *            *
>
> **Latin America Segment**
>
> We recorded strong performance in Latin America, with impressive increases in consumer loan originations and improvement in bad debt, and solid increases in both pawn service charges and pawn loan balances. The improvements were strong in both the translated and constant currency results.
>
> *Consumer Lending —*

- New loan originations at Grupo Finmart were $21.9 million, a year-over-year increase of 28% in total and 37% on a constant currency basis. Strength in new loan originations can be seen in both the growth in number of contracts and steady penetration rates at existing contracts.

- Structured asset sales resulted in approximately $6.6 million of gains (reported in "Consumer loan sales and other revenues"), up 43% as compared to the prior year and up 61% year-over-year on a constant currency basis. Consumer loan and interest fees on the remaining loan portfolio were $10.1 million, a year-over-year decrease of 30% (25% on a constant currency basis), primarily the result of structured asset sales over the last year.

- Reflecting the improvement of the quality of the loan portfolio, bad debt expense as a percentage of fees declined to 9%, down 100 basis points over the prior year.

- We continue to manage the growth and cost of capital at Grupo Finmart and have reduced the overall cost of debt to 9%, down from 11% in the same quarter last year. Total interest expense was up $1.9 million, up 57% year-over-year and 69% year-over-year on a constant currency basis, on a higher debt base.

106.    The press release disclosing 2015 first quarter financial results contained the following materially false and misleading statements: 1) the reporting of $14.2 million of net income from continuing operations was false as EZCORP reported after it restated its financial results that income was $10.569 million, an overstatement of $3.648 million or 35%; and 2) the reporting of $6.6 million of gains from structured asset sales as the $6.6 million gain was improperly recognized.

107.    Additionally during the January 27, 2015 conference call, the following exchange occurred between Defendant Kuchenrither and John Rowan, an analyst for Sidoti & Company:

JOHN ROWAN: Okay. And then lastly, can you remind me the $6.6 million gain that you reported in the quarter for the Grupo Finmart sales, can you remind, is that a net number, is that fully loaded for expenses?

MARK KUCHENRITHER: Yes, it's fully loaded.

JOHN ROWAN: So a $6.6 million gain and the tax rate you would use if you were trying to figure out what the per share impact was, is that still at 31%?

MARK KUCHENRITHER: Well let me walk through and answer your question very clearly. So the $6.6 million when it is fully loaded, the commissions that are accelerated are at the lines below in the expense lines. But when you look at the entire contribution of that segment, everything is fully loaded and all expenses are accelerated. And that was about $5.5 million total net.

So the net benefit of the transaction was $5.5 million. So you got to look at the revenue and then the expenses will net that down to $5.5 million pretax. And the tax affect is 30%.

108.  On February 6, 2015, after the market closed, EZCORP filed its Quarterly Report with the SEC on Form 10-Q for the 2015 fiscal first quarter. The Company's Q1 2015 Form 10-Q reaffirmed the Company's financial results previously announced on January 27, 2015. In particular, the Company reported total revenues for consumer loan fees and interest in Latin America of $10,070,000 and consumer loan bad debt expense of $941,000 for the 2015 fiscal first quarter.

109.  The representations in the preceding paragraphs regarding total revenues for consumer loan fees and interest of approximately $10.1 million for the first quarter of 2015 were false when made as total revenue for consumer loan fees and interest was overstated by $6.2 million. The consumer loan bad debt expense, originally reported as $941,000, was understated by $6.8 million, and was actually $7.7 million - a 722.5% understatement. The ratio of consumer loan income to bad debt was originally reported as 9.3% but was restated to 47.4%.

110.  The Q1 2015 Form 10-Q also contained the required SOX certification, signed by Defendant Kuchenrither, substantially similar to the certification contained in ¶ 66, *supra*. Kuchenrither's SOX certification was false and misleading for the reasons set forth in paragraphs 69-76 above.

111.  On February 1, 2015 Kuchenrither was no longer CEO of EZCORP. After Kuchenrither ceased being CEO of EZCORP, EZCORP has never again engaged in the kind of structured asset sale of Grupo Finmart loans which were reversed in the restatement.

112.    As set forth in its Form 10-K/A, which discloses its restated financial results, for

each of the financial statements that were restated, EZCORP admitted to: overstating Operating

Income by a total of $90.7 million, or 27.3% for the restated period; overstating EPS by $0.78 per

share, or 36.8% for the restated period; and, for fiscal 2014 alone, overstating income by $33

million due to the improper accounting for the "sales" of Grupo Finmart loans that were sold with

recourse and which should not have been recorded as sales in accordance with U.S. GAAP.

c.   **EZCORP Disclosed the Need to Restate Its Financials with Respect to Grupo Finmart**

113.    On April 30, 2015, after the market closed, the Company issued a press release

entitled, "EZCORP Reports Preliminary Financial Data for Second Quarter; Delays Earnings

Release." Therein, the Company, in relevant part, stated:

> EZCORP, Inc. (EZPW), a leading provider of pawn and consumer loans in the United
> States, Mexico and Canada, today announced that it will delay its earnings release for the
> second quarter of fiscal 2015 (ended March 31, 2015), due to an ongoing review of certain
> elements of its Grupo Finmart loan portfolio, which is not yet completed. The company
> identified certain errors in a portion of the Grupo Finmart loan portfolio that may impact
> current and historical amounts of loan reserves and interest income, and is conducting a
> more thorough review to quantify the errors and assess the associated processes and
> controls. The company will announce its second quarter earnings upon completion of that
> review.
>
> *            *            *
>
> "Grupo Finmart continued to grow its base of earning assets, with strong double digit-
> growth in loan originations over last year. ***We did not undertake any asset sales in Grupo
> Finmart this quarter as we have done over the past several quarters. During the quarter,
> we noted some differences in the performance of parts of our Grupo Finmart loan
> portfolio that prompted a more thorough review and analysis of our loan reserves,
> interest income, processes and controls.*** We are diligently working to complete that
> review as soon as possible and will delay our earnings release accordingly." [Emphasis
> added.]
>
> *            *            *
>
> **Latin America Segment**
>
> All revenue and pawn operating metrics are quoted a constant currency basis. See the
> accompanying table for a reconciliation of such amounts to the comparable GAAP
> amounts.

*        *        *

*Payroll Withholding Lending*

Demand for loans at Grupo Finmart was strong with double-digit growth in loan originations compared to the same period last year. ***This quarter Grupo Finmart did not conduct any loan sales that would have otherwise contributed to quarterly earnings from the segment. This is a timing issue, and for comparative purposes, an asset sale in the second quarter of the prior year provided $5 million in pre-tax gains.*** [Emphasis added.]

114.    On this news, shares of EZCORP declined $0.79 per share, over 8%, to close on

May 1, 2015, at $8.41 per share, on unusually heavy volume.

115.    On May 20, 2015, after the market closed, the Company issued a press release

entitled, "EZCORP Releases Selected Information For The Second Quarter Of Fiscal 2015."

Therein, the Company, in relevant part, stated:

**Company receives deficiency notice from Nasdaq related to the delayed quarterly filing**

EZCORP, Inc. (Nasdaq: EZPW), a leading provider of pawn and consumer loans in the United States, Mexico and Canada, has released selected financial and operating information for the second quarter of fiscal 2015 in a Current Report on Form 8-K filed with the Securities and Exchange Commission. As previously announced, the company delayed the filing of its Quarterly Report on Form 10-Q for the second quarter until it completes the review and analysis of certain errors identified in a portion of its Grupo Finmart loan portfolio. The Form 8-K discloses information about the second quarter that is unaffected by that review and contains more detail about the nature and scope of the Grupo Finmart review.

On May 14, 2015, the company received a written notice from The Nasdaq Stock Market stating that, due to the failure to timely file its Quarterly Report on Form 10-Q for the second quarter of fiscal 2015, the company is not currently in compliance with Nasdaq Listing Rule 5250(c)(1). The notice gives the company 60 days to submit a plan to regain compliance, and if that plan is accepted, the Nasdaq staff can grant an exception of up to 180 calendar days from the filing's due date. The notice was expected and has no immediate effect on the listing or trading of the company's common stock on the Nasdaq Global Select Market. The company will submit a plan of compliance within the 60-day period, and believes that its plan will be an acceptable plan to regain compliance with the Nasdaq's listing rules.

116.    On May 20, 2015, after the market closed, filed a Current Report on Form 8-K with

the SEC. Therein, the Company, in relevant part, stated:

**ITEM 2.02 — RESULTS OF OPERATIONS AND FINANCIAL CONDITION**

As previously disclosed, EZCORP, Inc. ("we" or the "Company") has delayed the filing of our Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 (ended March 31, 2015) pending the completion of the review and analysis of certain accounting issues relating to our Grupo Finmart loan portfolio. We have identified certain errors in a portion of our Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income. We are conducting a thorough review to quantify the errors, evaluate the associated processes and controls and remediate the identified control deficiencies. We are also reviewing whether certain structured asset sales from Grupo Finmart met the criteria required for sale accounting treatment or whether they should have been accounted for as secured borrowings.

We have not completed our review and analysis, and therefore, no definitive conclusions have been made. However, we believe that it is likely that management and the Audit Committee will conclude that we have a material weakness in internal control over financial reporting and deficiencies in our disclosure controls and procedures. For a description of the nature and scope of the Grupo Finmart review, including the preliminary findings to date, see "Item 7.01 — Regulation FD Disclosure — Grupo Finmart Review" below.

\*     \*     \*

**ITEM 7.01 — REGULATION FD DISCLOSURE**

As noted above, we have delayed the filing of our Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 until we have completed the review and analysis of the Grupo Finmart loan portfolio described below, have determined the impact on our current and historical financial statements, and have evaluated the significance of identified control deficiencies. We expect to file the delinquent Quarterly Report upon completion of that review, including a review of the results by BDO (our current independent registered public accounting firm) and Deloitte & Touche LLP ("Deloitte") (our independent registered public accounting firm for fiscal 2014 and 2013), and after BDO has completed its required review of our second quarter unaudited financial statements.

**Grupo Finmart Review**

_Background Description of Grupo Finmart Business and Accounting Policies_

We own a 76% interest in Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. ("Grupo Finmart"), a payroll withholding lender headquartered in Mexico City. We acquired a controlling interest in Grupo Finmart in January 2012, and its financial results are consolidated and reported as part of our Latin America segment.

Grupo Finmart enters into payroll withholding agreements ("convenios") with Mexican

employers, primarily federal, state and local governments and agencies, and provides unsecured, multiple-payment consumer loans to employees of those various employers. Interest and principal payments are collected by the employers through payroll deductions and remitted to Grupo Finmart. As of March 31, 2015, Grupo Finmart had over 100 active convenios and a total of 101,800 consumer loans outstanding. Those loans had an average principal balance per loan of approximately $900 and an average term per loan of 30 months.

We accrue and recognize interest revenue ratably over the life of all loans that are in current status, and we reserve the percentage of interest revenue that we expect not to collect (based on historical experience). We also reserve against the loan principal based on the percentage of loans that we expect not to collect (again, based on historical experience).

Grupo Finmart's loans are considered in current status as long as the customer remains employed ("in-payroll" loans). Loans outstanding from customers who are no longer employed ("out-of-payroll" loans) are considered current if payments are made by the due date. If one payment of an out-of-payroll loan is delinquent, that one payment is considered in default; if two or more payments are delinquent at any time, the entire loan is considered in default. Upon default, we charge the loan principal to consumer loan bad debt expense, reduce interest revenue by the amount of unpaid interest accrued on the loan prior to default and cease accruing future interest revenue. If we subsequently collect some or all of the defaulted loan, we reduce consumer loan bad debt expense by the amount of collected principal and increase interest revenue by the amount of collected interest.

Under Grupo Finmart's current policy, only defaulted out-of-payroll loans are considered in nonaccrual status. Due to the likelihood of ultimately receiving payment if the customer remains employed, we continue to accrue interest on all in-payroll loans, even though Grupo Finmart may not be currently receiving installment payments. It is not uncommon for payments to be temporarily interrupted. For example, it typically takes up to 90 days for the employer to set up initial payroll withholding and begin submitting payments to Grupo Finmart. Further, it is not unusual to have an interruption in payments for a number of reasons, such as holidays, summer vacations, illness, convenio renewals, union permits and political elections. In addition, issues with employer systems or payment consolidation processes sometimes cause interruptions in payments.

*Review of "Non-Performing" Loans*

During the second quarter of fiscal 2015, we began a review of the loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments ("non-performing" loans). During this review, we identified a number of out-of-payroll loans that had not been properly coded and recognized as such. The failure to properly account for these out-of-payroll loans results in an understatement of bad debt expense and an overstatement of accrued interest revenue. We are in the process of quantifying the magnitude of the error and determining the periods affected by the required adjustments.

In our review of the aging characteristics of the non-performing loans, we noted that many of these loans, while still in-payroll, have been in non-performing status for some time. Even though we have accounted for these loans in accordance with Grupo Finmart's current revenue recognition and bad debt policies, we are reviewing those policies to ensure they comply with generally accepted accounting principles in the United States of America ("GAAP"). If we determine that those policies do not comply with GAAP, we will resolve the extent to which we have understated bad debt expense and overstated interest revenue in prior periods.

In addition to our review of the non-performing loans, we are also evaluating associated processes and controls. ***We believe that failure to identify out-of-payroll loans and failure to adequately track the aging of non-performing loans are control deficiencies that likely constitute a material weakness in our internal control over financial reporting.*** We also believe that these failures likely constitute deficiencies in our disclosure controls and procedures. We have not yet completed our evaluation of the processes and controls, and there can be no assurance that we will not identify other deficiencies in our controls or that those deficiencies, if identified, will not constitute additional material weaknesses. [Emphasis added.]

We are conducting our review and evaluation under the supervision of the Audit Committee of our Board of Directors and in consultation with BDO and Deloitte. The Audit Committee has also engaged PricewaterhouseCoopers LLP to assist management with the review of the non-performing loans, the evaluation of associated processes and controls, and the design and implementation of an appropriate remediation plan, as well as to provide objective advice to the Audit Committee.

We have recently created the position of Chief Risk Officer of EZCORP and filled that position with an experienced executive with industry-related background and expertise. The Chief Risk Officer will report to the EZCORP Chief Executive Officer and will be responsible for the design, implementation and oversight of a comprehensive, enterprise-wide risk management program, which will analyze and seek to manage and mitigate internal and external risks, including loan portfolio risks, for Grupo Finmart and EZCORP's other businesses.

*Review of Accounting Treatment of Prior Asset Sales*

During fiscal 2014 and the first quarter of fiscal 2015, Grupo Finmart entered into structured asset sales pursuant to which a portion of the consumer loan portfolio was sold to third parties. These transactions were accounted for as sales, and we recognized gain on these sales. We are reviewing these transactions to confirm that they have met the criteria required for sale accounting treatment or whether they should have been accounted for as secured borrowings.

*Impact on Financial Statements*

In accordance with Staff Accounting Bulletin ("SAB") No. 99, Materiality, and SAB No.

108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, we will assess the materiality of the identified errors on our consolidated financial statements for the first quarter of fiscal 2015 and **for the fiscal years ended September 30, 2014, 2013 and 2012 (and the quarterly periods within those years).** At this point, we have not completed our review and analysis and, thus, have reached no definitive conclusions regarding whether correction of the identified accounting errors will require a restatement of prior period financial statements.

117.    On this news, shares of EZCORP declined $0.66 per share, over 7%, to close on

May 21, 2015, at $8.33 per share, on unusually heavy volume.

118.    On July 16, 2015, EZCORP shares opened at $7.06 per share, and closed at $6.74

per share, a decline of 4.5%. This decline, which came the day before EZCORP's July 17, 2015

press release, was statistically significant.

119.    On July 17, 2015, the Company issued a press release entitled, "EZCORP to Restate

Certain Financial Results." Therein, the Company, in relevant part, stated:

> EZCORP, Inc. (Nasdaq:EZPW), a leading provider of pawn and consumer loans in the United States, Mexico and Canada, today announced that it will restate its financial statements for fiscal 2014 (including the interim periods within that year) and the first quarter of fiscal 2015. This decision to restate was made by the company's board of directors, upon the recommendation of management and the audit committee and in consultation with the company's independent registered public accounting firms.
>
> **Structured Asset Sales**
> The restatement adjustments, all of which are non-cash, will correct certain errors relating to the accounting for Grupo Finmart's structured assets sales in fiscal 2014 and the first quarter of fiscal 2015. ***Following a comprehensive review of the terms and conditions of each of the structured asset sales, management has determined that the asset sales should not have been accounted for as sales, principally due to certain control rights that Grupo Finmart retained as servicer of the loans.*** Because of these control rights, the trusts to which the loans were sold should be accounted for as "variable interest entities" and consolidated pursuant to ASC 810-10 (Consolidation and the Variable Interest Model), and therefore, the sales should not have been recognized for accounting purposes. [Emphasis added.]
>
> As a result of the consolidation, the prior gains on sale will be eliminated, the assets and liabilities of the trusts will be included in the company's consolidated balance sheet and interest income (along with related expenses) will be recognized over the life of the loans. This process will result in a reduction in net income in the periods during which a structured asset sale occurred (due to the reversal of the gain on sale) and an increase in net income

thereafter (due to the accrual and recognition of interest income, net of related expenses, over the life of the loans).

Although the company has not yet quantified the effect of reversing the sale accounting treatment, it should be noted that, as a result of the asset sales, the company previously recognized $39.6 million of gain ($33.0 million in fiscal 2014 and $6.6 million in the first quarter of fiscal 2015). That gain will be eliminated, but interest income in the periods subsequent to the assets sales will be increased. Grupo Finmart's Mexican GAAP financial statements are unaffected by this adjustment.

**Grupo Finmart Loan Portfolio**

As previously disclosed, the company is also reviewing the Grupo Finmart loan portfolio to quantify errors that may impact current and historical amounts of loan reserves and interest income. ***The company has identified a number of out-of-payroll loans that had not been properly classified and accounted for as such, causing an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods.*** In addition, after reviewing the aging characteristics of the non-performing loans, the company, in consultation with Deloitte & Touche LLP, the company's independent registered public accounting firm for fiscal 2014 and 2013, and BDO USA, LLP, the company's current independent registered public accounting firm, has determined that ***it is more appropriate to accrue and recognize interest income over the period that payments are actually received rather than over the stated term of the loans*** (as has been Grupo Finmart's historic policy). That policy has caused interest income to be recognized earlier than will be the case by recognizing interest income over the actual term. [Emphasis added.]

Although these issues could be material, the company has not fully quantified the impact on bad debt reserves and accrued interest and, therefore, has not yet determined which prior reporting periods have been affected. Identified errors that relate to fiscal 2014 or the first quarter of fiscal 2015 will be corrected as part of the restatement described above. Based on the outcome of our review of the loan portfolio, we may determine that the financial statements for periods prior to fiscal 2014 should also be restated.

Additional information about these matters can be found in the company's Current Report on Form 8-K filed with the Securities and Exchange Commission contemporaneous with the issuance of this release.

120.    Also on July 17, 2015, the Company filed a Current Report on Form 8-K with the

SEC. Therein, the Company, in relevant part, stated:

**Item 4.02 — Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or a Completed Interim Review**

(a) As previously disclosed, EZCORP, Inc. ("we" or the "Company") has delayed the filing

of our Quarterly Report on Form 10-Q for the second quarter of fiscal 2015 (ended March 31, 2015) pending the completion of a review and analysis of certain accounting issues relating to our Grupo Finmart loan portfolio, specifically:

- The review of certain structured asset sales and the determination of whether those transactions met the criteria required for sale accounting treatment; and

- The quantification of certain errors in a portion of our Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income and the evaluation and remediation of associated processes and controls.

Based on management's review and analysis of the structured asset sales (as further described below), the Audit Committee, in consultation with management and Deloitte & Touche LLP ("Deloitte"), our independent registered public accounting firm for fiscal 2014 and 2013, and BDO USA, LLP ("BDO"), our current independent registered accounting firm, concluded on July 14, 2015 that the structured asset sales did not meet the criteria required for sale accounting treatment and should not have been accounted for as sales and, therefore, that our previously issued financial statements for fiscal 2014 and the first quarter of fiscal 2015 should be restated. The Audit Committee's recommendation was presented to the full Board of Directors on July 15, 2015, and at that time, the Board determined that the audited financial statements for fiscal 2014 (including the report of the independent registered public accounting firm relating thereto), the unaudited financial statements for the quarterly periods within fiscal 2014, and the unaudited financial statements for the first quarter of fiscal 2015 should no longer be relied upon because of the accounting errors associated with the structured asset sales. Accordingly, we will restate our previously issued financial statements for those periods.

We are continuing our quantification and evaluation of other accounting errors in our Grupo Finmart loan portfolio, and have not yet determined whether additional reporting periods have been affected. See "Review of Non-Performing Loans" below.

*     *     *

### *Review of Grupo Finmart Asset Sales*

During fiscal 2014 and the first quarter of fiscal 2015, Grupo Finmart entered into a total of six structured asset sales pursuant to which a portion of the loan portfolio was sold to a special purpose trust for the benefit of third parties (the "Asset Sales"). Each of the Asset Sales was accounted for as a sale, and we recognized a gain equal to the difference between the book value of the sold loans and the purchase price, which was generally equal to the aggregate amount of the payments Grupo Finmart expected to receive over the life of the loans minus a negotiated discount. The practical effect of this accounting treatment was to accelerate the recognition of the interest income that would otherwise have been recognized over the life of the loans.

Following a comprehensive review of the terms and conditions of each of the Asset Sales

and considerable discussion involving management, Ernst & Young ("EY") (our accounting advisors), our legal advisors in the U.S. and Mexico, Deloitte and BDO, management has determined that the Asset Sales should not have been accounted for as sales, principally due to certain control rights that Grupo Finmart retained as servicer of the loans. We believe that, because of these control rights, the trusts to which the loans were sold should be accounted for as "variable interest entities" and consolidated pursuant to ASC 810-10 (Consolidation and the Variable Interest Model), and therefore, the sales should not have been recognized for accounting purposes.

The practical effect of the consolidation is that the gain on sale is eliminated, the assets and liabilities of the trusts are included in our consolidated balance sheet and interest income (along with the related expenses) is recognized over the life of the loans. This process will result, generally, in a reduction in net income in the periods during which an Asset Sale occurred (due to the reversal of the gain on sale) and an increase in net income thereafter (due to the accrual and recognition of interest income, net of expenses, over the life of the loans). We are now engaged in the process of reconstructing the financial statements for the affected periods to reflect the trust consolidation.

Although we have not yet quantified the effect of reversing the sale accounting treatment, it should be noted that, as a result of the Asset Sales, we previously recognized a total of $39.6 million of gain, as follows:

| Fiscal Quarter | Realized Gain on Sale |
|---|---|
| First quarter of fiscal 2014 | $4.6 million |
| Second quarter of fiscal 2014 | $4.7 million |
| Third quarter of fiscal 2014 | $9.9 million |
| Fourth quarter of fiscal 2014 | $13.8 million |
| First quarter of fiscal 2015 | $6.6 million |
| Total | $39.6 million |

That gain will be eliminated, but interest income in the periods subsequent to the Asset Sales will be increased. Grupo Finmart's Mexican GAAP financial statements are unaffected by this adjustment.

### Review of "Non-Performing" Loans

*Relevant Accounting Policies* — Historically, the Company has recognized interest revenue on the Grupo Finmart loans ratably over the stated term of the loans. Based on historical experience, the Company estimates the percentage of loans that it expects not to collect and establishes a bad debt reserve against the principal and accrued interest.

Grupo Finmart's loans are considered in current status as long as the customer remains employed ("in-payroll" loans). Loans outstanding from customers who are no longer employed ("out-of-payroll" loans) are considered current if payments are made by the due date. If one payment of an out-of-payroll loan is delinquent, that one payment is considered in default; if two or more payments are delinquent at any time, the entire loan is considered in default. Upon default, we charge the loan principal to consumer loan bad debt expense,

reduce interest revenue by the amount of unpaid interest accrued on the loan prior to default and cease accruing future interest revenue. If we subsequently collect some or all of the defaulted loan, we reduce consumer loan bad debt expense by the amount of collected principal and increase interest revenue by the amount of collected interest.

Under Grupo Finmart's historic accounting policy, only defaulted out-of-payroll loans are considered in nonaccrual status. Due to the likelihood of ultimately receiving payment if the customer remains employed, we continue to accrue interest on all in-payroll loans, even though Grupo Finmart may not be currently receiving payments. It is not uncommon for payments to be temporarily interrupted. For example, it typically takes up to 90 days for the employer to set up initial payroll withholding and begin remitting payments to Grupo Finmart (a process referred to as "ratification"). Further, it is not unusual to have an interruption or delay in payments for a number of reasons, such as holidays, summer vacations, illness, convenio renewals and political elections. In addition, some larger employers act as a consolidator and remitter on behalf of other smaller employers and the payment consolidation processes, or other issues with employer systems, sometimes cause interruptions in payments.

*Issues Identified in Review* — In January 2015, Grupo Finmart management notified our finance management that a previous loan purchaser had requested to have some of its loans replaced because, nine months after the loan sale, some of the sold loans had still not been ratified. Upon receipt of that information, we initiated a review of the entire Grupo Finmart loan portfolio to identify all loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments ("non-performing" loans) and to determine the reason that payments on the loans were not being received. During the course of this review, the following issues were identified:

- We determined that the non-performing loans included a number of out-of-payroll loans that had not been properly classified and recognized as such. This error has caused an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods. Since March and continuing to date, we have been thoroughly analyzing the non-performing loan portfolio to (1) identify all out-of-payroll loans and (2) determine, on a loan-by-loan basis, the period during which Grupo Finmart should have charged the loan to bad debt expense and ceased accruing interest.

- We also found that many of the non-performing loans, while still in-payroll, have been in non-performing status for some time. Under Grupo Finmart's historic interest accrual policy, we have accrued and recognized interest income on in-payroll loans over the stated life of the loans even though, because of delays or interruptions in the receipt of payments, the period over which the interest income is actually received is longer than the stated loan term. After reviewing the aging characteristics of the non-performing loans and consulting with Deloitte and BDO, we have determined that it is more appropriate to accrue and recognize interest income over the period that payments are actually received rather than over the stated term of the loan. Grupo Finmart's historic interest accrual policy has caused

interest income to be recognized earlier than will the case by recognizing interest income over the over actual term. Since March and continuing to date, we have been thoroughly analyzing the entire Grupo Finmart loan portfolio to determine the appropriate period for the recognition of accrued interest income for each loan.

Although the issues described above could be material, we have not fully quantified the impact on bad debt reserves and accrued interest and, therefore, have not determined which prior reporting periods are affected. The identified errors that relate to fiscal 2014 or the first quarter of fiscal 2015 will be corrected as part of the restatement described above under "Review of Grupo Finmart Asset Sales." Based on the outcome of our review of the loan portfolio, we may determine that financial statements for periods prior to fiscal 2014 should also be restated. The restatements are expected to have no cash impact.

### *Nature of Accounting Errors*

Based on the work performed to date, we believe that the errors in our previously issued financial statements are the result of unintentional accounting errors or mistakes and ineffective internal controls, and the Audit Committee has concurred with that assessment. Neither the Audit Committee nor management has identified any evidence that would indicate that the errors were the result of any deliberate attempt to misstate financial statements, misrepresent the Company's financial condition or results of operations, or deceive or defraud investors.

### *Control Deficiencies and Remedial Measures*

Management and the Audit Committee are working to identify and evaluate the deficiencies in our internal control over financial reporting that gave rise to the accounting errors described above. We believe that failure to properly account for the structured asset sales constitutes a material weakness in our internal control over financial reporting and a deficiency in our disclosure controls and procedures. We also believe that the failure to identify out-of-payroll loans and the failure to adequately track the aging of non-performing loans are control deficiencies that likely constitute material weaknesses in our internal control over financial reporting and likely constitute deficiencies in our disclosure controls and procedures. Because of the control deficiencies described above, our previous disclosures regarding internal control over financial reporting (including the report of the independent registered public accounting firm related thereto) and disclosure controls and procedures contained in our Annual Report on Form 10-K for the year ended September 30, 2014 and our Quarterly Report on Form 10-Q for the quarter ended December 31, 2014 should no longer be relied upon. We have not yet completed our evaluation of the processes and controls, and there can be no assurance that we will not identify other deficiencies in our controls or that those deficiencies, if identified, will not constitute additional material weaknesses.

The Audit Committee has engaged PricewaterhouseCoopers LLP ("PwC") to evaluate the processes and controls at Grupo Finmart, assist with the design and implementation of an appropriate remediation plan, and provide independent advice to the Audit Committee.

121.    On this news, shares of EZCORP declined $0.26 per share, nearly 3.9%, to close on July 17, 2015, at $6.48 per share, on unusually heavy volume.

**d.  Defendants' Statements During the Class Period Regarding Grupo Finmart and The Company's Internal Controls Were Knowingly or Recklessly False and Misleading When Made**

122.    As alleged herein, the admissions in the Restatement, coupled with information provided by the Confidential Witnesses, and documents produced to date during pre-trial discovery, provides a strong inference that the statements identified above (Section V.b.) were either knowingly or recklessly false and misleading when made. Thus, EZCORP issued financial statements throughout the class period that were materially false and misleading when issued, Defendants omitted from disclosure material facts necessary in order to make the statements made not misleading, and those statements were made either with knowledge or in reckless disregard for the truth.

123.    As revealed in the restated financials filed on November 9, 2015, the Company (1) failed to properly identify and record non-performing loan write-offs and failed to cease accrual of interest revenue on the related non-performing loans, (2) improperly recorded as sales six portfolio asset sales of payroll loans from Grupo Finmart's loan portfolio, and (3) failed to maintain adequate internal controls over financial reporting.

124.    EZCORP and Grupo Finmart were under pressure to undertake the sale of loans. They both needed the cash and the earnings: for Grupo Finmart they were "facing a shortfall to achieve their Y2 earn-out payment" and for EZCORP "Cash Flows were low due to the high growth in new originations AND due to the amortization of the loan portfolio" and "For the second quarter of 2014, the asset sales were needed to "bridge an earnings gap at EZCORP and to fund the business." *See* Ex. E. Indeed, Kuchenrither told Maccarrone on April 28, 2014 that "EZCORP **needs** the benefit of $20 million worth of loan sales." *See* Ex. D. Kuchenrither ignored the reports of improper accounting at Grupo Finmart because EZCORP needed to sell the loans. Correcting

accounting errors and identifying nonperforming loans could jeopardize Grupo Finmart's ability to package and sell the loans at the very time EZCORP and Grupo Finmart were desperate for the cash and the earnings.

125.     The reversal of the loan asset sales were intertwined with the non-performing loans at Grupo Finmart. One of the purchasers of the loans via an asset sale, Altum, requested that loans be replaced because the loans were non-performing. Even though the loans were purportedly sold "without recourse," EZCORP replaced the loans. But, this led to EZCORP's accounting department to request a full review of Grupo Finmart's loan portfolio, which led to the restatement of not only the asset sales but to increase the loss reserves for non-performing loans at Grupo Finmart.

126.     Kuchenrither was in direct and frequent communication with Maccarrone on Loan Sales issues. For example, on February 24 and 25, 2014, Kuchenrither and Maccarone traded e-mails about the Loan Sales the subject of which was "Accounting US GAAP." *See* Ex. M; Maccarone forwarded an e-mail to Kuchenrither concerning recognizing revenue under US GAAP in which she wrote "Mark, FYI, just keeping you in the loop." *Id*. He responded "I am involved." *Id.* They then set up a call to discuss.

127.     Defendants have produced at least 63 emails from 2014 either from Kuchenrither to Maccarrone, or from Maccarrone to Kuchenrither, regarding Loan Sales.

128.     Plus, Maccarrone wrote to EZCORP's then new CEO, Grimshaw, that she felt "it critical to share with you the following activities and measures that were taken to manage risk and provide oversight to the company over the past two years as I feel strongly that Mark is grossly misrepresenting his awareness of the delays/nature of delays and what was already being done to reconcile the lack of visibility and intervention to improve risk management."  She continued:

"3rd Party Portfolio Performance Evaluations.

Over the past two years, there have been several diagnostic evaluations completed to analyze the performance of the portfolio:

- Sept 2013 – February 201[4] ATIK Capital (Guillermo Babitz's firm) was hired to oversee and facilitate the 2nd Securitization DD- this included an detailed evaluation of the portfolio
  - His findings in February of 2014 (and are attached) were that:
    - Out of 120,203 outstanding Loans:
    - 8.3% not ratified
    - 30% more than 60 days delinquent (5 accumulated fortnights)

    \*       \*       \*

*See* Ex. I.

129.    Grimshaw also questioned Kuchenrither's honesty in an email dated March 3, 2015: "And you wonder why we can't meet budget! This is an absolute wreckage that mainlines . . . **with a CFO [Kuchenrither was CFO at the time] pleading ignorance! [Bullshit] . . . why can't he tell us this? $27M in asset sales to prop the business up is [unbelievable]**. Why can't we make plan???? We can fix but I am not comfortable uncovering the crap that no one has been told about."

*See* Ex. J.

### i.   The Restatement Reveals Accounting Errors that are Highly Suggestive of Fraud

130.    The Restatement contained material changes to the Company's financial statements as originally stated. As revealed therein, the Company failed to properly identify and record non-performing loan write-offs and failed to cease accrual of interest revenue on the related non-performing loans. Thus, the Company overstated or prematurely recognized revenue from "Consumer loan fees and interest" and understated or improperly delayed recognition of "Consumer loan bad debt" expense. This error began in the second quarter of fiscal 2012 and continued through the first quarter of 2015.

131.    Specifically, the Restatement described these errors as follows:

*Review of "Non-Performing" Loans*

Relevant Accounting Policies — Historically, we have recognized interest revenue on the Grupo Finmart loans ratably over the stated terms of the loans. Based on historical experience, we estimated the percentage of loans that Grupo Finmart expects not to collect and established a bad debt reserve against the principal and accrued interest.

Loans to Grupo Finmart customers whose employment is continuing are referred to as "in-payroll" loans, while loans to Grupo Finmart customers whose employment is discontinued are referred to as "out-of-payroll" loans. A customer is generally considered to have discontinued their employment if they are no longer employed by the employer that is responsible for the payroll withholding.

Grupo Finmart's loans were considered active as long as they were in-payroll. Out-of-payroll loans were considered active if Grupo Finmart continued to receive payments, but were considered defaulted if payments were not made. Upon default, we charged the loan principal to consumer loan bad debt expense, reduced interest revenue by the amount of unpaid interest accrued on the loan prior to default and ceased accruing future interest revenue. If Grupo Finmart subsequently collected some or all of the defaulted loan, we reduced consumer loan bad debt expense by the amount of collected principal and increased interest revenue by the amount of collected interest.

Under Grupo Finmart's historical accounting policy, only defaulted out-of-payroll loans were considered in nonaccrual status. Due to the likelihood of ultimately receiving payment if the customer's employment continued, we continued to accrue interest on all in-payroll loans, even though Grupo Finmart might not be currently receiving payments. A number of circumstances cause delays in the receipt of payments on a Grupo Finmart loan. For example:

- It often takes 90 days or more for the employer to set up initial payroll withholding and begin remitting payments to Grupo Finmart (a process referred to as "ratification").

- It is not unusual to have an interruption or delay in payments for a number of reasons, such as holidays, summer vacations, illness, convenio renewals, union permits and political elections.

- Many convenios limit the amount that can be withheld from a borrower's paycheck, and if the borrower has multiple loans outstanding, the withheld amount is generally used to repay the loans in the order in which they were made.

- Some larger employers act as a consolidator and remitter on behalf of other smaller employers and the payment consolidation processes, or other issues with employer systems, sometimes cause interruptions in payments.

*Issues Identified in Review* — In January 2015, Grupo Finmart management notified our

finance management that a previous loan purchaser had requested to have some of its loans replaced because, several months after the loan sale, some of the sold loans had still not been ratified. Upon receipt of that information, we initiated a review of the entire Grupo Finmart loan portfolio to identify all loans that were being carried as active loans but with respect to which Grupo Finmart was not currently receiving payments ("non-performing" loans) and to determine the reason that payments on the loans were not being received. During the course of this review, the following issues were identified:

- We determined that the non-performing loans included a number of out-of-payroll loans that had not been correctly classified and recognized as such. This error caused an understatement of bad debt expense and an overstatement of accrued interest revenue in prior periods. We have now analyzed the non-performing loan portfolio to identify all out-of-payroll loans and determine, on a loan-by-loan basis, the period during which Grupo Finmart should have charged the loan to bad debt expense and ceased accruing interest revenue.

- We also found that many of the non-performing loans, while still in-payroll, had been in non-performing status for some time. Under Grupo Finmart's historical interest accrual policy, we accrued and recognized interest income on in-payroll loans over the stated life of the loans even though partial or delayed payments extended the loan's payback period beyond the stated loan term. After reviewing the aging characteristics of the non-performing loans and consulting with our independent registered public accounting firms, we have determined that it is appropriate to:

  o Accrue and recognize interest income over the period that payments are expected to be received rather than over the stated term of the loan;

  o For loans that have been in non-performing status for 180 days, charge the loan principal to consumer loan bad debt expense, reduce interest revenue by the amount of unpaid interest theretofore accrued on the loan, cease accruing future interest revenue and record future collections under the cost recovery method (recognizing income after principal has been recovered); and

  o Expense certain brokerage and other commission costs as incurred rather than amortize them over future periods.

The application of this methodology has resulted in adjustments to interest income and bad debt expense for all periods since we began consolidation of Grupo Finmart in the second quarter of fiscal 2012. Those adjustments are reflected in the restated financial statements for fiscal 2012, 2013 and 2014 presented in this Amended Annual Report on Form 10-K/A, and will be reflected in the restated financial statements for the first quarter of fiscal 2015, as well as in the financial statements for the second and third quarters of fiscal 2015 and future periods.

132.    By overstating consumer loan fees and interest while understating consumer loan

bad debt expense, Defendants were able to manipulate the ratio of bad debt expense to loan fees and interest. The ratio of bad debt expense to consumer loan fees and interest is an important metric for investors because it (a) measures how efficiently the Company can create income from making loans while keeping bad debt expense to a minimum, and (b) measures how well the Company collects on its loans as compared to total income generated from such loans.

133.    Artificially depressing this ratio made the Company appear healthier than it truly was. Indeed, as the Restatement revealed, a large amount of Grupo Finmart's loan portfolio was non-performing, requiring significant adjustments to both bad debt expense and loan fees and interest income in the Latin America segment. The tables below, which are derived from information provided in the Restatement, demonstrate the impact of the fraud on these metrics:

| Latin America - 2012 *(in millions)* | 2012 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $26.9 | ($.9) | $26.0 |
| Consumer loan bad debts expense (benefit) | 0.3 | 7.8 | 8.1 |
| Ratio of Consumer loan income/bad debts | **1.1%** | | **31.2%** |
| **Percentage Increase to bad debt expense** | **2,524.9%** | | |

| Latin America - 2013 *(in millions)* | 2013 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $50.5 | ($7.9) | $53.4 |
| Consumer loan bad debts expense (benefit) | (.113) | 11.8 | 11.714 |
| Ratio of Consumer loan income/bad debts | **(0.2%)** | | **27.5%** |
| **Percentage Increase to bad debt expense** | **10,466.4%** | | |

| Latin America - 2014 *(in millions)* | 2014 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $54.2 | ($0.8) | $53.4 |
| Consumer loan bad debts expense (benefit) | 6.9 | 12.7 | 19.6 |
| Ratio of Consumer loan income/bad debts | **12.7%** | | **36.7%** |
| **Percentage Increase to bad debt expense** | **185.5%** | | |

| Latin America – Q1 2015<br>*(in millions)* | Q1 2015 - As Stated | Restatement Adjustments | As Restated |
|---|---|---|---|
| Consumer loan fees and interest | $10.1 | $6.2 | $16.3 |
| Consumer loan bad debts expense (benefit) | 0.9 | 6.8 | 7.7 |
| Ratio of Consumer loan income/bad debts | **9.3%** | | **47.4%** |
| **Percentage Increase to bad debt expense** | **722.5%** | | |

134.    Thus, in fiscal 2013, EZCORP overstated bad debt by **10,466.4%** in fiscal 2013, by **185.5%** in fiscal 2014, and by **722.5%** in the first quarter of fiscal 2015. Accordingly, the ratio of consumer loan interest and fees to bad debt expense was immensely understated in each restated period, as evidenced by the charts in the preceding paragraph.

135.    By manipulating the ratio of bad debt expense to consumer loan income and fees, EZCORP was able to portray its loan portfolio as of higher quality, thus selling them for more money and stymieing Grupo Finmart's mounting losses. According to CW#1, Grupo Finmart was amassing large losses due to non-performing loans, mainly due to the fact that Grupo Finmart did not have a strong collections facility and it made loans to older debtors who subsequently left their jobs and failed to repay their loans. CW#4 confirmed that Grupo Finmart had a poor collection facility. Grupo Finmart did not adequately track the employment of its borrowers, such that if a borrower left his or her job, Grupo Finmart did not appropriately account for the fact that the payday loan was no longer being paid because Grupo Finmart lacked adequate aging reports. As CW#1 and CW#4 stated, because Grupo Finmart had a poor collections system, it could take up to two years for Grupo Finmart to realize that borrowers had left their jobs and were no longer making payments. These loans were subsequently written off as a cost of doing business, thus causing Grupo Finmart to amass large losses.

136.    In meetings with Kuchenrither at EZCORP's Austin Texas offices in early November, 2013, CW#1 informed Kuchenrither that Grupo Finmart had poor collections facilities

and was not properly tracking non-performing loans.

137.    After Altum asked EZCORP to replace the loans sold to it that were non-performing, EZCORP retained Millwood to review Grupo Finmart's accounting controls and procedures. Millwood's initial report found, among other things, that Grupo Finmart was lacking any "timing or vintage analysis." The report also found inaccuracies in Grupo Finmart's reporting, noting that "the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio." *See* Ex. F.

138.    The issues identified by Millwood were in-line with the accounting issues identified by CW#2 and #4, and which were relayed to Kuchenrither by CW#1 by November 2013.

139.    CW#4 assisted in preparing an internal audit report regarding Grupo Finmart. CW#4 stated that problems with Grupo Finmart's poor collection facilities and problems with tracking the employment of borrowers and non-performing loans was documented in a 2013 fiscal year-end internal audit report regarding Grupo Finmart.

140.    CW#1 stated that, in October 2013, a copy of the loan document regarding the first sale of Grupo Fimart loans was provided to CW#1. After reviewing the agreement, CW#1 met with Kuchenrither at EZCORP's Rollingwood Texas offices to discuss the agreement. The meeting occurred in early November, 2013 after the loan sale agreement was signed on October 21, 2013, but prior to EZCORP issuing its fiscal 2013 year-end financial results on November 7, 2013. CW#1 informed Kuchenrither that because there was a right to return loans to EZCORP it was not a true asset sale and under EZCORP's accounting policy the loan sale could not be recorded as revenue. Kuchenrither disagreed with CW#1 stating that he had consulted the appropriate personnel who stated that it was appropriate to record the revenue. As part of the restatement itself, however, EZCORP admitted with regard to reversing this, and all the subsequent sales of Grupo

Finmart loans, that: (1) "[t]he appropriate accounting expertise (internally and externally) was not engaged, resulting in a failure to recognize important U.S. GAAP issues"; (2) "[t]he accounting consequences of significant, unusual transactions were not identified and evaluated"; and (3) "[t]he accounting positions taken on significant, unusual transactions were not reviewed and approved at the appropriate level."

141.    Despite what CW#1 told Kuchenrither, EZCORP completed its first loan sale in October 2013 and realized $4.6 million in income on the sale gain in its 2013 fiscal fourth quarter.

142.    According to the Company's 2013 Form 10-K, during fiscal 2013, the Company did not achieve the specified business performance goals necessary for the payment of incentive bonuses under the fiscal 2013 annual incentive bonus plan to Defendant Kuchenrither, then-Chairman of the Board Sterling Brinkley, or then-CEO Paul Rothamel. The Compensation Committee declined to award any fiscal 2013 bonus to these three executives, and the Board charged them with quickly developing a plan to address the Company's challenges over the next several quarters. However, after the Compensation Committee reviewed their plan in November 2013, the Committee determined "that management, led by Mr. Brinkley, Mr. Rothamel and Mr. Kuchenrither, had formulated an effective plan for fiscal 2014, and on November 22, 2013, approved the following bonuses payable immediately for the completion of the strategic plan for fiscal 2014: Mr. Brinkley, $1,000,000; Mr. Rothamel, $1,000,000; and Mr. Kuchenrither, $350,000."

143.    During fiscal 2014 and the first quarter of fiscal 2015, "Grupo Finmart entered into a total of **six** structured asset sales pursuant to which a portion of the loan portfolio was sold to special purpose trusts...." Each asset sale occurred at the tail end of each reporting period. When sold, these loans were improperly moved off-balance sheet and a gain on sale was simultaneously

improperly recognized (as "Consumer loan sale and other income"). The table below describes the

six structured asset sales:

| Description of Portfolio (in millions) | Book Value of Principal | Book Value of Accrued Interest | Promissory Note Received | Realized Gain on Sale | Accelerated Amortization |
|---|---|---|---|---|---|
| 14,500 in payroll loans sold October 21, 2013 (Q1-2014) | $14.0 | $0.7 | $19.3 | $4.6 | $1.2 |
| 7,500 in payroll loans sold March 31, 2014 (Q2-2014) | 10.0 | 1.3 | 16.0 | 4.7 | 0.7 |
| 7,100 in payroll loans sold June 30, 2014 (Q3-2014) | 10.0 | 2.1 | 16.5 | 4.4 | 0.7 |
| 8,500 in payroll loans sold June 30, 2014 (Q3-2014) | 14.0 | 2.3 | 21.8 | 5.5 | 1.0 |
| 16,135 in payroll loans sold September 30, 2014 (Q4-2014) | 26.7 | 3.3 | 43.8 | 13.8 | 2.0 |
| **Total Gain on sale of payroll loans sold in 2014** | | | | **$33.0** | |
| 10,900 payroll loans sold December 19, 2014 (Q1-2015) | 13.9 | 1.5 | 22.0 | 6.6 | 1.0 |
| **Total Gain on sale of payroll loans sold in 2015** | | | | **$6.6** | |

144.    Significantly, EZCORP's as-stated financials disclosed the proper accounting

treatment. In the 2014 Form 10-K, the Company disclosed that "ASC 860-10-40-5, transfers of

financial assets are accounted for as sales when control over assets has been relinquished." Thus,

Defendant Kuchenrither was aware of the proper accounting standard at the time the statements in

the 2014 Form 10-K were made and, yet, the proper accounting treatment was completely

disregarded.

145.    Moreover, in conference calls with stock market research analysts, Kuchenrither expressly stated, in response to analysts' questions, that the loan sales were specifically without recourse to EZCORP. In response to questions, Kuchenrither stated: "so the risk associated with the loans passed to the buyer of the loans" (¶ 89); "but this is truly an asset sale. I just want to make that distinction, because it's very important" (¶ 90). Ironically, Kuchenrither even said "I don't want to mislead you with giving you a bad number" (¶ 90) despite knowing that the risk on the loans **did not** pass to the buyer and that these were truly **not** asset sales.

146.    As detailed in the Restatement, in 2015, a loan purchaser (Altum) "requested to have some of its loans replaced because, several months after the loan sale, some of the sold loans had still not been ratified." As identified in documents produced during discovery, the loans identified by Altum were "not ratified" because Grupo Finmart employees had altered the loan documents so they could be packaged and sold. After EZCORP accounting department learned of this (no later than in January 2015), they requested the entire Grupo Finmart loan portfolio be examined. *See, e.g.,* Ex. A.

147.    The only time EZCORP and Grupo Finmart engaged in these types of sales of loans at Grupo Finmart occurred during Kuchenrither's tenure as CFO and CEO. After Kuchenrither was no longer CEO of EZCORP, EZCORP ceased entering into the sales of Grupo Finmart loans, which were reversed in the restatement.

148.    The impact of correcting this intentional GAAP violation was significant. The table below provides an analysis of the impact of the reversal of the recorded gains on the sale of the six portfolios which were recorded throughout each quarter of fiscal 2014 and the first quarter of fiscal 2015 in violation of GAAP standards:

| Fiscal Period (number in millions) | Q1-2014 | Q2-2014 | Q3-2014 | Q4-2014 | Fiscal 2014 | Q1-2015 |
|---|---|---|---|---|---|---|
| Income from continuing operations before income taxes, as previously reported | $32.8 | $13.3 | $16.5 | $10.1 | $72.7 | $20.4 |
| Recorded gains on sale of loan portfolio(s) | 4.5 | 5.8 | 14.3 | 8.4 | 33.0 | 6.6 |
| **Percentage reduction to income from continuing operations due to reversal of gains on sale of loan portfolio(s)** | **(14%)** | **(44%)** | **(87%)** | **(83%)** | **(45%)** | **(32%)** |

149.    Thus, the false statements made by Defendants regarding the asset sales resulted in substantial overstatements the Company's operating income, thereby artificially inflating other key financial metrics, such as leverage. This manipulation painted a false picture of the Company's success and facilitated additional borrowing, including issuance of a $320 million convertible bond in 2014.

### ii.  The Restatement Had a Material Impact on the Company's Financial Statements

150.    The Restatement had a material impact on the Company's financial statements – specifically operating income and earnings per share. As operating income measures the income that a company can generate from its continuing operations, it is a metric that is closely watched by analysts and investors alike. The Company's stock price is heavily dependent on operating income and, thus, changes in operating income had a material impact on the Company's stock price.

151.    The following table calculates the percent reduction and percent overstatement in net income as a result of the Restatement:

| Fiscal Period Net Income (numbers in millions) | As Originally Reported | Restatement Adjustments | As Restated | % Decrease of Net Income | % Overstatement of Net Income |
|---|---|---|---|---|---|
| Q1-2013 | $30.7 | ($3.6) | $27.1 | (11.7%) | 13.3% |
| Q2-2013 | 34.0 | (3.8) | 30.2 | (11.2%) | 12.6% |
| Q3-2013 | (5.9) | (1.1) | (7.0) | (18.6%) | 15.7% |
| Fiscal 2013 | 34.1 | (11.8) | 22.3 | (34.6%) | 52.9% |
| Q1-2014 | 22.6 | (3.9) | 18.7 | (17.3%) | 20.9% |
| Q2-2014 | 8.0 | (1.9) | 6.1 | (23.8%) | 31.1% |
| Q3-2014 | 11.5 | (7.6) | 3.9 | (66.1%) | 194.9% |
| Fiscal 2014 | (45.7) | (19.0) | (64.7) | (41.6%) | 29.6% |
| Q1-2015 | 15.3 | (3.7) | 11.6 | (24.2%) | 31.9% |

152.    The following table calculates the percent reduction and percent overstatement in operating income per fiscal year as a result of the Restatement. As demonstrated therein, the Restatement resulted in an overall reduction in operating income (income from continuing operations before income taxes) of **21.5%** and a total overstatement of **27.3%**.

| Fiscal Period (numbers in millions) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations before Income Taxes | Restated Income from Continuing Operations before Income Taxes | % Reduction In Income from Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| 2012 | $227.1 | ($13.0) | $214.1 | (5.7%) | 6% |
| 2013 | 102.5 | (22.0) | 80.5 | (21.5%) | 27.3% |
| 2014 | 72.7 | (47.5) | 25.2 | (65.3%) | 188.5% |
| Q1-2015 | 20.4 | (8.2) | 12.2 | (40.2%) | 67.2% |
| **Total Restatement Impact** | **$442.7** | **($90.7)** | **$332.00** | **(21.5%)** | **27.3%** |

153.    The table below calculates the percent reduction in operating income (income from continuing operations before income taxes) per 2013 and 2014 interim fiscal quarter as a result of

the Restatement:

| Fiscal Period *(numbers in millions)* | Income From Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income From Continuing Operations before Income Taxes | Restated Income From Continuing Operations before Income Taxes | % Reduction In Income From Continuing Operations before Income Taxes | % Overstatement to Income from Continuing Operations before Income Taxes |
|---|---|---|---|---|---|
| Q1-2013 | $51.7 | ($7.9) | $43.8 | (15.3%) | 18% |
| Q2-2013 | 55.0 | (6.6) | 48.4 | (12.0%) | 13.6% |
| Q3-2013 | 27.0 | (4.4) | 22.6 | (16.3%) | 19.5% |
| Q1-2014 | 37.8 | (13.4) | 24.4 | (35.4%) | 54.9% |
| Q2-2014 | 14.0 | (7.9) | 6.1 | (56.4%) | 129.5% |
| Q3-2014 | 19.2 | (15.1) | 4.1 | (78.6%) | 368.3% |

154.    The tables below demonstrate the impact to operating income (income from continuing operations before income taxes) as a result of the portfolio review and the application of proper accounting treatment to the asset sales:

| Fiscal Period *(numbers in millions)* | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Portfolio Review | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2012 | $227.1 | ($8.7) | (3.8%) |
| 2013 | 102.5 | (21.4) | (20.9%) |
| 2014 | 72.7 | (27.9) | (38.4%) |
| Q1-2015 | 20.4 | (8.0) | (39.2%) |
| **Total Restatement Impact** | **$442.7** | **($66.0)** | **(15.6%)** |

| Fiscal Period (numbers in millions – There was no asset sale in fiscal 2012 or fiscal 2013.) | Income from Continuing Operations before Income Taxes As Stated in the 10-K/A | Restatement Reduction to Income from Continuing Operations Before Income Taxes From Asset Sales | % Reduction To Income from Continuing Operations Before Income Taxes |
|---|---|---|---|
| 2014 | 72.7 | (25.3) | (34.8%) |
| Q1-2015 | 20.4 | (1.8) | (8.8%) |
| Total Restatement Impact | $93.1 | ($27.1) | (29.1%) |

155.     Moreover, the Restatement had a material impact on earnings per share, as demonstrated in the table below:

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| 2012 | $2.82 | ($0.13) | $2.69 | (4.6%) | 4.8% |
| 2013 | 0.64 | (0.23) | 0.41 | (35.9%) | 56.1% |
| 2014 | (0.84) | (0.36) | (1.20) | (42.9%) | 30% |
| Q1-2015 | $0.28 | ($0.06) | $0.22 | (21.4%) | 27.8% |
| Total Restatement Impact | $2.90 | ($0.78) | $2.12 | (26.9%) | 36.8% |

156.     And the Restatement had a material impact on earnings per share per 2013 and 2014 interim fiscal quarter as demonstrated in the table below:

| Fiscal Period | EPS As Originally Reported | Restatement Reduction to EPS | Restated EPS | % Reduction To EPS | % Overstatement to EPS |
|---|---|---|---|---|---|
| Q1-2013 | $0.59 | ($0.07) | $0.52 | (11.9%) | 13.5% |
| Q2-2013 | 0.63 | (0.06) | 0.57 | (9.5%) | 10.5% |
| Q3-2013 | (0.11) | (0.02) | (0.13) | (18.2%) | 15.4% |
| Q1-2014 | 0.42 | (0.07) | 0.35 | (16.7%) | 20% |
| Q2-2014 | 0.15 | (0.04) | 0.11 | (26.7%) | 36.3% |

| Q3-2014 | 0.21 | (0.14) | 0.07 | (66.7%) | 200% |
|---------|------|--------|------|---------|------|

### e. **Defendant Kuchenrither Recklessly Disregarded EZCORP's Deficient Internal Controls**

157.    In its restated 10-K/A, the Company admitted that it had reassessed its evaluation "of the effectiveness of our internal control over financial reporting as of September 30, 2014, and concluded that a number of deficiencies in the design and operating effectiveness of our internal controls, collectively, represent material weaknesses in our internal control over financial reporting." Therefore, the Company concluded, "we did not maintain effective internal control over financial reporting as of September 30, 2014, September 30, 2013 and September 30, 2012."

158.    Specifically, the Company admitted:

- Management did not apply the appropriate authoritative accounting literature and thus reached incorrect conclusions with respect to proper accounting of the Asset Sales as a result of the following deficiencies that, collectively, represent a material weakness:

  - The appropriate accounting expertise (internally and externally) was not engaged, resulting in a failure to recognize important U.S. GAAP issues;

  - The accounting consequences of significant, unusual transactions were not identified and evaluated; and

  - The accounting positions taken on significant, unusual transactions were not reviewed and approved at the appropriate level.

- Management did not recognize the extent of the Grupo Finmart non-performing loans, or understand the reasons that loans did not recognize were non-performing, as a result of the following deficiencies that, collectively, represent a material weakness:

  - Processes to identify and address aging concerns (including loans with delayed or partial payments) were missing or inadequate;

  - Risk assessment processes were inadequate to identify situations that were likely to lead to payment non-performance;

  - Detailed loan performance data was not reviewed by the appropriate accounting

and management personnel; and

- Overall senior management supervision and review of Grupo Finmart's business performance was ineffective at identifying loan portfolio issues.

These material weaknesses in internal control over financial reporting resulted in the accounting errors that led to the restatement of previously issued financial statements.

159.   Similar disclosures regarding the Company's material weaknesses in internal controls were included in the Company's 10-Q/A:

Management identified a number of deficiencies in the design and operating effectiveness of the Company's internal controls as of September 30, 2014 that represent material weaknesses in our internal control over financial reporting. These deficiencies are the result of management's failure to design, implement and maintain adequate operational and internal controls and processes to (1) identify complex transactions requiring specialized accounting expertise and other financial reporting requirements and (2) monitor and report the performance of the Grupo Finmart loan portfolio.

160.   The Restatement, which identifies the internal control failures during the Class Period, is corroborated by CW#1, CW#2, and CW#4.

161.   As discussed in paragraphs 52-55 EZCORP's internal auditors identified these accounting deficiencies at Grupo Finmart as part of the 2013 fiscal year internal audit review of Grupo Finmart. CW#1 specifically informed Kuchenrither by November 7, 2013 that Grupo Finmart did not have an aging report and was not properly tracking loan performance data such that Grupo Finmart's internal controls were inadequate.

162.   Jeff Byal informed Kuchenrither in April 2014 that Grupo Finmart was not keeping its books in accordance with either Mexican or US GAAP and that the loan reserves had to be increased. *See* Ex. C.

163.   Additionally, Minglewood was hired to assess Grupo Finmart's "operation, reporting and analytical functions." Minglewood met with Grupo Finmart management during the week of August 25, 2014. Minglewood found that "while the reports, overall, contain metrics

deemed important to understanding the performance of Finmart's portfolio, **the one critical element that is absent is timing or vintage analysis.** For example, in the Risk Management Report above, several metrics are outlined. . . . While it can be argued that the new loan origination volume is fairly consistent, there is no measurement or comparison of loan vintages in the reported presented. This makes it difficult to determine if the more recent portfolios of loan originations are performing better, worse or the same as loan originations at an earlier time." The analysis continued that "on other reports, the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio. One critical performance indicator is the percent of Out-of-Payroll ("OOP") loans. The report below clearly shows the percentage of loans that are OOP but it also removes OOP loans that are sold the third parties. . . . It is estimated that the historical OOP rate could be as high as 8 to 10% absent OOP loan sales." *See* Ex. F.

164.    Kuchenrither was well aware of the work Minglewood was doing at Grupo Finmart.

165.    On Monday, July 28, 2014, Minglewood's Eric Torgenson and EZCORP's President of Global Financial Services, Jodie Maccarrone, exchanged e-mails about scheduling Torgenson's "travel to Mexico City," for the "week of the 25th [of August]." *See* Ex. G.

166.    An early e-mail in the same chain shows that Kuchenrither participated in a discussion with Torgenson that same day – Monday July 28, 2014. *Id.*

167.    Any doubt that the "Mark" to whom Maccarrone referred in this e-mail was Kuchenrither should be erased by an email chain from the week before in which Kuchenrither exchanged emails with Maccarrone about "discuss[ing] . . . what you want to negotiate each month as ranges to sell to Basepoint prior to the meeting with Andy on Monday." *See* Ex. N. Andy refers to Andrew "Andy" Neuberger, BasePoint's managing member, with whom Kuchenrither had initiated the relationship. *See* Ex. O.

168.    Kuchenrither later e-mailed a copy of the Minglewood report to Ernst & Young, to whom EZCORP had outsourced its internal audit functions, stating: "You can see the third party work that was happening." *See* Ex. H. Kuchenrither also e-mailed the report to Matt Appel (an EZCORP audit committee member) on May 2, 2015. *See* Ex. P.

169.    Thus, as admitted in the Restatement, the Company did not have proper controls in place to monitor Grupo Finmart's loan portfolio – *i.e.* the cornerstone of Grupo Finmart's business. Defendant Kuchenrither either knew, or recklessly disregarded, that EZCORP's internal controls were inadequate and insufficient. Kuchenrither was informed by CW#1 that Grupo Finmart did not have an aging report in November 2013 and was informed by Jeff Byal in April 2014 that Grupo Finmart was not keeping its books in accordance with Mexican or US GAAP. Kuchenrither was motivated to disregard these warning signs of accounting errors at Grupo Finmart because he was motivated to close the loan sales as EZCORP needed the cash and to close earnings gaps. As such, Kuchenrither knew, or recklessly disregarded, that Grupo Finmart's – and therefore EZCORP's financial statements – were truthful and accurate when they were issued.

170.    As a result, EZCORP did not have adequate internal financial controls and Kuchenrither either knew this, or in reckless disregard for the truth, certified that EZCORP did have adequate internal controls.

**f.  EZCORP's Violation Of GAAP Rules In Its Financial Statements Filed With The SEC**

171.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). Beginning July 1, 2009, the FASB's Accounting Standards Codification ("ASC") became the single official source of authoritative GAAP. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

172.    These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for Grupo Finmart's structured asset sales and non-performing payroll loans, in violation of GAAP rules. The fact that EZCORP restated its financial statements, and informed investors that the previous financial statements should not be relied upon is an admission that they were false and misleading when originally issued (FASB ASC 250 *Accounting Changes and Error Corrections*).

173.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

**g.  Defendant Kuchenrither's Compensation Package**

174.    In October 2012, after Defendant Kuchenrither assumed the role of CFO, his base

salary increased 56%, from $450,000 to $700,000. Additionally, in 2012, Kuchenrither was eligible for an annual incentive bonus, targeting 75% of his base salary tied to the Company's annual consolidated net income, and received a 2012 incentive award of $236,250. For 2013, Kuchenrither was eligible for an annual incentive bonus, targeting 125% of his base salary tied to the Company's annual consolidated net income. Kuchenrither also received an equity incentive grant of 33,200 shares for 2012.

175.    In fiscal 2013, the Company did not achieve the established business performance goals to award any annual incentive bonuses under the fiscal 2013 Incentive Bonus Plan. Nevertheless, as described in ¶ 179, Kuchenrither received a $350,000 discretionary bonus in 2013 which, according to the Form 10-K, was merited because of his role in developing a plan "to address the Company's challenges over the next several quarters." It was around this time that Kuchenrither came up with a plan to package and sell a portion of Grupo Finmart's loans to third-party investors. Kuchenrither also received an equity incentive grant of 200,000 shares for 2013.

176.    For 2014, Kuchenrither was eligible for an annual incentive bonus, targeting 75% of his base salary tied to the Company's annual consolidated net income. However, the Company did not achieve the established business performance goals in fiscal 2014 to award any annual incentive bonuses under the fiscal 2014 Incentive Bonus Plan.

177.    During 2015, Kuchenrither was eligible for an annual incentive bonus, targeting 150% of his base salary tied to the Company's annual consolidated net income. However, the Company did not achieve the established business performance goals in fiscal 2015 to award any annual incentive bonuses under the fiscal 2015 Incentive Bonus Plan.

178.    Kuchenrither ceased to serve as CEO in February 1, 2015 and he ceased to serve as CFO on May 26, 2015. In May 2015, the Company entered into a consulting agreement with

Kuchenrither, to provide "certain consulting and advisory services." During the term of the agreement, the Company agreed to pay Mr. Kuchenrither $450,000 per year and executive-level healthcare benefits for up to two years. If the agreement was terminated prior to the end of its stated two-year term by either party, Kuchenrither was eligible for a severance payment equal to $800,000, less the aggregate amount of payments he was already paid under the agreement. The agreement also allowed Kuchenrither to continue vesting in any existing equity awards in accordance with their terms. On November 30, 2014, Kuchenrither notified the Company that he would be terminating the agreement effective January 4, 2016, which entitled him to a severance payment of approximately $575,000.

179.    In summary, Kuchenrither's compensation for 2012-2015 is as follows:

| Fiscal Year | Salary ($) | Bonus ($) | Stock Awards ($) | Non-Equity Incentive Plan Compensation ($) (Estimated Value) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| 2012 | 432,837 | — | 900,716 | 236,250 | 78,789 | 1,648,592 |
| 2013 | 690,385 | — | 4,038,000 | — | 154,434 | 4,882,819 |
| 2014 | 700,000 | 350,000 | — | — | 161,898 | 1,211,898 |
| 2015 | 526,731 | — | 857,956 | — | 250,698 | 1,635,385 |

## VI.    CLASS ACTION ALLEGATIONS

180.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased EZCORP's Class A common stock between January 28, 2014 and October 20, 2015, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

181.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, EZCORP's Class A common shares were actively traded on the Nasdaq Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of EZCORP Class A shares were traded publicly during the Class Period on the NASDAQ. As of December 31, 2014, EZCORP had 50,680,358 shares of Class A Non-voting common stock outstanding and 2,970,171 shares of Class B Voting common stock outstanding. Record owners and other members of the Class A stock may be identified from records maintained by EZCORP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

182.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

183.    Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

184.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of EZCORP; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

185.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.     LOSS CAUSATION

186.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EZCORP's reported financial results. These material misstatements and/or omissions caused the Company's Class A common stock to be overvalued and artificially inflated

at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

187.    EZCORP's fraudulent accounting practices were revealed in a series of corrective disclosures beginning on April 30, 2015 and ending on October 20, 2015.

188.    On April 30, 2015, after the close of trading, EZCORP revealed that it would delay its earnings release for the second quarter of fiscal 2015. The Company revealed, among other things, that it "identified certain errors in a portion of the Grupo Finmart loan portfolio that may impact current and historical amounts of loan reserves and interest income, and is conducting a more thorough review to quantify the errors and assess the associated processes and controls." On this news, shares of EZCORP declined $0.79 per share, over 8%, to close on May 1, 2015, at $8.41 per share, on unusually heavy volume.

189.    In a Form 8-K filed with the Securities and Exchange Commission after the close of trading on May 20, 2015, EZCORP revealed that it was now "reviewing whether certain structured asset sales from Grupo Finmart met the criteria required for sale accounting treatment or whether they should have been accounted for as secured borrowings." The May 20, 2015 8-K also informs the market for the first time that EZCORP was "assess[ing] the materiality of the identified errors on our consolidated financial statements for the first quarter of fiscal 2015 and for the fiscal years ended September 30, 2014, 2013 and 2012 . . ." which greatly expanded the period that could be affected by the restatement. On this news, shares of EZCORP declined $0.66 per share, over 7%, to close on May 21, 2015, at $8.33 per share, on unusually heavy volume.

190.    On July 17, 2015, the Company issued a press release entitled, "EZCORP to Restate Certain Financial Results." The press release revealed that EZCORP would restate its 2014 and

first quarter 2015 financial results due to errors identified in the Grupo Finmart loan portfolio and to reverse the asset sales from Grupo Finmart. On this news, shares of EZCORP declined $0.26 per share, nearly 3.9%, to close on July 17, 2015, at $6.48 per share, on unusually heavy volume. One day earlier than its public announcement, EZCORP shares fell from $7.06 to $6.74, a drop which was determined to be statistically significant (that is, not otherwise explainable by market forces).

191.    On the morning of October 20, 2015, EZCORP issued a press release entitled, "EZCORP Restatement to Include Fiscal 2012 and 2013." On the news that EZCORP would restate an additional two years of financial results, its stock price declined $0.29 per share, nearly 4.4%, to close on October 20, 2015, at $6.32 per share, on heavy volume.

192.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

193.    During the Class Period, Plaintiff and the Class purchased EZCORP's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

194.    The market for EZCORP's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, EZCORP's securities traded at artificially inflated prices during the Class Period. On January 26, 2015, the Company's stock closed at a Class Period high of $12.25 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying

upon the integrity of the market price of EZCORP's securities and market information relating to EZCORP, and have been damaged thereby.

195.    During the Class Period, the artificial inflation of EZCORP's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EZCORP's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of EZCORP and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

196.    At all relevant times, the market for EZCORP's securities was an efficient market for the following reasons, among others:

(a)    EZCORP stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, EZCORP filed periodic public reports with the SEC and/or the NASDAQ;

(c)    EZCORP regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     EZCORP was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

197.    As a result of the foregoing, the market for EZCORP's securities promptly digested current information regarding EZCORP from all publicly available sources and reflected such information in EZCORP's stock price. Under these circumstances, all purchasers of EZCORP's securities during the Class Period suffered similar injury through their purchase of EZCORP's securities at artificially inflated prices and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

198.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of EZCORP who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

199.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

200.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase EZCORP's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

201.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for EZCORP's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

202.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about EZCORP's financial well-being and prospects, as specified herein.

203.    These defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of EZCORP's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about EZCORP and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

204.    The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendant was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) the Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendant enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

205.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them, including,

among other things, that certain of the Company's subsidiaries or business units were engaged in improper business practices and misrepresented the financial results, performance, and value of the Company's business units and equity investments. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing EZCORP's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

206.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of EZCORP's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired EZCORP's securities during the Class Period at artificially high prices and were damaged thereby.

207.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

EZCORP was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their EZCORP securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

208.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

209.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendant

210.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

211.      The Individual Defendant acted as controlling person of EZCORP within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

212.    In particular, the Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

213.    As set forth above, EZCORP and the Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of his position as a controlling person, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demand a trial by jury.

April 20, 2018                              By: _s/  Joe Kendall_____

                                           **KENDALL LAW GROUP, PLLC**
                                           Joe Kendall
                                           State Bar No. 11260700
                                           Jamie J. McKey
                                           State Bar No. 24045262
                                           3232 McKinney Avenue, Suite 700
                                           Dallas, Texas 75204
                                           Telephone: (214) 744-3000
                                           Facsimile: (214) 744-3015
                                           jkendall@kendalllawgroup.com
                                           jmckey@kendalllawgroup.com

                                           *Liaison Counsel for Lead Plaintiffs and the Class*


                                           By: _s/  Jeffrey C. Block_____

                                           **BLOCK & LEVITON LLP**
                                           Jeffrey C. Block (*pro hac vice*)
                                           Jacob A. Walker (*pro hac vice* motion filed)
                                           155 Federal Street, Suite 400
                                           Boston, Massachusetts 02110
                                           Telephone: (617) 398-5600
                                           Facsimile: (617) 507-6020
                                           Email: Jeff@blockesq.com
                                                   Jake@blockesq.com

                                           *Counsel for Lead Plaintiff John Rooney and*
                                           *Co-Lead Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com

*Co-Lead Counsel for the Class*

# EXHIBIT A



**Deficiency Severity Conclusion**

Memo:

To:  BDO

From:  Mark Kuchenrither

Topic:  Deficiency Severity Conclusion

Date:  May 4, 2015

---

## Grupo Finmart Business Overview

We own a 76% interest in Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. ("Grupo Finmart," doing business under the names "Crediamigo" and "Adex"), and a leading consumer loan provider headquartered in Mexico City.

Grupo Finmart operates using a network of low-cost branch offices dedicated to making loans to employees of government agencies (federal, state and local) and other employers with whom Grupo Finmart has processing and withholding agreements in place.  A centralized corporate office provides the lending approval function, processing of loans and repayments, collections, sales support and other administrative functions.  Payroll lending in Mexico is generally marketed to public sector employees, who on average earn more and rotate less frequently than their private sector peers.  Additionally, government entities tend to be more stable and on average have more employees than private companies.

Grupo Finmart customers obtain installment loans with a series of payments due over as long as a four-year period.  Interest and principal payments are withheld by the employers through payroll deductions and remitted to Grupo Finmart.  We recognize interest revenue ratably (interest method) over the life of the related loans and reserve the percentage of interest we expect not to collect.

Grupo Finmart's consumer loans are considered in current status as long as the customer is employed and we receive payments via payroll withholdings.  However, consumer loans made by Grupo Finmart remain on the condensed consolidated balance sheets as recorded investments when in delinquent status.  We consider a consumer loan past due if it has not been repaid or renewed by the maturity date; however, it is not unusual to have a lag in payments for a number of reasons, such as the time it takes the government agencies to setup the initial payroll withholding, holidays, summer vacations, illness, agency contract renewals, union permits and political elections, to name a few.  In addition, inadequate or manual systems, as well as agency payment consolidation processes, cause delays and sometimes lapses between payments.  Under Grupo Finmart's current policy, only consumer loans outstanding to customers who are no longer employed ("out-of-payroll") are considered in nonaccrual status.  Grupo Finmart provides an allowance for losses on consumer loans that have not yet matured and related fees receivable based on historical loan default experience.

Out-of-payroll loans are considered current if payments are made by the due date.  If one payment of an out-of-payroll loan is delinquent, that one payment is considered defaulted.  If two or more payments of an out-of-payroll loan are delinquent at any time, the entire loan is considered defaulted.  Although historical evidence indicates a portion of the defaulted loans are collected later, Grupo Finmart charges the loan principal to consumer loan bad debt upon default, leaving only active loans in the reported balance.  Subsequent collections of principal are

[AutoDate]                                    1

EZC-WDTX_00002398

**EZCORP**

recorded as a reduction of consumer loan bad debt when collected.  Accrued fees related to defaulted loans are charged against fee revenue upon default, and are credited back to fee revenue upon collection.

## Purpose and Scope

This memo has been prepared to determine the level of deficiencies in internal control over financial reporting relative to the Grupo Finmart loan and interest fee receivables recorded on the balance sheet and the corresponding interest income and bad debt expense recorded on the income statement.

## History

In FY2014, the Grupo Finmart business grew rapidly, with approximately 40% year-over-year loan origination growth, and EZCORP took the following additional steps to improve the accounting and controls of the business:

- **March to June 2014** – We reviewed portfolio sale transaction and provided guidance on accounting treatment.  The EZCORP corporate accounting department ("Corporate Accounting") designed a template for the Grupo Finmart accounting team to complete in order to determine that Corporate Accounting had the necessary documents and that the transaction was in compliance with ASC 860.  In addition, in order to determine there were no issues with income recognition, Corporate Accounting performed tests to validate that sold loans were not being included as part of Grupo Finmart's loan portfolio.

- **April 2014** – We implemented a monthly financial highlight report, which gathers and explains the major transactions that occurred during the month.  This report serves as a way to understand major transactions and ascertain that EZCORP has accounted for them correctly.

- **May 2014** – We implemented Hyperion in order to upload data more efficiently and improve the quality of information being provided.  (Grupo Finmart's operating and accounting system is not integrated with the EZCORP system.)

- **June 2014** – We implemented an end-of-month checklist for international subsidiaries and aligned month-end closing process to comply with SOX requirements.

- **June 2014** – We designed a cash template to separate cash accounts by operating, current restricted balances and noncurrent restricted balances and financial institution debt provider.  Corporate Accounting began to obtain detail information, monitor monthly movements of cash and identify cash collateral requirements.

- **July to August 2014** – We expanded the monthly deliverables from the Grupo Finmart team to include a monthly variance analysis per account and an end-of-month report that reconciles major account groups like loan portfolio, debt, fixed assets, deferred financing, prepaid assets, etc.  Each roll-forward includes checks and reconciles to the general ledger.

- **August 2014** – We engaged BasePoint Advisors LLC (Minglewood) to perform an on-site detailed assessment of Grupo Finmart's operating, analytical and reporting functions.  Please review the attached assessment report.  During the onsite visit, the Grupo Finmart risk department was assessed as follows:

  **Key Information**

  Reports produced by the risk department include portfolio performance analysis, concentrations and portfolio profiles, roll-rates, profitability analysis, historic out-of-payroll, time to ratification, early

[AutoDate]                                                    2

warning reports, recovery analysis and vintage analysis. While the reports overall contain metrics deemed important to understanding the performance of the loan portfolio, the one critical element that is absent is timing or a vintage analysis. There is no measurement or comparison of loan vintages in the reports, and therefore it is difficult to determine if loan originations are performing better, worse or the same as loans originated at an earlier time.

Additionally, the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio. One critical performance indicator is the percent of out-of-payroll loans. The report shows the percentage of out-of-payroll loans but it removes out-of-payroll loans sold to third parties and therefore does not accurately present the true out-of-payroll rate per government agency contract.

### Outcome of Third Party Assessment

Based on the BasePoint assessment, EZCORP management determined that the risk and reporting issues needed to be addressed immediately. A statement of work was agreed with BasePoint and signed December 15, 2014. The scope of work for the risk analysis and reporting project includes all planning, execution, implementation and training of Grupo Finmart personnel for a new fully automated risk reporting package for Grupo Finmart's management team. Please review the attached statement of work.

## Chronology of Current Issue and Company Response

**August 2014** – Grupo Finmart acts as a third party servicer for loans sold, including loans sold to Altum in May 2014. In August 2014, Grupo Finmart's loan administration department determined that 85 loans, approximately $MXN 4.9 million (principal and interest), were "non-performing" (i.e., no payments were being received from the applicable government agency), and informed the Grupo Finmart control desk department, which is responsible for verifying completeness and accuracy of loan application documentation that the commercial department collects from the customers.. An investigation was initiated in August 2014 based on data collected by the control desk department. A part of the investigation, Grupo Finmart's internal control department reviewed 100% of new loan originations for Pemex before approval. The internal control department verified that each of the following steps was completed properly prior to approving new loans:

1. Employment type was verified by the control desk, using the pay stub. The verification was made using the convenyo (government agency contract) manual created with the agency and used as a guideline to operate each convenyo.
2. The following documentation validation was performed:
   a. Verify the credit request was correctly filled with the customer's information and was signed by the customer.
   b. Verify the credit agreement was signed by the customer and that the customer received a copy.
   c. Verify the promissory note was correctly signed and the figures match the approved loan and the credit agreement.
   d. Verify that the figures in the summary of the credit agreement match with the credit agreement, promissory note and credit request form.
   e. Verify the disclosure was signed by the customer.
   f. Verify the sales team had authorization to offer the loan.
   g. Verify payroll stubs match the information that the customer had given in the credit request form, and verify their payment capacity.
   h. Verify proof of residence and that documented proof was not older than 3 months.
   i. Verify official identification matched the information provided by the customer.

[AutoDate]                                                 3

EZCORP

      j.    Verify work identification and matched the information provided by the customer and the official identification.

3.  Phone Validation:
      a.    Grupo Finmart call center made a phone call to the customer to their fixed line in order to validate information.
      b.    The call center contacted the people the customer selected as reference and verified the customer's information.
      c.    Verified that the loan was offered in the correct terms.

The head of the internal control department went to Poza Rica to investigate the matter. He conducted interviews with Grupo Finmart employees and determined that they were not responsible for the issue.

It was determined that documents were being altered regarding the employee type (changed union to non-union). The internal control department contacted the government agency in order to schedule a visit and interviewed the government employees that received the loans with altered documentation. It was determined that a distributor (defined as a contracted third party sales force) had altered the documentation. The contract with the distributor was cancelled immediately and the industry chamber (AMDEN) was notified about the distributor's practices.

**September 2014** – Accounting split out the loan roll-forward each month to improve visibility of the loan portfolio behavior by separating the loan roll-forward between in-payroll loans (defined as loans where the customer is working for the government agency) and out-of-payroll (defined as loans where the customer is no longer working for the government agency) and reserves. Accounting defined the categories to be used to describe the movement from the previous month to the current month (new originations, collections, out-of-payroll, amortizations, etc.).

**September 2014** – Grupo Finmart discussed the situation with Pemex and regarding the non-performing loans owned by Altum, and Pemex agreed to install the loans for payment.

**November 2014** – EZCORP changed the organizational structure in order to improve control and accountability. Grupo Finmart's accounting department now reports directly to Corporate Accounting. This change increases reporting independence by separating financial reporting from operations.

**December 2014** – EZCORP designed and redistributed accounting functions within the Grupo Finmart accounting team, which was discussed with each team member, to establish a different culture with an emphasis on internal controls, documentation and independence. The Grupo Finmart accounting team started in their new functions on January 2015. The objective of this restructuring was to separate functions, strengthen segregation of duties, increase ownership by area and prepare the foundation to improve on existing controls.

Altum requested that the loans from Pemex be replaced.

**January 2015** – EZCORP management increased the effort to reduce the amount of restricted cash on the balance sheet. The restricted cash is created when Grupo Finmart uses cash as collateral for their debt obligations. EZCORP management started reviewing the details of the loan eligibility process with Grupo Finmart treasury to understand how loans are evaluated in the portfolio and determined eligible based on lender requirements.

**January 2015** – The EZCORP CFO was made aware of the request by Altum to have the Pemex loans replaced and the issue regarding the sold loans. The CFO called Deloitte and spoke with Walter Powell (audit partner) and determined that, while Grupo Finmart did not have recourse obligation, Grupo Finmart would replace the loans for relationship purposes.

[AutoDate]                 4

EZC-WDTX_00002401

**EZCORP**

**January 2015** – This issue led Corporate Accounting to inquire whether there might be other non-performing loans on the Grupo Finmart balance sheet.

Grupo Finmart ran a report for all loans on their balance sheet and provided the following information:

1. Date loan funded by Grupo Finmart;
2. Date of last payment received from government agency;
3. Which contract the loan is associated with; and
4. Confirmation that management had not found evidence of additional document alteration in the loan portfolio.

From the analysis, Corporate Accounting was able to divide loans into two general categories:

1. Group 1 – Loans originated before January 31, 2015 for which Grupo Finmart had not received any payment as of March 6, 2015.
2. Group 2 – Loans for which Grupo Finmart had previously received payments, but no such payments had been received since December 31, 2014.

| Total Population | | Principal Receivable | | Interest Receivable | |
|---|---|---|---|---|---|
| | Total # | MXN | USD | MXN | USD |
| Group 1 | 12,655 | $ 215,765,832 | $ 14,155,355 | $ 57,364,372 | $ 3,763,400 |
| Group 2 | 23,025 | $ 189,644,562 | $ 12,441,665 | $ 96,926,774 | $ 6,358,898 |
| Total | 35,680 | $ 405,410,394 | $ 26,597,020 | $ 154,291,146 | $ 10,122,298 |

**Root Cause Analysis**

Loans reported on the receivable aging report have different codes that can be assigned to them. The codes identify the loans as out-of-payroll or identify other reasons for payment delay, typically delays driven by the government agency. The codes are reviewed monthly by the operations team and updated with information received from the government agencies. This is used by the treasury department to determine loans that are eligible for use as collateral. In addition the report codes allow accounting to calculate the loan principal and interest reserves each month. Loans outstanding from customers no longer employed are considered current if payments are made by the due date. If one payment of a loan is delinquent, the one payment is considered defaulted. If two or more payments are delinquent at any time, the entire loan is considered defaulted.

We were not accruing interest in the system for loans identified as out-of-payroll. However, loans identified with other code assignments did result in the accrual of interest on loans that should have been identified as out-of-payroll.

**Deficiency Analysis**

**Box 1:  Does the deficiency relate directly to the achievement of one or more financial statement assertions?**

Yes, the deficiency is related directly to principal and interest receivables recorded on the balance sheet and interest income and bad debt expenses recorded on the income statement — Under-reserving results in an overstatement of principal and interest receivables on the balance sheet, as well as an overstatement of interest income, and an understatement of bad debt expense, on the income statement.

The design of the loan receivable report is deficient in that it does not easily provide aging by loan code identification.

[AutoDate]                                                                 5

**EZCORP**

From a level one operational perspective, the local operations team did not have the controls in place to ensure that all loans were being reviewed for performance over time. However, as evidenced above, where the third party fraudulent loans were detected, local management investigated, identified and resolved the situation.

**Box 2:  Is the likelihood of a misstatement resulting from the deficiency at least reasonably possible?**

Yes.

**Box 3:  Is the magnitude of the potential restatement which is at least reasonably possible (considering qualitative and quantitative factors) material to either the interim or annual financial statements?**

Yes, the error correction is material in regards to the 2nd quarter fiscal year 2015. However, it is not material in any of the previous years and is not expected to be material in the current fiscal year.

**Box 4:  Is the deficiency important enough to merit attention by those responsible for oversight of the company's financial statement reporting?**

Yes

**Box 5:  Do compensating controls exist and operate effectively, at a level of precision sufficient to prevent or detect a misstatement that could be material to either interim or annual financial statements?**

Yes.  Based on the facts listed above, it is clear that management at level two are operating effectively.  EZCORP management found the understatement issue relating to the principal and interest loan balance.  EZCORP management started the process of reviewing 100% of the loans in question.  EZCORP management brought in their internal audit team (EY) to validate the work being done at the local level.  EZCORP management brought the issue to BDO's attention in a timely fashion.

It is clear from the actions above that EZCORP management has compensating controls in place now and is taking the necessary steps to improve the level one processes at Grupo Finmart relative to risk and loan portfolio management.  Corporate Accounting had compensating controls in place with the detailed analysis of the loan roll-forward each month and had taken methodical steps to drill down into the transaction details to ensure quality and integrity of the financial statements.  Management had hired a third party to perform an assessment and did not ignore the results – determining that the first priority was to improve risk analysis and reporting and hiring the third party to perform the work.  Management was looking into the details of the loan portfolio relative to the restricted cash and loan eligibility – an analysis that would have brought the non-performance issue to light in February.

**Box 6:  Would a well-informed competent and objective individual conclude that the deficiency is a material weakness?**

No.  Based on compensating controls that are in place with Corporate Accounting and level two management, as well as EZCORP management's attention and focus on improving the processes and controls at Grupo Finmart, the individual would conclude that the deficiency is not a material weakness.

<u>Conclusion</u>

The under reserving of the principal and interest loan balances represents a significant deficiency that the Company is immediately addressing through the combination of compensating controls and improved standard operating procedures.  The Company is developing systemic corrections, and is undertaking detailed compensating actions. Management will report the status of these activities to the EZCORP audit committee and BDO on a regular basis.

[AutoDate]                                          6

The misstatement was not material to prior years, is not expected to be material in the current fiscal year. Controls are in place and will be improved upon to ensure that this issue will not pose a risk to future periods.

Confidential                                                                                                EZC-WDTX_00002404

# EXHIBIT B

| From: | Kuchenrither, Mark <Mark_Kuchenrither@ezcorp.com> |
|---|---|
| Sent: | Friday, April 17, 2015 9:20 PM |
| To: | mappel@teamappel.net |
| Subject: | FW: Grupo Update |

I am reading and digesting this prior to calling Jill.

Mark Kuchenrither
President & COO
EZCORP, Inc.
2801 Via Fortuna Suite 460 Building 7
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

---

**From:** Jill Svoboda [mailto:jsvoboda@bdo.com]
**Sent:** Friday, April 17, 2015 3:17 PM
**To:** Kuchenrither, Mark
**Cc:** Ted Vaughan
**Subject:** Grupo Update

Hi Mark –

I went through the loan documentation with Jorge this morning and then I had a status meeting with my concurring partner and SEC partner and wanted to touch base with you on those items.  I know we have touched on all of these in our conversations but wanted to send a comprehensive list to make sure we are on the same page.  I know there is a lot in this email so please let me know if you would like to set up a call to discuss.  My concurring partner and I can be available Saturday morning as well for a conversation.  I have copied him here.

1.  In the loan documentation, it appears that E&Y is obtaining the necessary items to verify that there was a (1) valid loan issued, (2) the employee is active and (3) there is an active agreement with the government agency.  Based on our discussions, the items they are not considering sufficient are consistent with what we would expect it to be and they are requesting appropriate verification items for follow up.

2.  Outside of the employment status indication of out of payroll, there does not appear to be an assessment of collectability for the sampled items based on any specific cause of the non-payment.  We discussed this yesterday and you indicated that the Company's position was that if the three items mentioned above were met, the Company considered them to be collectible based on the prior year's history.  At this time, I do still need to see the data that proves out that history.  I assume that analysis would show how many and amounts of loans generated in each year, how many collected, balance that is still outstanding, etc. to get to the basis for the 4%.  In this history, do you also have something built into the analysis that shows the company's history of collecting on loans when there is a period of non-payment outside the normal ratification process?  As mentioned yesterday, it seems that the data for the last 2 years could differ from earlier years since there appear to be greater instances of non-payment for long periods of time and I assume there could be potential for the causes of non-payment to carry different recovery history but I will wait to see the analysis you have on the reserves.

3.  From a controls perspective, where is the company with their determination of whether a material weakness exists considering what could go wrong? The SEC speech in December referenced here: (http://www.sec.gov/News/Speech/Detail/Speech/1370543613733) discusses the SEC concerns around

1

Confidential                                                          EZC-WDTX_00025031

this determination. Also, have you had any additional conversations with Deloitte? I know they want to wait for the results of the testing, but finalization and issuance of the 10-Q is dependent on their analysis as well. I think we all agree that the error is related to the prior years and it is a matter of how material the number may be as to whether any restatement would be necessary. I know they were involved in other matters this past week but am interested in what their thought process is at this point. You can come up with a number and analysis of the control issues and we can do our audit procedures on it, but I would assume they are going to need to do some test work as well considering they withheld their consent on the S-8 due to this matter.

4. For our testing and review of the work, would it make sense for us to start reviewing the results and making our selections from the E&Y testing to do our reperformance work now? It may be easier to wait until their done but it is an option considering time constraints.

5. And lastly, based on your original communication as to the background and identification of this issue, the discovery of customer fraud in one of the portfolio sales triggered the company's investigation. We did talk about whether there were any particular patterns in the data, or possibly by salesman, in the population of problem loans but I was not sure if the company did see any issues there. Within E&Y's testing, is the root cause of this customer fraud being considered? It appears the supporting documentation addresses this situation, if such data and procedures are consistently applied but I would like to understand your thoughts. Also, has the company identified any further issues within the company that contributed to the situation?

Again, I know this is a lot to read through so please let me if you would like to talk .

Thank you,

Jill

**Jill Svoboda**
Assurance Partner
214-665-0797 (Direct)    327-0797 (Internal)
214-649-5926 (Mobile)   214-953-0722 (Fax)
jsvoboda@bdo.com

**BDO**
700 North Pearl, Suite 2000
Dallas, TX 75201
UNITED STATES
214-969-7007
www.bdo.com

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

IMPORTANT NOTICES

The contents of this email and any attachments to it may contain privileged and confidential information from BDO USA, LLP. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in reliance upon, the information contained in this e-mail, or any of the attachments to this e-mail, is strictly prohibited and that this e-mail and all of the attachments to this e-mail, if any, must be immediately returned to BDO USA, LLP or destroyed and, in either case, this e-mail and all attachments to this e-mail must be immediately deleted from your computer without making any copies hereof. If you have received this e-mail in error, please notify BDO USA, LLP by e-mail immediately.

Confidential

EZC-WDTX_00025032

# EXHIBIT C

| | |
|---|---|
| **From:** | Byal, Jeff |
| **Sent:** | Wednesday, April 16, 2014 7:34 PM |
| **To:** | Kuchenrither, Mark |
| **Cc:** | Byal, Jeff |
| **Subject:** | DRAFT for Paul |
| **Attachments:** | Attachments migrated |

**A draft for you to work with……at least the facts for you to message into the type of response you want to give Paul**

The one-time good guys that hit March were as follows, and masked the core performance of the businesses.
- USPR - $500k of Utah key money, $507K gain by settling Crawfish note at discount, $350K workers comp true-up, deep scrap pulls
- USFS / EZOnline - $700K above normal bad debt sale gain, CSO rebase $425k, software capitalization $150k, workers comp true-up $120k, $200 Q1 revenue true-up
- CCV NA - $300k disc ops good guy
- GG - $600k USD bad debt reserve good guy with policy change, now that we were able to get the detailed loan data we needed.

Paul, we provided you the reconciliation of the GF miss last night and we can discuss further on each item if you'd like. GF provided us a reconciliation last week that not only reflected the BasePoint transaction shortfall, but each of the other items on the Recon we included last night on the one-pager summary.  Some of the key points include:
- When we sell loan portfolios and refinance debt, there are various deferred costs that have the be accelerated and written-off, which accounted for USD $1.1M of the gap.
- The core gain on the BasePoint was $0.7M less than forecasted due to the estimated accrued interest provided to us by GF.
- In addition, the Fondo purchase accounting adjustments were identified 11 months ago and we recently discovered that they had not been made, thus the catch-up.  At our counsel, GF has retained local Big 4 accounting firms to prepare the analysis, valuations and purchase accounting around the acquisitions they've made but we're trying to stay plugged in to make sure they follow what the advisors are telling them.  A better approach would be for them to prepare the entire front to back analysis whenever they present an acquisition to the Board for consideration.  This is why we pushed for GF to hire a seasoned and strong technical CFO, which did not occur.  We've since hired a former CFO here in Austin as our Director of International Accounting to be able to dig deep into GF's accounting each month both on-site and from Austin.  Jose has had resort to showing GF in the Mexican GAAP codification (in Spanish) where they are not even keeping their books according to Mexican GAAP, which by the way is the same as US GAAP in many instances.  We continually hear from them that the adjustments we end up giving them are US GAAP only –which is not the case.

Regarding the $2.5 million Panama fee, it's a full $2.5 million deduction on the GF books, but at the consolidated level, 60% of this fee is eliminated in our P&L.  We get the 100% of the cash, but we only get $1.0 million of it on our EZCORP P&L.

GF will be incurring a $1.0 deferred commission charge in April as it relates to the BasePoint sale that occurred in March.  We also paid over $700k in legal fees yesterday that will be charged back to GF in April as a transaction cost of the sale.  The team is also working on getting the data pulled together so we have a better view on what our bad debt reserves should be at GF, which based on my time with them in Mexico will be an increase in our reserve.  More work is being done on this now that the quarter is closed.

1

Confidential

G&A.  The $1.2 million ICP reversal was spread across the operating units based on how it was accrued.  The Corporate benefit was almost $700K, which flows through each dept.  For March, each of the corporate G&A departments were favorable except for Sterling's severance (in BOD dept) and other severance in Tony's dept.  For Q2, the story is the same except that internal audit act v. budget was $0.3 M negative due to double costs incurred for a period of time with Mary's staff and EY hitting us.  That one time bad guy only occurred in Q2 as Mary's team is now off our payroll.  Corp shared services were favorable to Plan for both March and Q2 – both less than $50k, but favorable.

Also in the future, the addition of the compliance team at USFS and corporate will be a negative delta. Jeff has had the corporate compliance addition in our corporate G&A forecast for 3 months now (Q4 item) but the USFS has just in the past 30 days planned out what their compliance team will look like and working to see how to fit it into their forecast.  Since last fall, we've had on our Rolling Forecast a G&A expense of $800k as the write-off of the deferred financing costs we incurred for the November Morgan Stanley project that was put on hold.  It is likely that half or more would be usable under the convertible debt project and would not have to be written off, but we've kept it in the forecast to be conservative.

**Jeff Byal,** CPA, CGMA
SVP & Chief Accounting Officer



1901 Capital Parkway
Austin, TX 78746
Direct: 512.314.3392
Jeff_Byal@ezcorp.com

CONFIDENTIALITY NOTICE: This email message and any attachments may contain confidential, proprietary or non-public information.  This information is intended solely for the designated recipient(s).  If an addressing or transmission error has misdirected this email, please notify the sender immediately and destroy this email.  Any review, dissemination, use or reliance upon this information by unintended recipients is prohibited.  Any opinions expressed in this email are those of the author personally.

Confidential                                                                                          EZC-WDTX_00000641

# EXHIBIT D

| | |
|---|---|
| **From:** | Kuchenrither, Mark |
| **Sent:** | Monday, April 28, 2014 2:44 PM |
| **To:** | Maccarrone, Jodie |
| **Subject:** | Open items to resolve regarding loan sale transactions |
| | |
| **Importance:** | High |

Jodie,

I hope you enjoyed your vacation last week.

I was hoping that we could discuss and resolve the following open items this week during your stay in Austin.  Nothing big – just a lot of small items to wrap up and/or decide upon.

1.  File movement from Iron Mountain to A de A.  This may not be a big issue but I am concerned due to the liability of lost files.
2.  Reporting and loan sale tracking of loans sold to trust.  This may not be a big issue but I am concerned because I haven't seen the team's report(s).  I am out of the loop on this so it may be in good shape – I just don't know.
3.  Refinancing of loans sold – as you are aware this impacts both loan sales to date.
4.  Grupo Finmart cash flow/loan generation review.  EZCORP needs the benefit of $20 million worth of loan sales.  Currently we have forecasted two $10 million loan sales transactions – one in each of the remaining quarters.  Is this feasible and does it make sense?  Could we go bigger?
5.  Loan book purchase and simultaneous sale.  Is there an opportunity to complete a transaction this fiscal year – currently not in the forecast and would represent performance protection and upside to results.

Best Regards,

Mark

Mark Kuchenrither
Executive Vice President
Chief Financial Officer
EZCORP, Inc.
1901 Capital Parkway
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

1

Confidential

# EXHIBIT E

| | |
|---|---|
| **From:** | Maccarrone, Jodie |
| **Sent:** | Monday, May 18, 2015 3:25 AM |
| **To:** | Grimshaw, Stuart; Given, Lachie |
| **Subject:** | RE: Grupo |
| **Attachments:** | RFP follow up (120813).pptx; Crediamigo Debt IPO Discussion 6-24-14.pdf |

Stuart,

The timeline of events at a high level are as follows:

- In Q114, the local team proposed to the GF Board of Directors the CiBanco transaction to 'test' the Columbia model
  - There were two factors driving this test:
    - 1) the business was facing a shortfall to achieve their Y2 earn-out payment and this would bridge the earnings gap
    - 2) the Columbia model appeared to be a favorable opportunity to create a self-funding mechanism which was important
- The self-funding mechanism was important at the time because we had launched a comprehensive RFP to identify a lead bank that could offer a warehousing, unsecured line and act as a book runner for the 2nd securitization
  - Cash flows were low due to the high growth in new originations AND due to the amortization of the portfolio – this made it difficult to fund the business with LOC that required performing collateral
  - Scotia Bank and Bancomer were the two final banks (all others dropped out – details in the attached)
  - Long story, but in the end neither bank offered us unsecured funding and both fell down in the book running position for the 2nd securitization in Feb 2014
- As a result of the cash flow need AND the opportunity to accelerate earnings, both the GF and EZCORP jointly agreed to pursue another transaction in Feb 2014
  - BasePoint was identified as the potential partner and the 2nd transaction was completed in Q2 (to bridge an earnings gap at EZCORP and to fund the business)
- From there, the scenarios started to be more draconian (selling all the book, transitioning to an originator only model)
  - The Minority were not comfortable with the approach nor were local management, nor was I at 100%
  - UBS was engaged to perform a valuation to validate that the model to continue to sell or the 'hybrid' created more value due to the ability to redeploy the cash flow multiple times vs. hold for 32 months (this is the IRR Andres is referring to) – this is what Lachie sent yesterday
  - Ultimately, the Minority, management and I agreed on a 3rd transaction in Q3
- In addition however, I worked with the local team and Mark to continue to try to identify other unsecured funding sources – Cross Border and were in the process of appointing Morgan Stanley as the book runner with Credit Suisse as the secondary when the governance changes took place – MS presentation attached with their proposed approach
- Once the governance changes took place, the direction from Mark was to abandon the Cross Border and work to pay off debt
- In addition, due to the two asset sales in Q2/Q3, we had access to significant cash – but a significant portion was restricted due to the sale of the collateral pledged against the secured lines of credit

I can walk through this with you if you wish to discuss.  I think it is important you have the history.

Jodie Maccarrone
President US Financial Services
EZCORP, Inc.

1

EZC-WDTX_00002787

2801 Via Fortuna, Suite 460
Austin, TX 78746
(o) 512-314-3467
(m) 561-809-4052

-----Original Message-----
From: Grimshaw, Stuart
Sent: Sunday, May 17, 2015 7:16 PM
To: Given, Lachie; Maccarrone, Jodie
Subject: RE: Grupo

I think there are many threads of an argument running through here....funding, business model, IRR...take your pick as to which one you want to use to suit your argument.

I am a little more simplistic in that a simple business model is much easier to understand and value. The future profitability of the business is critical to how we look at Grupo...not sure whether the minorities are looking at the same time horizon.

Was the asset sale model one EZCorp developed or one that Grupo developed? I am never a fan of bringing forward three years of earnings if you have a choice...annuity streams are much more valuable in the hand of any investor as compared to an investment banking model.

Stuart
_____

From: Given, Lachie
Sent: Sunday, May 17, 2015 9:16 AM
To: Maccarrone, Jodie; Grimshaw, Stuart
Subject: FW: Grupo

Good morning both - I dont think either of you have seen this document drafted by Andres last week. It is his crack at showing Banorte why the forecasts from last year were not met. Please have a read ahead of our kick-off tomorrow as it will be part of our agenda.
Thks


_____
From: Timothy Jugmans [tjugmans@gmail.com]
Sent: Friday, May 15, 2015 10:45 AM
To: Given, Lachie
Subject: Grupo

1.  Reminder to check to see if the document regarding the valuation should be based on Mexican GAAP or Ezcorp accounting standards?
2.  Can you ask Javier to send us what they send (or have sent to Banorte)  3.  Attached is the explanation for the transformation of the business as well as comparison of 2013 and 2014.  Was this a board decision to be an asset originator and seller? or is this something that Andres says to support his case.  I was under the impression that the Asset sales were only done for funding, not as part of the ongoing business model?  Who was on the board at that time that can tell us?

2

# EXHIBIT F

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

### Executive Summary

Minglewood Administrative Services ("Minglewood") was engaged by Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR ("Finmart") to perform an on-site detailed assessment of Finmart's operation, reporting and analytical functions.  During the week of August 25th, Minglewood's Engagement Team, consisting of Peter Woroniecki, Director of Operations, and Eric Torgerson, Director of Analytics, were on site at Finmart's offices in Mexico City, Mexico and met with several of Finmart's executives and key personnel. During the visit the following areas of Finmart's business were assessed:

- Asset Allocation Process
- Risk Analysis & Reporting
- Loan Origination Process
- Information Technology

- Compliance
- Collateral Management
- Master Trust Structure

- Collections
- Investor Reporting
- Convenios Management

The information below summarizes Minglewood's interaction with the Finmart team and its assessment of the various areas reviewed while in Mexico City.

### Asset Allocation Process

The asset allocation process is a monthly process by which Finmart allocates consumer receivables as collateral across the multiple lines of credit used to finance Finmart's business.  The credit lines currently have distinct terms and conditions and collateral eligibility criteria.  Each one of these variables is factored into the asset allocation process with varying priority based on Finmart's business demands for that specific month.  The process is quite complex as shown in the document provided by Finmart below.  There are multiple decision points, loops and different milestones to be considered for each lender.



Confidential

EZC-WDTX_00009890

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

Per our discussions with Joel Rosas, in general, it is estimated that the asset allocation process takes two to three hours per month.  This can vary significantly depending upon the number of iterations required based on needs of the business, including requirements or changes from outside parties such as new lenders.

The process is currently not automated but is a manual process performed by Joel Rosas and other team members.  While the process generally does not appear to be too demanding of Finmart's resources, it can easily escalate as multiple iterations are sometimes required and the process may be prone to human error as most of the work is completed in MS Excel.  Data is currently provided by the IT department and the majority of the asset allocation work is currently performed in MS Excel.  The challenges to automating the process include the variability in lender priority due to changing business needs, the complexity of the process decision map with loops, and, at the time of the assessment, the process flow documentation was still not complete.

***Recommendation***
Minglewood can provide project management support and expertise to create an automated system or process for Finmart's asset allocation.  In order to complete this, the following is needed:

1.  Complete all documentation related to the asset allocation process including the process map
2.  Complete a discovery process to determine the capabilities and limitations of all software or product options available for facilitating the automation process including acquisition and implementation costs

After selecting the appropriate software, product or development options Minglewood will project manage the scope, development, and implementation of the automation software and provide detailed documentation on the new asset allocation process.

**Risk Analysis & Reporting**
The Risk Department of Finmart has the following primary objectives:

- Analyze all product related information and develop periodical credit risk reports
- Allocate the portfolio and monitor the funding covenants, eligibility criteria and collateral
- Analyze product profitability and new products, prepare adhoc analyses for internal and external purposes

Confidential

EZC-WDTX_00009891

Reports produced by the Risk Department include portfolio performance analysis, concentrations and portfolio profiles, roll-rates, profitability analyses, historic out-of-payroll and time to ratification, early warning reports, recovery analyses, and vintage analysis.  During Minglewood's on-site visit, several hours were spent with the head of the Risk Department, Alejandro Pequeño.  Multiple reports were provided to Minglewood and the contents of the reports were discussed.  Below are several samples of the reports provided to Minglewood.



While the reports, overall, contain metrics deemed important to understanding the performance of Finmart's portfolio, the one critical element that is absent is timing or a vintage analysis.  For example, in the Risk Management Report above, several metrics are outlined.  While the metrics chosen are adequate in concept, the way they are presented can potentially hide issues related to changes in the origination or underwriting processes.  The denominator embedded within several of the formulas is consistently changing as new loans are added to the portfolio.   While it can be argued that the new loan origination volume is fairly consistent, there is no measurement or comparison of loan vintages in the reports presented.  This makes it difficult to determine if the more recent portfolios of loan originations are performing better, worse or the same as loans originated at an earlier time.

Confidential

Additionally, on other reports, the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio.  One critical performance indicator is the percent of Out-of-Payroll ("OOP") loans.  The report below clearly shows the percentage of loans that are OOP but it also removes OOP loans that are sold to third parties.  Sales occur as frequently as every quarter and there was a significant OOP loan sales event in June 2013 which effectively reduced the OOP percentage of loans by more than 4%.  The overall impact of the sales in the report reduces the total OOP percentage to 3.36% as of the end of July 2014.   While this measurement is a good indicator of the amount of loans that are OOP in the current portfolio, it does not accurately reflect what the true OOP rate is on the Finmart portfolio on a static basis.  It is estimated that the historical OOP rate could be as high as 8 to 10% absent OOP loan sales.



Confidential

Furthermore, other reports, (for example in the report shown below), do not present historical information even though it is available in Finmart's data. The intent of the report is to present, by agency, loan profitability. It lists each agency, the loan portfolio originated to date under each agency agreement, the factor rate, commissions, as well as several IRR calculations. The first of which is labeled a Theoretical IRR. It is understood that this calculation is based on the expected payments of the loan portfolio at inception. The report further modifies this IRR calculation by taking into account the ratification period, delays and OOP. While the intent of the report is meaningful, the Risk Department should also be tracking what the actual realized IRR has been to date by agency. This should also be analyzed by vintage to determine if profitability is changing over time in each convenio.



### Recommendation

Minglewood can create and automate a full risk reporting package to be provided to management on a regular basis. The risk reporting would be further expanded to include more vintage analyses and comparing expected performance to actual performance across all loan products and agencies. Minglewood would ensure that the reporting is fully automated, creating a monthly process by which the Finmart team could reproduce all reports with support from Finmart's Information Technology group. Currently the Risk Department appears to be heavily reliant on MS Excel, which, while useful for adhoc

Confidential

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

reports, has limitations on size and scope of data files and is not easily automated for repeat reporting that may be useful for Finmart's management.

**Loan Origination Process**

Finmart's loan origination process is expansive and includes over 480 employees and covers almost all of the country of Mexico. The loan origination process is supported by an integrated technological platform and gives Finmart the ability to fund loans within 24 to 48 hours from time of application. Overall, loan origination follows a rigid process, through multiple stages and with multiple verification points before funds are actually released to the customer. The origination process is outlined below:

| Customer Contact | Branch Analysis | Quality Control | Treasury | Document Control |
|---|---|---|---|---|
| • Its own sales force, call center and brokers to contact the customer and offer products<br>• Fill out the documents and gather customer signatures | • Reception and Review of documents<br>• Assessment of the accuracy of the information<br>• First review of employees' payment capacity<br>• In the event of irregularities, request additional information<br>• If matters are in order, the documents are digitized | • Receipt of ID and proof of address<br>• Second review of documents<br>• Second review of payment capacity<br>• Control and validation of all the documents received<br>• In the vent of irregularities, notify the originating branch | • Release of funds for the Loans that have been verified during the previous stages<br>• A policy to verify loans has been implemented for loans in excess of $40k MXP | • All the documentation has been received and verified and the information is sent to the database; Custodian takes control of the documents |

Having been previously very familiar with most of the loan origination process, during the visit, Minglewood focused on the Branch's role in the origination process by visiting a local branch located in Mexico City. Minglewood spoke with several branch employees about their roles and responsibilities including reviewing their daily tasks. Minglewood also observed a single live loan application and watched how the loan application was entered into Finmart's origination platform at the Branch location.

Finmart currently has 48 branches with an additional six movable units in towns or cities where collaboration agreements have been executed. It was explained that the branches are centrally located relative to the government agencies' locations in a type of hub-spoke setup. All of the branches are leased, usually for a year with annual renewals. Finmart has a dedicated team that negotiates the branch leases, designs the interior and exterior appearance of each branch and provides facility maintenance as needed.

While the branches create a geographic presence for Finmart, there appears to be little to none customer interaction at the locations. The primary function for the branch is to serve as a data entry hub for Finmart's sales force. As loan applications are completed at each individual government agency, the sales

Confidential

representative will go to his or her respective branch location.  At the location, the information is handed over to a processor who then reviews the application and supporting information and enters it into the Finmart system.  In general, the sales representatives do not arrive at the branch location until the end of the business day.  The branch remains relatively inactive until that time.

*Recommendation*
Minglewood can project manage the scope, development, and implementation of new technology that would allow Finmart to further streamline the customer application process. The work done at the branch can be interpreted as an "extra step" in the data entry process.  Ideally, it would prove more beneficial for Finmart to have the sales representative provide the information directly to Finmart's loan processing group located in their company headquarters. New technology should be explored with this end in mind. The branches appear vacant for several hours of the day with an afternoon rush of sales representatives bringing in new loan applications.  By introducing new technology, Finmart could realize significant savings by closing some or all of Finmart's branch locations.

**Information Technology**
Finmart's Information Technology architecture has, overall, been established in an efficient and structurally sound manner (see diagram below). Finmart uses proprietary software and interfaces (Orus and Cronos) for it loan origination and servicing processes.  Other third party software is used for enterprise resource planning (Contpaq) and business intelligence (Jasper Soft).  Additionally, all data is stored in an industry standard relational database management system.  Finmart also uses industry standard practices for general data protection and disaster recovery scenarios.  Redundant storage has been established in multiple geographic locations and backups are created nightly through multiple channels including local backup tapes which are stored offsite.

Confidential                                    EZC-WDTX_00009896



The Jasper Soft product is business intelligence software that includes data visualization, reporting and analytics and has a high level of flexibility for deployments in any IT environment.  It is intended to take information from multiple data sources and present it in an easy-to-read and interactive format.  Jasper Soft can be used for trend analysis as well as to create customized business dashboards for executive review.

At present, most of the reporting developed in Jasper Soft by Finmart is from data relating to loan originations.  Approximately 80% of the reporting is focused on sales.  Jasper Soft has the potential to be a significant tool within the Risk department but it is currently not being used to produce the majority of the Risk Management reports.

***Recommendations***
It would be beneficial to determine the feasibility of using Jasper Soft to develop current and new Risk Management reports. It is likely that Jasper Soft has the capabilities to produce the needed reports in the Risk Management area.  It was explained to Minglewood that, to date, the Jasper Soft programmer at Finmart has been used primarily by the sales function.  It may be necessary to temporarily add more resources and prioritize some of the risk management reporting to fully leverage the IT tools currently in place.

Confidential

EZC-WDTX_00009897

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

**Compliance**

Grupo Finmart has an extensive and robust compliance process as outlined by Finmart's legal team during Minglewood's visit to Mexico.   Finmart provided Minglewood with highly detailed information surrounding the current regulatory environment for payroll deduction loans in Mexico.  In its outline, Finmart summarized all regulatory reporting obligations including the government agency requesting the reports, the type of reports, the frequency and party held responsible for producing the reports (i.e. external or internal legal counsel, etc.).  Finmart also provided the dates on which the most recent reports were filed.

***Recommendations:***

The majority of Finmart's compliance work is done internally.  While there appears to be adequate controls in place and Finmart works diligently to stay current on all reporting requirements and industry trends, it may prove more advantageous to engage additional third parties or external specialists to keep Finmart on the forefront of any upcoming regulatory issues.

**Collateral Management/Document Control:**

Minglewood thoroughly reviewed Finmart's document control and collateral management process as it pertains to the all originated consumer loans.  All of the original documents executed by the borrower are brought to the branch by the sales staff and reviewed by the branches' support teams for accuracy and completeness. Once the file passes the branch review the collateral packages are sent weekly to Finmart's Corporate Headquarters. The collateral documents are then certified by Finmart's staff to ensure that the branch has delivered a complete collateral package. Once reviewed and determined to be complete, the complete package is then handed off to a representative of Iron Mountain who certifies the file at Finmart's Headquarters.  A certification is provided by Iron Mountain to Finmart and Iron Mountain ships the file for storage. Iron Mountain does not provide indemnifications for any lost collateral nor does Iron Mountain have the ability to act as a fiduciary Bailee of the collateral.

***Recommendation***

The work flow requires a number of additional touches and although provides additional protection to make sure the files are delivered properly the process could be reduced by setting up a relationship where the files are sent directly from the branches to the custodian. Although Iron Mountain is reputable as a document storage provider, they are not a custodian.  They do not provide the adequate indemnifications to Finmart that are industry standard for a document custodian. In addition Iron Mountain legally cannot act as a Bailee and hold the files in trust.

**The Master Trust Structure:**

Finmart has set up an efficient process with HSBC to perform the following tasks: 1) assign and transfer Credit Rights that secure its First Beneficiaries; 2) pass through actual collections received to each of the First Beneficiaries. This process provides for an independent third party to receive the cash and make the actual distribution to the beneficial owner avoiding Finmart from actually taking control of the cash collateral.

Confidential                                                                    EZC-WDTX_00009898

*Recommendation*

Minglewood recommends that Finmart further expand the current process so that includes HSBC acting as trustee not only for the Credit Rights, but also for the physical collateral as well.  Minglewood estimates that a lot of time and effort is spent, along with additional recording costs when assigning the collateral from one First Beneficiary to another.  This could be eliminated by initially assigning the collateral to the trustee, the trustee will then act as collateral agent for Finmart and record who they are holding the collateral for. Detailed reporting could then be provided to the First Beneficiaries. This would eliminate any additional recording cost, the cost of moving to a custodian and the human resource cost currently required to complete the process.

## Collections:

Finmart has decentralized its collection efforts and has set up regional collection teams that are divided into three zones. The collectors in each zone are allocated accounts within geographic proximities to maximize the ability of the collector to have frequent on site visits at each one of the government agencies. Although collection efforts are decentralized the oversight and reporting is centralized and the support team provides timely performance reports to the collectors and management that highlight the areas of concern. Weekly Collection Meetings are held and the management teams discusses any open items with the collectors. The Loan Installment Process is well structured and is individualized for each agency in order to provide for a smooth boarding process of the loan by the government agencies. Finmart can deliver the information to the agencies in a number of different layouts, each one being customized for an agency's particular needs. Finmart currently has a certification process where the company confirms with the government agencies that the loan is boarded and Finmart receives a signed notice of confirmation.

*Recommendation*

Finmart's collection team has established a strong process to identify, report, manage, and cure delinquencies however it is more reactionary then proactive. The collection process starts when the government agencies have missed a payment. There is no contact with the agency prior to discover if the payment is coming. Finmart currently does not prepare or send invoices or bills to the government agencies that payment is due.  Prior to each payment due date a call should be made to the government agency confirming the payment amount and that the payment will be made on time.

## Investor Reporting:

The Investor Reporting team has adequate access to all data necessary to complete the reporting required under the Trust Agreements.  Currently, prior to submitting the reports there is no validation process to ensure the reports integrity.  Upon meeting with the team there was little or no interaction or input by the Investor Reporting Team on reviewing the actual Trust Agreements prior to deal execution.

*Recommendation*

Minglewood can create and fully automate all of the periodical investor reporting packages, improving upon the current report-creation process.  For example, in the existing transactions with BasePoint, there is no actual report that provides the actual outstanding note balance or interest due.   The current

Confidential

EZC-WDTX_00009899

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

reporting does provide sufficient information on the underlying collateral and actual collections in the master trust but there have been instances where the reports weren't completely accurate. Before the reports go out there should be a secondary review to ensure the accuracy of the reports. The Investor Reporting team should also review the actual Trust Agreements prior to execution. This would allow the Investor Reporting team to give its input on the reporting requirements and provide improved reporting to support the transaction.

**Convenios Management**:
Finmart has a dedicated team to assist and manage the relationships with the government agencies. The team is very active with AMDEN "Asociacion Mexicana de Emoresas de Nomina" which allows Finmart to promote best practices throughout the industry and maintain a good relationship with the regulatory agencies. Finmart has also established an "Execution Team" to provide support to the government agencies in establishing a relationship for a smooth transition.

*Recommendation*
The Execution team is a true sales team and is primarily focused on originating more product. To assist in the Risk Management of Finmart, a team could be established in the group that would focus on not the sales but the actual risks associated the government agencies. At present, due diligence is not performed on the government agencies' ability to support the product. Prior to execution of an agreement, Finmart should conduct an on-site evaluation of the agencies' ability to support the product. The Government Agency Oversight team could also be more pro-active in assisting the government agencies in times where there could be a disruption caused by a natural disaster or similar event. In discussions with the collections team, it was determined that there was an event that caused a spike in delinquencies at one of the government agencies. It is understood that the collections team only determined this through discussions with the government agency after the loans have gone delinquent and not prior through reaching out to an agency that might have been effected.

**Item for Discussion:**
Finmart could create a Point of Sale Platform that could be integrated with the government agencies to provide a web-based Interface between the government agencies and Finmart. Data could be messaged over to the government agencies, specifically regarding new loans that need to be boarded as well as confirmation back once that has been completed. Additionally, notifications of payments could be electronically messaged by the government agencies which could then reduce manual uploads as well as prompt delinquency calls sooner.

Also, Finmart's niche in the Market Place is time to execution of a loan. Time to execution may not be the only differentiating factor. Finmart may want to consider originating additional products that are rate based in order to expand their market share.

Confidential                                                                 EZC-WDTX_00009900

# EXHIBIT G

| | |
|---|---|
| **From:** | Frank Amato <famato@basepointcapital.com> |
| **Sent:** | Monday, December 15, 2014 11:25 PM |
| **To:** | Maccarrone, Jodie |
| **Cc:** | Eric Torgerson; Peter Woroniecki |
| **Subject:** | FW: Hedge spreadsheet & Other Follow up items |
| **Attachments:** | Phase I expense schedule as of Dec 15, 2014.pdf; Finmart Advisory Services Proposal.pdf |

Jodie

Attached please find a schedule of expenses related to Phase I advisory work associated with the attached Statement of Work agreement.

Please wire the amount of $21,791.88 to the following instructions:

Citibank N.A.
Routing Number 021000089
Account Number 9992152795

Please let us know if you have any questions.

Regards
Frank Amato

---

**From:** Eric Torgerson
**Sent:** Thursday, December 04, 2014 4:28 PM
**To:** Frank Amato
**Subject:** FW: Hedge spreadsheet & Other Follow up items

**From:** Eric Torgerson
**Sent:** Thursday, July 31, 2014 12:03 AM
**To:** 'Maccarrone, Jodie'
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Jodie,

Attached is the statement of work for the advisory work.  Obviously we can discuss the scope.  I want to make sure we cover anything else you have in mind for the assessment.

Thanks.
Eric

Confidential

EZC-WDTX_00001695

**From:** Maccarrone, Jodie [mailto:Jodie.Maccarrone@changecapitalinvestments.com]
**Sent:** Wednesday, July 30, 2014 7:22 PM
**To:** Eric Torgerson
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Hi Eric,
Here is the March 2013 – I will ask Karina to send you the full reports.

I look forward to seeing the advisory work proposal… we need your assistance.

Let me know if you need anything else..

Jodie

Jodie Maccarrone
President Global Financial Services
*EZCORP*, Inc.
2801 Via Fortuna, Suite 460
Austin, TX 78746
(o) 512-314-3467
(m) 561-809-4052

**From:** Eric Torgerson [mailto:etorgerson@basepointcapital.com]
**Sent:** Wednesday, July 30, 2014 6:19 PM
**To:** Maccarrone, Jodie
**Subject:** RE: Hedge spreadsheet & Other Follow up items

That is very helpful.  Thank you.  I thought Fitch issued a full rating report on Finmart in May of this year.  If handy, great, if not, no worries.  I know you have a lot going on.

I will also be sending you later this evening our proposal for the advisory work starting on the 25th of August.  Obviously we can discuss as needed this week or next.

Talk to you soon.

Thanks.
Eric

**From:** Maccarrone, Jodie [mailto:Jodie.Maccarrone@changecapitalinvestments.com]
**Sent:** Wednesday, July 30, 2014 7:01 PM
**To:** Eric Torgerson
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Great.  Thank you.  Yes I do… I think the attached is what you are looking for..

Let me know if it isn't.

Jodie Maccarrone
President Global Financial Services
*EZCORP*, Inc.
2801 Via Fortuna, Suite 460
Austin, TX 78746

2

Confidential

(o) 512-314-3467
(m) 561-809-4052

**From:** Eric Torgerson [mailto:etorgerson@basepointcapital.com]
**Sent:** Wednesday, July 30, 2014 5:59 PM
**To:** Maccarrone, Jodie
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Yes, that should be fine.  You don't by chance have a copy of the most recent Fitch ratings report on Finmart do you (not as administrator of receivables but as a company)?

Thanks.
Eric

**From:** Maccarrone, Jodie [mailto:Jodie.Maccarrone@changecapitalinvestments.com]
**Sent:** Wednesday, July 30, 2014 6:47 PM
**To:** Eric Torgerson
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Hi Eric,
We are working on the new pool and will have something mid-next week.  Does that work for you?

**From:** Eric Torgerson [mailto:etorgerson@basepointcapital.com]
**Sent:** Wednesday, July 30, 2014 3:13 PM
**To:** Maccarrone, Jodie
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Ok, thanks.

How is the new pool coming along?

**From:** Maccarrone, Jodie [mailto:Jodie.Maccarrone@changecapitalinvestments.com]
**Sent:** Wednesday, July 30, 2014 1:09 PM
**To:** Eric Torgerson
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Hi Eric,
I will call you to discuss but the structure below is fine as it has been.
Jodie

**From:** Eric Torgerson [mailto:etorgerson@basepointcapital.com]
**Sent:** Monday, July 28, 2014 12:20 PM
**To:** Maccarrone, Jodie
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Yes, we definitely should work in advance.  The August 31 close for the $13.3mm doesn't change.  As in the past transactions is it your expectation that we will close on the 31st and fund early September?

**From:** Maccarrone, Jodie [mailto:Jodie.Maccarrone@changecapitalinvestments.com]
**Sent:** Monday, July 28, 2014 1:08 PM
**To:** Eric Torgerson
**Subject:** RE: Hedge spreadsheet & Other Follow up items

3

EZC-WDTX_00001697

Hi Eric,
There is no problem pushing the trip to the week of the 25th for the advisory work.  However, could we work in advance of that date to finalize the August transaction so that we still achieve the Aug 31 deadline for the $13.3M transaction?

**From:** Eric Torgerson [mailto:etorgerson@basepointcapital.com]
**Sent:** Monday, July 28, 2014 10:53 AM
**To:** Maccarrone, Jodie
**Subject:** RE: Hedge spreadsheet & Other Follow up items

Jodie,

I just tried your office.  Regarding the timing of our travel to Mexico City, I know the week before the 18th was not good, but how is the week of the 25th?  Is it a problem if we push one week?  You can call me on my cell to discuss if needed (203) 550-1310.  We are putting together everything else for our engagement which you should have later this week.

Thanks.
Eric

**From:** Maccarrone, Jodie [mailto:Jodie.Maccarrone@changecapitalinvestments.com]
**Sent:** Friday, July 25, 2014 9:45 AM
**To:** Eric Torgerson
**Subject:** Hedge spreadsheet & Other Follow up items

Hi Eric,
As a follow-up to our conversation yesterday, see the table below with the target sale amounts we shared with Andy and you and I discussed this week:

| | Total Portfolio BasePoint Monthly Sale Summary | | |
|---|---|---|---|
| | August | September | Q4 Total |
| Principal MXN | 127,000,000 | 310,000,000 | 437,000,000 |
| USD | 9,769,231 | 23,846,154 | 33,615,385 |
| Estimated Promissory Value | 17,584,615 | 42,923,077 | 60,507,692 |
| Estimated Purchase Price (1.3) | 13,221,515 | 32,272,990 | 45,494,505 |

Incremental Transaction**      $35M           September 2014

Monthly Transactions          $5M - $10M     Starting in Oct  FY15

*\*\*As a reminder, the Incremental Transaction timing has not been finalized.*

Could you please confirm if the week of August 18 works for you and Pete to travel down to Mexico City?  If so, if you have thoughts on an agenda please send when you can.

Finally, I asked Mark to send me the hedge spreadsheet and he identified a miscalculation that is causing the hedge to pay off the promissory note early.  He is working on the analysis and agreed to send it for discussion with Andy, Pete, yourself and I on Monday.  I will be sure to keep this moving but please let Pete know we are working on it.

4

Confidential

Look forward to hearing from you.
Have a nice weekend.

Jodie

---

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

The BasePoint logo and the word "BasePoint" are shared service marks of BasePoint Capital, LLC and its subsidiaries (collectively, "BasePoint"). The information contained in this e-mail message is for discussion purposes only, and is not an offer to participate in any commercial lending transaction with BasePoint Capital, LLC or any of its subsidiaries, and shall not be deemed or construed as an offer to buy or sell or a solicitation of an offer to buy or sell any "security" or an "investment" (as those terms are commonly understood). Unless otherwise specified, the terms "we," "us" and "our" mean the applicable subsidiary of BasePoint Capital, LLC referred to above and/or in the attached materials. BasePoint does not render investment, tax or legal advice. Please also be advised that all email sent to or from this address may be received and otherwise recorded by BasePoint's shared email system and is subject to archival and review by someone other than the recipient.

5

EZC-WDTX_00001699

**Phase I**
**Schedule of Expenses**
**as of December 15, 2014**

| | # of Hours | Time Charged ($185/ Hour) | Travel Expenses | Total |
|---|---|---|---|---|
| Peter Woroniecki | 52.00 | 9,620.00 | 5,183.04 | 14,803.04 |
| Eric Torgerson | 52.00 | 9,620.00 | 5,368.84 | 14,988.84 |
| **Total** | | **$ 19,240.00** | **$ 10,551.88** | **$ 29,791.88** |

Confidential

# Minglewood Administrative Services, LLC

### STATEMENT OF WORK

This Statement of Work entered into as of August 18th, 2014 ("Effective Date") and is made between Minglewood Administrative Services, LLC ("Minglewood") and Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR ("Client").

In consideration for Client's payment of the fees set forth below, Minglewood shall provide the Services for Client as described in **Appendix A**.

**ENGAGEMENT TEAM:**  Director of Operations, Peter Woroniecki
Director of Analytics, Eric Torgerson

**FEES:**  As compensation for the Phase I Services described in the Statement of Work, Minglewood will invoice on a time/materials basis at an hourly rate of $185 plus Minglewood's out-of-pocket expenses associated with the Services provided including but not limited to professional fees, travel expenses and other miscellaneous fees and expenses.

Fees and expenses will be billed monthly and should be paid within thirty (30) days after Client's receipt of an invoice.  Typical expenses are for travel related costs (as incurred).

## Phase I

Minglewood will perform an on-site detailed assessment of Client's operational, reporting and analytical functions as described in **Appendix A**.  Minglewood will deliver to Client the assessment in written form.

Minglewood has budgeted the time necessary to complete Phase I of this project at 90 hours.

## Phase II

Scope for Phase II will be determined under a separate Statement of Work upon completion of Phase I.

IN WITNESS WHEREOF, the undersigned have executed this Statement of Work as of the Effective Data.  The parties hereto agree that facsimile signatures shall be as effective as if originals.

39 LEWIS STREET | GREENWICH, CT  06830 | PHONE:  (203) 618-0200 | FAX:  (203) 618-1800

Confidential

EZC-WDTX_00001701

# Minglewood Administrative Services, LLC

**Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR**

By: _____

Name: _____

Title: _____

Date Signed: _____

**Minglewood Administrative Services, LLC**

By: _____

Name: _____

Title: _____

Date Signed: _____

Confidential

EZC-WDTX_00001702

# Minglewood Administrative Services, LLC

## APPENDIX A

### Scope and Approach

Minglewood will perform a detailed assessment of the Client's operational, reporting and analytical functions:  The assessment will include:

- Review and assess all processes related to the management and delivery of collateral related to the payroll deduction loans originated and/or serviced by Client
- Review and assess all cash control processes and treasury management functions
- Evaluate all processes related to investor reporting including account reconciliations and report preparation and presentation
- Evaluate data storage, extraction and preparation process for historical loan performance reports and metrics
- Review and assess all risk and management reporting metrics related to Client's loan portfolio
- Review forecasting methodology for Client's loan portfolio

### Deliverables

- Discuss the findings with Client's management
- Make recommendations for corrective action based on industry best practices
- Provide a report detailing all issues noted

THIS NON-BINDING LETTER, SETS FORTH THE ENTIRE UNDERSTANDING OF BASEPOINT AND FINMART WITH RESPECT TO THE SUBJECT MATTER HEREOF AND SUPERCEDES ALL PRIOR DISCUSSIONS AND CORRESPONDENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR ELSEWHERE, NEITHER BASEPOINT NOR FINMART SHALL BE OBLIGATED TO CONSUMMATE OR CONTINUE TO NEGOTIATE THE TERMS OF THE CONTEMPLATED TRANSACTION.  THIS NON-BINDING LETTER SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK GOVERNING WRITINGS MADE IN SUCH STATE, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

Confidential

# EXHIBIT H

| | |
|---|---|
| **From:** | Kuchenrither, Mark |
| **Sent:** | Friday, May 1, 2015 1:50 PM |
| **To:** | milene.carvalho@ey.com; Chris.Pretiger@ey.com |
| **Subject:** | FW: Risk Reporting |
| **Attachments:** | Prestactiones Finmart Assessment - 2014.pdf; SOW Basepoint (executed version).pdf |

You can see the third party work that was happening.

Mark Kuchenrither
President & COO
EZCORP, Inc.
2801 Via Fortuna Suite 460 Building 7
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

---

**From:** Eric Torgerson [mailto:etorgerson@basepointcapital.com]
**Sent:** Friday, May 01, 2015 7:44 AM
**To:** Kuchenrither, Mark
**Subject:** Risk Reporting

Mark,

Please find attached our original review and the executed engagement.

By way of status of the project, I am continuing to work in the design and development phases of the project. The objectives of these phases include designing and producing new risk reporting templates for a monthly reporting package which will include more detailed reporting metrics separated by origination vintages. The reports are designed to highlight any change in performance when comparing vintages (i.e. last month originations vs. loans originated a year ago) and will be grouped by agency as well.  The reports, in general, will detail payment delays, ratification periods, out of payroll, delinquency metrics among other things and will create more transparency into the portfolio performance and how it has evolved over time.

I am currently working with three months of data.  This enables me to identify all of the data fields required for the comprehensive reporting package.  It took some time to receive the data as Finmart was moving offices etc. but once all of the fields are identified, I will be submitting a complete historical data request and then ongoing monthly data requests for the reporting project.  I am targeting the end of the month to have a complete reporting package produced for management review.

If you have further questions please don't hesitate to call.

Thanks.
Eric

---

Eric H. Torgerson

Confidential

EZC-WDTX_00002357

**BasePoint**

39 Lewis Street, 2nd Flr.
Greenwich, CT  06830
Ph:  (203) 618-0200
Fax: (203) 618-1800

---

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

The BasePoint logo and the word "BasePoint" are shared service marks of BasePoint Capital, LLC and its subsidiaries (collectively, "BasePoint"). The information contained in this e-mail message is for discussion purposes only, and is not an offer to participate in any commercial lending transaction with BasePoint Capital, LLC or any of its affiliates or subsidiaries, and shall not be deemed or construed as an offer to buy or sell or a solicitation of an offer to buy or sell any "security" or an "investment" (as those terms are commonly understood). Unless otherwise specified, the terms "we," "us" and "our" mean the applicable subsidiary or affiliate of BasePoint Capital, LLC referred to above and/or in the attached materials. BasePoint does not render investment, tax or legal advice. Please also be advised that all email sent to or from this address may be received and otherwise recorded by BasePoint's shared email system and is subject to archival and review by someone other than the recipient.

Confidential                                    EZC-WDTX_00002358

# STATEMENT OF WORK (SOW)

**BasePoint Advisors LLC**
**39 Lewis Street, Ste. 2**
**Greenwich, CT 06830**

**December 15, 2014**



December 15, 2014

Confidential                                                    EZC-WDTX_00002370

**BASEPOINT ADVISORS LLC – STATEMENT OF WORK**

## Table of Contents

Introduction/Background .......................................................... 3
Scope of Work ........................................................................ 3
Period of Performance ............................................................ 3
Place of Performance .............................................................. 4
Work Requirements ................................................................ 4
Schedule/Milestones .............................................................. 5
Acceptance Criteria ................................................................ 6
Other Requirements ............................................................... 6
Pricing .................................................................................... 6
Acceptance ............................................................................. 8



Confidential                                                                 EZC-WDTX_00002371

**BASEPOINT ADVISORS LLC – STATEMENT OF WORK**

## Introduction/Background

In August 2014, Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR ("Finmart") engaged BasePoint Advisors LLC ("BasePoint") to perform an on-site detailed assessment of Finmart's operational, reporting and analytical functions.  The initial on-site assessment occurred late August 2014 with additional work completed in the following months.  In the assessment, BasePoint identified multiple areas in Finmart's business where automation and improvement were possible with the ultimate goal of creating greater efficiencies and transparency within the Finmart organization.

One specific area identified was the Risk Analysis and Reporting function.  Currently, the Risk Department is heavily reliant on MS Excel, which, while useful for adhoc reporting, has limitations on the size and scope of data files and is not easily automated for repeat reporting that may be useful for Finmart's management.   BasePoint can create and automate a full risk reporting package to be provided to management on a regular basis.

## Scope of Work

The scope of work for the Risk Analysis and Reporting project includes all planning, execution, implementation and training of Finmart personnel for a new fully automated risk reporting package for Finmart's management team.  The project will have two primary stages: 1) design, development and production of risk reports for management (semi-automated utilizing an off-the-shelf collateral analysis tool); and 2) fully automating the risk reporting and integrating it into Finmart's business intelligence software.  Each stage of the project will require approval from Finmart's management before moving on to the next stage.  BasePoint must ensure it has adequate resources for designing, building, testing and implementing the new reporting package and for the training of Finmart personnel as well.  Specific deliverables and milestones will be listed in the Work Requirements and Schedules and Milestones sections of this SOW.

## Period of Performance

The period of performance for the Risk Analysis and Reporting project is six to seven months beginning on January 12, 2015.  All work must be scheduled to complete within this timeframe.  Any modifications or extensions will be requested through Finmart for review and discussion.




Confidential                                                            EZC-WDTX_00002372

**BASEPOINT ADVISORS LLC – STATEMENT OF WORK**

## Place of Performance

BasePoint will perform a majority of the work at its offices located in Greenwich Connecticut. BasePoint will meet with Finmart in Finmart's offices located in Mexico City during the discovery and design phases as needed to gather business requirements for fully automating the reporting package and on a regular basis in Finmart's offices located in Mexico City to provide updates and review work completed to date.

## Work Requirements

As part of the Risk Analysis and Reporting project, BasePoint will be responsible for performing tasks throughout the various stages of this project. The following is a list of these tasks which will result in the successful completion of the project:

Discovery Phase:

- ✓ Review Finmart's current data dictionary and data structure to determine best practice for data extraction (frequency, amount of data, etc.)
- ✓ Determine the usability of Finmart's current business intelligence software, Jaspersoft including all report implementation and coding requirements
- ✓ Review speed of report implementation and resource requirements for Jaspersoft implementation
- ✓ Present written status on Discovery Phase results

Design Phase:

- ✓ Collect all existing reporting requirements from Finmart to ensure all new reports will include already established metrics
- ✓ Design new report templates which will include detailed report content and report presentation
- ✓ Develop a report design proposal for Finmart review and approval
- ✓ Design a monthly reporting package for management presentation
- ✓ Ensure all reports will be compatible or reproducible utilizing the Jaspersoft business intelligence software (dependent upon results of the Discovery Phase)
- ✓ Present written status on Design Phase

Development Phase:

- ✓ Utilizing the off-the-shelf collateral analysis tool ("CAS"), develop semi-automated reports as outlined in the design phase
- ✓ A sample of existing Finmart reports will be reproduced using CAS to ensure data integrity and process viability
- ✓ All newly created reports will be tested and tied out




December 15, 2014     4

Confidential

- ✓ All conflicts arising in testing will be identified and resolved
- ✓ A testing report will be presented to Finmart
- ✓ Provide written status on Development Phase

Production Phase:

- ✓ Using data for two consecutive calendar months, produce all reports reviewed and approved by Finmart for management review
- ✓ Document the semi-automated reporting process and workflow while the Automation Phase begins
- ✓ Provide written status on Production Phase

Automation Phase:

- ✓ Initiate report design phase providing all produced reports to Jaspersoft developers
- ✓ Oversee JasperSoft developers and programmers in the report programming and production
- ✓ Produce a minimum of two months of management reporting utilizing live data
- ✓ Ensure all JasperSoft reports tie out to the BasePoint semi-automated reports
- ✓ Provide written status on Automation Phase

Training Phase:

- ✓ BasePoint will provide training to designated employees of Finmart on the production and methodology of all Risk reporting

Project Handoff/Closure:

- ✓ BasePoint will provide Finmart will all working files and documentation related to the Risk Analysis and Reporting project
- ✓ BasePoint will present a project closure report to Finmart for review and approval which will show all project tasks have been completed

## Schedule/Milestones

SOW Approval:              December 31, 2015

Project Commencement:      January 12, 2015

Discovery Phase Report:    January 28, 2015

Design Phase Report:       March 6, 2015

Development Phase:         April 17, 2015

Production Phase:          May 8, 2015

Confidential

EZC-WDTX_00002374

Automation Phase:          July 13, 2015*

Training Phase:            July 20, 2015

Project Handoff/Closure:   July 27, 2015

*The completion of the Automation Phase will be dependent upon the availability of JasperSoft programmers either currently employed by Finmart or hired upon commencement of the Automation Phase

## Acceptance Criteria

For the Risk Analysis and Reporting project the acceptance of all deliverables will reside with multiple personnel at Finmart including but not limited to Alejandro Pequeno, Risk Director, Edwin Vega, CEO, and Jodie Maccarrone, President of Global Financial Services for EZCorp, Inc. Once a project phase is completed and BasePoint provides their report for review and approval, one or more of the above mentioned parties will either sign off on the approval for the next phase to being, or reply, in writing, advising what tasks must still be accomplished.

Once all project tasks have been completed, the project will enter the handoff/closure stage. During this stage of the project, BasePoint will provide a project closure report and task checklist. In addition, BasePoint will provide all working documents relating to the semi-automated report creation process.  Finmart will sign-off on this documentation, will acknowledge acceptance of all project deliverables and that BasePoint has met all assigned tasks.

## Other Requirements

Finmart will provide BasePoint access to all historical and current loan data under supervision by Finmart's IT department.  BasePoint will provide Finmart access to a secure ftp site enabling the transfer of raw data files for processing.  All work is expected to be completed on BasePoint's computers and servers and provided to Finmart securely as deliverables are required.

## Pricing

Total cost for the Risk Analysis and Reporting project is USD $150,000 plus travel related expenses. This pricing does not include the costs related to the employment or use of JasperSoft programmers in the Automation phase of the project.

Payment of the project will occur in phases based on the following schedule:



December 15, 2014          6

Confidential                                          EZC-WDTX_00002375

## BASEPOINT ADVISORS LLC – STATEMENT OF WORK

| | |
|---|---|
| Initial Payment due upon project commencement: | $25,000.00 |
| Design Phase completion: | $30,000.00 |
| Development Phase completion: | $30,000.00 |
| Production Phase completion: | $30,000.00 |
| Automation Phase completion: | $30,000.00 |
| Project Handoff & Closure: | $5,000.00 |
| Total: | $150,000.00 |

December 15, 2014

7

Confidential

EZC-WDTX_00002376

BASEPOINT ADVISORS LLC – STATEMENT OF WORK

**Finmart Acceptance**

Approved By:

Name: Kaura Ojeda / Gerardo Tarcals

Title: General Counsel / DCM

Date: _____

**BasePoint Advisors**

Name: ERIC H. TORGERSON

Title: DIRECTOR

Date: 1/12/15

Confidential

EZC-WDTX_00002377

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

**Executive Summary**

Minglewood Administrative Services ("Minglewood") was engaged by Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR ("Finmart") to perform an on-site detailed assessment of Finmart's operation, reporting and analytical functions.  During the week of August 25th, Minglewood's Engagement Team, consisting of Peter Woroniecki, Director of Operations, and Eric Torgerson, Director of Analytics, were on site at Finmart's offices in Mexico City, Mexico and met with several of Finmart's executives and key personnel. During the visit the following areas of Finmart's business were assessed:

- Asset Allocation Process
- Risk Analysis & Reporting
- Loan Origination Process
- Information Technology

- Compliance
- Collateral Management
- Master Trust Structure

- Collections
- Investor Reporting
- Convenios Management

The information below summarizes Minglewood's interaction with the Finmart team and its assessment of the various areas reviewed while in Mexico City.

**Asset Allocation Process**

The asset allocation process is a monthly process by which Finmart allocates consumer receivables as collateral across the multiple lines of credit used to finance Finmart's business.  The credit lines currently have distinct terms and conditions and collateral eligibility criteria.  Each one of these variables is factored into the asset allocation process with varying priority based on Finmart's business demands for that specific month.  The process is quite complex as shown in the document provided by Finmart below.  There are multiple decision points, loops and different milestones to be considered for each lender.



Confidential                    EZC-WDTX_00002359

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

Per our discussions with Joel Rosas, in general, it is estimated that the asset allocation process takes two to three hours per month. This can vary significantly depending upon the number of iterations required based on needs of the business, including requirements or changes from outside parties such as new lenders.

The process is currently not automated but is a manual process performed by Joel Rosas and other team members. While the process generally does not appear to be too demanding of Finmart's resources, it can easily escalate as multiple iterations are sometimes required and the process may be prone to human error as most of the work is completed in MS Excel. Data is currently provided by the IT department and the majority of the asset allocation work is currently performed in MS Excel. The challenges to automating the process include the variability in lender priority due to changing business needs, the complexity of the process decision map with loops, and, at the time of the assessment, the process flow documentation was still not complete.

***Recommendation***
Minglewood can provide project management support and expertise to create an automated system or process for Finmart's asset allocation. In order to complete this, the following is needed:

1. Complete all documentation related to the asset allocation process including the process map
2. Complete a discovery process to determine the capabilities and limitations of all software or product options available for facilitating the automation process including acquisition and implementation costs

After selecting the appropriate software, product or development options Minglewood will project manage the scope, development, and implementation of the automation software and provide detailed documentation on the new asset allocation process.

**Risk Analysis & Reporting**
The Risk Department of Finmart has the following primary objectives:

- Analyze all product related information and develop periodical credit risk reports
- Allocate the portfolio and monitor the funding covenants, eligibility criteria and collateral
- Analyze product profitability and new products, prepare adhoc analyses for internal and external purposes

Confidential

EZC-WDTX_00002360

Reports produced by the Risk Department include portfolio performance analysis, concentrations and portfolio profiles, roll-rates, profitability analyses, historic out-of-payroll and time to ratification, early warning reports, recovery analyses, and vintage analysis.  During Minglewood's on-site visit, several hours were spent with the head of the Risk Department, Alejandro Pequeño.  Multiple reports were provided to Minglewood and the contents of the reports were discussed.  Below are several samples of the reports provided to Minglewood.



While the reports, overall, contain metrics deemed important to understanding the performance of Finmart's portfolio, the one critical element that is absent is timing or a vintage analysis.  For example, in the Risk Management Report above, several metrics are outlined.  While the metrics chosen are adequate in concept, the way they are presented can potentially hide issues related to changes in the origination or underwriting processes.  The denominator embedded within several of the formulas is consistently changing as new loans are added to the portfolio.   While it can be argued that the new loan origination volume is fairly consistent, there is no measurement or comparison of loan vintages in the reports presented.  This makes it difficult to determine if the more recent portfolios of loan originations are performing better, worse or the same as loans originated at an earlier time.

Confidential

Additionally, on other reports, the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio.  One critical performance indicator is the percent of Out-of-Payroll ("OOP") loans.  The report below clearly shows the percentage of loans that are OOP but it also removes OOP loans that are sold to third parties.  Sales occur as frequently as every quarter and there was a significant OOP loan sales event in June 2013 which effectively reduced the OOP percentage of loans by more than 4%.  The overall impact of the sales in the report reduces the total OOP percentage to 3.36% as of the end of July 2014.   While this measurement is a good indicator of the amount of loans that are OOP in the current portfolio, it does not accurately reflect what the true OOP rate is on the Finmart portfolio on a static basis.  It is estimated that the historical OOP rate could be as high as 8 to 10% absent OOP loan sales.



October 10, 2014

4

Furthermore, other reports, (for example in the report shown below), do not present historical information even though it is available in Finmart's data.  The intent of the report is to present, by agency, loan profitability.  It lists each agency, the loan portfolio originated to date under each agency agreement, the factor rate, commissions, as well as several IRR calculations.  The first of which is labeled a Theoretical IRR.  It is understood that this calculation is based on the expected payments of the loan portfolio at inception.  The report further modifies this IRR calculation by taking into account the ratification period, delays and OOP.  While the intent of the report is meaningful, the Risk Department should also be tracking what the actual realized IRR has been to date by agency.  This should also be analyzed by vintage to determine if profitability is changing over time in each convenio.



### Recommendation

Minglewood can create and automate a full risk reporting package to be provided to management on a regular basis.  The risk reporting would be further expanded to include more vintage analyses and comparing expected performance to actual performance across all loan products and agencies.  Minglewood would ensure that the reporting is fully automated, creating a monthly process by which the Finmart team could reproduce all reports with support from Finmart's Information Technology group.  Currently the Risk Department appears to be heavily reliant on MS Excel, which, while useful for adhoc

EZC-WDTX_00002363

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

reports, has limitations on size and scope of data files and is not easily automated for repeat reporting that may be useful for Finmart's management.

**Loan Origination Process**

Finmart's loan origination process is expansive and includes over 480 employees and covers almost all of the country of Mexico.  The loan origination process is supported by an integrated technological platform and gives Finmart the ability to fund loans within 24 to 48 hours from time of application.  Overall, loan origination follows a rigid process, through multiple stages and with multiple verification points before funds are actually released to the customer.  The origination process is outlined below:

| Customer Contact | Branch Analysis | Quality Control | Treasury | Document Control |
|---|---|---|---|---|
| • Its own sales force, call center and brokers to contact the customer and offer products<br>• Fill out the documents and gather customer signatures | • Reception and Review of documents<br>• Assessment of the accuracy of the information<br>• First review of employees' payment capacity<br>• In the event of irregularities, request additional information<br>• If matters are in order, the documents are digitized | • Receipt of ID and proof of address<br>• Second review of documents<br>• Second review of payment capacity<br>• Control and validation of all the documents received<br>• In the vent of irregularities, notify the originating branch | • Release of funds for the Loans that have been verified during the previous stages<br>• A policy to verify loans has been implemented for loans in excess of $40k MXP | • All the documentation has been received and verified and the information is sent to the database; Custodian takes control of the documents |

Having been previously very familiar with most of the loan origination process, during the visit, Minglewood focused on the Branch's role in the origination process by visiting a local branch located in Mexico City.    Minglewood spoke with several branch employees about their roles and responsibilities including reviewing their daily tasks.  Minglewood also observed a single live loan application and watched how the loan application was entered into Finmart's origination platform at the Branch location.

Finmart currently has 48 branches with an additional six movable units in towns or cities where collaboration agreements have been executed.  It was explained that the branches are centrally located relative to the government agencies' locations in a type of hub-spoke setup.  All of the branches are leased, usually for a year with annual renewals.  Finmart has a dedicated team that negotiates the branch leases, designs the interior and exterior appearance of each branch and provides facility maintenance as needed.

While the branches create a geographic presence for Finmart, there appears to be little to none customer interaction at the locations.   The primary function for the branch is to serve as a data entry hub for Finmart's sales force.  As loan applications are completed at each individual government agency, the sales

Confidential

EZC-WDTX_00002364

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

representative will go to his or her respective branch location.  At the location, the information is handed over to a processor who then reviews the application and supporting information and enters it into the Finmart system.  In general, the sales representatives do not arrive at the branch location until the end of the business day.  The branch remains relatively inactive until that time.

### Recommendation
Minglewood can project manage the scope, development, and implementation of new technology that would allow Finmart to further streamline the customer application process. The work done at the branch can be interpreted as an "extra step" in the data entry process.  Ideally, it would prove more beneficial for Finmart to have the sales representative provide the information directly to Finmart's loan processing group located in their company headquarters. New technology should be explored with this end in mind. The branches appear vacant for several hours of the day with an afternoon rush of sales representatives bringing in new loan applications.  By introducing new technology, Finmart could realize significant savings by closing some or all of Finmart's branch locations.

### Information Technology
Finmart's Information Technology architecture has, overall, been established in an efficient and structurally sound manner (see diagram below). Finmart uses proprietary software and interfaces (Orus and Cronos) for it loan origination and servicing processes.   Other third party software is used for enterprise resource planning (Contpaq) and business intelligence (Jasper Soft).  Additionally, all data is stored in an industry standard relational database management system.  Finmart also uses industry standard practices for general data protection and disaster recovery scenarios.   Redundant storage has been established in multiple geographic locations and backups are created nightly through multiple channels including local backup tapes which are stored offsite.

Confidential

EZC-WDTX_00002365

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**



The Jasper Soft product is business intelligence software that includes data visualization, reporting and analytics and has a high level of flexibility for deployments in any IT environment.  It is intended to take information from multiple data sources and present it in an easy-to-read and interactive format.  Jasper Soft can be used for trend analysis as well as to create customized business dashboards for executive review.

At present, most of the reporting developed in Jasper Soft by Finmart is from data relating to loan originations.  Approximately 80% of the reporting is focused on sales.  Jasper Soft has the potential to be a significant tool within the Risk department but it is currently not being used to produce the majority of the Risk Management reports.

***Recommendations***
It would be beneficial to determine the feasibility of using Jasper Soft to develop current and new Risk Management reports. It is likely that Jasper Soft has the capabilities to produce the needed reports in the Risk Management area.  It was explained to Minglewood that, to date, the Jasper Soft programmer at Finmart has been used primarily by the sales function.  It may be necessary to temporarily add more resources and prioritize some of the risk management reporting to fully leverage the IT tools currently in place.

Confidential

## Compliance

Grupo Finmart has an extensive and robust compliance process as outlined by Finmart's legal team during Minglewood's visit to Mexico.   Finmart provided Minglewood with highly detailed information surrounding the current regulatory environment for payroll deduction loans in Mexico.  In its outline, Finmart summarized all regulatory reporting obligations including the government agency requesting the reports, the type of reports, the frequency and party held responsible for producing the reports (i.e. external or internal legal counsel, etc.).  Finmart also provided the dates on which the most recent reports were filed.

### *Recommendations:*

The majority of Finmart's compliance work is done internally.  While there appears to be adequate controls in place and Finmart works diligently to stay current on all reporting requirements and industry trends, it may prove more advantageous to engage additional third parties or external specialists to keep Finmart on the forefront of any upcoming regulatory issues.

## Collateral Management/Document Control:

Minglewood thoroughly reviewed Finmart's document control and collateral management process as it pertains to the all originated consumer loans.  All of the original documents executed by the borrower are brought to the branch by the sales staff and reviewed by the branches' support teams for accuracy and completeness. Once the file passes the branch review the collateral packages are sent weekly to Finmart's Corporate Headquarters. The collateral documents are then certified by Finmart's staff to ensure that the branch has delivered a complete collateral package. Once reviewed and determined to be complete, the complete package is then handed off to a representative of Iron Mountain who certifies the file at Finmart's Headquarters.  A certification is provided by Iron Mountain to Finmart and Iron Mountain ships the file for storage. Iron Mountain does not provide indemnifications for any lost collateral nor does Iron Mountain have the ability to act as a fiduciary Bailee of the collateral.

### *Recommendation*

The work flow requires a number of additional touches and although provides additional protection to make sure the files are delivered properly the process could be reduced by setting up a relationship where the files are sent directly from the branches to the custodian. Although Iron Mountain is reputable as a document storage provider, they are not a custodian.  They do not provide the adequate indemnifications to Finmart that are industry standard for a document custodian. In addition Iron Mountain legally cannot act as a Bailee and hold the files in trust.

## The Master Trust Structure:

Finmart has set up an efficient process with HSBC to perform the following tasks: 1) assign and transfer Credit Rights that secure its First Beneficiaries; 2) pass through actual collections received to each of the First Beneficiaries. This process provides for an independent third party to receive the cash and make the actual distribution to the beneficial owner avoiding Finmart from actually taking control of the cash collateral.

Confidential

*Recommendation*

Minglewood recommends that Finmart further expand the current process so that includes HSBC acting as trustee not only for the Credit Rights, but also for the physical collateral as well.  Minglewood estimates that a lot of time and effort is spent, along with additional recording costs when assigning the collateral from one First Beneficiary to another.  This could be eliminated by initially assigning the collateral to the trustee, the trustee will then act as collateral agent for Finmart and record who they are holding the collateral for. Detailed reporting could then be provided to the First Beneficiaries. This would eliminate any additional recording cost, the cost of moving to a custodian and the human resource cost currently required to complete the process.

## Collections:

Finmart has decentralized its collection efforts and has set up regional collection teams that are divided into three zones. The collectors in each zone are allocated accounts within geographic proximities to maximize the ability of the collector to have frequent on site visits at each one of the government agencies. Although collection efforts are decentralized the oversight and reporting is centralized and the support team provides timely performance reports to the collectors and management that highlight the areas of concern. Weekly Collection Meetings are held and the management teams discusses any open items with the collectors. The Loan Installment Process is well structured and is individualized for each agency in order to provide for a smooth boarding process of the loan by the government agencies. Finmart can deliver the information to the agencies in a number of different layouts, each one being customized for an agency's particular needs. Finmart currently has a certification process where the company confirms with the government agencies that the loan is boarded and Finmart receives a signed notice of confirmation.

*Recommendation*

Finmart's collection team has established a strong process to identify, report, manage, and cure delinquencies however it is more reactionary then proactive. The collection process starts when the government agencies have missed a payment. There is no contact with the agency prior to discover if the payment is coming. Finmart currently does not prepare or send invoices or bills to the government agencies that payment is due.  Prior to each payment due date a call should be made to the government agency confirming the payment amount and that the payment will be made on time.

## Investor Reporting:

The Investor Reporting team has adequate access to all data necessary to complete the reporting required under the Trust Agreements.  Currently, prior to submitting the reports there is no validation process to ensure the reports integrity.  Upon meeting with the team there was little or no interaction or input by the Investor Reporting Team on reviewing the actual Trust Agreements prior to deal execution.

*Recommendation*

Minglewood can create and fully automate all of the periodical investor reporting packages, improving upon the current report-creation process.  For example, in the existing transactions with BasePoint, there is no actual report that provides the actual outstanding note balance or interest due.  The current

*October 10, 2014*

**10**

reporting does provide sufficient information on the underlying collateral and actual collections in the master trust but there have been instances where the reports were not completely accurate. Before the reports go out there should be a secondary review to ensure the accuracy of the reports. The Investor Reporting team should also review the actual Trust Agreements prior to execution. This would allow the Investor Reporting team to give its input on the reporting requirements and provide improved reporting to support the transaction.

**Convenios Management**:
Finmart has a dedicated team to assist and manage the relationships with the government agencies. The team is very active with AMDEN "Asociacion Mexicana de Emoresas de Nomina" which allows Finmart to promote best practices throughout the industry and maintain a good relationship with the regulatory agencies. Finmart has also established an "Execution Team" to provide support to the government agencies in establishing a relationship for a smooth transition.

*Recommendation*
The Execution team is a true sales team and is primarily focused on originating more product. To assist in the Risk Management of Finmart, a team could be established in the group that would focus on not the sales but the actual risks associated the government agencies. At present, due diligence is not performed on the government agencies' ability to support the product. Prior to execution of an agreement, Finmart should conduct an on-site evaluation of the agencies' ability to support the product. The Government Agency Oversight team could also be more pro-active in assisting the government agencies in times where there could be a disruption caused by a natural disaster or similar event. In discussions with the collections team, it was determined that there was an event that caused a spike in delinquencies at one of the government agencies. It is understood that the collections team only determined this through discussions with the government agency after the loans have gone delinquent and not prior through reaching out to an agency that might have been effected.

**Item for Discussion:**
Finmart could create a Point of Sale Platform that could be integrated with the government agencies to provide a web-based Interface between the government agencies and Finmart. Data could be messaged over to the government agencies, specifically regarding new loans that need to be boarded as well as confirmation back once that has been completed. Additionally, notifications of payments could be electronically messaged by the government agencies which could then reduce manual uploads as well as prompt delinquency calls sooner.

Also, Finmart's niche in the Market Place is time to execution of a loan. Time to execution may not be the only differentiating factor. Finmart may want to consider originating additional products that are rate based in order to expand their market share.

Confidential

# EXHIBIT I

| | |
|---|---|
| **To:** | Grimshaw, Stuart |
| **Cc:** | Given, Lachie |
| **Subject:** | FW: Our conversation yesterday |
| **Attachments:** | Notes on Meeting with Jodie Feb 14 2014.docx; Documento 1_Estructura de la bursatilización V250913.pdf; Documento 2_Portafolio a bursatilizar V25092013.pdf; Documento 3_Análisis de sensibilidad V250913.pdf; Documento 4_Análisis de mora 150 días V260913.pdf; Copia de Monthly Sep14.pdf |

Stuart,

As a follow-up to the Board Meeting discussion regarding Grupo Finmart, I feel it is critical to share with you the following activities and measures that were taken to manage risk and provide oversight to the company over the past two years as I feel strongly that Mark is grossly misrepresenting his awareness of the delays/nature of delays and what was already being done to reconcile the lack of visibility and intervention to improve risk management.

3rd Party Portfolio Performance Evaluations

Over the past two years, there have been several diagnostic evaluations completed to analyze the performance of the portfolio:

- Sept 2013 – February 2013 ATIK Capital (Guillermo Babitz's firm) was hired to oversee and facilitate the 2nd Securitization DD- this included an detailed evaluation of the portfolio
  - His findings in February of 2014 (and are attached) were that:
    - Out of 120,203 outstanding loans:
    - 8.3% not ratified
    - 30% more than 60 days delinquent (5 accumulated fortnights)
    - Ratification period: (41% more than 90 days) and volatile (Pg 6 Document 2)
  - As a result discussed an engagement with ATIK to review the portfolio and set up improved controls and process – unfortunately due to bandwidth, ATIK was not able to move forward with this engagement
- March 2014 – BasePoint completed Due Diligence on the entire portfolio and produced delay curves that confirm that we receive 85% cash flow in Y1 (or as intended) 5% Y2 and balance after that- this was provided to Banorte as well to justify adjustments to their cashflow model
  - As a result of work with BasePoint on modeling risk – I engaged BP on 2 Phase Diagnostic:
    - Assessment and Risk Reporting
  - The Assessment was completed in November and they were hired in December to begin working with the company to prepare a Risk Management dashboard and associated exception reporting

Monthly Reporting – at the same time, the company was tracking and reporting monthly Delays

Jodie Maccarrone
President US Financial Services
*EZCORP*, Inc.
2801 Via Fortuna, Suite 460

Confidential                                                        EZC-WDTX_00006260

Austin, TX 78746
(o) 512-314-3467
(m) 561-809-4052

---

**From:** Guillermo Babatz T. [mailto:gbabatz@atikcapital.com]
**Sent:** Thursday, February 13, 2014 2:32 PM
**To:** Maccarrone, Jodie
**Subject:** Re: Our conversation yesterday

Sorry

I send you the document.

Regards,
Guillermo



Guillermo Babatz
Socio - Partner

gbabatz@atikcapital.com

M (+52 1) 55 - 9199 - 7049
O(+52 55) 6391-3379 & 94

El 13/02/2014 02:18 p.m., Maccarrone, Jodie escribió:

Hi Guillermo,
Thank you..  Unfortunately nothing was attached! Can you please resend?

Jodie Maccarrone
Managing Director



600 Brickell Ave.
Miami, FL 33131
(o) 512.314.3467
(c) 561.809.4052
Jodie.Maccarrone@changecapitalinvestments.com

---

**From:** Guillermo Babatz T. [mailto:gbabatz@atikcapital.com]
**Sent:** Thursday, February 13, 2014 2:18 PM
**To:** Maccarrone, Jodie
**Subject:** Our conversation yesterday

Dear Jodie,

Thanks so much for a very good and productive meeting yesterday. As you know, we are very

2

Confidential

EZC-WDTX_00006261

happy working with Change Capital.

I am attaching a Word document that contains the same notes I sent yesterday, plus my thoughts on the rest of the issues. Number 1. is the same (so no need to read it), but number 2 forward contain other things that I think is important you read. In particular, our proposal on how to take the work forward, plus a a few items on Empeño Fácil. On this front, we are supposed to get the info from the company tomorrow and it is crucial that we get it to be able to meet the deadlines.

Once you have looked at it, we could talk to discuss it or exchange views by email.

Best

Guillermo
--

atik.
capital

Guillermo Babatz
Socio - Partner

gbabatz@atikcapital.com

M (+52 1) 55 - 9199 - 7049
O(+52 55) 6391-3379 & 94

3

EZC-WDTX_00006262

# EXHIBIT J

| | |
|---|---|
| **From:** | Grimshaw, Stuart |
| **Sent:** | Tuesday, March 3, 2015 12:17 AM |
| **To:** | Given, Lachie |
| **Subject:** | Fwd: Grupo Finmart loan sale history |

And you wonder why we can't meet budget! This is an absolute wreckage that mainlines...with a CFO pleading ignorance! Bulls*t....why can't he tell us this? $27M in asset sales to prop the business up is unbeFbievable. Why can't we make plan????

We can fix but I am not comfortable uncovering the crap that no one has been told about.

Sent from my iPhone

Begin forwarded message:

> **From:** "Royer, Jason" <Jason_Royer@ezcorp.com>
> **Date:** March 2, 2015 at 2:54:52 PM CST
> **To:** "Grimshaw, Stuart" <Stuart_Grimshaw@ezcorp.com>
> **Subject: RE: Grupo Finmart loan sale history**
>
> Stuart,
>
> There were no loan sales at USFS.
>
> I have added the relevant net gains next to the loan sales.  I also show the gains net of commissions acceleration expense and transaction legal fees (partially offset by deferred revenue).
>
> > Principal Sold (USD)
> > - 1Q14 - $14.0 million (gain: $4.6 million, $3.5 excl expenses)
> > - 2Q14 - $9.9 million (gain: $4.7 million, $3.4 excl expenses)
> > - 3Q14 - $24.0 million (gain: $9.9 million, $8.0 excl expenses)
> > - 4Q14 - $26.7 million (gain: $13.8 million, $11.7 excl expenses)
> > - 1Q15 - $13.9 million (gain: $6.6 million, $4.8 excl expenses)
> > - 2Q15E - $16.6 million (gain: $6.1 million, $4.8 excl expenses)
> > - 3Q15E - $17.4 million (gain: $6.3 million , $5.1 excl expenses)
> > - 4Q15E - $25.2 million (gain: $9.2 million, $7.4 excl expenses)
> >
> > Same info as above but shown in picture format:

1

EZC-WDTX_00014151

| | Principal Sold | | Net Gain | | Transaction Expenses (net of deferred revenue) | | Net Gain Excluding Transaction Expenses |
|---|---|---|---|---|---|---|---|
| 1Q14 | $ | 14.0 | $ | 4.6 | $ | 1.1 | $ | 3.5 |
| 2Q14 | $ | 9.9 | $ | 4.7 | $ | 1.3 | $ | 3.4 |
| 3Q14 | $ | 24.0 | $ | 9.9 | $ | 1.9 | $ | 8.0 |
| 4Q14 | $ | 26.7 | $ | 13.8 | $ | 2.0 | $ | 11.7 |
| 1Q15 | $ | 13.9 | $ | 6.6 | $ | 1.8 | $ | 4.8 |
| 2Q15E | $ | 16.6 | $ | 6.1 | $ | 1.2 | $ | 4.8 |
| 3Q15E | $ | 17.4 | $ | 6.3 | $ | 1.3 | $ | 5.1 |
| 4Q15E | $ | 25.2 | $ | 9.2 | $ | 1.8 | $ | 7.4 |

-----Original Message-----
From: Grimshaw, Stuart
Sent: Monday, March 02, 2015 9:38 AM
To: Royer, Jason
Subject: Last year

Hi Jason

Could you let me know the timing and amount of asset and portfolio sales from last year....and also if we have done any this year.

Thx

Sent from my iPhone

2

EZC-WDTX_00014152

# EXHIBIT K

**From:**          Grimshaw, Stuart
**Sent:**          Sunday, May 3, 2015 12:39 AM
**To:**            Matt Appel
**Subject:**       RE: Deficiency DRAFT

Hi Matt

I will work through your thoughts which provide good food for thought.

The basic operating rhythm of any financial business revolves around not just the sale but the collections of the loans made. I always grew up with a report that provided a 7 day/30 day/60 day/60 day+ report. We religiously managed the loans past due report while still managing the sales pipeline. My sense of where we are here is a thread between the three lines of defense that I have always worked with. I believe that the first line of defense has not worked at all - the executive tram have focused solely on the sales; collections and recoveries are not central to their thinking.

What we are now debating is whether the second line of defense actually worked. My reading from this is that we picked up anomalies in the performance of loans that were sold to Altum...as we remained the manager of the servicing of these loans we found an irregularity that caused further research and then questions of more. The timeline is interesting here as there are minority interests at play as well as a change in EZCorp management. The PEMEX issue was closed out in January and then, as one always asks, there must be more! Hence the position we are in....my awareness of an issue arose in March 2015 but the depth was not known...even now I believe the auditors are taking the most conservative view of this. We are receiving collections of loans that predate our acquisition. I actually believe that we will receive a close to 30-40% recovery on these loans  (maybe more) - now that we have management focus.

The other issue that hasn't come through here is that the Finance tram at EZCorp (2nd level of defense) were also reviewing the loan portfolio and were seeing the same issues picked up by Grupo. I think we can comfortably say the first line did not work but the second line of defense has placed us into the position we are now.

The reason that the US business is fairly immune from this is that 45% of loans are 14 days duration and on average are around 4 months...we simply don't have the same issues here as they are completely different business models.

I will continue to work through this


Stuart


_____

From: Matt Appel [matt.appel@gmail.com]
Sent: Saturday, May 02, 2015 4:09 PM
To: Grimshaw, Stuart
Subject: Re: Deficiency DRAFT

Stuart:

Rather than send this to Mark and then have a 60 minute phone call on a Saturday afternoon I am sharing with only you. I am available to discuss with you if you wish.

1

EZC-WDTX_00002942

I have reviewed the documents sent and unfortunately do not find them persuasive enough to carry the day. Reasons follow:

*   The Minglewood analysis looks more like a sales document than an objective analysis. I am not clear how much credibility to ascribe to them.
*   While you sent the SOW with BasePoint I see no evidence that the work has commenced or, if commenced, that it has had any impact on the current or historical period(s).
*   I am surprised at the lag between discovery of potential portfolio issues and the current quarter. Lots of time to address but looks like we have not remediated the issues. And I am surprised at how slowly these issues have been communicated to the audit committee, at least during my tenure. Were these matters discussed with the committee in calendar 2014?
*   While a single distributor committed a fraud this fraud really has nothing to do with the issues that remain in the portfolio. Those issues have existed for a long time.
*   As I have said all along, aging/collectibility reviews are fundamental to a business that lends and manages receivables. Clearly there was no system, manual or automated, that was operating for a very long time. As a point of information, what controls are in place in the US for non-pawn loans?
*   Most importantly, what you call "Box 5" - I cannot reach the same conclusion from the facts that have been presented previously and what is contained in this memo. Management is not operating effectively simply because the review that is currently on-going was initiated. I do not agree that we had compensating controls in place – if we did we would have detected these issues long ago and not be engaged in this fire drill. Uou need to rethink this section.
*   Box 6 – I know we want to reach the conclusion of "no" but your reasoning does not persuade me.

I know these comments are very direct – I offer them in the spirit of collaboration that we have been engaged in during this process.

Regards,
Matt

From: "Kuchenrither, Mark"
Date: Saturday, May 2, 2015 at 3:01 PM
To: "Grimshaw, Stuart", Matt Appel, "Brown, Stephen"
Subject: Deficiency DRAFT

Gentlemen,

Please review and provide comments.  I need to step away from it and clear my head and then come back and work on it some more.

Best Regards
Mark

Mark Kuchenrither
President & COO
EZCORP, Inc.
2801 Via Fortuna Suite 460 Building 7
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com<mailto:mark_kuchenrither@ezcorp.com>

2

Confidential

# EXHIBIT L

| | |
|---|---|
| **From:** | Jill Svoboda <jsvoboda@bdo.com> |
| **Sent:** | Wednesday, May 6, 2015 9:39 PM |
| **To:** | Kuchenrither, Mark |
| **Cc:** | Brown, Stephen; Ted Vaughan; Chris Dilley |
| **Subject:** | RE: Deficiency Position Report |

Mark –

Please see below for questions/comments on the control deficiency analysis you provided.  Please note that some of these questions may not be directly related to controls but there are several comments regarding other accounting issues (loan sales) and inconsistencies in other memos.

1. Memo refers to attached analyses/scope of work – do we need these to fully understand the memo?  It doesn't seem so but wanted to be sure.

2. p.3– top paragraph – first sentence leading into this page says that a vintage report was produced; however, the very next sentence says that there was no timing or vintage report?
    a. Was there a control present that an aging report was being produced and reviewed?
    b. Who was supposed to be reviewing the aging report?
    c. Why did that not happen?

3. p.3 – second paragraph – how does this affect the current out of payroll analysis and calculation of your general reserve percentage?  If your reports are not including these OOP loans sold to others, how is the current reserve percentage affected?

4. p.3 – August 2014 section – this indicates that the company was aware of having to replace loans in the portfolio prior to 2014 YE.  The original memo provided to BDO on April 1, 2015 detailing the situation indicated that this was something discovered in February 2015.  Was Deloitte made aware of the loan replacement?  What were their thoughts on the true sale accounting at that time?

5. p.4 – September 2014 – 1st paragraph – did any of these loan rollforward include any aging analysis?

6. p.4 – December 2014 – if the loans were determined to be a problem in August 2014 and the sale happened in May 2014, and the contract provides for a 90 day window, why did the request for replacement happen in December?

7. p.4 – January 2015 – discussion with Deloitte indicates there was no recourse.  There is no sale accounting memo on Altum and that agreement appears to differ from CIBanco and BasePoint – what analysis was done on the 90 day language in the agreement to verify that it did not represent recourse?

8. p.5 – Root Cause Analysis – indicates that there is an aged receivables report.  Who should have been reviewing this report and how effective was the review?  Can you provide this report to us?

9. p.5 – Box 1 – identifies that the design of the aging report was deficient – need to evaluate this control at a point in time.  Has this report been revised and if so, when was it implemented?  Who is responsible for reviewing it? How are you ensuring this is happening?  You indicate that when the 3rd party identified fraudulent loans you investigated and resolved the issue.  A control appears to have been lacking where the company should be identifying the issues, not relying on a third party to bring it to their attention.  It doesn't appear that this mitigates the control deficiency.

10. p.6 – Box 3 – once updated analysis of the allocation of errors is complete, this section should be revisited.

1

EZC-WDTX_00002588

11. p.6 – Box 5 – please specifically list the compensating controls that are in place and are operating?  Have the reports all been redesigned?  Have individuals been designated to review the reports and take action?  It does not appear these items were in place as of March 31, 2015 and were not in place as of September 30, 2014.  What affects does this have management's assessment and certifications in the 2014 10-K?  What affects does this have on Deloitte's 404 opinion as of September 30, 2014? The steps mentioned did not appear to identify errors in a timely fashion.

12. p.6 – Box 6 – the compensating controls were not in place at period end.

13. Conclusion – The overall analysis needs to take into consideration the "could factor".  The actual misstatement is only the starting point.  When the issue was identified, approximately $26M in loans (principle only) were not being collected and many had been outstanding for extended periods of time.  Management has represented that they have begun to receive payments, but the potential magnitude seems to be much greater.

Jill

Jill Svoboda
Assurance Partner
214-665-0797 (Direct)    327-0797 (Internal)
214-649-5926 (Mobile)    214-953-0722 (Fax)
jsvoboda@bdo.com

BDO
700 North Pearl, Suite 2000
Dallas, TX 75201
UNITED STATES
214-969-7007
www.bdo.com

**From:** Kuchenrither, Mark [mailto:Mark_Kuchenrither@ezcorp.com]
**Sent:** Monday, May 04, 2015 3:01 PM
**To:** Jill Svoboda
**Cc:** Brown, Stephen
**Subject:** Deficiency Position Report

Jill,
Please find the deficiency position report for your review.
Best Regards
Mark

Mark Kuchenrither
President & COO
EZCORP, Inc.
2801 Via Fortuna Suite 460 Building 7
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.

IMPORTANT NOTICES

Confidential

EZC-WDTX_00002589

The contents of this email and any attachments to it may contain privileged and confidential information from BDO USA, LLP. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in reliance upon, the information contained in this e-mail, or any of the attachments to this e-mail, is strictly prohibited and that this e-mail and all of the attachments to this e-mail, if any, must be immediately returned to BDO USA, LLP or destroyed and, in either case, this e-mail and all attachments to this e-mail must be immediately deleted from your computer without making any copies hereof. If you have received this e-mail in error, please notify BDO USA, LLP by e-mail immediately.

Confidential

EZC-WDTX_00002590

# EXHIBIT M

| | |
|---|---|
| **From:** | Kuchenrither, Mark |
| **Sent:** | Monday, February 24, 2014 10:52 PM |
| **To:** | Maccarrone, Jodie |
| **Subject:** | Re: Accounting US Gaap |

Not at all speak to you then

Sent from my iPhone

On Feb 24, 2014, at 4:31 PM, "Maccarrone, Jodie" <Jodie.Maccarrone@changecapitalinvestments.com> wrote:

Can I call you at 6:30 or is that too late today?

Sent from my iPhone

On Feb 25, 2014, at 6:30 AM, "Kuchenrither, Mark" <Mark_Kuchenrither@ezcorp.com> wrote:

Let me know if you want to talk about it

Sent from my iPhone

On Feb 24, 2014, at 4:29 PM, "Maccarrone, Jodie" <Jodie.Maccarrone@changecapitalinvestments.com> wrote:

Ok should have assumed that.

Sent from my iPhone

On Feb 25, 2014, at 6:20 AM, "Kuchenrither, Mark" <Mark_Kuchenrither@ezcorp.com> wrote:

I am involved.  It relates to the residual

Sent from my iPhone

On Feb 24, 2014, at 3:37 PM, "Maccarrone, Jodie" <Jodie.Maccarrone@changecapitalinvestments.com> wrote:

Mark,
FYI, just keeping you in the loop.  I will be connecting with Andres at some point today to get the details but I wanted you to know we are facing some exceptions or adjustments in US GAAP on the transaction so it will affect the current one.

Jodie

Sent from my iPhone

Begin forwarded message:

**From:** Andrés Casas <acasas@crediamigo.com.mx>
**Date:** February 25, 2014, 4:40:21 AM GMT+08:00

1

Confidential

**To:** "Maccarrone, Jodie" <Jodie.Maccarrone@changecapitalinvestments.com>
**Cc:** EDUARDO ELEUTERIO GASTELU RAMIREZ <eduardo.gastelu@grupofinmart.com>,
"evega@crediamigo.com.mx" <evega@crediamigo.com.mx>, JAVIER CREL <jacreel@crediamigo.com.mx>
**Subject: Accounting US Gaap**

Jodie, we just had the meeting with EZ Accounting team and Deloitte, we reviewed the Ci transaction.
For Mex Gaap it's a True Sale so we can recognize accelerate the interest income.
For us Gaap we need to have some other consideration that we don't have in the contract, but we can do an ammendment.
Jeff want KPMG or other third party to review the operation and they give us their perspective.
When we recieve the comments from KPMG we can do the ammendment in order to accelerate the income.
Regards
Andres

Confidential

EZC-WDTX_00004028

# EXHIBIT N

**From:** Kuchenrither, Mark
**Sent:** Friday, July 18, 2014 9:59 PM
**To:** Maccarrone, Jodie
**Subject:** RE: asset sale information

It is tuesday

Mark Kuchenrither
Executive Vice President
Chief Financial Officer
EZCORP, Inc.
1901 Capital Parkway
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

**From:** Maccarrone, Jodie
**Sent:** Friday, July 18, 2014 3:32 PM
**To:** Kuchenrither, Mark
**Subject:** RE: asset sale information

Mark,
I tried to call you on this.  Is the meeting for Monday?  I thought it was Tuesday.

Jodie Maccarrone
Managing Director



600 Brickell Ave.
Miami, FL 33131
(o) 512.314.3467
(c) 561.809.4052
Jodie.Maccarrone@changecapitalinvestments.com

**From:** Kuchenrither, Mark
**Sent:** Friday, July 18, 2014 4:22 PM
**To:** Maccarrone, Jodie
**Subject:** asset sale information

Jodie,

When do you expect to receive a view of Promecap from the team?  I want to review with you and discuss along with what you want to negotiate each month as ranges to sell to Basepoint prior to the meeting with Andy on Monday.

Thank you

1

Confidential

Mark

Mark Kuchenrither
Executive Vice President
Chief Financial Officer
EZCORP, Inc.
1901 Capital Parkway
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

Confidential

EZC-WDTX_00001974



Confidential

# EXHIBIT O

| | |
|---|---|
| **From:** | on behalf of Kuchenrither, Mark |
| **Sent:** | Sunday, January 12, 2014 3:35 PM |
| **To:** | Rothamel, Paul |
| **Attachments:** | ezBasePoint Capital Presentation 2013.pdf |

FYI – this is the firm that is interested in working with us and providing debt in several different ways.

Mark Kuchenrither
Executive Vice President
Chief Financial Officer
EZCORP, Inc.
1901 Capital Parkway
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

---

**From:** Andrew Neuberger [mailto:aneuberger@basepointcapital.com]
**Sent:** Friday, January 10, 2014 12:16 PM
**To:** Kuchenrither, Mark
**Subject:** RE: Meeting follow up

Mark:

It was a pleasure to meet you in Austin. I am really looking forward to discussing multiple partnership opportunities. I have attached our general presentation but happy to have a follow up call to discuss my company in more detail. I look forward to meeting in Miami at the end of the month.

Regards,
Andy

---

**From:** Kuchenrither, Mark [mailto:Mark_Kuchenrither@ezcorp.com]
**Sent:** Thursday, January 09, 2014 5:11 PM
**To:** Andrew Neuberger
**Subject:** Meeting follow up

Andy,

Thank you for meeting with me during your trip to Austin.

I would like to present your business and potential partnership opportunities to our CEO and Chairman in order to set up a meeting with you and them in Miami in the next couple of weeks.  They will want to know that I have completed some research regarding your firm.

Would you please send me an overview presentation of BasePoint Capital and any other information that you think that I might find helpful?

1

EZC-WDTX_00001979

Thank you
Mark

Mark Kuchenrither
Executive Vice President
Chief Financial Officer
EZCORP, Inc.
1901 Capital Parkway
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

---

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

The BasePoint logo and the word "BasePoint" are shared service marks of BasePoint Capital, LLC and its subsidiaries (collectively, "BasePoint"). The information contained in this e-mail message is for discussion purposes only, and is not an offer to participate in any commercial lending transaction with BasePoint Capital, LLC or any of its subsidiaries, and shall not be deemed or construed as an offer to buy or sell or a solicitation of an offer to buy or sell any "security" or an "investment" (as those terms are commonly understood). Unless otherwise specified, the terms "we," "us" and "our" mean the applicable subsidiary of BasePoint Capital, LLC referred to above and/or in the attached materials. BasePoint does not render investment, tax or legal advice. Please also be advised that all email sent to or from this address may be received and otherwise recorded by BasePoint's shared email system and is subject to archival and review by someone other than the recipient.

Confidential                                                                                    EZC-WDTX_00001980

# EXHIBIT P

| **From:** | Kuchenrither, Mark |
|---|---|
| **Sent:** | Saturday, May 2, 2015 9:01 PM |
| **To:** | Grimshaw, Stuart; Matt.appel@gmail.com; Brown, Stephen |
| **Subject:** | Deficiency DRAFT |
| **Attachments:** | SOW Basepoint (executed version).pdf; Prestactiones Finmart Assessment - 2014 - BasePoint.pdf; Deficiency Position Report 5-2-15.docx |

Gentlemen,

Please review and provide comments.  I need to step away from it and clear my head and then come back and work on it some more.

Best Regards
Mark

Mark Kuchenrither
President & COO
EZCORP, Inc.
2801 Via Fortuna Suite 460 Building 7
Austin, Texas 78746
(512) 314-3406
(512) 588-0855
mark_kuchenrither@ezcorp.com

1

EZC-WDTX_00009881



**Deficiency Severity Conclusion**

**Memo:**

**To:  BDO**

**From:  Mark Kuchenrither**

**Topic:  Deficiency Severity Conclusion**

**Date:  May 2, 2015**

---

### Grupo Finmart Business Overview

We own a 76% interest in Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, E.N.R. ("Grupo Finmart," doing business under the names "Crediamigo" and "Adex"), and a leading consumer loan provider headquartered in Mexico City.

Grupo Finmart operates using a network of low-cost branch offices dedicated to making loans to employees of government agencies (federal, state and local) and other employers with whom Grupo Finmart has processing and withholding agreements in place.  A centralized corporate office provides the lending approval function, processing of loans and repayments, collections, sales support and other administrative functions.  Payroll lending in Mexico is generally marketed to public sector employees, who on average earn more and rotate less frequently than their private sector peers.  Additionally, government entities tend to be more stable and on average have more employees than private companies.

Grupo Finmart customers obtain installment loans with a series of payments due over as long as a four-year period. Interest and principal payments are withheld by the employers through payroll deductions and remitted to Grupo Finmart.  We recognize interest revenue ratably (interest method) over the life of the related loans and reserve the percentage of interest we expect not to collect.

Grupo Finmart's consumer loans are considered in current status as long as the customer is employed and we receive payments via payroll withholdings.  However, consumer loans made by Grupo Finmart remain on the condensed consolidated balance sheets as recorded investments when in delinquent status.  We consider a consumer loan past due if it has not been repaid or renewed by the maturity date; however, it is not unusual to have a lag in payments due to the time it takes the government agencies to setup the initial payroll withholding, holidays, summer vacations, illness, agency contract renewals, union permits and political elections to name a few.  In addition, antiquated or lack of adequate/automated systems as well as agency payment consolidation cause delays in addition to lapses between payments.  Grupo Finmart's current policy is only consumer loans outstanding to customers that are no longer employed are considered in nonaccrual status.  Grupo Finmart provides an allowance for losses on consumer loans that have not yet matured and related fees receivable based on historical loan default experience.

Loans outstanding from customers no longer employed are considered current if payments are made by the due date. If one payment of a loan is delinquent, that one payment is considered defaulted.  If two or more payments are delinquent at any time, the entire loan is considered defaulted.  Although historical evidence indicates a portion of the defaulted loans are collected later, Grupo Finmart charges the loan principal to consumer loan bad debt upon default, leaving only active loans in the reported balance.  Subsequent collections of principal are recorded as a

[AutoDate]                                       1                          

reduction of consumer loan bad debt when collected.  Accrued fees related to defaulted loans reduce fee revenue upon default, and increase fee revenue upon collection.

## Purpose and Scope

This memo has been prepared to determine the level of deficiencies in internal control relative to Grupo Finmart and specifically the loan and interest fee receivables recorded on the balance sheet and the corresponding interest income and bad debt expense recorded on the income statement.

## History

In FY2014, the business grew rapidly; approximately 40% year-over-year loan origination growth and EZCORP took additional take steps to improve the accounting and controls of the business.

**March to June 2014** – Reviewed portfolio sale transaction and provided guidance on accounting treatment.  The EZCRP corporate accounting department designed a template for the Grupo Finmart accounting team to complete in order to determine that the accounting department had the minimum set of documents and that the transaction was in compliance with ASC 860.  In addition, in order to determine there were no issues with income recognition, corporate accounting performed tests to validate that sold loans were not being included as part of Grupo Finmart's loan portfolio.

**April 2014**– Implemented a monthly financial highlight report which gathers and explains the major transactions that occurred during the month.  This report serves as a way to understand major transactions and ascertain that EZCORP has accounted for them correctly.

**May 2014** – Grupo Finmart's operating and accounting system is not integrated with the EZCORP system.  In May Hyperion was implemented in order to upload data more efficiently and improve the quality of information being provided.

May 2014 – Grupo Finmart sold loans to a third party (Altum).  Grupo Finmart was contracted as the third party servicer as part of the sale.

**June 2014** – Implemented an International EZCORP's end of month checklist and aligned month end closing process to comply with SOX requirements.

**June 2014 -** Designed a cash template to separate cash accounts by operating, current restricted balances and noncurrent restricted balances and financial institution debt provider.  EZCORP accounting began to obtain detail information, monitor monthly movement of cash and identify cash collateral requirements.

**July to August 2014** – Expanded the month deliverables from the Grupo Finmart team to include a  monthly variance analysis per account and an end of month report that reconciles major account groups like loan portfolio, debt, fixed assets, deferred financing, prepaid assets, etc.).  Each roll forward includes checks and reconciles to the general ledger.

 **August 2014** – Engaged BasePoint Advisors LLC (Minglewood) to perform an on-site detailed assessment of Grupo Finmart's operating, analytical, and reporting functions.  Please review the attached assessment report.  During the onsite visit the risk department was assessed:

### Key Information

Confidential                                                                                          EZC-WDTX_00009902

Reports produced by the risk department include portfolio performance analysis, concentrations and portfolio profiles, roll-rates, profitability analysis, historic out –of –payroll, time to ratification, early warning reports, recovery analysis, and vintage analysis.  While the reports overall contain metrics deemed important to understanding the performance of the loan portfolio, the one critical element that is absent is timing or a vintage analysis.  There is no measurement or comparison of loan vintages in the reports and therefore make it difficult to determine if loan originations are performing better, worse, or the same as loans originated at an earlier time.

Additionally, the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio.  One critical performance indicator is the percent of out-of-payroll loans.  The report shows the percentage of out-of-payroll loans but it removes out-of-payroll loans sold to third parties and therefore does not accurately present the true out-of-payroll rate per government agency contract.

**Outcome of Third Party Assessment**

EZCORP management determined that the risk and reporting issues needed to be addressed immediately.  A statement of work was agreed with BasePoint and signed December 15, 2014.  The scope of work for the risk analysis and reporting project includes all planning, execution, implementation and training of Grupo Finmart personnel for a new fully automated risk reporting package for Grupo Finmart's management team.  Please review the attached statement of work.

**August 2014 –** Acting as a third party servicer for loans sold, Grupo Finmart determined that 85 loans, approximately $MXN 4.9 million (principal and interest), were non-performing (no payments being received from government agency) by the loan administration department at Grupo Finmart.  The loan administration department made the internal control department at Grupo Finmart aware of the non-performing loans.  An investigation was initiated in August 2014 based on data collected by the control desk department.  The control desk department is in charge of verifying completeness and accuracy of loan application documentation that the commercial department collects from the customers.  The additional control of 100% of new loan originations for Pemex were reviewed by Grupo Finmart's internal control department before approval during the investigation.  The internal control department verified and that each of the following steps were completed properly prior to approving new loans:

1. Employment type verification was verified by the control desk, using the pay stub. The verification was made using the convenyo (government agency contract) manual created with the agency and used as a guideline to operate each convenyo.
2. Document verification consisting of validating the following documentation in order to grant a loan:
   a. Verify the credit request was signed by the customer, verifying that it was correctly filled with the customer's information
   b. Verify the credit agreement was signed by the customer and ensure that the customer received a copy
   c. Verify the promissory note was correctly signed and the figures match the approved loan and the credit agreement
   d. Summary of the credit agreement - ensured that the figures match with the credit agreement, promissory note and credit request form
   e. Verify the disclosure was signed by the customer
   f. Credit Bureau – verify the sales team had authorization to offer the loan
   g. Verify payroll stubs match the information that the customer had given in the credit request form, and verify their payment capacity
   h. Verify proof of residence – documented proof was not older than 3 months
   i. Verify official identification matched the information provided by the customer
   j. Verify work identification and matched the information provided by the customer and the official identification



Confidential

EZCORP

3. Phone Validation:
   a. Grupo Finmart call center made a phone call to the customer to their fixed line in order to validate information
   b. The call center contacted the people the customer selected as reference and verified the customer's information
   c. Verified that the loan was offered in the correct terms

The head of the internal control department went to Poza Rica to investigate the matter. He conducted interviews with Grupo Finmart employees and determined that they were not responsible for the issue.
It was determined that documents were being altered regarding the employee type (changed union to non-union). The internal control department contacted the government agency in order to schedule a visit and interviewed the government employees that received the loans with altered documentation. It was determined that a distributor (defined as a contracted third party sales force) had altered the documentation. The contract with the distributor was cancelled immediately and the industry chamber (AMDEN) was notified about the distributor's practices.

**September 2014** – Accounting split out the loan roll forward each month to improve visibility of the loan portfolio behavior by separating the loan roll forward between in- payroll loans (defined as loans where the customer is working for the government agency) and out of payroll (defined as the customer is no longer working for the government agency) and reserves. Accounting defined the categories to be used to describe the movement from the previous month to the current month (new originations, collections, out of payroll, amortizations, etc.).

**September 2014** – Grupo Finmart discussed the situation with Pemex and regarding the non-performing loans owned by Altum and Pemex agreed to install the loans for payment.

**November 2014** – EZCORP changed the organizational structure in order to improve control and accountability. Grupo Finmart's accounting department reports directly to EZCORP's accounting department. This change increases reporting independence by separating financial reporting from operations.

**December 2014** – Designed and redistributed accounting functions within GF accounting team, which was discussed with each team member to establish a different culture, emphasis on internal controls, documentation and independence. Accounting team started in their new functions on January 2015. The objective of this restructuring was to separate functions, strengthen segregation of duties, increase ownership by area and prepare the foundation to improve on existing controls.

**December 2014** – Altum requested that the loans from Pemex be replaced.

**January 2015** – EZCORP management increased the effort to reduce the amount of restricted cash on the balance sheet. The restricted cash is created when Grupo Finmart uses cash as collateral for their debt obligations. EZCORP management started reviewing the details of the loan eligibility process with Grupo Finmart treasury to understand how loans are evaluated in the portfolio and determined eligible based on lender requirements.

**January 2015** – EZCORP CFO made aware of the request by Altum and the issue regarding the sold loans. The CFO called Deloitte and spoke with Walter Powell (audit partner) and determined that while Grupo Finmart did not have a recourse obligation that for relationship and ethical purposes, Grupo would replace the loans.

**January 2015** – This issue led to a concern by EZCORP accounting that there may be non-performing loans such as these unidentified on the balance sheet of Grupo Finmart.

Grupo Finmart ran a report for all loans on their balance sheet and provided the following information:

1. Date loan funded by Grupo Finmart

EZCORP

Confidential



2. Date of last payment received by government agency
3. Contract the loan is associated with
4. Management has not found evidence of additional document alteration in the loan portfolio.

Management did not find evidence of additional document alteration in the loan portfolio. However, from the analysis were able to divide loans into two general categories:

1. Group 1 – Loans originated before 1/31/15 that have not received a payment as of March 6, 2015.
2. Group 2 – Loans that have received payments, but no such payments have been received in calendar year 2015.

| Total Population | | Principal Receivable | | Interest Receivable | |
|---|---|---|---|---|---|
| | Total # | MXN | USD | MXN | USD |
| Group 1 | 12,655 | $ 215,765,832 | $ 14,155,355 | $ 57,364,372 | $ 3,763,400 |
| Group 2 | 23,025 | $ 189,644,562 | $ 12,441,665 | $ 96,926,774 | $ 6,358,898 |
| Total | 35,680 | $ 405,410,394 | $ 26,597,020 | $ 154,291,146 | $ 10,122,298 |

## Root Cause Analysis

Loans reported on the receivable aging report have different codes that can be assigned to them. The codes identify the loans as out-of-payroll, or other reasons for payment delay - typically government agency delay driven. The codes are reviewed monthly by the operations team and updated from information received from the government agencies. This is used by the treasury department to determine loans that are eligible for use as collateral. In addition the report codes allow accounting to calculate the loan and interest principal reserves each month. The calculation is the following – loans determined as out-of-payroll are reserved for at 100%. A rolling 12 month average of out-of-payroll reserve is then used and applied to the loan balance at the end of the month to determine the additional reserve requirement.

Loans that were coded with some type of delay other than out-of –payroll were not looked at from an aging perspective and therefore actions to resolve the issues that were delaying payments were not being taken.

## Deficiency Analysis

### Box 1:  Does the deficiency relate directly to the achievement of one or more financial statement assertions?

Yes, the deficiency is related directly to the financial statement assertion. Under reserving impacts the balance sheet by overstating principal and interest receivable balances and overstates income by overstating interest income and understating bad debt.

The design deficiency of the loan receivable report exists as it does not easily provide aging by loan code identification.

From a level one operational perspective, the local operations team did not have the controls in place to ensure that all loans were being reviewed for performance over time. However, as evidenced above level one management worked in the situation where the third party fraudulent loans were detected, investigated and resolved.

### Box 2:  Is the likelihood of a misstatement resulting from the deficiency at least reasonably possible?

Yes, we determined that the likelihood of a misstatement was at least reasonably possible.



Confidential                                                                                    EZC-WDTX_00009905



**Box 3:  Is the magnitude of the potential restatement which is at least reasonably possible (considering qualitative and quantitative factors) material to either the interim or annual financial statements?**

Yes, the error correction is material in regards to the 2nd quarter fiscal year 2015.  It is not material in any of the previous years and is not expected to be material in the current fiscal year.

**Box 5:  Do compensating controls exist and operate effectively, at a level of precision sufficient to prevent or detect a misstatement that could be material to either interim or annual financial statements?**

Yes, based on the facts listed above it is clear that management at level two are operating effectively.  EZCORP management found the understatement issue relating to the principal and interest loan balance.  EZCORP management started the process of reviewing 100% of the loans in question.  EZCORP management brought in their internal audit team (EY) to validate the work being done at the local level.  EZCORP management brought the issue to BDO's attention in a timely fashion.

It is clear from the actions above that EZCORP management had compensating controls in place and taking the necessary steps to improve the processes at Grupo Finmart relative to risk and loan portfolio management.  Accounting had compensating controls in place with the detailed analysis of the loan roll forward each month and had taken methodical steps to drill down into the transaction details to ensure quality and integrity of the financial statements.  Management had hired a third party to perform an assessment and did not ignore the results – determining that the first priority was to improve risk analysis and reporting and hiring the third party to perform the work.  Management were looking into the details of the loan portfolio relative to the restricted cash and loan eligibility – an analysis that would have brought the non-performance issue to light in February.

**Box 4:  Is the deficiency important enough to merit attention by those responsible for oversight of the company's financial statement reporting?**

Yes

**Box 6:  Would a well-informed competent and objective individual conclude that the deficiency is a material weakness?**

No, based on accounting's compensating controls that are in place and management's compensating controls and attention and focus on improving the processes and controls at Grupo Finmart, the individual would conclude that the deficiency is not a material weakness.

<u>Conclusion</u>

The under reserving of the principal and interest loan balances represents a significant deficiency that the company is immediately addressing through the combination of compensating controls and improved standard operating procedures.

Confidential                                                                                EZC-WDTX_00009906

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

## Executive Summary

Minglewood Administrative Services ("Minglewood") was engaged by Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR ("Finmart") to perform an on-site detailed assessment of Finmart's operation, reporting and analytical functions.  During the week of August 25th, Minglewood's Engagement Team, consisting of Peter Woroniecki, Director of Operations, and Eric Torgerson, Director of Analytics, were on site at Finmart's offices in Mexico City, Mexico and met with several of Finmart's executives and key personnel. During the visit the following areas of Finmart's business were assessed:

- Asset Allocation Process
- Risk Analysis & Reporting
- Loan Origination Process
- Information Technology

- Compliance
- Collateral Management
- Master Trust Structure

- Collections
- Investor Reporting
- Convenios Management

The information below summarizes Minglewood's interaction with the Finmart team and its assessment of the various areas reviewed while in Mexico City.

## Asset Allocation Process

The asset allocation process is a monthly process by which Finmart allocates consumer receivables as collateral across the multiple lines of credit used to finance Finmart's business.  The credit lines currently have distinct terms and conditions and collateral eligibility criteria.  Each one of these variables is factored into the asset allocation process with varying priority based on Finmart's business demands for that specific month.  The process is quite complex as shown in the document provided by Finmart below.  There are multiple decision points, loops and different milestones to be considered for each lender.



Confidential

EZC-WDTX_00009890

Per our discussions with Joel Rosas, in general, it is estimated that the asset allocation process takes two to three hours per month.  This can vary significantly depending upon the number of iterations required based on needs of the business, including requirements or changes from outside parties such as new lenders.

The process is currently not automated but is a manual process performed by Joel Rosas and other team members.  While the process generally does not appear to be too demanding of Finmart's resources, it can easily escalate as multiple iterations are sometimes required and the process may be prone to human error as most of the work is completed in MS Excel.  Data is currently provided by the IT department and the majority of the asset allocation work is currently performed in MS Excel.  The challenges to automating the process include the variability in lender priority due to changing business needs, the complexity of the process decision map with loops, and, at the time of the assessment, the process flow documentation was still not complete.

***Recommendation***
Minglewood can provide project management support and expertise to create an automated system or process for Finmart's asset allocation.  In order to complete this, the following is needed:

1.  Complete all documentation related to the asset allocation process including the process map
2.  Complete a discovery process to determine the capabilities and limitations of all software or product options available for facilitating the automation process including acquisition and implementation costs

After selecting the appropriate software, product or development options Minglewood will project manage the scope, development, and implementation of the automation software and provide detailed documentation on the new asset allocation process.

**Risk Analysis & Reporting**
The Risk Department of Finmart has the following primary objectives:

- Analyze all product related information and develop periodical credit risk reports
- Allocate the portfolio and monitor the funding covenants, eligibility criteria and collateral
- Analyze product profitability and new products, prepare adhoc analyses for internal and external purposes

Confidential

EZC-WDTX_00009891

Reports produced by the Risk Department include portfolio performance analysis, concentrations and portfolio profiles, roll-rates, profitability analyses, historic out-of-payroll and time to ratification, early warning reports, recovery analyses, and vintage analysis.  During Minglewood's on-site visit, several hours were spent with the head of the Risk Department, Alejandro Pequeño.  Multiple reports were provided to Minglewood and the contents of the reports were discussed.  Below are several samples of the reports provided to Minglewood.



While the reports, overall, contain metrics deemed important to understanding the performance of Finmart's portfolio, the one critical element that is absent is timing or a vintage analysis.  For example, in the Risk Management Report above, several metrics are outlined.  While the metrics chosen are adequate in concept, the way they are presented can potentially hide issues related to changes in the origination or underwriting processes.  The denominator embedded within several of the formulas is consistently changing as new loans are added to the portfolio.   While it can be argued that the new loan origination volume is fairly consistent, there is no measurement or comparison of loan vintages in the reports presented.  This makes it difficult to determine if the more recent portfolios of loan originations are performing better, worse or the same as loans originated at an earlier time.

Confidential

Additionally, on other reports, the credit quality indicators do not appear to accurately reflect the true performance of the loan portfolio.  One critical performance indicator is the percent of Out-of-Payroll ("OOP") loans.  The report below clearly shows the percentage of loans that are OOP but it also removes OOP loans that are sold to third parties.  Sales occur as frequently as every quarter and there was a significant OOP loan sales event in June 2013 which effectively reduced the OOP percentage of loans by more than 4%.  The overall impact of the sales in the report reduces the total OOP percentage to 3.36% as of the end of July 2014.   While this measurement is a good indicator of the amount of loans that are OOP in the current portfolio, it does not accurately reflect what the true OOP rate is on the Finmart portfolio on a static basis.  It is estimated that the historical OOP rate could be as high as 8 to 10% absent OOP loan sales.



Confidential

Furthermore, other reports, (for example in the report shown below), do not present historical information even though it is available in Finmart's data.  The intent of the report is to present, by agency, loan profitability.  It lists each agency, the loan portfolio originated to date under each agency agreement, the factor rate, commissions, as well as several IRR calculations.  The first of which is labeled a Theoretical IRR.  It is understood that this calculation is based on the expected payments of the loan portfolio at inception.  The report further modifies this IRR calculation by taking into account the ratification period, delays and OOP.  While the intent of the report is meaningful, the Risk Department should also be tracking what the actual realized IRR has been to date by agency.  This should also be analyzed by vintage to determine if profitability is changing over time in each convenio.



### Recommendation

Minglewood can create and automate a full risk reporting package to be provided to management on a regular basis.  The risk reporting would be further expanded to include more vintage analyses and comparing expected performance to actual performance across all loan products and agencies. Minglewood would ensure that the reporting is fully automated, creating a monthly process by which the Finmart team could reproduce all reports with support from Finmart's Information Technology group. Currently the Risk Department appears to be heavily reliant on MS Excel, which, while useful for adhoc

reports, has limitations on size and scope of data files and is not easily automated for repeat reporting that may be useful for Finmart's management.

## Loan Origination Process

Finmart's loan origination process is expansive and includes over 480 employees and covers almost all of the country of Mexico. The loan origination process is supported by an integrated technological platform and gives Finmart the ability to fund loans within 24 to 48 hours from time of application. Overall, loan origination follows a rigid process, through multiple stages and with multiple verification points before funds are actually released to the customer. The origination process is outlined below:

| Customer Contact | Branch Analysis | Quality Control | Treasury | Document Control |
|---|---|---|---|---|
| • Its own sales force, call center and brokers to contact the customer and offer products<br>• Fill out the documents and gather customer signatures | • Reception and Review of documents<br>• Assessment of the accuracy of the information<br>• First review of employees' payment capacity<br>• In the event of irregularities, request additional information<br>• If matters are in order, the documents are digitized | • Receipt of ID and proof of address<br>• Second review of documents<br>• Second review of payment capacity<br>• Control and validation of all the documents received<br>• In the vent of irregularities, notify the originating branch | • Release of funds for the Loans that have been verified during the previous stages<br>• A policy to verify loans has been implemented for loans in excess of $40k MXP | • All the documentation has been received and verified and the information is sent to the database; Custodian takes control of the documents |

Having been previously very familiar with most of the loan origination process, during the visit, Minglewood focused on the Branch's role in the origination process by visiting a local branch located in Mexico City. Minglewood spoke with several branch employees about their roles and responsibilities including reviewing their daily tasks. Minglewood also observed a single live loan application and watched how the loan application was entered into Finmart's origination platform at the Branch location.

Finmart currently has 48 branches with an additional six movable units in towns or cities where collaboration agreements have been executed. It was explained that the branches are centrally located relative to the government agencies' locations in a type of hub-spoke setup. All of the branches are leased, usually for a year with annual renewals. Finmart has a dedicated team that negotiates the branch leases, designs the interior and exterior appearance of each branch and provides facility maintenance as needed.

While the branches create a geographic presence for Finmart, there appears to be little to none customer interaction at the locations. The primary function for the branch is to serve as a data entry hub for Finmart's sales force. As loan applications are completed at each individual government agency, the sales

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

representative will go to his or her respective branch location.  At the location, the information is handed over to a processor who then reviews the application and supporting information and enters it into the Finmart system.  In general, the sales representatives do not arrive at the branch location until the end of the business day.  The branch remains relatively inactive until that time.

*Recommendation*

Minglewood can project manage the scope, development, and implementation of new technology that would allow Finmart to further streamline the customer application process. The work done at the branch can be interpreted as an "extra step" in the data entry process.  Ideally, it would prove more beneficial for Finmart to have the sales representative provide the information directly to Finmart's loan processing group located in their company headquarters. New technology should be explored with this end in mind. The branches appear vacant for several hours of the day with an afternoon rush of sales representatives bringing in new loan applications.  By introducing new technology, Finmart could realize significant savings by closing some or all of Finmart's branch locations.

<u>Information Technology</u>

Finmart's Information Technology architecture has, overall, been established in an efficient and structurally sound manner (see diagram below). Finmart uses proprietary software and interfaces (Orus and Cronos) for it loan origination and servicing processes.  Other third party software is used for enterprise resource planning (Contpaq) and business intelligence (Jasper Soft).  Additionally, all data is stored in an industry standard relational database management system.  Finmart also uses industry standard practices for general data protection and disaster recovery scenarios.  Redundant storage has been established in multiple geographic locations and backups are created nightly through multiple channels including local backup tapes which are stored offsite.

Confidential                                                                    EZC-WDTX_00009896



The Jasper Soft product is business intelligence software that includes data visualization, reporting and analytics and has a high level of flexibility for deployments in any IT environment.  It is intended to take information from multiple data sources and present it in an easy-to-read and interactive format.  Jasper Soft can be used for trend analysis as well as to create customized business dashboards for executive review.

At present, most of the reporting developed in Jasper Soft by Finmart is from data relating to loan originations.  Approximately 80% of the reporting is focused on sales.  Jasper Soft has the potential to be a significant tool within the Risk department but it is currently not being used to produce the majority of the Risk Management reports.

***Recommendations***
It would be beneficial to determine the feasibility of using Jasper Soft to develop current and new Risk Management reports. It is likely that Jasper Soft has the capabilities to produce the needed reports in the Risk Management area.  It was explained to Minglewood that, to date, the Jasper Soft programmer at Finmart has been used primarily by the sales function.  It may be necessary to temporarily add more resources and prioritize some of the risk management reporting to fully leverage the IT tools currently in place.

Confidential

EZC-WDTX_00009897

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

## Compliance

Grupo Finmart has an extensive and robust compliance process as outlined by Finmart's legal team during Minglewood's visit to Mexico.  Finmart provided Minglewood with highly detailed information surrounding the current regulatory environment for payroll deduction loans in Mexico.  In its outline, Finmart summarized all regulatory reporting obligations including the government agency requesting the reports, the type of reports, the frequency and party held responsible for producing the reports (i.e. external or internal legal counsel, etc.).  Finmart also provided the dates on which the most recent reports were filed.

### Recommendations:

The majority of Finmart's compliance work is done internally.  While there appears to be adequate controls in place and Finmart works diligently to stay current on all reporting requirements and industry trends, it may prove more advantageous to engage additional third parties or external specialists to keep Finmart on the forefront of any upcoming regulatory issues.

## Collateral Management/Document Control:

Minglewood thoroughly reviewed Finmart's document control and collateral management process as it pertains to the all originated consumer loans.  All of the original documents executed by the borrower are brought to the branch by the sales staff and reviewed by the branches' support teams for accuracy and completeness. Once the file passes the branch review the collateral packages are sent weekly to Finmart's Corporate Headquarters. The collateral documents are then certified by Finmart's staff to ensure that the branch has delivered a complete collateral package. Once reviewed and determined to be complete, the complete package is then handed off to a representative of Iron Mountain who certifies the file at Finmart's Headquarters.  A certification is provided by Iron Mountain to Finmart and Iron Mountain ships the file for storage. Iron Mountain does not provide indemnifications for any lost collateral nor does Iron Mountain have the ability to act as a fiduciary Bailee of the collateral.

### Recommendation

The work flow requires a number of additional touches and although provides additional protection to make sure the files are delivered properly the process could be reduced by setting up a relationship where the files are sent directly from the branches to the custodian. Although Iron Mountain is reputable as a document storage provider, they are not a custodian.  They do not provide the adequate indemnifications to Finmart that are industry standard for a document custodian. In addition Iron Mountain legally cannot act as a Bailee and hold the files in trust.

## The Master Trust Structure:

Finmart has set up an efficient process with HSBC to perform the following tasks: 1) assign and transfer Credit Rights that secure its First Beneficiaries; 2) pass through actual collections received to each of the First Beneficiaries. This process provides for an independent third party to receive the cash and make the actual distribution to the beneficial owner avoiding Finmart from actually taking control of the cash collateral.

Confidential

**MINGLEWOOD ADMINISTRATIVE SERIVCES – PRESTACIONES FINMART ASSESSMENT**

*Recommendation*

Minglewood recommends that Finmart further expand the current process so that includes HSBC acting as trustee not only for the Credit Rights, but also for the physical collateral as well.  Minglewood estimates that a lot of time and effort is spent, along with additional recording costs when assigning the collateral from one First Beneficiary to another.  This could be eliminated by initially assigning the collateral to the trustee, the trustee will then act as collateral agent for Finmart and record who they are holding the collateral for. Detailed reporting could then be provided to the First Beneficiaries. This would eliminate any additional recording cost, the cost of moving to a custodian and the human resource cost currently required to complete the process.


<u>Collections:</u>

Finmart has decentralized its collection efforts and has set up regional collection teams that are divided into three zones. The collectors in each zone are allocated accounts within geographic proximities to maximize the ability of the collector to have frequent on site visits at each one of the government agencies. Although collection efforts are decentralized the oversight and reporting is centralized and the support team provides timely performance reports to the collectors and management that highlight the areas of concern. Weekly Collection Meetings are held and the management teams discusses any open items with the collectors. The Loan Installment Process is well structured and is individualized for each agency in order to provide for a smooth boarding process of the loan by the government agencies. Finmart can deliver the information to the agencies in a number of different layouts, each one being customized for an agency's particular needs. Finmart currently has a certification process where the company confirms with the government agencies that the loan is boarded and Finmart receives a signed notice of confirmation.

*Recommendation*

Finmart's collection team has established a strong process to identify, report, manage, and cure delinquencies however it is more reactionary then proactive. The collection process starts when the government agencies have missed a payment. There is no contact with the agency prior to discover if the payment is coming. Finmart currently does not prepare or send invoices or bills to the government agencies that payment is due.  Prior to each payment due date a call should be made to the government agency confirming the payment amount and that the payment will be made on time.


<u>Investor Reporting:</u>

The Investor Reporting team has adequate access to all data necessary to complete the reporting required under the Trust Agreements.  Currently, prior to submitting the reports there is no validation process to ensure the reports integrity.  Upon meeting with the team there was little or no interaction or input by the Investor Reporting Team on reviewing the actual Trust Agreements prior to deal execution.

*Recommendation*

Minglewood can create and fully automate all of the periodical investor reporting packages, improving upon the current report-creation process.  For example, in the existing transactions with BasePoint, there is no actual report that provides the actual outstanding note balance or interest due.  The current

Confidential

reporting does provide sufficient information on the underlying collateral and actual collections in the master trust but there have been instances where the reports were not completely accurate.  Before the reports go out there should be a secondary review to ensure the accuracy of the reports.  The Investor Reporting team should also review the actual Trust Agreements prior to execution. This would allow the Investor Reporting team to give its input on the reporting requirements and provide improved reporting to support the transaction.

**Convenios Management**:
Finmart has a dedicated team to assist and manage the relationships with the government agencies. The team is very active with AMDEN "Asociacion Mexicana de Emoresas de Nomina" which allows Finmart to promote best practices throughout the industry and maintain a good relationship with the regulatory agencies.  Finmart has also established an "Execution Team" to provide support to the government agencies in establishing a relationship for a smooth transition.

*Recommendation*
The Execution team is a true sales team and is primarily focused on originating more product. To assist in the Risk Management of Finmart, a team could be established in the group that would focus on not the sales but the actual risks associated the government agencies. At present, due diligence is not performed on the government agencies' ability to support the product. Prior to execution of an agreement, Finmart should conduct an on-site evaluation of the agencies' ability to support the product. The Government Agency Oversight team could also be more pro-active in assisting the government agencies in times where there could be a disruption caused by a natural disaster or similar event. In discussions with the collections team, it was determined that there was an event that caused a spike in delinquencies at one of the government agencies.   It is understood that the collections team only determined this through discussions with the government agency after the loans have gone delinquent and not prior through reaching out to an agency that might have been effected.

**Item for Discussion:**
Finmart could create a Point of Sale Platform that could be integrated with the government agencies to provide a web-based Interface between the government agencies and Finmart.  Data could be messaged over to the government agencies, specifically regarding new loans that need to be boarded as well as confirmation back once that has been completed.  Additionally, notifications of payments could be electronically messaged by the government agencies which could then reduce manual uploads as well as prompt delinquency calls sooner.

Also, Finmart's niche in the Market Place is time to execution of a loan.  Time to execution may not be the only differentiating factor.  Finmart may want to consider originating additional products that are rate based in order to expand their market share.

Confidential

# STATEMENT OF WORK (SOW)

**BasePoint Advisors LLC**
**39 Lewis Street, Ste. 2**
**Greenwich, CT 06830**

**December 15, 2014**



Confidential

BASEPOINT ADVISORS LLC – STATEMENT OF WORK

## Table of Contents

| | |
|---|---|
| Introduction/Background | 3 |
| Scope of Work | 3 |
| Period of Performance | 3 |
| Place of Performance | 4 |
| Work Requirements | 4 |
| Schedule/Milestones | 5 |
| Acceptance Criteria | 6 |
| Other Requirements | 6 |
| Pricing | 6 |
| Acceptance | 8 |



December 15, 2014

2

EZC-WDTX_00009883

**BASEPOINT ADVISORS LLC – STATEMENT OF WORK**

## Introduction/Background

In August 2014, Prestaciones Finmart, S.A.P.I. de C.V., SOFOM, ENR ("Finmart") engaged BasePoint Advisors LLC ("BasePoint") to perform an on-site detailed assessment of Finmart's operational, reporting and analytical functions.  The initial on-site assessment occurred late August 2014 with additional work completed in the following months.  In the assessment, BasePoint identified multiple areas in Finmart's business where automation and improvement were possible with the ultimate goal of creating greater efficiencies and transparency within the Finmart organization.

One specific area identified was the Risk Analysis and Reporting function.  Currently, the Risk Department is heavily reliant on MS Excel, which, while useful for adhoc reporting, has limitations on the size and scope of data files and is not easily automated for repeat reporting that may be useful for Finmart's management.   BasePoint can create and automate a full risk reporting package to be provided to management on a regular basis.

## Scope of Work

The scope of work for the Risk Analysis and Reporting project includes all planning, execution, implementation and training of Finmart personnel for a new fully automated risk reporting package for Finmart's management team.  The project will have two primary stages: 1) design, development and production of risk reports for management (semi-automated utilizing an off-the-shelf collateral analysis tool); and 2) fully automating the risk reporting and integrating it into Finmart's business intelligence software.  Each stage of the project will require approval from Finmart's management before moving on to the next stage.  BasePoint must ensure it has adequate resources for designing, building, testing and implementing the new reporting package and for the training of Finmart personnel as well.  Specific deliverables and milestones will be listed in the Work Requirements and Schedules and Milestones sections of this SOW.

## Period of Performance

The period of performance for the Risk Analysis and Reporting project is six to seven months beginning on January 12, 2015.  All work must be scheduled to complete within this timeframe. Any modifications or extensions will be requested through Finmart for review and discussion.




December 15, 2014        3

Confidential                                    EZC-WDTX_00009884

BASEPOINT ADVISORS LLC – STATEMENT OF WORK

## Place of Performance

BasePoint will perform a majority of the work at its offices located in Greenwich Connecticut. BasePoint will meet with Finmart in Finmart's offices located in Mexico City during the discovery and design phases as needed to gather business requirements for fully automating the reporting package and on a regular basis in Finmart's offices located in Mexico City to provide updates and review work completed to date.

## Work Requirements

As part of the Risk Analysis and Reporting project, BasePoint will be responsible for performing tasks throughout the various stages of this project. The following is a list of these tasks which will result in the successful completion of the project:

Discovery Phase:

- ✓ Review Finmart's current data dictionary and data structure to determine best practice for data extraction (frequency, amount of data, etc.)
- ✓ Determine the usability of Finmart's current business intelligence software, Jaspersoft including all report implementation and coding requirements
- ✓ Review speed of report implementation and resource requirements for Jaspersoft implementation
- ✓ Present written status on Discovery Phase results

Design Phase:

- ✓ Collect all existing reporting requirements from Finmart to ensure all new reports will include already established metrics
- ✓ Design new report templates which will include detailed report content and report presentation
- ✓ Develop a report design proposal for Finmart review and approval
- ✓ Design a monthly reporting package for management presentation
- ✓ Ensure all reports will be compatible or reproducible utilizing the Jaspersoft business intelligence software (dependent upon results of the Discovery Phase)
- ✓ Present written status on Design Phase

Development Phase:

- ✓ Utilizing the off-the-shelf collateral analysis tool ("CAS"), develop semi-automated reports as outlined in the design phase
- ✓ A sample of existing Finmart reports will be reproduced using CAS to ensure data integrity and process viability
- ✓ All newly created reports will be tested and tied out




December 15, 2014        4

EZC-WDTX_00009885

- ✓ All conflicts arising in testing will be identified and resolved
- ✓ A testing report will be presented to Finmart
- ✓ Provide written status on Development Phase

Production Phase:

- ✓ Using data for two consecutive calendar months, produce all reports reviewed and approved by Finmart for management review
- ✓ Document the semi-automated reporting process and workflow while the Automation Phase begins
- ✓ Provide written status on Production Phase

Automation Phase:

- ✓ Initiate report design phase providing all produced reports to Jaspersoft developers
- ✓ Oversee JasperSoft developers and programmers in the report programming and production
- ✓ Produce a minimum of two months of management reporting utilizing live data
- ✓ Ensure all JasperSoft reports tie out to the BasePoint semi-automated reports
- ✓ Provide written status on Automation Phase

Training Phase:

- ✓ BasePoint will provide training to designated employees of Finmart on the production and methodology of all Risk reporting

Project Handoff/Closure:

- ✓ BasePoint will provide Finmart will all working files and documentation related to the Risk Analysis and Reporting project
- ✓ BasePoint will present a project closure report to Finmart for review and approval which will show all project tasks have been completed

## Schedule/Milestones

| | |
|---|---|
| SOW Approval: | December 31, 2015 |
| Project Commencement: | January 12, 2015 |
| Discovery Phase Report: | January 28, 2015 |
| Design Phase Report: | March 6, 2015 |
| Development Phase: | April 17, 2015 |
| Production Phase: | May 8, 2015 |

December 15, 2014

5

Confidential

**BASEPOINT ADVISORS LLC – STATEMENT OF WORK**

Automation Phase:          July 13, 2015*

Training Phase:            July 20, 2015

Project Handoff/Closure:   July 27, 2015

*The completion of the Automation Phase will be dependent upon the availability of JasperSoft programmers either currently employed by Finmart or hired upon commencement of the Automation Phase*

## Acceptance Criteria

For the Risk Analysis and Reporting project the acceptance of all deliverables will reside with multiple personnel at Finmart including but not limited to Alejandro Pequeno, Risk Director, Edwin Vega, CEO, and Jodie Maccarrone, President of Global Financial Services for EZCorp, Inc. Once a project phase is completed and BasePoint provides their report for review and approval, one or more of the above mentioned parties will either sign off on the approval for the next phase to being, or reply, in writing, advising what tasks must still be accomplished.

Once all project tasks have been completed, the project will enter the handoff/closure stage. During this stage of the project, BasePoint will provide a project closure report and task checklist. In addition, BasePoint will provide all working documents relating to the semi-automated report creation process.  Finmart will sign-off on this documentation, will acknowledge acceptance of all project deliverables and that BasePoint has met all assigned tasks.

## Other Requirements

Finmart will provide BasePoint access to all historical and current loan data under supervision by Finmart's IT department.  BasePoint will provide Finmart access to a secure ftp site enabling the transfer of raw data files for processing.  All work is expected to be completed on BasePoint's computers and servers and provided to Finmart securely as deliverables are required.

## Pricing

Total cost for the Risk Analysis and Reporting project is USD $150,000 plus travel related expenses.  This pricing does not include the costs related to the employment or use of JasperSoft programmers in the Automation phase of the project.

Payment of the project will occur in phases based on the following schedule:



December 15, 2014    6

Confidential

EZC-WDTX_00009887

**BASEPOINT ADVISORS LLC – STATEMENT OF WORK**

| | |
|---|---|
| Initial Payment due upon project commencement: | $25,000.00 |
| Design Phase completion: | $30,000.00 |
| Development Phase completion: | $30,000.00 |
| Production Phase completion: | $30,000.00 |
| Automation Phase completion: | $30,000.00 |
| Project Handoff & Closure: | $5,000.00 |
| Total: | $150,000.00 |



December 15, 2014          7

Confidential                                                                      EZC-WDTX_00009888

BASEPOINT ADVISORS LLC – STATEMENT OF WORK

**Finmart Acceptance**

Approved By:

Date: _____

Name: Kaurra Ojeda / Gerardo Tarcals

Title: General Council / DCM

**BasePoint Advisors**

Date: 1/12/15

Name: ERIC H. TORGERSON

Title: DIRECTOR

Confidential

EZC-WDTX_00009889